ACCEPTED
01-15-00260
FIRST COURT OF APPEALS
HOUSTON, TEXAS
8/17/2015 8:29:47 PM
CHRISTOPHER PRINE
CLERK

**NO. 01-15-00260-CV**

In The

# First Court of Appeals

Houston, Texas

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
8/17/2015 8:29:47 PM
CHRISTOPHER A. PRINE
Clerk

Joan DeYoung, Stephen DeYoung, M.D., and David DeYoung

*Appellants*,

v.

Judy Page Maynard, William L. Maynard, and Maynard Properties, L.P.

*Appellees*.

On Appeal from the 270th Judicial District Court
of Harris County, Texas

Trial Court Cause No. 2011-18770

## BRIEF OF APPELLANTS

Daniel W. Jackson, SBN 00796817
Scott K. Vastine, SBN 24056469
Jennifer H. Frank, SBN 24087537
The Jackson Law Firm
3900 Essex Lane, Suite 1116
Houston, Texas 77027
(713) 522-4435
(713) 527-8850 – fax

Counsel for Appellants

## ORAL ARGUMENT REQUESTED

## IDENTITY OF PARTIES AND COUNSEL

**Appellants/Plaintiffs**      Joan DeYoung
Stephen DeYoung, M.D.
David DeYoung

**Counsel for Appellants**     Daniel W. Jackson
Scott K. Vastine
Jennifer H. Frank
The Jackson Law Firm
3900 Essex Lane, Suite 1116
Houston, Texas 77027
(713) 522-4435
(713) 527-8850 – fax

**Appellees/Defendants**       William L. Maynard, as Independent
Executor of the Estate of Judy Page
Maynard
William L. Maynard
Maynard Properties, L.P.

**Counsel for Appellees**      Gregory N. Jones
Law Office of Gregory N. Jones
2323 S. Shepherd, 14th Floor
Houston, Texas 77019
(713) 979-4691
(713) 979-4440 – fax

Counsel for Appellee William L.
Maynard as Independent Executor of
the Estate of Judy Page Maynard

William L. Maynard
1300 Post Oak Blvd., Suite 2500
Houston, Texas 77056
(713) 623-0887
(713) 960-1527 – fax

Counsel for Appellees William L.
Maynard and Maynard Properties, L.P.

ii

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ..................................................ii

INDEX OF AUTHORITIES ..............................................................v

STATEMENT OF THE CASE ...........................................................vii

STATEMENT REGARDING ORAL ARGUMENT ......................................viii

ISSUE PRESENTED ...................................................................viii

PROCEDURAL BACKGROUND.........................................................1

STATEMENT OF FACTS ................................................................2

    Without notice, an appraisal, or compensation, Appellee William
    L. Maynard stripped the Partnership of its property. ..........................3

    Judy and Bill Maynard owed the DeYoungs a fiduciary duty. .............5

    Bill Maynard also purchased substantial property surrounding
    the Partnership's property. ..................................................7

STANDARD OF REVIEW ...............................................................8

ARGUMENT AND AUTHORITIES .........................................................8

    I.    The trial court erred in granting final summary judgment
        because Appellees did not move on all causes of action
        asserted by the DeYoungs. ..................................................9

        A.    Even though the trial court committed reversible
            error by granting more relief than requested, the
            Court should treat the summary judgment as a final
            judgment and consider all issues raised in this
            appeal..........................................................................11

II.    The trial court erred in granting final summary judgment because Appellees failed to specify the elements as to which the DeYoungs purportedly had no evidence. ................ 12

III.    The trial court erred in granting final summary judgment because Appellees improperly used a no-evidence motion to shift the burden of proof back to the DeYoungs on their self-dealing allegation. ........................................................ 15

IV.    The trial court erred in granting final summary judgment because the DeYoungs submitted competent summary judgment evidence establishing each element of their causes of action. **................................................................... 16**

**PRAYER** ...........................................................................................**19**

**CERTIFICATE OF COMPLIANCE** ..........................................................**22**

**CERTIFICATE OF SERVICE**..................................................................**22**

**APPENDICES**

Appendix 1:    Defendants' motions for no-evidence and traditional summary judgment (exhibits omitted)

Appendix 2:    Trial court's February 17, 2015 order

Appendix 3:    Text of applicable rules and statutes

Appendix 4:    Cases

# INDEX OF AUTHORITIES

**Texas Supreme Court Cases**

*Chessher v. Sw. Bell Telephone Co.*,
658 S.W.2d 563 (Tex. 1983) ............................................................. 9

*Farm Bureau Cty. Mut. Ins. Co. v. Rogers*,
455 S.W.3d 161 (Tex. 2015) ............................................................ 11

*Forbes, Inc. v. Granada Biosciences, Inc.*,
124 S.W.3d 167 (Tex. 2003) ............................................................ 17

*Ford Motor Co. v. Ridgway*,
135 S.W.3d 598 (Tex. 2004) ............................................................ 17

*G & H Towing Co. v. Magee*,
347 S.W.3d 293 (Tex. 2011) ......................................................... 9, 11

*Joe v. Two Thirty Nine Joint Venture*,
145 S.W.3d 150 (Tex. 2004) .............................................................. 8

*Kinzbach Tool Co. v. Corbett-Wallace Corp.*,
160 S.W.2d 509 (Tex. 1942) ....................................................... 14, 17

*Lehmann v. Har-Con Corp.*,
39 S.W.3d 191 (Tex. 2001) .............................................................. 11

*M.R. Champion, Inc. v. Mizell*,
904 S.W.2d 617 (Tex. 1994) .............................................................. 6

**Texas Court of Appeals Cases**

*Cluck v. Mecom*,
401 S.W.3d 110
(Tex. App.—Houston [14th Dist.] 2011, pet. denied) ........................ 15

*Jose Fuentes Co., Inc. v. Alfaro*,
418 S.W.3d 280 (Tex. App.—Dallas 2013, pet. denied) ............. 12, 13

*Garcia v. State Farm Lloyds*,
    287 S.W.3d 809
    (Tex. App.——Corpus Christi-Edinburg 2009, pet. denied) ................. 13

*Harvey v. Casebeer*,
    531 S.W.2d 206 (Tex. Civ. App.—Tyler 1975, no writ) ............... 14, 17

*In re Estate of Coleman*,
    360 S.W.3d 606 (Tex. App.——El Paso 2011, no pet.) ....................... 15

*Mathis v. Restoration Builders, Inc.*,
    231 S.W.3d 47 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ........ 8

*Rose v. Kober Fin. Corp.*,
    874 S.W.2d 358 (Tex. App.——Houston [14th Dist.] 1994, no writ) .... 10

## Statutory Provisions

Tex. Bus. Orgs. Code § 152.205 ................................................................. 9

Tex. Bus. Orgs. Code § 152.206 ................................................................. 9

## Rules

Tex. R. Civ. P. 166a(i) ................................................................... 12, 14, 16

Tex. R. Civ. P. 166a(i) (cmt. 1997) ........................................................... 14

TO THE HONORABLE FIRST COURT OF APPEALS:

COME NOW appellants Joan DeYoung, Stephen DeYoung, M.D., and David DeYoung and respectfully present their brief on the merits in the above-named cause, pursuant to the Texas Rules of Appellate Procedure.

## STATEMENT OF THE CASE

| | |
|---|---|
| **Nature of the Case** | Judy Page Maynard was trustee of a Texas general partnership, Russell, Page & Partners. Throughout the course of her tenure, the partnership property was transferred to her husband, William L. Maynard, as well as Maynard Properties, L.P., without notice or compensation to the other partners. |
| | The DeYoungs sued the Maynard defendants for breach of fiduciary duty (all defendants), breach of duty of loyalty and care (Judy Maynard), conversion (Bill and Judy Maynard), and breach of contract (Judy Maynard). |
| **Trial Court** | The Honorable Brent Gamble, 270th Judicial District Court, Harris County, Texas |
| **Trial Court Disposition** | The trial court granted defendants' no-evidence motion for summary judgment, which was treated as a final judgment even though defendants did not move on all of plaintiffs' causes of action. |

## STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument.  This appeal involves questions of law that should be evaluated in the context of the specific facts in this case. Oral argument will aid the Court in making a decision because the parties will be able to assist with the record.

## ISSUE PRESENTED

Whether the trial court erred in granting Appellees' no-evidence motion for summary judgment when:

(I)   Appellees did not move on all causes of action asserted by the DeYoungs;

(II)  Appellees failed to specify the elements as to which the DeYoungs purportedly had no evidence;

(III) Appellees used a no-evidence motion to improperly shift the burden of proof back to the DeYoungs as to the DeYoungs' breach of fiduciary duty cause of action; and

(IV)  The DeYoungs presented more than a scintilla of evidence in response to Appellees' defective no-evidence motion.

## PROCEDURAL BACKGROUND

On October 23, 2014, defendants Judy Page Maynard, William L. Maynard, and Maynard Properties, L.P. (collectively "the Maynards" or "Appellees") filed their motions for no-evidence and traditional summary judgment. C.R. 161–227; App. 1.

On January 9, 2015, plaintiffs Joan DeYoung, Stephen DeYoung, M.D., and David DeYoung (collectively "the DeYoungs" or "Appellants") filed plaintiffs' response to defendants' no-evidence and traditional motions for summary judgment, C.R. 233–47, the declaration of Stephen DeYoung, M.D., C.R. 248–50, and the declaration of Daniel W. Jackson. C.R. 251–57; Suppl. C.R. 3–218.

On February 17, 2015, the trial court granted the Maynards' no-evidence motion for summary judgment, C.R. 276–77 and App. 2, which, as indicated on the trial court's activity inquiry sheets and electronic docket sheet, was interlocutory because the Maynards did not move for summary judgment on all of the DeYoungs' causes of action. C.R. 284, 292.

On March 9, 2015, the trial court entered a second order granting the Maynards' no-evidence motion for summary judgment, C.R. 278–79, which

was identical to the order entered on February 17, 2015, yet designated as a final judgment. C.R. 292.

On March 13, 2015, as reflected on the trial court's electronic docket sheet, the parties were informed that "The Court's order of 2/17/15 was intended to be a final J disposing of all parties and all claims. Request parties submit final J in appropriate form." C.R. 292.

Although the Maynards submitted a proposed final judgment on March 16, 2015, C.R. 280–81, and the DeYoungs submitted a proposed final judgment[1] on March 19, 2015, C.R. 282–83, the trial court did not enter either order.

## STATEMENT OF FACTS

In April 1966, the DeYoungs[2] each purchased a 3.596% ownership interest in Russell, Page & Partners (the "Partnership"), a Texas general partnership formed to invest in real estate in Liberty County, Texas. C.R. 248, ¶¶ 2–3.

The Partnership's property consisted of hundreds of acres of real property, primarily located in the M.G. White survey on the east side of the

---

[1] Which was approved as to form only.

[2] The ownership interests were actually purchased for the DeYoungs by their parents, as they were minors at the time.

Trinity River, which was initially held in the name of "Maurice Page, Trustee." Maurice Page is Appellee Judy Page Maynard's mother. C.R. 248, ¶¶ 2–4.

***Without notice, an appraisal, or compensation, Appellee***
***William L. Maynard stripped the Partnership of its property.***

On January 28, 1991, Maurice Page transferred 20.1449 acres of Partnership property to her son-in-law, Appellee William L. Maynard ("Bill Maynard") without providing notice to the DeYoungs. C.R. 248, ¶ 5; Suppl. C.R. 3–5. The 20.1449 acres was not appraised prior to its transfer to Bill Maynard, and Bill Maynard did not pay the Partnership for the property. C.R. 255, ¶¶ 35–37, 42; Suppl. C.R. 209–18.

In April 1994, Maurice Page resigned as the Partnership's trustee and appointed her daughter, Appellee Judy Maynard, as substitute trustee. Suppl. C.R. 6–9. Bill Maynard prepared the documents to transfer the property to Judy Page Maynard and to appoint her as substitute trustee. Suppl. C.R. 6–9. As part of this transition, on May 11, 1994, Maurice Page, Trustee, transferred approximately 755 acres of Partnership property to Judy Maynard as trustee. Suppl. C.R. 10–15. The general warranty deed transferring the partnership property to Judy Maynard was prepared and filed by Bill Maynard. Suppl. C.R. 10–16.

3

In December 1994, just seven months after she took over the Partnership's operations, Judy Maynard transferred 629 acres of the Partnership's property to Bill Maynard, again without notice to the partners or an appraisal of the property. Suppl. C.R. 17–20; C.R. 249, ¶ 6; C.R. 255–56, ¶¶ 35, 38, 39; Suppl. C.R. 209–18. Although Bill Maynard produced a 10-year promissory note for $28,305 plus 7% interest,[3] thus revealing the nature of this transaction as an "unsecured, seller financed transaction," Suppl. C.R. 21–24, Bill Maynard has been unable to produce a single document evidencing any payments to the Partnership toward satisfaction of the promissory note.[4] C.R. 255–56, ¶¶ 35, 38, 39, 42; Suppl. C.R. 209–18.

On April 20, 2010, Judy Maynard transferred another 47.49 acres of Partnership property to Appellee Maynard Properties, L.P., a company owned by Bill Maynard, without notice to the partners, an appraisal, or compensation. Suppl. C.R. 25–28; C.R. 249, ¶ 7; C.R. 255–56, ¶¶ 35, 40–42; Suppl. C.R. 209–18.

---

[3] The prime interest rate in December 1994 was 8.5%.

[4] Although no amounts were actually paid for the 629 acres, the "negotiated price" of $45 per acre is significantly less than the $193.17 per acre Bill Maynard agreed to pay Exxon in October 1989. Suppl. C.R. 62–66, 68–80.

Finally, on May 21, 2010, $42,170.34 was transferred out of the Partnership's Wells Fargo account, which was controlled by Judy Maynard. C.R. 255, ¶ 32; Suppl. C.R. 197–202. The DeYoungs did not receive notice that the $42,170.34 was being withdrawn from the Partnership's bank account, have not received an explanation for this withdrawal, and have not received any of the funds from this unexplained withdrawal. C.R. 249, ¶ 10.

### Judy and Bill Maynard owed the DeYoungs a fiduciary duty.

There is no legitimate dispute that Bill and Judy Maynard owed the DeYoungs a fiduciary duty. In April 1994, Judy Maynard was appointed "Trustee for Russell Page & Partners" and accepted the attendant duties and obligations. Suppl. C.R. 6–7. In fact, Judy Maynard held the Partnership's property as trustee and prepared and signed the Partnership's tax returns. Suppl. C.R. 10–15, 29; C.R. 180, 191, 194.

In May 2000, Bill Maynard bought Frankie West-David's six percent (6%) interest in the Partnership, Suppl. C.R. 37–38, and, in June 2001, purchased a five percent (5%) interest from the estate of H.B. Canter. Suppl. C.R. 39–42. As a result, Bill Maynard was a general partner in the Partnership, and owed his partners, including the DeYoungs, the attendant

5

fiduciary duties.  *M.R. Champion, Inc. v. Mizell*, 904 S.W.2d 617, 618 (Tex. 1994).

Although Bill Maynard contends that he wanted to close out the Partnership because of "its dire financial condition," C.R. 165, between 1999 and 2006, Bill Maynard attempted to purchase all remaining partnership interests, Suppl. C.R. 31–60.  In fact, in May 2006, Maynard offered to pay the DeYoungs, Claudia West, and the Nelson Trust $53,157 for their partnership interests.  Suppl. C.R. 47–58.  Not only was Bill Maynard willing to pay substantial sums of money to purchase a partnership in "dire financial condition," Maynard was even willing to mislead his partners to do so.

Specifically, on May 1, 2000, Bill Maynard offered to purchase Frankie West-David's six percent (6%) partnership interest for $2,500, which Maynard represented was ***"slightly less than [Frankie's] current capital account."***  Suppl. C.R. 37 (emphasis added).  However, less than a year later, when attempting to purchase Carla Nelson's partnership interest, Maynard represented to his partner that ***"Frankie sold Phillips Estate's interest for approximately 50% of capital account value."***  Suppl. C.R. 44 (emphasis added).

6

In addition to being a general partner, Bill Maynard "assisted Judy with the preparation of the partnership tax returns" since 1994:

> Since 1994, I have assisted Judy with the preparation of the partnership tax returns and the payment of the taxes on the remaining land each year. The partnership has never been billed for any services. I have generally monitored the status of the land (I was frequently in the area for other reasons anyway). In order to simplify the bookkeeping and eventually terminate this partnership, I am trying to purchase the interests of each partner. I am willing to pay you $200.00 cash for your interest. Although this is slightly less than your current capital account, I feel it is a fair offer.

Suppl. C.R. 29.

Likewise, Bill Maynard was responsible for transmitting the Partnership's tax returns to the Internal Revenue Service. Suppl. C.R. 30, 35–37.

### Bill Maynard also purchased substantial property surrounding the Partnership's property.

Although Bill Maynard now contends that the Partnership property had little value due to its locale and being "used as a land dump," thus incurring "damages as a result of oil spills" that were expensive to clean-up, C.R. 164, n.3, from 1989 through 2010, Bill Maynard, individually and through Maynard Properties, purchased over 2,200 acres in the same area, some of which adjoined the Partnership's property. C.R. 253–54, ¶¶ 15–27; Suppl. C.R. 61–196.

7

## STANDARD OF REVIEW

An appellate court reviews a no-evidence motion for summary judgment *de novo*. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex. 2004).

When reviewing a no-evidence summary judgment, the Court must "review the entire record in <u>the light most favorable to the nonmovant</u>, indulging every reasonable inference and resolving any doubts against the motion. *Mathis v. Restoration Builders, Inc.*, 231 S.W.3d 47, 50 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (emphasis added).

## ARGUMENT AND AUTHORITIES

The trial court committed reversible error in granting final summary judgment on Appellees' no-evidence motion because: (I) Appellees did not move on all causes of action asserted by the DeYoungs; (II) Appellees failed to articulate the elements on which the DeYoungs purportedly have no evidence; (III) Appellees improperly used the no-evidence motion to shift the burden of proof back to the DeYoungs to prove self-dealing; and (IV) the DeYoungs nevertheless provided more than a scintilla of evidence in response.

8

**I.**   **The trial court erred in granting final summary judgment because Appellees did not move on all causes of action asserted by the DeYoungs.**

"It is axiomatic that one may not be granted judgment as a matter of law on a cause of action not addressed in a summary judgment proceeding." *Chessher v. Sw. Bell Telephone Co.*, 658 S.W.2d 563, 564 (Tex. 1983). Summary judgments "may only be granted upon grounds expressly asserted in the summary judgment motion." *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011).

Because Appellees did not move for summary judgment on all causes of action asserted by the DeYoungs, the trial court erroneously granted Appellees more relief than they were entitled to. Therefore, the Court should remand this matter at least with respect to the unaddressed cause of action.

On October 10, 2012, the DeYoungs filed their second amended petition, asserting the following causes of action:

1. breach of fiduciary duty (against all Appellees) C.R. 115–16;

2. breach of the duty of loyalty and care under Texas Business Organizations Code §§ 152.205, 152.206 (against Judy Maynard) C.R. 117;

3. conversion (against Bill and Judy Maynard) C.R. 117; and

4. breach of contract (against Judy Maynard) C.R. 117.

9

In their no-evidence motion for summary judgment, Appellees moved for summary judgment on three of the DeYoungs' four causes of action: "Plaintiffs can produce no evidence to support a cause of action for breach of fiduciary duty, breach of contract, and conversion against Defendants." C.R. 163; App. 1 at 3. Defendants did not move for summary judgment on the DeYoungs' cause of action for breach of the duty of loyalty and care, much less specify the elements upon which they believed the DeYoungs had no evidence. C.R. 161–64; App. 1 at 1–4.

Under factually similar circumstances, the Fourteenth Court of Appeals remanded a case where the trial court granted final summary judgment even though the defendant had not expressly set forth the causes of action in plaintiffs' supplemental petition. *Rose v. Kober Fin. Corp.*, 874 S.W.2d 358, 362 (Tex. App.—Houston [14th Dist.] 1994, no writ). The defendant in *Rose* argued on appeal that the final summary judgment should be upheld because it negated the damage element on all of plaintiff's causes of action.

The Fourteenth Court of Appeals disagreed, reversing and remanding the case because the summary judgment purported to "grant more relief than requested." *Id.* Accordingly, any argument by Appellees in the instant

10

case that their no-evidence motion was properly granted because they negated the damage element on each of the DeYoungs' causes of action should, likewise, be rejected by this Court.

As such, the trial court's final judgment should be reversed and remanded with respect to the DeYoungs' claim for breach of duty of loyalty and care.

> **A.    Even though the trial court committed reversible error by granting more relief than requested, the Court should treat the summary judgment as a final judgment and consider all issues raised in this appeal.**

"When a trial court grants more relief than requested and, therefore, makes an otherwise partial summary judgment final, that judgment, although erroneous, is final and appealable." *G & H Towing Co.*, 347 S.W.3d at 298. "The court of appeals should treat such a summary judgment as any other final judgment, considering all matters raised and reversing only those portions of the judgment based on harmful error. *Id.*[5]

---

[5] *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 206 (Tex. 2001) ("The record may help illumine whether an order is made final by its own language, so that an order that all parties appear to have treated as final may be final despite some vagueness in the order itself …"); *Farm Bureau Cty. Mut. Ins. Co. v. Rogers*, 455 S.W.3d 161, 163–64 (Tex. 2015) (dismissing a case for want of jurisdiction where the language of the order did not disposed of all parties and claims, but where there was no other evidence of the trial court's intent with respect to the finality of the order).

11

Therefore, the trial court's judgment should be reversed and the case remanded for further proceedings with respect to the DeYoungs' breach of duty of loyalty and due care claim, and this Court should consider the merits of the DeYoungs' remaining points of error.

## II. The trial court erred in granting final summary judgment because Appellees failed to specify the elements as to which the DeYoungs purportedly had no evidence.

Appellees' one-paragraph argument in support of its no-evidence motion for summary judgment belies Rule 166a(i)'s requirement that "[t]he motion must state the elements as to which there is no evidence." In particular, "a no-evidence motion that only generally challenges the sufficiency of the non-movant's case and fails to state the specific elements that the movant contends lack supporting evidence is fundamentally defective and cannot support summary judgment as a matter of law." *Jose Fuentes Co., Inc. v. Alfaro*, 418 S.W.3d 280, 283 (Tex. App.—Dallas 2013, pet. denied).

In *Alfaro*, the movant listed each of the causes of action asserted and listed the elements of each claim, but argued only that the plaintiffs had no evidence to support "one or more" of the elements of the claim, without any further discussion. *Id.* at 284. The Dallas Court of Appeals remanded the

12

case, finding the no-evidence motion to be legally insufficient as a matter of law. *Id.* at 288.

Similarly, in *Garcia v. State Farm Lloyds*, State Farm moved for no-evidence summary judgment on the following grounds:

> (1) there was no evidence that it owed the Garcias more than it already paid; (2) there was no evidence that the Garcias had any complaint with the way State Farm handled their claims, other than that State Farm did not pay enough; and (3) there was no evidence of any misrepresentations by State Farm.

287 S.W.3d 809, 818–19 (Tex. App.—Corpus Christi-Edinburg 2009, pet. denied). The Corpus Christi Court of Appeals likewise found State Farm's no-evidence motion to be insufficient for "only generally attack[ing] a factual theory, without specifying the elements of the claims being attacked," and treated the motion like a traditional motion for summary judgment. *Id.* at 819.

In the instant case, Appellees moved for no-evidence summary judgment on the DeYoungs' claims for breach of fiduciary duty, breach of contract, and conversion. C.R. 163; App. 1 at 3. In their motion, Appellees first stated that the DeYoungs do not have evidence on one or more elements of their claims, just as in the *Alfaro* case. Then, Appellees made a general attack, as in the *Garcia* case, merely noting that:

13

> Plaintiff cannot show any evidence that Defendants wrongfully engaged in any transactions that injured Plaintiffs or that Defendants received any personal benefit as a result of transactions related to the sale of partnership property.

C.R. 163; App. 1 at 3. Appellees' conclusory statement fails to identify the specific elements of the claims as to which they allege the DeYoungs have no evidence, as required by Rule 166a(i).[6]

Moreover, Appellees' conclusory statement further fails because, even if it had complied with Rule 166a(i), in the context of self-dealing and breach of fiduciary duty, an injury need not be shown. *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) ("It would be dangerous precedent for us to say that unless some affirmative loss can be shown, the person who has violated his fiduciary relationship with another may hold on to any secret gain or benefit he may have thereby acquired."); *Harvey v. Casebeer*, 531 S.W.2d 206, 207 (Tex. Civ. App.—Tyler 1975, no writ) ("Self-dealing transactions may be attacked by the beneficiary even though he has suffered no damages …").

---

[6] A no-evidence motion "must be specific in challenging the evidentiary support for an element of a claim or defense; [Rule 166a](i) does not authorize conclusory motions or general no-evidence challenges to an opponent's case." Tex. R. Civ. P. 166a(i) (cmt. 1997).

14

Therefore, the trial court's judgment should be reversed and this case remanded for further proceedings with respect to the DeYoungs' causes of action for breach of fiduciary duty, breach of contract, and conversion.

**III.    The trial court erred in granting final summary judgment because Appellees improperly used a no-evidence motion to shift the burden of proof back to the DeYoungs on their self-dealing allegation.**

"[W]hen a plaintiff alleges self-dealing by the fiduciary as part of a breach-of-fiduciary-duty claim, a presumption of unfairness automatically arises, which the fiduciary bears the burden to rebut." *Cluck v. Mecom*, 401 S.W.3d 110, 114 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). A party with the burden of proof on an issue cannot shift the burden of proof through a no-evidence motion for summary judgment. In fact, "[i]t is error for a trial court to grant a no-evidence summary judgment on a claim for which the moving party bears the burden of proof." *In re Estate of Coleman*, 360 S.W.3d 606, 610 (Tex. App.—El Paso 2011, no pet.).

It is undisputed that the DeYoungs alleged self-dealing in connection with their breach of fiduciary duty claim against Appellees. C.R. 116, ¶ 37. Therefore, Appellees "bear[] the burden to fully disclose [their] activities as fiduciar[ies] and prove the fairness of [their] personal transactions with the [Partnership]." *Cluck*, 401 S.W.3d at 114.

15

In connection with the DeYoungs' breach of fiduciary duty claim, the trial court improperly allowed Appellees to shift the burden of proof to the DeYoungs by improvidently granting their no-evidence motion for summary judgment.

Because the trial court committed reversible error by granting Appellees' no-evidence motion for summary judgment on the DeYoungs' breach of fiduciary duty claim, the trial court's judgment should be reversed and this case remanded for further proceedings with respect to the DeYoungs' breach of fiduciary duty claim

**IV. The trial court erred in granting final summary judgment because the DeYoungs submitted competent summary judgment evidence establishing each element of their causes of action.**

The DeYoungs presented sufficient – actually, abundant – evidence to defeat Appellees' no-evidence motion.

Again, even if this Court considers Appellees' no-evidence motion to be in compliance with Rule 166a(i) of the Texas Rules of Civil Procedure, the only element Appellees challenged was that the DeYoungs did not have any evidence of an injury. Notwithstanding the fact that the DeYoungs need not prove injury in connection with their breach of fiduciary duty and

breach of the duty of loyalty and care causes of action,[7] the DeYoungs presented ample evidence to defeat Appellees' no-evidence motion for summary judgment.

"[I]f the nonmovant presents more than a scintilla of evidence supporting the disputed issue, summary judgment is improper." *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex. 2003). In other words, "[a] no-evidence summary judgment is improper if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact." *Id*.

> When determining if more than a scintilla of evidence has been produced in response to a Rule 166a(i) motion for summary judgment, the evidence must be viewed in the light most favorable to the non-movant. We have repeatedly held that more than a scintilla of evidence exists if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions."
>
> * * *
>
> Both direct and circumstantial evidence may be used to establish any material fact.

*Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

---

[7] *Kinzbach Tool Co.*, 160 S.W.2d at 514 ("It would be dangerous precedent for us to say that unless some affirmative loss can be shown, the person who has violated his fiduciary relationship with another may hold on to any secret gain or benefit he may have thereby acquired."); *Harvey*, 531 S.W.2d at 207 ("Self-dealing transactions may be attacked by the beneficiary even though he has suffered no damages …").

The DeYoungs attached exhibits to their summary judgment response demonstrating that, from January 1991 through April 2010, Appellees transferred 696.6349 acres of Partnership property to Bill Maynard and Maynard Properties, without notice to the DeYoungs or compensation to the Partnership. C.R. 248, ¶ 5; Suppl. C.R. 3–5; C.R. 255, ¶¶ 35–37, 42; Suppl. C.R. 209–18; CR 249, ¶ 6; C.R. 255–56, ¶¶ 35, 38, 39; Suppl. C.R. 17–20; CR 255–56, ¶¶ 35, 38, 39, 42; Suppl. C.R. 209–18; C.R. 249, ¶ 7; Suppl. 25–28; C.R. 255–56, ¶ 35, 40, 41; Suppl. C.R. 209–18.

Although worth much more, Appellees admitted that the property they stole was worth at least $45 per acre,[8] which Bill Maynard never actually paid to the Partnership. Suppl. C.R. 17–24; C.R. 255–56, ¶¶ 35, 38, 39, 42; Suppl. C.R. 209–18.

In other words, the DeYoungs suffered damages because: (1) they were deprived of the value of each of their 3.596% interests in the partnership as a result of Appellees withdrawing $42,170.34 from the Partnership's Wells Fargo account, without notice to the DeYoungs or an

---

[8] On December 5, 1994, in connection with his "purchase" of 629 partnership acres, Bill Maynard signed a promissory note for $28,305, which is $45 per acre. C.R. 252, ¶ 10; Suppl. C.R. 17–24.

18

explanation, C.R. 255, ¶ 32; Suppl. C.R. 197–202; C.R. 249, ¶ 10; and (2) the Partnership's real property was transferred to Bill Maynard and Maynard Properties, without notice or compensation. C.R. 248, ¶ 5; Suppl. C.R. 3–5; C.R. 255, ¶¶ 35–37, 42; Suppl. C.R. 209–18; C.R. 249, ¶ 6; C.R. 255–56, ¶¶ 35, 38, 39; Suppl. C.R. 17–20; C.R. 255–56, ¶¶ 35, 38, 39, 42; Suppl. C.R. 209–18; C.R. 249, ¶ 7; Suppl. C.R. 25–28; C.R. 255–56, ¶ 35, 40, 41; Suppl. C.R. 209–18.  In short, the Partnership's assets were depleted without notice or explanation, much less consideration or compensation.

When self-dealing by a fiduciary is alleged, it is the fiduciary's burden to demonstrate the fairness of the transactions at issue, and the plaintiff need not prove injury.  Nevertheless, the DeYoungs presented more than a scintilla of evidence establishing that the DeYoungs suffered injury as a result of Appellees' depletion of the Partnership's assets.  Therefore, the trial court committed reversible error and this matter should be remanded for trial.

## PRAYER

Appellees' no-evidence motion for summary judgment was improvidently granted as a final judgment.

19

It is well settled under Texas law that a party may not be granted more relief than requested. However, Appellees were granted final judgment even though they did not move on all causes of action asserted by the DeYoungs.

Texas law undeniably requires that a party moving for summary judgment on no evidence grounds must specify the elements as to which the opposing party has no evidence. Appellees failed to adhere to this requirement, yet obtained final judgment in their favor nonetheless.

Texas precedent explicitly dictates that when self-dealing is alleged against a defendant, the defendant has the burden to establish the fairness of the transactions and cannot use a no-evidence motion to shift the burden of proof back to the plaintiff. Appellees did just that, but were nevertheless granted final judgment.

Texas law demands that any evidence submitted in response to a no-evidence motion for summary judgment be viewed in a light most favorable to the non-movant and even allows circumstantial evidence to establish material facts. The DeYoungs submitted ample evidence that, at the very least, allow reasonable minds to differ in their conclusions about the propriety of Bill Maynard's actions in "purchasing" Partnership property.

20

Despite the evidence presented by the DeYoungs, the trial court erroneously granted Appellees' no-evidence motion.

For these reasons, the trial court's final judgment should be reversed and this matter should be remanded for trial on each of the DeYoungs' causes of action.

Respectfully submitted,

/s/ *Daniel W. Jackson*

Daniel W. Jackson, SBN 00796817
Scott K. Vastine, SBN 24056469
Jennifer H. Frank, SBN 24087537
3900 Essex Lane, Suite 1116
Houston, Texas 77027
(713) 522-4435
(713) 527-8850 – fax
daniel@jacksonlaw-tx.com
scott@jacksonlaw-tx.com
jennifer@jacksonlaw-tx.com

Counsel for Appellants

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 9.4(i)(1) of the Texas Rules of Appellate Procedure,

I hereby certify that the content to be included in calculating the length of a

document contains 4,217 words.

/s/ *Daniel W. Jackson*
Daniel W. Jackson, SBN 00796817

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document has been served on all

counsel of record, *via* ProDocs and email, on August 17, 2015:

Gregory N. Jones
Law Office of Gregory N. Jones
2323 S. Shepherd, 14th Floor
Houston, Texas  77019

**gjones@gnjlaw.net**

William L. Maynard
1300 Post Oak Blvd, Suite 2500
Houston, Texas  77056

**wmaynard@bmpllp.com**

/s/ *Daniel W. Jackson*
Daniel W. Jackson

NO. 2011-18770

| | | |
|---|---|---|
| JOAN DEYOUNG, STEPHEN DEYOUNG, M.D., AND DAVID DEYOUNG, | § § § | |
| Plaintiffs, | § § | IN THE DISTRICT COURT OF |
| V. | § | |
| JUDY PAGE MAYNARD, WILLIAM L. MAYNARD, MAYNARD PROPERTIES, L.P., AND BEIRNE, MAYNARD & PARSONS, L.L.P., | § § § § | HARRIS COUNTY, TEXAS |
| | § § | 270TH JUDICIAL DISTRICT |
| Defendants. | § | |

## DEFENDANTS' MOTIONS FOR NO EVIDENCE AND TRADITIONAL SUMMARY JUDGMENT

COME NOW, Defendants Judy Paige Maynard,[1] William L. Maynard and Maynard Properties, L.P.,[2] and file this their Motions for No Evidence Summary Judgment and Traditional Summary Judgment. In support thereof, Defendants would show unto the Court the following:

### I. FACTUAL SUMMARY

Plaintiffs' suit is based on the allegation that Defendants breached duties owed to a family partnership, Russell, Page & Partners, of which Plaintiffs held a total interest of 10.788%. To summarize, Plaintiffs have alleged that Defendants wrongfully transferred land tracts to themselves without paying a fair price for the land and without notifying Plaintiffs. Plaintiffs cannot present credible evidence to support their claims. Indeed, the summary judgment evidence as set forth in this

---

[1] Defendant Judy Paige Maynard died in 2013. Accordingly, she is now appearing by and through her husband, Defendant William L. Maynard.

[2] Defendant Beirne, Maynard & Parsons, L.L.P.'s motion for summary judgment was granted by Order of this Court on September 26, 2012. Ex. 1, attached hereto. Thus, Beirne Maynard is no longer a party to this case.

1

Appendix 1

motion clearly establishes that Plaintiffs knew or, at a minimum, should have known of the transfers of real estate from the partnership to Defendants at or near the time they occurred, which was many years before Plaintiffs filed this suit on March 28, 2011.

## II. NO EVIDENCE SUMMARY JUDGMENT STANDARD

A court may grant a no evidence motion for summary judgment if the movant can show that adequate time for discovery has passed and the non-movant has no evidence to support one or more essential elements of its claim or defense. Tex. R. Civ. P. 166a(i). Defendants contend that a "no-evidence" motion for summary judgment should be granted pursuant to Texas Rule of Civil Procedure 166a (i). Under the no-evidence summary judgment standard, "the party with the burden of proof at trial will have the same burden of proof in a summary judgment proceeding." *Galveston Newspapers, Inc. v. Norris*, 981 S. W.2d 797,799 (Tex. App.-Houston [1st Dist.] 1998, pet. denied), citing *Esco Oil & Gas, Inc. v. Sooner Pipe & Supply Cmp.*, 962 S.W.2d 193,197 n. 3 (Tex. App.-Houston [1st Dist.] 1997, pet. denied) (commenting that under Rule 166a(i), "the plaintiff as the non-movant [has] the burden to raise a triable issue on each element essential to the plaintiffs case against each defendant"). Here, Plaintiffs' claims against Defendants for breach of fiduciary duty, breach of contract, and conversion must fail because there is no evidence that Defendants were in any way engaged in the wrongful conduct that was detrimental to Plaintiffs.

## III. ADEQUATE TIME FOR DISCOVERY

Under Rule 166a(i), a no evidence motion for summary judgment is proper if, after an adequate time for discovery, there is a complete absence of evidence of one or

2

more essential element of a claim or defense on which an adverse party has the burden of proof at trial. In this case, Plaintiffs have had an adequate time to conduct discovery. This case has been pending for more than three (3) years. Discovery is substantially complete. The parties have exchanged extensive written discovery, inspected relevant documents, and designated expert witnesses. This case is set for trial on December 1, 2014. Plaintiffs have had more than ample opportunity to gather the evidence necessary to support its allegations against the Defendants.

## IV. NO EVIDENCE SUMMARY JUDGMENT GROUNDS

After adequate time for discovery, Plaintiffs can produce no evidence to support a cause of action for breach of fiduciary duty, breach of contract, and conversion against Defendants. Accordingly, pursuant to Rule 166a(i) of the Texas Rules of Civil Procedure, Defendants seek summary judgment on the ground that Plaintiff has failed to adduce any evidence to support one or more essential elements of its claims.

## V. ARGUMENTS AND AUTHORITIES

Defendants contend that entry of a no evidence summary judgment is proper based on the following:

**There is No Evidence that Defendants Judy Page Maynard, William L. Maynard or Maynard Properties, L.P. Engaged in any Conduct Harmful to Plaintiffs or to Their own Benefit.**

Plaintiff cannot show any evidence that Defendants wrongfully engaged in any transactions that injured Plaintiffs or that Defendants received any personal benefit as a result of transactions related to the sale of partnership property. Proving these claims are obviously essential to Plaintiffs' assertions. There are no depositions, answers to interrogatories, admissions on file, or any other admissible evidence to support the

3

Plaintiffs' claims. In the absence of such evidence, Plaintiffs cannot establish any evidence sufficient to sustain their case against Defendants. Thus, Defendant's motion for summary judgment should be granted.

## VI. DEFENDANTS' TRADITIONAL MOTION FOR SUMMARY JUDGMENT

Plaintiffs' claims are barred by the statute of limitations. Tex. Civ. Prac. & Rem. Code §16.004(a)(5). While Plaintiffs' petition admits that Maurice Page decided in 1994 to retire as Trustee for the partnership and appoint Defendant Judy Page Maynard as her successor to handle the partnership's business affairs, they do not contend they were unaware of Ms. Page's transfer to Defendant Judy Page Maynard. Plaintiffs' Second Amended Petition, ¶¶ 19-20. In fact, notice of the transfer was provided to each of the partners, including the Plaintiffs, in the spring of 1994. Ex. 2, attached hereto and incorporated herein. Moreover, Plaintiffs have judicially admitted that they knew the value of the partnerships assets were declining from 1968-1970. Plaintiffs' Second Amended Petition, ¶15. Partnership tax returns mailed to all partners, including Plaintiffs and, as result, they were also informed that value of the partnership continued to be reduced as a result of sales of property owned by the partnership. Ex. 3, attached hereto and incorporated herein. Because the property owned by the partnership did not generate any revenue, property had to be sold to generate cash for ad valorem taxes and clean-up expenses.[3] In addition, much of the property did not have clear title and were encumbered with right-of-way easements. Thus, the appraised valued of the

---

[3] Much of the property owned by the partnership, which was all located in Liberty County, Texas, was used as a land dump and had incurred damage as a result of oil spills. Needless to say, clean-up has been expensive.

4

property was not anywhere near $2,500,000, as alleged by Plaintiffs, but was at or near the prices paid by Defendant William Maynard for the property. *See* Ex. 4, attached hereto and incorporated herein.

## VII.

As established by the evidence, Plaintiffs were aware of the partnership's distressed financial condition. Ex. 3. In the spring of 2000, Defendant William Maynard directly notified Plaintiffs of the impending close-out of the partnership as a result of its dire financial condition and offered to purchase their interests. [4] Moreover, he again offered to purchase each of their remaining interests in the partnership for $2,127.00. Ex. 5, attached hereto and incorporated herein. Plaintiffs did not respond to the correspondence in any fashion. If Plaintiffs had merely called Defendants or checked the public deed records of Liberty County, Texas they would have known that sales from the partnership to Defendant William L. Maynard had occurred as early as 1991, when under control of the predecessor Trustee Maurice R. Page, and continued thereafter in 1994, 1996, and 2010, when Defendant Judy Page Maynard had become Trustee. *See* Exs. 1, 4, 5, 7, & 8 attached to Plaintiffs' Second Amended Petition and incorporated herein by reference.

## VIII. ARGUMENT AND AUTHORITIES

Plaintiffs filed this suit on March 28, 2011, over ten (10) years after Defendant William L. Maynard's first letter advising Plaintiffs of the partnership Trustee's decision to "close out" the partnership and over fifteen years after Trustee

---

[4] It cannot be disputed that Plaintiffs received the letters from Mr. Maynard. In addition to his affidavit confirming that they were mailed, the documents contain "DeYoung" bates numbers indicating that they came from their files.

Maurice Page advised Plaintiffs of her appointment of Defendant Judy Page Maynard as her successor and her instructions to "direct any further inquiries . . . to Judy Maynard . . . ." Ex. 2, attached hereto. This notice, when combined with tax returns and other communications related to the dire financial condition of the partnership, clearly give rise to the conclusion that Plaintiffs knew, or should have known, that the partnership was being liquidated and would be closed down.

Statutes of limitation "operate to prevent the litigation of stale claims; they 'afford plaintiffs what the legislature deems a reasonable time to present their claims and protect defendants and the courts from having to deal with cases in which the search of truth may be seriously impaired by the loss of evidence, whether by death . . . or otherwise." *Kerlin v. Sauceda,* 263 S.W.3d 920, 925 (Tex. 2008). Not only do limitations "preclude claimants from sleeping on their rights," they provide both stability and security in personal affairs. *Little v. Smith,* 943 S.W.2d 414, 418 (Tex. 1997). The objective of statutes of limitations is to compel the assertion of claims within a reasonable period of time, while the evidence is fresh in the minds of the parties and witnesses. *Computer Assoc. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex 1996).

Limitations generally begin to run when facts come into existence which authorize a claimant to seek judicial remedy. *Apex Towing Co. v. Tolin,* 41 S.W.3d 118, 120 (Tex. 2001); *see also, Bayou Bend Towers Council of Co-Owners,* 866 S.W.2d 740, 743-44 (Tex. App.—Houston [14th Dist.] 1993, writ denied). A party need only be aware of enough facts to be apprised of the right to seek a judicial remedy. *Robinson v. Weaver,* 550 S.W.2d 18, 19 (Tex.1977).

The discovery rule operates to toll the limitations period until a plaintiff discovers or, through the exercise of reasonable care and diligence, should have discovered the nature of his loss. *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex. 1990). Limitations begin to run – even against a person to whom a fiduciary duty is owed – when such person "learns of facts or circumstances that would lead a reasonably prudent person to inquire and therefore discover the concealed cause of action." *Wright v. Greenberg,* 2 S.W.3d 666, 675 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). It is this knowledge that triggers the period of time within which the plaintiff must investigate and determine whether to file suit. *Bell v. Showa Denko K.K.,* 899 S.W.2d 749, 754 (Tex. App.—Amarillo 1995, writ denied); *Arabian Shield Dev. Co. v. Hunt,* 808 S.W.2d 577,583 (Tex. App.—Dallas 1991, writ denied). The discovery rule measures "what the [claimant] should have known based on a reasonable person standard – an objective standard." *Trousdale v. Henry,* 261 S.W.3d 221, 234-37 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). While a fiduciary relationship is one of many circumstances to be considered in determining whether a breach of duty might have been discovered as a result of reasonable diligence, it does not change the rule that diligence in discovering the breach of fiduciary duty is required. *Courseview, Inc. v. Phillips Petroleum Co.,* 312 S.W.2d 197, 205 (Tex. 1957).

The summary judgment evidence in this case clearly establishes that Defendants did not attempt to conceal anything from Plaintiffs. Indeed, Plaintiffs were aware that Plaintiff Judy Page Maynard had become Trustee in 1994. Tax returns were mailed annually to Plaintiffs that revealed the declining value of the

7

partnership's value. Correspondence was sent to Plaintiffs and other family-member partners that clearly related to the monetary issues faced by the partnership and its Trustee. Defendant Judy Page Maynard. Exs. 5 & 6, attached hereto and incorporated herein. With all of this knowledge, Plaintiffs did nothing, including simply calling Defendants, to inquire about the status of events. Given that Defendants fully responded to inquiries from other family-member partners, it should be clear that Defendants would not have withheld any information. Ex. 6, attached hereto. This is true particularly given the fact that the land sales to Mr. Maynard were made a matter of public record that anyone could access. Summary judgment in favor of the Defendants, therefore, is appropriate.

WHEREFORE, PREMISES CONSIDERED, Defendants Judy Page Maynard, William L. Maynard, and Maynard Properties, L.P. respectfully request that the Court GRANT this Motion for No Evidence Summary Judgment and sign an order for final summary judgment and/or such other relief to which Defendants may be justly entitled.

Respectfully submitted,

**LAW OFFICE OF GREGORY N. JONES**

By: *Gregory N. Jones*
      Gregory N. Jones
      State Bar No. 10889450
      2323 S. Shepherd, 14th Floor
      Houston, Texas 77019
      (713) 979-4691 (telephone)
      (713) 979-4440 (facsimile)

ATTORNEY FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing document has been served on all counsel of record *via* electronic mail on October 23, 2014:

Daniel W. Jackson, SBN 00796817
Scott K. Vastine, SBN 24056469
3900 Essex Lane, Suite 1116
Houston, Texas 77027
(713) 522-4435
(713) 527-8850 – fax
daniel@jacksonlaw-tx.com
scott@jacksonlaw-tx.com

William L. Maynard
1300 Post Oak Blvd, Suite 2500
Houston, Texas 77056
Fax: (713) 960-1527

By: *Gregory N. Jones*
Gregory N. Jones

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

2/9/2015 1:22:12 PM
Chris Daniel - District Clerk Harris County
Envelope No. 4073073
By: SHELLEY BOONE
Filed: 2/9/2015 1:22:12 PM

### NO. 2011-18770

| | | |
|---|---|---|
| JOAN DEYOUNG, STEPHEN DEYOUNG, M.D., AND DAVID DEYOUNG, | § § § | |
| Plaintiffs, | § § | IN THE DISTRICT COURT OF |
| V. | § § | |
| JUDY PAGE MAYNARD, WILLIAM L. MAYNARD, MAYNARD PROPERTIES, L.P., AND BEIRNE, MAYNARD & PARSONS, L.L.P., | § § § § § | HARRIS COUNTY, TEXAS |
| Defendants. | § § | 270TH JUDICIAL DISTRICT |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ON THIS 3rd day of February 2015, came on to be heard Defendants' Motion for Judgment. After consideration of same, the Court finds as follows:

It is ORDERED, ADJUDGED and DECREED that Defendants' Motion for No Evidence Summary Judgment is granted.

SIGNED this _17_ day of _February_, 2015

FEB 1 7 2015

_____
JUDGE PRESIDING

1

Appendix 2

Submitted by:
LAW OFFICE OF GREGORY N. JONES

By: */s/ Gregory N. Jones*
TSB 10889450
2323 S. Shepherd, 14th Floor
Houston, TX 77019
Tele. (713) 979-4691
Fax (713) 979-4440

2

TX Rules of Civil Procedure, Rule 166a

Rule 166a. Summary Judgment

Currentness

**(a) For Claimant.** A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the adverse party has appeared or answered, move with or without supporting affidavits for a summary judgment in his favor upon all or any part thereof. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to amount of damages.

**(b) For Defending Party.** A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof.

**(c) Motion and Proceedings Thereon.** The motion for summary judgment shall state the specific grounds therefor. Except on leave of court, with notice to opposing counsel, the motion and any supporting affidavits shall be filed and served at least twenty-one days before the time specified for hearing. Except on leave of court, the adverse party, not later than seven days prior to the day of hearing may file and serve opposing affidavits or other written response. No oral testimony shall be received at the hearing. The judgment sought shall be rendered forthwith if (i) the deposition transcripts, interrogatory answers, and other discovery responses referenced or set forth in the motion or response, and (ii) the pleadings, admissions, affidavits, stipulations of the parties, and authenticated or certified public records, if any, on file at the time of the hearing, or filed thereafter and before judgment with permission of the court, show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response. Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal. A summary judgment may be based on uncontroverted testimonial evidence of an interested witness, or of an expert witness as to subject matter concerning which the trier of fact must be guided solely by the opinion testimony of experts, if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted.

**(d) Appendices, References and Other Use of Discovery Not Otherwise on File.** Discovery products not on file with the clerk may be used as summary judgment evidence if copies of the material, appendices containing the evidence, or a notice containing specific references to the discovery or specific references to other instruments, are filed and served on all parties together with a statement of intent to use the specified discovery as summary judgment proofs: (i) at least twenty-one days before the hearing if such proofs are to be used to support the summary judgment; or (ii) at least seven days before the hearing if such proofs are to be used to oppose the summary judgment.

**(e) Case not Fully Adjudicated on Motion.** If summary judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the judge may at the hearing examine the pleadings and the evidence on file, interrogate counsel,

Appendix 3

ascertain what material fact issues exist and make an order specifying the facts that are established as a matter of law, and directing such further proceedings in the action as are just.

**(f) Form of Affidavits; Further Testimony.** Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits. Defects in the form of affidavits or attachments will not be grounds for reversal unless specifically pointed out by objection by an opposing party with opportunity, but refusal, to amend.

**(g) When Affidavits Are Unavailable.** Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

**(h) Affidavits Made in Bad Faith.** Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused him to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

**(i) No-Evidence Motion.** After adequate time for discovery, a party without presenting summary judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. The motion must state the elements as to which there is no evidence. The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact.

**Credits**
Oct. 12, 1949, eff. March 1, 1950. Amended by orders of Oct. 1, 1951, eff. March 1, 1952; July 20, 1966, eff. Jan. 1, 1967; July 21, 1970, eff. Jan. 1, 1971; July 11, 1977, eff. Jan. 1, 1978; June 10, 1980, eff. Jan. 1, 1981; Dec. 5, 1983, eff. April 1, 1984; July 15, 1987, eff. Jan. 1, 1988; April 24, 1990, eff. Sept. 1, 1990; Aug. 15, 1997, eff. Sept. 1, 1997.

Notes of Decisions (8176)

Vernon's Ann. Texas Rules Civ. Proc., Rule 166a, TX R RCP Rule 166a
Current with amendments received through 6/1/2015

658 S.W.2d 563
Supreme Court of Texas.

Paul G. CHESSHER, Petitioner,

v.

SOUTHWESTERN BELL

TELEPHONE COMPANY, Respondent.

No. C–2367.  |  Oct. 5, 1983.
|  Rehearing Denied Nov. 9, 1983.

Suit was instituted against telephone utility to recover damages for alleged breach of employment contract, wrongful discharge, fraud, and misrepresentation. The 189th District Court, Harris County, Hughes, J., rendered summary judgment in favor of defendant, and plaintiff appealed. The Houston Court of Civil Appeals, Fourteenth Supreme Judicial District Court, Murphy, J., affirmed in an unpublished opinion and plaintiff brought error. The Supreme Court held that plaintiff did not waive his tort claims by failing to raise them in his response to defendant's motion for summary judgment based on the statute of frauds, and since the defendant moved for summary judgment on only one of the plaintiff's four causes of action, summary judgment rendered in favor of defendant was improper insofar as it disposed of all four of the causes.

Reversed and remanded.

West Headnotes (2)

[1]     **Judgment**
        👈 Actions in Which Summary Judgment Is Authorized
        **Judgment**
        👈 Weight and Sufficiency

A movant may not be granted judgment as a matter of law on a cause of action not addressed in a summary judgment proceeding; rather, he must establish his entitlement to a summary judgment on issues expressly presented to trial court by conclusively proving all essential elements of his cause of action or defense as a matter of law.

215 Cases that cite this headnote

[2]     **Judgment**
        👈 Partial Summary Judgment

Plaintiff, who sought to recover damages against defendant telephone utility for alleged breach of employment contract, wrongful discharge, fraud, and misrepresentation, did not waive his tort claims by failing to raise them in his response to defendant's motion for summary judgment based on the statute of frauds, and since the defendant moved for summary judgment on only one of the plaintiff's four causes of action, summary judgment rendered in favor of defendant on basis of the statute of frauds was improper insofar as it disposed of all four of the causes. V.T.C.A., Bus. & C. § 26.01(b)(6); Vernon's Ann.Texas Rules Civ.Proc., Rule 452.

175 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*564** Wheat & Rickard, Robert W. Rickard, Houston, for petitioner.

Fulbright & Jaworski, Roger Townsend, Houston, for respondent.

**Opinion**

PER CURIAM.

Paul G. Chessher instituted this suit against Southwestern Bell Telephone Company seeking damages for breach of employment contract, wrongful discharge, fraud, and misrepresentation. Summary judgment was rendered in favor of Southwestern Bell on the basis of the Statute of Frauds, Tex.Bus. & Comm.Code Ann. art. 26.01(b)(6) (1977), and the court of appeals affirmed in an unpublished opinion. Tex.R.Civ.P. 452. We reverse the judgments of the courts below and remand the cause to the trial court.

The record discloses that the sole ground upon which Southwestern Bell sought summary judgment was the Statute of Frauds; no defense was raised as to the tort allegations set forth in Chessher's petition. The trial court's judgment,

Appendix 4

however, disposed of all four of Chessher's causes of action. The court of appeals concluded that Chessher had waived his tort claims by failing to raise them in his response to the motion for summary judgment. In so holding, the court committed reversible error.

**[1]** It is axiomatic that one may not be granted judgment as a matter of law on a cause of action not addressed in a summary judgment proceeding. In *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979), we wrote, "The movant ... must establish his entitlement to a summary judgment on the issues *expressly presented* to the trial court by conclusively proving all essential elements of his cause of action or defense as a matter of law." (emphasis added).

**[2]** Because Southwestern Bell moved for summary judgment on only one of Chessher's four causes of action, the court of appeals' affirmation of this judgment was improper as to the other causes of action alleged by Chessher. *Griffin v. Rowden*, 654 S.W.2d 435 (Tex.1983); *Puga v. Donna Fruit Co., Inc.*, 634 S.W.2d 677 (Tex.1982); *Missouri-Kan.-Tex. R.R. Co. v. City of Dallas*, 623 S.W.2d 296 (Tex.1981).

Pursuant to Tex.R.Civ.P. 483, the application for writ of error is granted, and without hearing oral argument, the judgments of the courts below are reversed and the cause is remanded to the trial court.

**All Citations**

658 S.W.2d 563

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

455 S.W.3d 161
Supreme Court of Texas.

Farm Bureau County Mutual
Insurance Company, Petitioner,
v.
Cristil Rogers, Respondent

NO. 14–0279 | OPINION
DELIVERED: January 30, 2015

**Synopsis**

**Background:** Automobile insurer brought declaratory-judgment action against insured, seeking declaration that it was not obligated to defend or indemnify insured and seeking award of court costs and attorney fees under Uniform Declaratory Judgments Act (UDJA). Insured sought recovery of court costs and attorney fees under Texas Deceptive Trade Practices Act (DTPA). The County Court at Law, Lamar County, William H. Harris, J., denied insurer's motion for summary judgment. Insurer appealed. The Texarkana Court of Appeals, 2014 WL 786455, dismissed appeal. Insurer filed petition for review.

**[Holding:]** The Supreme Court held that order denying motion for summary judgment did not constitute final, appealable order.

Judgment of Court of Appeals affirmed.

West Headnotes (4)

**[1]**     **Declaratory Judgment**
              Appeal and Error

Trial court's order denying automobile insurer's motion for summary judgment did not dispose of all parties and claims and thus did not constitute final, appealable order in insurer's declaratory-judgment action regarding insurance coverage, although order decreed that insurer was required to defend and indemnify insured, provided that all court costs were taxed against party incurring same, and contained Mother Hubbard clause providing that any and all relief sought which was not expressly granted herein was denied, where order did not resolve parties' competing requests for attorney fees.

2 Cases that cite this headnote

**[2]**     **Appeal and Error**
              Finality as to All Parties

**Appeal and Error**
              Determination of Controversy

The language of an order or judgment can make it final for appellate purposes, even though it should have been interlocutory, if that language expressly disposes of all claims and all parties.

2 Cases that cite this headnote

**[3]**     **Appeal and Error**
              Nature and Scope of Decision

If a trial court's intent to enter a final judgment is clear from the order, then the order is final and appealable, even though the record does not provide an adequate basis for rendition of judgment; in that case, the judgment is erroneous, but final.

2 Cases that cite this headnote

**[4]**     **Appeal and Error**
              Determination of Controversy

In determining whether an order denying a motion for summary is final for appellate purposes, there must be evidence in the record to prove the trial court's intent to dispose of any remaining issues when it includes in the order a Mother Hubbard clause, which essentially provides that all relief not granted is denied, given that Mother Hubbard clauses do not, on their face, implicitly dispose of claims not expressly mentioned in the order, including claims for attorney fees.

1 Cases that cite this headnote

ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE SIXTH DISTRICT OF TEXAS

**Attorneys and Law Firms**

Gregory R. Ave, Walters, Balido & Crain, L.L.P., Dallas TX, for Petitioner.

George L. Preston, George L. Preston & Associates, Paris, TX, for Respondent.

**Opinion**

PER CURIAM

This case presents the familiar issue of whether a trial court's order, issued without a full trial and containing a Mother **\*162** Hubbard clause, is final for purposes of appeal. In this declaratory judgment action involving insurance coverage, the court of appeals held that the trial court's order denying the insurer's motion for summary judgment is not final because the insured did not file a cross-motion for summary judgment. We agree that the order is not final, but for a different reason: it did not resolve the parties' competing requests for attorney's fees. We therefore affirm the court of appeals' dismissal of this appeal.

Farm Bureau County Mutual Insurance Company filed this declaratory judgment action against its insured, Cristil Rogers, seeking a declaration that it had no duty to defend or indemnify her in an underlying tort action (the Dominguez suit)[1] and requesting an award of court costs and attorney's fees under the Uniform Declaratory Judgments Act (UDJA). *See* TEX. CIV. PRAC. & REM. CODE § 37.009 (authorizing courts in a declaratory judgment action to award "costs and reasonable and necessary attorney's fees as are equitable and just"). Rogers answered the suit and prayed for recovery of her court costs and attorney's fees under the Texas Deceptive Trade Practices Act (DTPA), even though she asserted no claims for relief under the DTPA.

[1] The plaintiffs in the Dominguez suit sought damages for injuries they sustained when they were thrown from their horses while riding along FM 906 in Lamar County, Texas. Their petition alleged that, as Rogers drove past them in a pickup truck, a dog leaped from the bed of the truck and charged at the horses, causing them to buck and throw the plaintiffs. The plaintiffs alleged that Rogers proximately caused their injuries by negligently failing to secure her dog. Rogers sought coverage of these claims under her automobile insurance policy with Farm Bureau.

Farm Bureau later moved for summary judgment. Rogers opposed the motion but did not file a cross-motion seeking summary judgment in her favor. After a hearing on Farm Bureau's motion, the trial court entered an "Order Denying Plaintiff Farm Bureau['s] ... Motion for Summary Judgment." The order decreed that (1) Farm Bureau "has a duty to defend [Rogers] in or as to" the Dominguez suit; (2) Farm Bureau "has a duty to indemnify [Rogers] in or as to" the Dominguez suit; (3) "[a]ll court costs are taxed against the party incurring same"; and (4) "[a]ny and all relief sought in this cause which is not expressly granted herein is DENIED." The order did not expressly address the parties' claims for attorney's fees.

The court of appeals dismissed Farm Bureau's appeal for want of jurisdiction, holding that an order denying a motion for summary judgment cannot be final and appealable unless the opposing party filed a cross-motion for summary judgment. Farm Bureau petitioned for this Court's review. Relying on our decision in *Lehmann v. Har–Con Corp.*, 39 S.W.3d 191 (Tex. 2001), Farm Bureau argues that the trial court's order is a final and appealable judgment because it disposed of all parties and claims, even though Rogers did not file a cross-motion for summary judgment seeking that relief. Rogers responds by arguing that the order is not a final judgment because it did not dispose of the parties' competing claims for attorney's fees. In reply, Farm Bureau argues that Rogers' request for attorney's fees under the DTPA was defective and the trial court implicitly denied both parties' requests for attorney's fees by expressly taxing court costs to each party and denying "[a]ny and all relief ... which is not expressly granted herein."[2]

[2] We need not consider Farm Bureau's argument that Rogers' claim for attorney's fees is defective because, even if it is, Farm Bureau's own claim for attorney's fees remains pending. *See Barshop v. Medina Cnty. Underground Water Conserv. Dist.*, 925 S.W.2d 618, 637–38 (Tex. 1996) (holding that failure to "substantially prevail[ ]" on a declaratory judgment claim does not preclude recovery of attorney's fees under the UDJA).

**[1] [2] [3] \*163** We agree with Farm Bureau that the fact that Rogers did not file a cross-motion for summary judgment did not preclude the trial court from entering a "final" judgment. As we explained in *Lehmann,* "the language of an order or judgment *can* make it final, even though it should have been interlocutory, if that language expressly disposes of all claims and all parties." *Lehmann,* 39 S.W.3d at 200. If the trial court's intent to enter a final judgment is "clear from the order, then the order is final and appealable,

even though the record does not provide an adequate basis for rendition of judgment." *Id.* In that case, "the judgment is final—erroneous, but final." *Id.* But we agree with Rogers that the order at issue here did not dispose of all parties and claims, because neither the language taxing court costs nor the Mother Hubbard clause disposed of the parties' claims for attorney's fees.

In *Lehmann,* we held that "a judgment issued without a conventional trial is final for purposes of appeal if and only if either [1] it actually disposes of all claims and parties then before the court, regardless of its language, or [2] it states with unmistakable clarity that it is a final judgment as to all claims and all parties." *Lehmann,* 39 S.W.3d at 192–93. We explained that "[a]n order does not dispose of all claims and all parties merely because it is entitled 'final', or because the word 'final' appears elsewhere in the order, *or even because it awards costs*." *Id.* at 205 (emphasis added). "Rather, there must be some other clear indication that the trial court intended the order to completely dispose of the entire case." *Id.* Attempting to resolve decades of confusion, we held that "the inclusion of a Mother Hubbard clause—by which we mean the statement, 'all relief not granted is denied', or essentially those words—does not indicate that a judgment rendered without a conventional trial is final for purposes of appeal." *Id.* at 203–04. Mother Hubbard clauses are problematic because they are open to interpretation. *Id.* at 204. Sometimes a Mother Hubbard clause "mean[s] only that the relief requested *in the motion*—not all the relief requested by anyone in the case—and not granted by the order is denied," and sometimes it "may also have no intended meaning at all, having been inserted for no other reason than that it appears in a form book or resides on a word processor." *Id.* We thus rejected the notion that a Mother Hubbard clause gives "any indicia of finality in any order not issued after a conventional trial." *Id.*

After *Lehmann,* we confirmed that the disposition of a claim for court costs does not dispose of a claim for attorney's fees, even when doing so would also dispose of all parties and claims. *See McNally v. Guevara,* 52 S.W.3d 195, 196 (Tex. 2001). In *McNally,* the defendants filed a motion for summary judgment but failed to request summary judgment on their counterclaim for attorney's fees. Although the trial court's order granted the motion and taxed court costs against the plaintiff, we concluded that "[n]othing in the trial court's judgment, other than its award of costs to the defendants, suggests that it intended to deny the defendants' claim for attorney fees. The award of costs, by itself, does not make

the judgment final." *Id.* Consistent with our statement in *Lehmann,* we held that the resolution of a claim for court costs did not dispose of a claim for attorney's fees and did not serve **\*164** as an indicium of finality. *See id.*; *Lehmann,* 39 S.W.3d at 205.

**[4]** This case is slightly different from *McNally* because, although Farm Bureau failed to expressly request attorney's fees in its motion for summary judgment, it argues that the Mother Hubbard clause, not just the disposition of court costs, effectively denied the claim for attorney's fees. However, the reasoning of *Lehmann* and *McNally* control our decision here. Interpreting Mother Hubbard clauses in the manner Farm Bureau urges would necessarily run afoul of *Lehmann* because it would allow such clauses to serve as indicia of finality for purposes of appeal—the very function we prohibited in *Lehmann*. Thus, Mother Hubbard clauses do not, on their face, implicitly dispose of claims not expressly mentioned in the order, including claims for attorney's fees. Instead, there must be evidence in the record to prove the trial court's intent to dispose of any remaining issues when it includes a Mother Hubbard clause in an order denying summary judgment. *See Lehmann,* 39 S.W.3d at 205–06; *McNally,* 52 S.W.3d at 196. To hold otherwise would simply resurrect the issues we put to rest in *Lehmann* and *McNally,* albeit in a slightly different form.

Like the movant in *McNally,* Farm Bureau failed to request an award of attorney's fees in its motion for summary judgment or to attach evidence supporting its claim for fees. Thus, as in *McNally,* there is no reason to presume that the trial court considered the issue when ruling on Farm Bureau's motion. The order's language taxing court costs is of no import because our decision in *McNally* established that such language does not, alone, evince a trial court's intent to dispose of attorney's fees. And most importantly, the parties presented no evidence from the record suggesting that the trial court intended the Mother Hubbard clause to deny attorney's fees to either party. [3] In the absence of evidence of the trial court's intent with respect to the parties' claims for attorney's fees, we find that the trial court's order did not dispose of all parties and claims.

3    As noted above, Farm Bureau did not need to "substantially prevail[ ]" in a suit under the UDJA to receive attorney's fees. *See Barshop,* 925 S.W.2d at 637–38. Thus, the trial court did not dispose of the issue simply by ruling against Farm Bureau with respect to its duty to defend and indemnify Rogers.

Accordingly, without hearing oral argument, we affirm the court of appeals' judgment dismissing the appeal for want of jurisdiction. TEX. R. APP. P. 59.1.

**All Citations**

455 S.W.3d 161, 58 Tex. Sup. Ct. J. 270

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

124 S.W.3d 167
Supreme Court of Texas.

FORBES INC. and William P. Barrett

v.

GRANADA BIOSCIENCES, INC.
and Granada Foods Corporation.

No. 01–0788.　|　Argued on Jan. 15, 2003.　|　Decided Dec. 19, 2003.

**Synopsis**

**Background:** Related corporations brought business disparagement claims, and company executives brought defamation and intentional infliction of emotional distress claims, against magazine publisher, author of article appearing in magazine, and source for article. The 190th District Court, Harris County, John P. Devine, J., granted summary judgment for defendants, and plaintiffs appealed. The Amarillo Court of Appeals, 958 S.W.2d 215, reversed the summary judgment order insofar as it affected plaintiff companies' business disparagement claims, but affirmed the remainder of the judgment. On remand, the District Court, John P. Devine, J., granted summary judgment for defendants on the business disparagement claims, and plaintiffs appealed. On overruling of rehearing, the Houston Court of Appeals, Fourteenth District, Maurice Amidei, Justice, sitting by assignment, 49 S.W.3d 610, reversed and remanded. Review was granted.

**Holdings:** The Supreme Court, O'Neill, J., held that:

[1] author's statements after article was printed and in distribution could not be evidence of actual malice at time of publication, and

[2] generic statements about organization of related businesses were not made with actual malice and were not business disparagement as to two corporate subsidiaries, even if untrue as to them.

Reversed and rendered.

West Headnotes (14)

**[1]　Libel and Slander**
　☛ Actionable words or conduct relating to quality or value

To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff.

41 Cases that cite this headnote

**[2]　Libel and Slander**
　☛ Actionable words or conduct relating to quality or value

The tort of business disparagement differs from defamation in that defamation actions chiefly serve to protect the personal reputation of an injured party, while a business disparagement claim protects economic interests.

32 Cases that cite this headnote

**[3]　Libel and Slander**
　☛ Criticism and comment on public matters and publication of news

Public figures cannot recover for damaging statements made about them absent proof of actual malice.

3 Cases that cite this headnote

**[4]　Libel and Slander**
　☛ Criticism and comment on public matters and publication of news

"Actual malice" that a public figure plaintiff must show in a defamation action requires proof that the defendant made a statement with knowledge that it was false or with reckless disregard of whether it was true or not.

9 Cases that cite this headnote

**[5]　Libel and Slander**

☞ Criticism and comment on public matters and publication of news

To establish reckless disregard, a public-figure plaintiff must prove in a defamation suit that the defendant entertained serious doubts as to the truth of his publication or had a high degree of awareness of the probable falsity of the published information; reckless disregard is a subjective standard focusing on the defendant's state of mind, and mere negligence is not enough.

6 Cases that cite this headnote

[6] **Libel and Slander**
☞ Criticism and comment on public matters and publication of news

Constitutional malice necessary for defamation action by public-figure plaintiff generally consists of calculated falsehood. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

[7] **Libel and Slander**
☞ Criticism and comment on public matters and publication of news

When the defendant's words lend themselves to more than one interpretation, a public-figure plaintiff must establish either that the defendant knew that the words would convey a defamatory message or had reckless disregard for their effect.

1 Cases that cite this headnote

[8] **Libel and Slander**
☞ Intent, malice, or good faith

Actual malice must be proved by clear and convincing evidence at trial in defamation action.

3 Cases that cite this headnote

[9] **Appeal and Error**
☞ Judgment
**Judgment**
☞ Weight and sufficiency

In reviewing a no-evidence summary judgment motion, the Supreme Court examines the record in the light most favorable to the non-movant; if the non-movant presents more than a scintilla of evidence supporting the disputed issue, summary judgment is improper. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

86 Cases that cite this headnote

[10] **Judgment**
☞ Weight and sufficiency

A no-evidence summary judgment is improper if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

105 Cases that cite this headnote

[11] **Judgment**
☞ Weight and sufficiency

Less than a scintilla of evidence exists in opposition to no-evidence summary judgment motion when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact; more than a scintilla of evidence exists if it would allow reasonable and fair-minded people to differ in their conclusions. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

134 Cases that cite this headnote

[12] **Libel and Slander**
☞ Defenses

Statements by author after magazine article was printed and in distribution could not be evidence of actual malice at time of publication of article allegedly resulting in business disparagement.

7 Cases that cite this headnote

[13] **Libel and Slander**
☞ Criticism and comment on public matters and publication of news

The actual malice inquiry in a defamation action by a public-figure plaintiff focuses on

the defendant's state of mind at the time of publication.

2 Cases that cite this headnote

**[14]** **Libel and Slander**
 Defenses

Statements in magazine article about organization of related businesses were not made with actual malice and were not business disparagement as to two corporate subsidiaries, even though the author stated that certain generic references to the organization were not intended to apply to the subsidiaries; the author was charged with the task of producing a readable article about an extremely complicated network of business entities and was at most guilty of using imprecise language, and while it would have been more accurate for the author to identify the precise entities, the careless use of the generic term was no evidence of serious doubts as to the truth or a high degree of awareness of falsity.

5 Cases that cite this headnote

**Attorneys and Law Firms**

**\*169** Peter D. Kennedy, David H. Donaldson Jr., George & Donaldson, L.L.P., Austin, for petitioner.

Michael D. Sydow, Ralph S. Carrigan, Sydow, Kormanik, Carrigan & Eckerson, L.L.P., Houston, for respondent.

Thomas S. Leatherbury, Vinson & Ekins, L.L.P., Dallas, for amicus curiae.

Justice O'NEILL delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice OWEN, Justice JEFFERSON, Justice SMITH, Justice WAINWRIGHT, and Justice BRISTER joined.

Granada Biosciences, Inc. and Granada Foods Corporation sued Forbes, Inc., publisher of *Forbes* magazine, and writer William P. Barrett for business disparagement. The trial court rendered summary judgment for *Forbes* and *Barrett,* and the court of appeals reversed. 49 S.W.3d 610. We hold that the court of appeals erred in reversing the trial court's summary

judgment because the plaintiffs produced no evidence that Forbes and Barrett acted with actual malice in publishing the article that is the subject of this controversy. Accordingly, we reverse the court of appeals' judgment and render judgment for Forbes and Barrett.

**I**

In its issue dated November 11, 1991, Forbes published an article entitled "The Incredible Shrinking Empire."[1] The article, authored by Barrett, focused on the financial condition of the Granada Corp., a privately held company, and on its chairman, David Eller. Granada Corp. was the parent of a number of other private and public entities. While the Granada organization consisted of dozens of entities, the article only named two of the public entities, Granada Foods Corp. (GFC) and Granada Biosciences, Inc. (GBI). In general, the Granada entities were engaged in developing and applying advanced technology in the area of agriculture, primarily cattle production. The article noted that the *Wall Street Journal* had described Granada Corp. as a "corporate star[ ] of the future" in 1989, and that the organization, under Eller's stewardship, had garnered much favorable publicity. But, the article said, "there is less to Granada than meets the eye. Actually, its total revenues, $1 billion as recently as 1988, will scarcely be $200 million for 1991. Profits: zilch. Granada's work force has shrunk to below 900 from 2,200; its cattle herd has dwindled to 25,000 from 1 million." The article identified GFC and GBI as the two publicly traded stock companies within the Granada organization, and said that they were "so broke they haven't been able to publish their 1990 annual reports." It went on to say that "Granada is beset with a series of serious shareholder lawsuits," including one filed by "Fort Worth near-billionaire Edward Bass." It is undisputed that, while a person with that name had sued one of the Granada entities, it was not the "Fort Worth near-billionaire." Furthermore, the article described a number of other signs of serious financial trouble: "Possibly anticipating a bankruptcy filing, former Granada employees say officials in recent months have moved some farm equipment and vehicles off Granada books and gotten rid of backup documentation."

[1] The article is attached as an Appendix to this opinion.

According to Barrett's affidavit, he used the term "Granada" in a generic sense to describe the various entities controlled by Eller, and when he "intended to specifically address Granada Biosciences, Inc. or Granada Food Corporation, [he] did so

by **\*170** name." The day the article was released, the shares of GBI and GFC dropped precipitously, and trading was permanently suspended in early 1992.

GBI, GFC, Eller, and his wife, Linda, sued Barrett, Forbes, Inc., and Cheryl Munke, an employee of a former Granada affiliate, for damages allegedly caused by the article's publication. Forbes and Barrett (collectively "Forbes") filed joint motions for summary judgment, which the trial court granted. On appeal, the Seventh District court of appeals, to which the case was transferred, reversed, holding that Forbes's summary judgment motion did not address the plaintiffs' business disparagement claims. *Granada Biosciences, Inc. v. Barrett,* 958 S.W.2d 215, 221 (Tex.App.-Amarillo 1997, pet. denied).[2] On remand, Forbes filed a renewed and supplemental summary judgment motion under Rule 166a(c) and(i), which specifically addressed the plaintiffs' business disparagement claims. The trial court again granted summary judgment in Forbes's favor, but the Fourteenth District court of appeals reversed, concluding that several fact issues precluded summary judgment. The court determined that there were fact issues concerning whether the article as a whole and several specific passages in the article were false and disparaging. 49 S.W.3d at 621–22. The court agreed with Forbes's contention that, to recover on their business disparagement claims, the plaintiffs were required to satisfy the constitutional actual-malice standard the United States Supreme Court established in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), but held that a fact issue on Forbes's state of mind at the time of publication precluded summary judgment. We hold that GBI and GFC presented no evidence of actual malice under the *New York Times* standard, and thus reverse the court of appeals' judgment.

2  The Amarillo court affirmed the summary judgment as to all claims against Munke, and she is no longer a party. *Granada Biosciences, Inc.,* 958 S.W.2d at 222. It also affirmed the summary judgments as to the Ellers' claims. *Id.* at 222–25.

## II

 **[1]** **[2]** To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff. *Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 766 (Tex.1987). A business disparagement claim is

similar in many respects to a defamation action. *Id.* The two torts differ in that defamation actions chiefly serve to protect the personal reputation of an injured party, while a business disparagement claim protects economic interests. *Id.* In *Hurlbut,* a suit brought by an insurance agent against his former employer, we noted that a business disparagement defendant may be held liable "only if he knew of the falsity or acted with reckless disregard concerning it, or *if he acted with ill will or intended to interfere in the economic interest of the plaintiff in an unprivileged fashion.*" *Id.* (emphasis added) (quoting RESTATEMENT (SECOND) OF TORTS § 623A, cmt. g (1977)).

The court of appeals noted in this case that GBI and GFC did not dispute Forbes's contention that they were "public figures for the purpose of discussing their respective financial statuses," a conclusion that GBI and GFC do not challenge here. 49 S.W.3d at 615 n. 2. The court then held that ill will or intent to interfere with the plaintiff's economic interest will not suffice to establish malice in a business disparagement claim brought by a public figure **\*171** against a media defendant. *Id.* at 618. Instead, the court held that the constitutional interests at stake—"the conflict between constitutionally-protected free expression and a state's power to award damages based on a defendant's statements"—require proof of actual malice under the standard the United States Supreme Court articulated in *New York Times. Id.* at 618. Accordingly, the court held that GFC and GBI must establish that Forbes published the article with knowledge that it made false statements about them, or with reckless disregard as to the statements' truth. *Id.* In this Court, GBI and GFC do not challenge the court of appeals' application of the constitutional malice standard. We thus assume without deciding that the *New York Times* actual-malice standard applies in a public figure's business disparagement suit against a media defendant.[3]

3  We note, however, that the United States Supreme Court has applied the *New York Times* standard in contexts other than defamation, applying it to an intentional infliction of emotional distress claim, *Hustler Magazine v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), and to a product disparagement claim, *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 511–14, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

## III

[3] The actual malice standard articulated in *New York Times* fortifies our Constitution's guarantees of free speech and a free press. *New York Times,* 376 U.S. at 254, 84 S.Ct. 710. The relatively demanding standard honors our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks" on public figures. *New York Times,* 376 U.S. at 270, 84 S.Ct. 710. The standard recognizes that "erroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive.' " *Id.* at 271, 84 S.Ct. 710 (quoting *N.A.A.C.P. v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)). Thus, public figures cannot recover for damaging statements made about them absent proof of actual malice. *New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710; *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex.1998).

[4] [5] [6] [7] Actual malice, in this context, "is a term of art." It is not ill will, spite, or evil motive. *Huckabee v. Time Warner,* 19 S.W.3d 413, 420 (Tex.2000) (citing *Casso v. Brand,* 776 S.W.2d 551, 558 (Tex.1989)). Instead, "actual malice" requires proof that the defendant made a statement " 'with knowledge that it was false or with reckless disregard of whether it was true or not.' " *Huckabee,* 19 S.W.3d at 420 (quoting *New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710). To establish reckless disregard, a public-figure plaintiff must prove that the defendant " 'entertained serious doubts as to the truth of his publication.' " *Huckabee,* 19 S.W.3d at 420 (quoting *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)). Reckless disregard is a subjective standard, focusing on the defendant's state of mind. *Bentley v. Bunton,* 94 S.W.3d 561, 591 (Tex.2002). Mere negligence is not enough. *Id.* Rather, the plaintiff must establish " 'that the defendant in fact entertained serious doubts as to the truth of his publication,' " or had a " 'high degree of awareness of ... [the] probable falsity' " of the published information. *Id.* (quoting *Harte–Hanks Comm., Inc. v. Connaughton,* 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989)). Constitutional malice generally consists of " '[c]alculated falsehood.' " *Bunton,* 94 S.W.3d at 591 (quoting **\*172** *Garrison v. Louisiana,* 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)). When the defendant's words lend themselves to more than one interpretation, the plaintiff must establish either that the defendant knew that the words would convey a defamatory message, or had reckless disregard for their effect. *See Bunton,* 94 S.W.3d at 603.

[8] Actual malice must be proved by clear and convincing evidence at trial. *Huckabee,* 19 S.W.3d at 420. However, we have declined to adopt the clear-and-convincing standard for summary judgment purposes, because its application would "suggest[ ] that the trial court must weigh the evidence." *Id.* at 421–22. Accordingly, Forbes was entitled to summary judgment unless the record reveals a fact issue as to actual malice.

## IV

[9] [10] [11] In its no-evidence summary judgment motion, Forbes asserted that there was no evidence of actual malice to support the plaintiffs' claims. *See* TEX.R. CIV. P. 166a(i). In reviewing a no-evidence summary judgment motion, we examine the record in the light most favorable to the nonmovant; if the nonmovant presents more than a scintilla of evidence supporting the disputed issue, summary judgment is improper. *King Ranch v. Chapman,* 118 S.W.3d 742, 750 (Tex.2003); *Wal–Mart Stores, Inc. v. Rodriguez,* 92 S.W.3d 502, 506 (Tex.2002). A no-evidence summary judgment is improper if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. TEX.R. CIV. P. 166a(i); *Wal–Mart,* 92 S.W.3d at 506. "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch,* 118 S.W.3d at 751 (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983)). More than a scintilla of evidence exists if it would allow reasonable and fair-minded people to differ in their conclusions. *King Ranch,* 118 S.W.3d. at 751 (citing *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997)). Thus, if *GBI* and GFC presented evidence creating more than a surmise or suspicion that Forbes published the article with actual malice, summary judgment is improper. The court of appeals concluded that fact issues about Forbes's state of mind at the time of publication precluded summary judgment. 49 S.W.3d at 627. We disagree.

### A

[12] The court of appeals rested its decision, in large part, on evidence suggesting that Barrett misled Eller into believing that he would have an opportunity to review the article for accuracy before its publication. 49 S.W.3d at 626. In his affidavit, Eller stated that when Barrett first contacted him

about writing the article, Barrett agreed to let him review it before it was published. On Friday, October 25, 1991, Eller received a copy of "what [Barrett] said was a draft of the article." According to Eller, he read the article that day and telephoned Barrett, telling him that the article "contained innumerable false statements and clearly misleading and false innuendos." Eller's affidavit maintains that he was misled in the conversation into believing that the article could still be corrected, and that he told Barrett he would send him a letter identifying the purported inaccuracies as quickly as possible. Eller transmitted the letter to a courier for delivery by late the next day. According to the court of appeals, this evidence "creates a fact question as to Barrett's state of mind at the time of publication, provided that the article was not published until *after* Barrett's **\*173** representation." *Id.* at 625 (emphasis added).

 [13]     The actual malice inquiry focuses on the defendant's state of mind at the time of publication. *See Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). It is undisputed, however, that the article had been "locked up"—printed and mailed to subscribers—on October 21st, before Barrett's October 25th conversation with Eller and before Forbes received Eller's letter. Nevertheless, the court of appeals held that the record presented a fact issue on malice "[b]ecause the summary judgment proof raises a question as to whether the October 25 conversation took place *before the article was published.*" 49 S.W.3d at 627 (emphasis added). The court concluded that the conversation may have taken place before the article was published based on authority holding that, for limitations purposes, " 'publication is complete on the last day of the mass distribution of copies of the printed matter.' " *Id.* at 626 (quoting *Holloway v. Butler,* 662 S.W.2d 688, 692 (Tex.App.-Houston [14th Dist.] 1983, writ ref'd n.r.e.)).

The court of appeals erred in applying the *Holloway* limitations standard in this context. Determining the date of an article's publication for limitations purposes involves considerations entirely different from those that apply when gauging whether actual malice exists at the time of publication. In *Holloway,* the plaintiff sued for libel based upon an article that appeared in *Texas Monthly* magazine. 662 S.W.2d at 690. Like most mass-media publishers, the defendant distributed its magazine through the mail and by private delivery in the month prior to the month indicated on the issue cover. Accordingly, distribution of the March 1977 issue occurred on February 17 and 18, 1977. By special order, though, some back issues were sold after February 22,

1977. Plaintiff filed suit on February 22, 1978. In response to the defendant's assertion of limitations, the plaintiff relied on the "multiple-publication rule," which recognizes a new cause of action each time a copy of the allegedly libelous publication is sold. Noting that such a rule would allow stale claims, encourage multiple suits, and create a number of other problems, and recognizing that mass publication of a single defamatory statement constitutes, in effect, a single wrong, the court adopted what it referred to as the "single-publication rule." *Id.* at 691. Under the court of appeals' articulation of that rule, publication is complete "on the last day of the mass distribution of copies of the printed matter" because "[i]t is that day when the publisher, editors and authors have done all they can to relinquish all right of control, title and interest in the printed matter." *Id.* at 692. The court emphasized that defining publication in this manner "provides ample time for a diligent plaintiff to pursue a cause of action for libel and also allows full recovery for any damages suffered." *Id.*

The single-publication rule's definition of the publication date for limitations purposes is clearly designed to protect publishers from repeated liability based on old publications that might be reprinted or back ordered. *See* ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 7.2 (2003). It has nothing to do with determining the publisher's state of mind at the time of publication. Applying the single-publication rule in this context could lead to virtually uncontrollable liability and potentially absurd results. For example, a media defendant could be held liable for knowingly publishing false information even if it did not become aware of the error until the article has **\*174** been printed and mailed to subscribers or otherwise distributed. Such a result would have an impermissible " 'chilling' effect ... antithetical to the First Amendment's protection of true speech on matters of public concern." *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 778, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (holding that application of state law that did not require private media defamation defendant to prove falsity violated First Amendment). Moreover, the focus of the actual-malice inquiry is the defendant's state of mind during the editorial process. *See Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). Evidence concerning events after an article has been printed and distributed, has little, if any, bearing on that issue. Because the Forbes article was printed and in distribution before Eller's October 25th conversation with Barrett, the conversation cannot constitute evidence of actual malice at the time of publication.

**B**

During Barrett's October 25th conversation with Eller, he acknowledged that he had that day become aware that he had misidentified the Edward Bass that had sued one of the Granada entities.[4] GBI and GFC argue that this constitutes some evidence of actual malice. For the same reason that any misleading statements Barrett may have made in the October 25th conversation are no evidence of malice, his acknowledgment that he had become aware of the Bass error that day is no evidence of actual malice.

[4]    The error was corrected in a later issue of the magazine.

**C**

 [14]    Finally, the plaintiffs contend that the article made a number of negative statements about "Granada" that Forbes was aware were untrue as to GFC and GBI. By failing to specifically distinguish the public corporations from other entities within the Granada group, they argue, Forbes knowingly or recklessly juxtaposed true statements to create the misleading impression that they applied to GFC and GBI. They argue that Barrett's affidavit itself provides some evidence of malice because he testified that he used the term "Granada" to describe "the organization of subsidiaries, affiliates, limited partnerships, joint ventures and other business organizations that were managed or otherwise under the direction and control of David Eller," a group that includes GFC and GBI. Because Barrett also testified that certain of the generic Granada references were not intended to apply to GBI or GFC, the plaintiffs maintain that the article is admittedly false with respect to those statements. In essence, the plaintiffs contend that Forbes should have included qualifying language specifically excluding GBI and GFC whenever the article referred to "Granada."

Read fairly, Barrett's affidavit establishes, at most, that Forbes was " 'guilty of using imprecise language in the article—perhaps resulting from an attempt to produce a readable article.' " *Bose,* 466 U.S. at 492, 104 S.Ct. 1949 (quoting *Bose Corp. v. Consumers Union of United States, Inc.,* 692 F.2d 189, 197 (1st Cir.1982)). Both we and the United States Supreme Court have repeatedly held that a media defendant's poor choice of words or content, without more, does not amount to actual malice.

In *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103 (Tex.2000), for example, we considered a political candidate's contention that a television news story suggesting that he had participated in a multi-million dollar insurance scam defamed him. **\*175** Turner had drafted a will for a man named Foster shortly before Foster disappeared under suspicious circumstances. Foster, the target of several criminal investigations, signed the will three days before he was reported to have drowned. Foster's life had been insured for more than $1.7 million, and American authorities learned some time later that he was alive in a Spanish prison. KTRK, a Houston television station, broadcast a story about the connection between Turner and Foster in the midst of Turner's campaign for mayor of Houston. The story omitted several critical contextual facts and juxtaposed others in a misleading manner in the course of suggesting that Turner had engaged in unethical conduct. We therefore held that the broadcast as a whole conveyed a false and defamatory message. *Id.* at 119. But we rejected Turner's contention that the story's discussion of the timing of his work on the will was evidence of actual malice. *Id.* at 121. We agreed that a reasonable viewer could take the segment to mean that "Turner 'drew up' the will three days before Foster disappeared." *Id.* But we concluded that even obviously misleading statements, without more, were not enough to constitute clear and convincing evidence of actual malice:

> We agree that there was a discrepancy in the segment's language and that it is possible that [the reporter] cleverly manipulated this language to deceive viewers. But it is equally possible that [the reporter] simply failed to choose his words with proper precision, that is, by stating that Foster "drew up" rather than "signed" the will (outside of Turner's presence) three days before he disappeared. Because there is no other evidence that [the reporter] knew or strongly suspected that this segment would mislead viewers, its lack of clarity alone is not clear and convincing evidence of actual malice.

*Id.* at 121–22.

In *Huckabee,* we affirmed summary judgment granted to a media defamation defendant that had been sued for statements in a documentary about four southeast Texas cases in which family courts granted custody of a child to the father after the

mother accused him of child abuse. *Huckabee,* 19 S.W.3d at 417. One of the judges who presided over two of the custody disputes sued Time–Warner, alleging that the documentary omitted key information in an effort to depict him as biased or corrupt. We acknowledged that a publisher might present such an incomplete or unbalanced picture of the facts as to constitute evidence of actual malice. *Id*. at 426. On the facts of that case, however, we held that the record presented no evidence of actual malice, even though the story might have been misleading:

> Although the facts omitted might or might not have led a reasonable viewer to suspend judgment or even to reach an opposite conclusion regarding Judge Huckabee's order, their omission did not grossly distort the story. At most, HBO's failure to capture accurately all the story's details suggests an error in judgment, which is no evidence of actual malice.

*Id*.

Similarly, in *Bose,* the Supreme Court considered a manufacturer's claim that a *Consumer Reports* article describing a new Bose speaker system disparaged the product. The district court had ruled that the article falsely stated as fact that "instruments heard through the *Bose* system 'tended to wander about the room,' " and rendered judgment for Bose, the manufacturer. *Bose,* 466 U.S. at 488, 104 S.Ct. 1949. Applying the *New York Times'* actual-malice standard, the Supreme Court **\*176** rendered judgment for the publisher. The Court observed that the circuit court correctly concluded "that there is a significant difference between proof of actual malice and mere proof of falsity." *Id*. at 511, 104 S.Ct.1949 (citations omitted). The district court had found that the writer's actual perception was that sound moved "along the wall" rather than "about the room." *Id*. Nevertheless, the Court held that the writer's choice of language,

though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella.... The statement in this case represents the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies.... "Realistically, ... some error is inevitable; and the difficulties of separating fact from fiction convinced the Court in *New York Times* [and other cases] to limit liability to instances where some degree of culpability is present in order to eliminate the risk of undue self-censorship and the suppression of truthful material."

*Id*. at 513, 104 S.Ct. 1949 (citations omitted).

Here, Barrett was charged with the task of producing a readable article about an extremely complicated network of business entities related to the Granada Corp. While it would have been more accurate for Forbes to identify the precise entities within that group to which it was referring, Forbes's careless use of the generic "Granada" is no evidence that Forbes entertained serious doubts as to the statements' truth or had a high degree of awareness of their falsity. *See Turner,* 38 S.W.3d at 121.

## V

The record before us presents no evidence that Forbes published defamatory statements about GBI and GFC with actual malice. Accordingly, we reverse the court of appeals' judgment and render judgment that the plaintiffs take nothing.

Justice SCHNEIDER did not participate in the decision.

**\*177  APPENDIX**

APPENDIX: Forbes article

Houston's Granada Corp. talks of 1991 revenues of $2 billion. Try $200 million. This much-touted high-tech food concern is near collapse.

# The incredible shrinking empire

By William P. Barrett

IN 1989 THE *Wall Street Journal* included Granada Corp. among its "corporate stars of the future." The newspaper cited the research by this Houston-based parent of several public and private entities into cattle cloning and embryo transfers. The plug was but one more triumph in the relentless and largely successful quest for publicity by David Eller, Granada's chairman and chief executive. Newer news clippings, which Granada's press agents still hand out, call Granada a $1 billion organization. In mid-October a Granada executive told FORBES that revenues this year would reach $2 billion.

But there is less to Granada than meets the eye. Actually, its total revenues, $1 billion as recently as 1988, will scarcely be $200 million for 1991. Profit: zilch. Granada's work force has shrunk to below 900 from 2,200; its cattle herd has dwindled to 25,000 from 1 million.

There are two publicly traded stock companies within the Granada organization, Granada Foods (1990 revenues, $149 million) and Granada Bio-Sciences ($16 million). They are so broke they haven't been able to publish their 1990 annual reports. The Granada organization is vacating the Houston headquarters building it co-owns with the Eller family so the property can be sold to satisfy the mortgage holder. In addition, Granada is beset with a series of serious shareholder lawsuits.

Granada is yet another case of the media and many investors taking exaggerated claims at face value. In 1972 David Eller, now 53, and his brother James, 59, founded Granada



Granada's David Eller
No money to print the annual report.

Corp., which they still own 50-50. Stated purpose: to bring high technology to the ancient craft of farming, mainly cattle farming. Indeed, starting in the late 1970s Granada earned a reputation for research into ways of transferring bovine embryos and cloning the perfect cow. The idea was that genetically engineered cattle would produce more meat or milk cheaper.

From 1975 on, the outfit was largely financed by tax-sheltered limited partnerships. A petroleum engineer by background, with an easy, genial demeanor, David Eller proved to be one terrific salesman. In a series of five limited partnerships formed from 1981 to 1986, he raised $249 million. These interests were later rolled over—without a vote of limited partners—into Granada Foods and Granada BioSciences, still majority-owned by the Ellers.

Today that $249 million in public

money has a market value of only $26 million. The development cost of all this whiz-bang technology proved to be so expensive that old-fashioned cattle breeding techniques, including artificial insemination, were a lot cheaper. Granada's overhead was also quite high. "We got science conquered, but our efficiencies were very poor," Eller concedes.

Granada lost an estimated $30 million speculating in cattle commodities, then couldn't sell off its own stock profitably. Plans to set up a vertically integrated operation including eateries and retail stores foundered. And a large amount of funds was drained off into the Eller family through management fees and transactions with enterprises it controlled. The big 1986 changes in the tax laws cut off the flow of new funds into the Granada partnerships because they removed most of the tax incentives for investing in them.

Yet even while its affairs were deteriorating, Granada managed to hide the facts from the outside world. How? Through its complex corporate structure, which involved a score of interlocking entities, most of them private. Their dealings with one another exaggerated Granada's actual revenues. The partners did not know the overall picture.

What they did know was that David Eller was a prominent figure in Houston's celebrity world. He and his wife, Linda, a Granada official who was just voted Houston Business Woman of the Year, were frequently featured on the society pages and photographed for posh national magazines like *Town & Country*. Eller served four years as the board chairman of his alma mater, Texas A&M University, where a building is named after him.

But now the image is fraying fast. According to their latest filings, Granada Foods (recently trading at 5¼) and Granada BioSciences (recently 6¼) are losing money and have negative cash flows from operations. Recently laid off employees—even ten-year veterans—got only two weeks' severance plus vacation. Many vendors have Granada on a C.O.D. basis. Last year Granada BioSciences announced executives had bought $300,000 of stock with company loans, a seeming vote of confidence.

48

**\*178**

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.     9

Granada Corp.

Only later did it become known that the company would cover any losses.

Eller's team is scrambling for fresh funds to keep going—really scrambling. In mid-September, according to Houston deed records, a Granada Foods subsidiary got a $2 million bank loan—but only after the Eller family signed personal guarantees and also posted some unrelated collateral. Attempts by Granada to find joint venture partners have been unsuccessful. Even Texas A&M balked at supporting a bond issue that would have helped Granada. Contracts selling goods or technology to foreign buyers, announced by Granada BioSciences amid much hoopla, have generated little money.

In a Houston court pleading this summer, one Granada entity acknowledged huge unpaid legal bills—a virtual admission of insolvency. Not surprising. A half-dozen serious lawsuits are moving toward trial, filed by disgruntled Granada investors claiming Eller and others misled them over the years or siphoned off assets. One investor lawsuit accuses Granada of touting tax-writeoff advantages while aware the Internal Revenue Service had successfully challenged deductions by individual taxpayers. Among the many people suing Granada is Fort Worth near-billionaire Edward Bass. Granada responds it has done nothing wrong.

Possibly anticipating a bankruptcy filing, former Granada employees say officials in recent months have moved some farm equipment and vehicles off Granada books and gotten rid of backup documentation. Eller denies any improprieties. But this is not exactly unheard-of stuff at Granada; in the course of continuing litigation, a Granada employee admitted under oath that he signed back-dated loan and corporate documents at the direction of superiors. Other embarrassing documents have also surfaced.

Don't write Granada off—completely. You can't rule out that some larger company will buy part or all of the Granada organization, or that Eller will find foreign joint venture partners with deep pockets. David Eller is one resourceful man. But his unfortunate fellow shareholders can kiss most of their original investment good-bye.  ▬

**All Citations**

124 S.W.3d 167, 32 Media L. Rep. 1498, 47 Tex. Sup. Ct. J. 162

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

135 S.W.3d 598
Supreme Court of Texas.

FORD MOTOR COMPANY,
v.
Jack RIDGWAY and Linda Ridgway.

No. 02–0552. | Argued Sept. 10, 2003. | Decided Feb. 6, 2004. | Rehearing Denied June 25, 2004.

**Synopsis**

**Background:** Injured motorist brought action against automobile manufacturer for products liability and negligence. The 131st District Court, Bexar County, Phylis J. Speedlin, J., granted summary judgment in favor of the manufacturer. Motorist appealed. The Court of Appeals, 82 S.W.3d 26, affirmed in part, reversed and remanded in part.

**Holdings:** On grant of manufacturer's petition for review, the Supreme Court, Phillips, C.J., held that

[1] expert's affidavit failed to identify any defect at time motorist's pick-up truck left the manufacturer and

[2] the manufacturer was not liable for causing the fire.

Reversed.

Hecht, J., filed a concurring opinion, in which Owen, J., joined.

West Headnotes (11)

**[1] Judgment**

 Presumptions and Burden of Proof

The non-movants on no-evidence motion for summary judgment must produce summary judgment evidence raising a genuine issue of material fact to defeat summary judgment. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

344 Cases that cite this headnote

**[2] Judgment**

 Weight and Sufficiency

For purposes of motion for summary judgment, a genuine issue of material fact exists if more than a scintilla of evidence establishing the existence of the challenged element is produced. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

349 Cases that cite this headnote

**[3] Products Liability**

 Manufacturing Defect

A "manufacturing defect" exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous.

33 Cases that cite this headnote

**[4] Products Liability**

 Manufacturing Defect

**Products Liability**

 Proximate Cause

A plaintiff must prove that a manufacturing defect was defective when it left the hands of the manufacturer and that the defect was a producing cause of the plaintiff's injuries.

23 Cases that cite this headnote

**[5] Judgment**

 Torts

Summary judgment affidavit of motorist's expert failed to identify a defect in motorist's pick-up truck at time it left the manufacturer, and thus, affidavit was insufficient to show that manufacturer was liable for product defect for fire that the expert "suspected" was caused by truck's electrical system. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

8 Cases that cite this headnote

**[6] Judgment**

🔑 Presumptions and Burden of Proof

When determining if more than a scintilla of evidence has been produced in response to no-evidence motion for summary judgment, evidence must be viewed in light most favorable to non-movant. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

305 Cases that cite this headnote

**[7]** **Judgment**

🔑 Weight and Sufficiency

When evidence offered to prove a vital fact in response to a motion for summary judgment is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

376 Cases that cite this headnote

**[8]** **Judgment**

🔑 Weight and Sufficiency

Both direct and circumstantial evidence may be used to establish any material fact in response to motion for summary judgment. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

10 Cases that cite this headnote

**[9]** **Judgment**

🔑 Weight and Sufficiency

To raise a genuine issue of material fact in response to motion for summary judgment, the evidence must transcend mere suspicion; evidence that is so slight as to make any inference a guess is in legal effect no evidence. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

115 Cases that cite this headnote

**[10]** **Products Liability**

🔑 Automobiles

**Products Liability**

🔑 Proximate Cause

Motorist, the third owner of pick-up truck, produced no direct evidence of cause of fire in truck, in which fuel system had been previously repaired by second owner to improve truck's poor gas mileage, and only circumstantial evidence that a manufacturing defect existed in truck when it left manufacturer, and thus, manufacturer was not liable for causing fire as result of a product defect.

15 Cases that cite this headnote

**[11]** **Products Liability**

🔑 Automobiles

**Products Liability**

🔑 Nature of Product and Existence of Defect or Danger

**Products Liability**

🔑 Proximate Cause

Section of Restatement of Torts, providing circumstance under which it may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, was inapplicable to product liability action against pick-up truck manufacturer for damages suffered by motorist from fire in truck, where vehicle was not new or almost new product and had been modified or repaired by previous owner. Restatement (Third)of Torts: Product Liability, Sec. 3.

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*599** Chris A. Blackerby, Michael W. Eady, Kurt Howard Kuhn, Brown McCarroll, L.L.P., Austin, for Petitioner.

Tina Cheryl Torres, Robert E. Hughes, Law Office of Peter Torres, Jr., P.C., San Antonio, for Respondent.

William A. Worthington, Strasburger & Price, Houston, for Amicus Curiae.

**Opinion**

Chief Justice PHILLIPS delivered the opinion of the Court.

We must decide whether the evidence offered by plaintiffs in response to the defendant's Rule 166a(i) summary judgment motion created a genuine issue of material fact that a manufacturing defect in the defendant's product caused the plaintiff's injuries. Because we hold that the court of appeals erred in holding that the evidence was sufficient, we reverse the judgment of the court of appeals, 82 S.W.3d 26, and render judgment that the plaintiffs take nothing.

**I**

Jack Ridgway sustained serious injuries when his two-year-old Ford F–150 pick-up truck caught fire while he was driving. Ridgway was the truck's third owner. The first owner drove the truck approximately 7,000 miles and installed a spotlight on the front left "A" pillar, which is the front part of the door frame. The second owner drove the truck approximately 47,000 more miles and had the truck repaired four times at the Red McCombs Ford dealership in San Antonio ("Red McCombs"). Each repair attempted to fix a clunking noise that occurred during hard turns. Three of the four repairs also involved the fuel system and attempted to improve the truck's poor gas mileage. The Ridgways drove the truck for only one month before the fire, making no repairs or modifications.

The fire occurred when Ridgway was driving home from work on a paved county road in Bandera County. Driving at or below the speed limit, he looked into the **\*600** rear-view mirror and noticed flames curling up around the cab of the truck. Before he could jump out of the truck, Ridgway sustained second-degree burns to 20 percent of his body.

Ridgway and his wife Linda sued Red McCombs and Ford, alleging products liability, breach of express and implied warranties, violations of the Texas Deceptive Trade Practices Act, and negligence. After both defendants moved for summary judgment, the Ridgways nonsuited Red McCombs, leaving only their negligence and strict products liability claims against Ford. After adequate time for discovery, Ford moved for summary judgment under Rule 166a(i) and alternatively under Rule 166a(c). The trial court granted summary judgment without specifying on which provision it relied. On appeal, a divided court of appeals affirmed the trial

court's judgment on plaintiffs' negligence claim but reversed on products liability. We granted Ford's petition for review to determine whether the Ridgways presented more than a scintilla of evidence in support of their claim.

**II**

[1] [2] We first review the trial court's summary judgment under the standards of Rule 166a(i). The non-movants, here the plaintiffs, must produce summary judgment evidence raising a genuine issue of material fact to defeat the summary judgment under that provision. Tex.R. Civ. P. 166a(i). A genuine issue of material fact exists if more than a scintilla of evidence establishing the existence of the challenged element is produced. Morgan v. Anthony, 27 S.W.3d 928, 929 (Tex.2000). If the plaintiffs fail to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether Ford's proof satisfied the Rule 166a(c) burden.

[3] [4] A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous. Torrington Co. v. Stutzman, 46 S.W.3d 829, 844 (Tex.2000); Am. Tobacco Co. v. Grinnell, 951 S.W.2d 420, 434 (Tex.1997). A plaintiff must prove that the product was defective when it left the hands of the manufacturer and that the defect was a producing cause of the plaintiff's injuries. Torrington Co., 46 S.W.3d at 844.

[5] In an attempt to defeat Ford's motion, the Ridgways presented affidavits from all three of the truck's owners and from Bill Greenlees, an expert who inspected the truck after the accident. The owners explained when and where they purchased the truck, how many miles they drove it, and any modifications or repairs they made. In addition, Ridgway described when he first noticed the fire, how he reacted, and the injuries he sustained. Greenlees explained that his expert opinion was based on his visual inspection of the truck after the accident, a visual comparison of a similar but undamaged truck, a review of Ford service manuals, and a review of the National Highway Traffic Safety Administration's database. Based on the areas of greatest damage to the truck and an indication of a "hot spot in the left center area of the engine compartment," Greenlees concluded that the fire originated within the engine compartment and opined that "a malfunction of the electrical system in the engine compartment is suspected of having caused this accident."

Greenlees, however, declined to eliminate all portions of the fuel system as a possible cause of the accident and conceded that "the actual cause of the fire has not been determine [sic] yet." Although Greenlees suggested that further investigation might yield a more definitive conclusion, particularly **\*601** if the vehicle were disassembled, the Ridgways made no motion for further testing and did not complain that the trial court failed to allow adequate time for or sufficient scope of discovery. [1]

[1] Greenlees' affidavit stated: "The inspection of the subject Ford was a visual inspection only. No disassembly nor alterations have been performed as of this time." In oral argument, the Ridgways' attorney suggested that Greenlees could not perform destructive testing on the vehicle because it was severely damaged.

[6] [7] When determining if more than a scintilla of evidence has been produced in response to a Rule 166a(i) motion for summary judgment, the evidence must be viewed in the light most favorable to the non-movant. *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 208 (Tex.2002). We have repeatedly held that more than a scintilla of evidence exists if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994). On the other hand, "[w]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983).

[8] [9] Both direct and circumstantial evidence may be used to establish any material fact. *Lozano v. Lozano,* 52 S.W.3d 141, 149 (Tex.2001); *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993). To raise a genuine issue of material fact, however, the evidence must transcend mere suspicion. Evidence that is so slight as to make any inference a guess is in legal effect no evidence. *Lozano,* 52 S.W.3d at 148; *Browning–Ferris, Inc.,* 865 S.W.2d at 928.

[10] The Ridgways produced no direct evidence of the fire's cause, and their circumstantial evidence that a manufacturing defect existed in the Ford F–150 when it left the manufacturer does not exceed a scintilla. Ridgway's affidavit establishes only that a fire occurred, and Greenlees could say no more than that he "suspects" the electrical system caused the fire.

Because Greenlees could not rule out part of the fuel system as a possible cause and because there is no proof that identified a defect in the truck at the time it left the manufacturer, Greenlees' affidavit is not sufficient to raise a fact issue.

[11] The Ridgways argue that this proof is nevertheless sufficient under section 3 of the Third Restatement of Torts, which provides:

It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff:

(a) was of the kind that ordinarily occurs as a result of a product defect; and

(b) was not, in the particular case, solely the result of causes other than the product defect existing at the time of sale or distribution.

Restatement (Third) of Torts: Products Liability '3 (1998). No Texas court has ever cited this section, and we do not decide today whether it reflects the law of this state. Even if § 3 were the law in Texas, it would generally apply only to new or almost new products. Such products typically have not been modified or repaired, therefore making a product defect the likely cause of an accident. The **\*602** drafters of the Restatement realized this limitation and noted: "The inference of defect may not be drawn ... from the mere fact of a product-related accident.... Evidence that the product may have been used improperly or was altered by repair people weakens the inference [that there was a product defect]." Id. at reporters' notes to cmt. d (citations omitted). The reporters' notes also provide several examples to illustrate when a product defect cannot be inferred without proof of a specific defect because of the product's age or the presence of modifications or repairs. *Compare Woodin v. J.C. Penney Co.,* 427 Pa.Super. 488, 629 A.2d 974, 976–77 (1993) (recognizing that a product defect cannot be inferred in a freezer cord when it functioned flawlessly for eight years before catching fire), and *Walker v. Gen. Elec. Co.,* 968 F.2d 116, 120 (1st Cir.1992) (holding that the mere fact that a six-year-old toaster oven caught fire does not support an inference that a manufacturing defect exists), with *Dietz v. Waller,* 141 Ariz. 107, 685 P.2d 744, 748 (1984) (stating that a boat that broke in half after only ten hours of use gives rise to an inference of a manufacturing defect). When courts have cited section 3, they have also noted this limitation on the Restatement's operation. See *Jarvis v. Ford Motor Co.,* 283 F.3d 33, 44 (2nd Cir.2002) (applying a New

York law similar to section 3 to excuse a plaintiff from proving a specific defect, instead inferring a defect from proof that a six-day-old vehicle did not perform as intended); *Myrlak v. Port Auth.,* 157 N.J. 84, 723 A.2d 45, 56 (1999) (adopting section 3 in a case involving a collapsed five-week-old chair). Therefore, we reiterate that because section 3 is not applicable to the facts of this case, we need not decide if it is an accurate statement of Texas law.

### III

Under the circumstances of this case, the Ridgways' summary judgment proof is no more than a scintilla of evidence that a manufacturing defect was present when the truck left the manufacturer. Therefore, the Ridgways have not met their burden of showing that a genuine issue of material fact exists regarding a manufacturing defect. We accordingly reverse the judgment of the court of appeals and render judgment that the plaintiffs take nothing.

Justice HECHT filed a concurring opinion, in which Justice OWEN joined.

Justice HECHT, joined by Justice OWEN, concurring.

I join in the Court's opinion and write only to explain that while Texas law would allow proof of products liability by circumstantial evidence in certain cases,[1] the black-letter rule of section 3 of the Restatement (Third) of Torts: Products Liability does not accurately restate Texas law.

[1]     See, e.g., *General Motors Corp. v. Hopkins,* 548 S.W.2d 344 (Tex.1977), overruled on other grounds by *Turner v. Gen. Motors Corp.,* 584 S.W.2d 844 (Tex.1979) and *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414 (1984); *Darryl v. Ford Motor Co.,* 440 S.W.2d 630 (Tex.1969); see also *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983) (citing *Hopkins,* 548 S.W.2d 344).

Section 3 states:

Circumstantial Evidence Supporting Inference of Product Defect

It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff:

(a) was of a kind that ordinarily occurs as a result of product defect; and

(b) was not, in the particular case, solely the result of causes other than **\*603** product defect existing at the time of sale or distribution.[2]

[2]     Restatement (Third) of Torts: Products Liability ′3 (1998).

"It may be inferred" cannot mean "it is always proper to infer", as the present case demonstrates. Section 3(a) requires only that an injury-causing incident be the kind of thing that ordinarily results from a product defect, not that the incident is the kind of thing that ordinarily does not result unless there is a defect. A pickup suddenly bursting into flame for no discernible reason is the kind of thing that ordinarily occurs as a result of product defect in the sense that product defects do cause such things. Thus Ridgway has satisfied section 3(a), even though it is also true that fires in vehicles ordinarily occur for many reasons other than product defect.[3] As for section 3(b), although Ridgway cannot conclusively negate that the fire was caused solely by something other than a defect, Ford cannot point to anything as the sole cause of the fire. Therefore, Ridgway argues, section 3 entitles him to an inference that his pickup was defective and the further inference that the defect existed when Ford sold the pickup. The Court rejects Ridgway's argument, not because of the text of the rule, but because comment d to section 3, the reporter's notes, and cases allowing proof of products liability by circumstantial evidence limit the stated rule. In other words, the section 3 rule means much less than it appears to say.

[3]     See U.S. Fire Administration, Highway Vehicle Fires, 2 Topical Fire Research Series No. 4 (July 2001, revised Mar. 2002) (reporting that highway vehicle fires are due 66% to mechanical or design problems 18% to incendiary or suspicious origins, 8% to misuse, 4% to operational deficiency, and 3% to other design, construction, and installation deficiencies), available at http:// www.usfa.fema.gov/downloads/pdf/tfrs/v2i4.pdf (last visited Feb. 5, 2004).

"It may be inferred" really means "it is sometimes proper to infer", but while this reading makes the rule stated in section 3 accurate, it also makes the rule not very helpful. Few would question the use of circumstantial evidence to prove products liability in appropriate cases. The hard issue is not whether it can be done, but when and how. The comments to section

3 and the cases cited in support of it illustrate the kinds of considerations courts have taken into account in deciding whether to allow an inference of pre-sale defect in a product, but these considerations are not reflected the in the black-letter rule itself. One looks to comments to explain the rule; one does not look to comments to find the rule.

Section 3 is modeled on section 328D of the Restatement (Second) of Torts, [4] which states:

[4]     Proceedings at 72nd Annual Meeting: American Law Institute, 72 A.L.I. Proc. 179, 231 (1996) (remarks of James A. Henderson, Reporter, introducing Restatement (Third) of Torts: Products Liability § 3 (Tentative Draft No. 2, 1995)) ("Section 3 is derived quite faithfully from § 328D of the Restatement, Second, of Torts.").

Res Ipsa Loquitur

(1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when

(a) the event is of a kind which ordinarily does not occur in the absence of negligence;

(b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by evidence; and

(c) the indicated negligence is within the scope of the defendant's duty to the plaintiff. [5]

[5]     Restatement (Second) of Torts § 328D (1965).

 **\*604**  But the differences in the two provisions are such that section 3 is not an analogue of section 328D but rather a kind of res ipsa B lite! Sections 3(a) and (b) are less strict than the parallel provisions in sections 328D(1)(a) and (b), at least in a case like the present one. It cannot be said that fires in pickups do not ordinarily occur absent a product defect; they ordinarily occur for all sorts of reasons. [6] Nor has Ridgway "eliminated by evidence" the existence of other responsible causes of the fire. The most he can say is that Ford has offered no evidence of another cause. He has not shown that, given the circumstances, another cause was impossible or even improbable. If section 3 were as strictly worded as section 328D, Ridgway's claim would clearly fail.

[6]     See infra note 3.

Texas law of res ipsa loquitur is at least as strict as section 328D. We require the first condition stated in section 328D(1)(a), and instead of the second condition stated in section 328D(1)(b), we require that the instrumentality causing harm have been under the defendant's management and control. [7]

[7]     Haddock v. Arnspiger, 793 S.W.2d 948, 950 (Tex.1990) ("Res ipsa loquitur is applicable only when two factors are present: (1) the character of the accident is such that it would not ordinarily occur in the absence of negligence; and (2) the instrumentality causing the injury is shown to have been under the management and control of the defendant.") (citing Mobil Chem. Co. v. Bell, 517 S.W.2d 245, 251 (Tex.1974) and Marathon Oil Co. v. Sterner, 632 S.W.2d 571, 573 (Tex.1982)).

We have explained that

the "control" requirement is not a rigid rule that the instrumentality must have always been in the defendant's possession or even that it must have been in the defendant's control at the time of the injury. It is sufficient if the defendant was in control at the time that the negligence inferable from the first factor probably occurred, so that the reasonable probabilities point to the defendant and support a reasonable inference that he was the negligent party. The possibility of other causes does not have to be completely eliminated, but their likelihood must be so reduced that the jury can reasonably find by a preponderance of the evidence that the negligence, if any, lies at the defendant's door. [8]

[8]     Mobil Chem. Co., 517 S.W.2d at 251 (citations omitted).

The rule of res ipsa loquitur allows an inference of negligence, absent direct proof, only when injury would ordinarily not have occurred but for negligence, and defendant's negligence is probable.

There is no reason to allow an inference of products liability any more freely than an inference of negligence. An inference of products liability is really two inferences: that the product was defective, and that the defect existed at the time of sale. Applying the principle underlying res ipsa loquitur, neither inference can be drawn without evidence that the injury would not ordinarily have occurred absent a product defect and that that defect probably existed when the product was sold. This is not what section 3 says.

**All Citations**

135 S.W.3d 598, Prod.Liab.Rep. (CCH) P 16,878, 47 Tex.
Sup. Ct. J. 266

---

**End of Document**                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

347 S.W.3d 293
Supreme Court of Texas.

G & H TOWING COMPANY, et al., Petitioners,

v.

Cory Wayne MAGEE, et al., Respondents.

No. 10–0145.    |    Aug. 26, 2011.

**Synopsis**

**Background:** Automobile accident victims' relatives, individually and as legal representative of estates, brought action against driver, truck owner, and their employer to recover for negligence, negligent hiring, and negligent entrustment. The Probate Court No. 1, Harris County, Russell P. Austin, J., entered summary judgment in favor of owner and employer. The Court of Appeals affirmed in part, reversed in part, and remanded, 312 S.W.3d 807. Owner and employer petitioned for review, which was granted.

**[Holding:]** The Supreme Court held that entry of summary judgment on vicarious liability claim that was not addressed in summary judgment motion was rendered harmless upon Court of Appeals holding that employee had not committed a tort.

Reversed and remanded for further proceedings.

West Headnotes (7)

**[1]**     **Appeal and Error**
　　　　🔑 Judgment or Order
　　　　**Appeal and Error**
　　　　🔑 Ordering New Trial, and Directing Further Proceedings in Lower Court

Erroneous entry of summary judgment on vicarious liability claim that was not expressly presented in the summary judgment motion was rendered harmless upon Court of Appeals holding, on review of another substantive issue, that employee had not committed a tort, which necessarily precluded vicarious liability claim, and thus, even though trial court granted more relief than requested and, therefore, made

an otherwise partial summary judgment final, remand was not necessary, in action concerning an employer's alleged liability for fatal vehicle accident involving one of its employees. Rules App.Proc., Rule 44.1(a); Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

18 Cases that cite this headnote

**[2]**     **Labor and Employment**
　　　　🔑 Scope of Employment

Generally, a master is vicariously liable for the torts of its servants committed in the course and scope of their employment.

2 Cases that cite this headnote

**[3]**     **Appeal and Error**
　　　　🔑 Judgment or Order
　　　　**Judgment**
　　　　🔑 Motion or Other Application

Summary judgments may only be granted upon grounds expressly asserted in the summary judgment motion; granting a summary judgment on a claim not addressed in the summary judgment motion therefore is, as a general rule, reversible error. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

42 Cases that cite this headnote

**[4]**     **Appeal and Error**
　　　　🔑 Extent of Review Dependent on Nature of Decision Appealed from

Summary judgments may be affirmed even though the underlying motion omitted one of multiple causes of action when: (1) the movant has conclusively proved or disproved a matter, usually corresponding to a claim's element or to an affirmative defense, that would also preclude the unaddressed claim as a matter of law, or (2) when the unaddressed claim is derivative of the addressed claim, and the movant proved its entitlement to summary judgment on that addressed claim.

8 Cases that cite this headnote

**[5]    Appeal and Error**
 Prejudice to Rights of Party as Ground of Review

The harmless error rule applies to all errors. Rules App.Proc., Rule 44.1(a).

13 Cases that cite this headnote

**[6]    Appeal and Error**
 Judgment or Order

Although a trial court errs in granting a summary judgment on a cause of action not expressly presented by written motion, the error is harmless when the omitted cause of action is precluded as a matter of law by other grounds raised in the case.

18 Cases that cite this headnote

**[7]    Appeal and Error**
 Nature and Scope of Decision

**Appeal and Error**
 Reversal in Part

When a trial court grants more relief than requested and, therefore, makes an otherwise partial summary judgment final, that judgment, although erroneous, is final and appealable; the Court of Appeals should treat such a summary judgment as any other final judgment, considering all matters raised and reversing only those portions of the judgment based on harmful error.

3 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*294**  J. Mike Johanson, Chris M. Volf, Johanson & Fairless, L.L.P., Sugar Land, TX, for G & H Towing Company.

Kathryn V. Smyser, Kathryn Smyser PLLC, Benjamin L. Hall III, Elizabeth B. Hawkins, Kimberly R. Bennett, The Hall Law Firm, Houston, TX, for Cory Wayne Magee.

Jeffrey A. Fanaff, Acosta & Soule, Houston, TX, for William C. Colson.

**Opinion**

PER CURIAM.

This summary judgment appeal involves an employer's liability for a tragic vehicular accident involving one of its employees. At the time of the accident, the employee had left work and was driving a personal **\*295** vehicle that he borrowed from a co-worker. The representatives of the decedent-occupants of the other vehicle sued the employer, alleging negligence, negligent hiring, and negligent entrustment. These plaintiffs also sued the co-worker, alleging negligent entrustment, and the employee, alleging negligence. Both the employer and the co-worker obtained summary judgments, which after severance orders, the plaintiffs appealed.

The court of appeals affirmed the co-worker's summary judgment, concluding that as a matter of law the co-worker had not negligently entrusted his vehicle to the other employee. 312 S.W.3d 807, 809, 812 (Tex.App.-Houston [1st Dist.] 2009). The court of appeals, however, reversed the employer's summary judgment because its summary judgment motion did not specifically address one of the plaintiffs' claims: the claim that the employer was vicariously liable for its agent's (the co-worker's) negligent entrustment. *Id.* at 810–11. Concluding that the employer's summary judgment granted more relief than requested, the court remanded the case against the employer without considering the plaintiffs' other claims or the employer's related grounds for summary judgment. *Id.* at 813.

Because an employer cannot be vicariously liable in tort when its agent or employee has not engaged in tortious conduct, we conclude that the court of appeals erred in remanding the vicarious liability claim while simultaneously holding that the employee had not committed a tort. We reverse the court of appeals' judgment and remand the cause to that court for consideration of the other grounds for summary judgment.

William Colson and Joseph Violante were employed by G & H Towing as tugboat quartermasters. They worked on the same tugboat, but they were on different schedules. One would work for several days and then be relieved by the other, who then worked for a similar period. Because the tugboats did not have a regular route that allowed each man to return to the place he began his shift, the men would loan their personal vehicles to one another to drive home at the end of a

shift. Whether G & H required or endorsed this practice was disputed.

As was their custom, Violante borrowed Colson's vehicle at the end of one shift and drove himself home. Some time later, Violante drove Colson's vehicle to a bar at which he became inebriated. After leaving the bar, Violante was involved in a collision that killed Douglas and Lois Magee. Violante was subsequently convicted of intoxication manslaughter.

The Magees' adult children (the Magees) sued Violante, Colson, G & H Towing, and others connected to the bar, asserting theories of negligence, negligent hiring, and negligent entrustment. The claims against G & H were both direct and vicarious. Regarding the latter, the Magees asserted that G & H was vicariously liable for Colson's negligent entrustment of his vehicle to Violante because Colson was acting as G & H's employee and agent at the time. The Magees further asserted that Colson had a duty to make inquiry about Violante's competence as a driver because G & H had a company policy of checking the driving records of employees who would be driving in the course of their employment.

G & H Towing filed a motion for summary judgment, which the trial court granted, rendering an interlocutory take-nothing summary judgment. The Magees thereafter moved to sever their claims against G & H from the remainder of the case, and the trial court granted the motion making the summary judgment a final, appealable order. Colson also filed a **\*296** motion for summary judgment, which the trial court similarly granted and then severed, making Colson's take-nothing summary judgment final. The Magees appealed both summary judgments.

The Magees moved to consolidate their two appeals, but the court of appeals denied the motion. The court also declined to hear oral argument in either case. G & H contended on appeal that its motion for summary judgment encompassed the issue of its vicarious liability for Colson's actions. In the alternative, G & H urged that even if its motion omitted this issue, the trial court's error in granting final summary judgment on the omitted issue was nevertheless harmless because of the court's determination that Colson had not negligently entrusted his vehicle to Violante. G & H reasoned that if Colson did not negligently entrust his vehicle, G & H could not be vicariously liable for negligent entrustment.

Although the appeals remained separate, the court discussed their respective merits in a single opinion. 312 S.W.3d at

809. In separate judgments, the court affirmed Colson's take-nothing summary judgment but reversed and remanded the summary judgment favoring G & H Towing. *Id*. at 813.

The court of appeals concluded that the trial court correctly granted Colson's no-evidence summary judgment because there was no evidence of at least one element of the Magees' negligent entrustment claim against him. *Id*. at 812. The court accordingly affirmed Colson's summary judgment, and the Magees have not appealed that judgment.

The court further concluded that the trial court had erred in rendering a take-nothing summary judgment in favor of G & H Towing because G & H's motion for summary judgment failed to address the Magees' claim that G & H was vicariously liable for Colson's negligent entrustment of his vehicle to Violante. *Id*. at 810–11. G & H's summary judgment motion addressed its direct responsibility for allegedly entrusting the vehicle to Violante, but the motion did not also address its alleged vicarious liability for Colson's negligent entrustment. Because of this omission, the court of appeals held the motion to be "legally insufficient as a matter of law in regard to that ground." *Id*. at 811 (citing *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 342 (Tex.1993)). The court, with one justice dissenting, reversed the summary judgment and remanded the cause without considering the other grounds raised in the motion for summary judgment. *Id*. at 813.

[1] [2] G & H Towing again argues here that any error in granting summary judgment on this vicarious liability claim was harmless in light of the court's conclusion that there was no evidence to support the Magees' negligent entrustment claim against Colson. Generally, a master is vicariously liable for the torts of its servants committed in the course and scope of their employment. *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 617 (Tex.1999). But having concluded as a matter of law that its alleged agent, Colson, did not commit the tort of negligent entrustment, G & H submits that the trial court's error is harmless and that remanding the vicarious liability claim is a meaningless gesture because its liability is derivative of Colson's. *See Knutson v. Morton Foods, Inc.*, 603 S.W.2d 805, 807 n. 2 (Tex.1980) (noting "that where the employer's liability rests solely on respondeat superior, an adjudication acquitting the employee of negligence will [bar] a subsequent suit against the employer").

[3] The purpose of a summary judgment is to "provide a method of summarily **\*297** terminating a case when it

clearly appears that only a question of law is involved and that there is no genuine issue of fact." *Gaines v. Hamman,* 163 Tex. 618, 358 S.W.2d 557, 563 (1962). Summary judgments, however, may only be granted upon grounds expressly asserted in the summary judgment motion. TEX.R. CIV. P. 166a(c); *see also McConnell,* 858 S.W.2d at 341 (holding that a motion for summary judgment must expressly present grounds on which it is made). Granting a summary judgment on a claim not addressed in the summary judgment motion therefore is, as a general rule, reversible error. *Chessher v. Sw. Bell Tel. Co.,* 658 S.W.2d 563, 564 (Tex.1983) (per curiam).

Several appellate courts have recognized a limited exception to this general rule. These courts have affirmed summary judgments, even though the underlying motion omitted one of multiple causes of action, when the omitted ground was intertwined with, and precluded by, a ground addressed in the motion. *See, e.g., Zarzosa v. Flynn,* 266 S.W.3d 614, 621 (Tex.App.-El Paso 2008, no pet.) (holding reversal would be meaningless because questioned recovery precluded as a matter of law); *Withrow v. State Farm Lloyds,* 990 S.W.2d 432, 437–38 (Tex.App.-Texarkana 1999, pet. denied) (same); *Vogel v. Travelers Indem. Co.,* 966 S.W.2d 748, 754–55 (Tex.App.-San Antonio 1998, no pet.) (same); *Cissne v. Robertson,* 782 S.W.2d 912, 918 (Tex.App.-Dallas 1989, writ denied) (same). One authority states the exception as follows: "If the defendant has conclusively disproved an ultimate fact or element which is common to all causes of action alleged, or the unaddressed causes of action are derivative of the addressed cause of action, the summary judgment may be affirmed." TIMOTHY PATTON, SUMMARY JUDGMENTS IN TEXAS: PRACTICE, PROCEDURE AND REVIEW § 3.06[3] at 3–20 (3d ed.2010) (collecting cases).

[4] Although the court of appeals did not apply this exception here, it has previously recognized it. In fact, a different panel of the court surveyed the Texas decisions discussing this limited exception and wrote the following just a few months before the decision in this case:

> [S]ome courts of appeals, including our own, have recognized a very limited exception to the general rule. Although the exception's application has been expressed in various ways, it can be reduced to two: (1) when the movant has conclusively proved or disproved a matter (usually corresponding to a claim's element or

to an affirmative defense) that would also preclude the unaddressed claim as a matter of law or (2) when the unaddressed claim is derivative of the addressed claim, and the movant proved its entitlement to summary judgment on that addressed claim. For the exception to apply, this Court has always required a very tight fit between what was proved or disproved in the motion and what elements the unaddressed claim, as it was alleged, required: otherwise, the exception could swallow the rule.

*Wilson v. Davis,* 305 S.W.3d 57, 73 (Tex.App.-Houston [1st Dist.] 2009, no pet.) (internal footnotes omitted).

[5] [6] The harmless error rule states that before reversing a judgment because of an error of law, the reviewing court must find that the error amounted to such a denial of the appellant's rights as was reasonably calculated to cause and probably did cause "the rendition of an improper judgment," or that the error "probably prevented the appellant from properly presenting the case [on appeal]." TEX.R.APP. P. 44.1(a). The rule applies to all errors. *Lorusso v. Members Mut. Ins. Co.,* 603 S.W.2d 818, 819–20 (Tex.1980). Although **\*298** a trial court errs in granting a summary judgment on a cause of action not expressly presented by written motion, we agree that the error is harmless when the omitted cause of action is precluded as a matter of law by other grounds raised in the case. *See, e.g., Withrow,* 990 S.W.2d at 437–38 (affirming summary judgment on cause of action not specifically addressed in movant's motion where reversing the summary judgment would be meaningless because omitted cause of action was precluded as a matter of law); *cf. Mercedes–Benz Credit Corp. v. Rhyne,* 925 S.W.2d 664, 667 (Tex.1996) (holding that wrongful denial of jury trial is harmful error only when the case contains a question of material fact). The undisputed facts and Colson's final judgment establish that Colson did not negligently entrust his vehicle. G & H therefore cannot have vicarious liability for negligent entrustment because its agent did not commit the tort.

[7] When a trial court grants more relief than requested and, therefore, makes an otherwise partial summary judgment final, that judgment, although erroneous, is final and appealable. *See Bandera Elec. Coop. v. Gilchrist,* 946 S.W.2d 336, 337 (Tex.1997) (per curiam). The court of appeals

should treat such a summary judgment as any other final judgment, considering all matters raised and reversing only those portions of the judgment based on harmful error. *Page v. Geller,* 941 S.W.2d 101, 102 (Tex.1997) (per curiam). Because the court of appeals did not follow this procedure, we grant the petition for review and, without hearing oral argument, reverse the court of appeals' judgment and remand the case to that court for further proceedings. *See* TEX.R.APP. P. 59.1.

**All Citations**

347 S.W.3d 293, 54 Tex. Sup. Ct. J. 1751

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

145 S.W.3d 150
Supreme Court of Texas.

Harry J. JOE and Jenkens & Gilchrist,
A Professional Corporation, Petitioners,

v.

TWO THIRTY NINE JOINT
VENTURE, Respondent.

No. 02–0218.  |  Argued April
9, 2003.  |  Decided Sept. 3, 2004.

**Synopsis**

**Background:** Client brought action for malpractice and breach of fiduciary duty against attorney and law firm after attorney, a member of city council, voted in favor of construction moratorium adverse to client. The 14th Judicial District Court, Dallas County, John Marshall, J., granted summary judgment for attorney and law firm. Client appealed. The Dallas Court of Appeals, Barbara Rosenberg, J., 60 S.W.3d 896,reversed and remanded. Review was granted.

**Holdings:** The Supreme Court, Wainwright, J., held that:

[1] legislative immunity shielded attorney from liability for any conflict of interest;

[2] the law firm was not liable since the attorney was immune;

[3] firm owed no duty to inform client of city council meeting at which attorney voted in favor of moratorium; and

[4] attorney had official immunity from liability.

Reversed and rendered.

West Headnotes (26)

**[1]** **Municipal Corporations**
 Duties and liabilities

Legislative immunity shields lawyer-legislators from civil liability for activities within their legislative capacities.

1 Cases that cite this headnote

**[2]** **Estoppel**
 Nature and Application of Estoppel in Pais

Equitable estoppel is not a cause of action, but may be asserted as a defensive plea to bar a defendant from raising a particular defense.

8 Cases that cite this headnote

**[3]** **Appeal and Error**
 Cases Triable in Appellate Court

Summary judgments are reviewed de novo.

150 Cases that cite this headnote

**[4]** **Appeal and Error**
Judgment

When reviewing a summary judgment, the Supreme Court takes as true all evidence favorable to the nonmovant and indulges every reasonable inference and resolves any doubts in the nonmovant's favor.

141 Cases that cite this headnote

**[5]** **Appeal and Error**
Scope and theory of case

The Supreme Court affirms a summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious.

107 Cases that cite this headnote

**[6]** **Municipal Corporations**
Duties and liabilities

Individuals acting in a legislative capacity are immune from liability for those actions.

1 Cases that cite this headnote

**[7]** **Municipal Corporations**
Duties and liabilities

**States**
Privileges and exemptions

**United States**

👉 Judicial intervention and immunity in general

Legislative immunity applies to legislators at the federal, state, regional, and local levels of government—including city council members—who are performing legitimate legislative functions.

2 Cases that cite this headnote

**[8]** **Attorney and Client**

👉 Acting for party adversely interested

**Municipal Corporations**

👉 Duties and liabilities

Legislative immunity shielded attorney from liability to his law firm's client for any conflict of interest created by legitimate legislative functions undertaken in connection with his position as a city council member.

Cases that cite this headnote

**[9]** **Attorney and Client**

👉 Acting for party adversely interested

**Municipal Corporations**

👉 Duties and liabilities

Attorney, who was city council member, engaged in legitimate legislative functions when supporting moratorium on construction of apartment buildings and, therefore, was protected by legislative immunity from liability to his law firm's client that was adversely affected by the moratorium and claimed a conflict of interest; ordinance was a law of general application based on concerns over zoning and commercial development, and the attorney's alleged leadership role, discussions, persuasion of colleagues, and vote on the ordinance were legitimate legislative functions.

1 Cases that cite this headnote

**[10]** **Attorney and Client**

👉 Acts and omissions of partners and associates

**Municipal Corporations**

**Duties and liabilities**

👉 Duties and liabilities

Law firm was not liable to client for its attorney's legitimate legislative activities as city council member, for alleged conflict of interest created by attorney's activities, or for failure to disclose alleged conflict; legislative immunity protected the attorney, and the firm's liability was derivative.

Cases that cite this headnote

**[11]** **Attorney and Client**

👉 Elements of malpractice or negligence action in general

To recover on a claim for legal malpractice, the plaintiff must establish that: (1) the attorney owed the plaintiff a duty, (2) the attorney breached that duty, (3) the breach proximately caused the plaintiff's injuries, and (4) damages occurred.

4 Cases that cite this headnote

**[12]** **Attorney and Client**

👉 Nature of attorney's duty

Generally, a lawyer's fiduciary duties to a client, although extremely important, extend only to dealings within the scope of the underlying relationship of the parties.

10 Cases that cite this headnote

**[13]** **Attorney and Client**

👉 Nature of attorney's duty

While an attorney owes to a client a duty to inform the client of matters material to the representation, this duty to inform does not extend to matters beyond the scope of the representation.

6 Cases that cite this headnote

**[14]** **Attorney and Client**

👉 Employment and authority of counsel

A lawyer may not act beyond the scope of the contemplated representation without additional authorization from the client. State Bar Rules,

V.T.C.A., Government Code Title 2, Subtitle G App. A, Art. 10, § 9, Rules of Prof.Conduct, Rule 1.02.

3 Cases that cite this headnote

**[15]     Attorney and Client**

⚷ Acting for party adversely interested

Law firm owed no duty to inform client of city council meeting at which attorney in firm voted in favor of moratorium on construction of apartment buildings; scope of representation included review and drafting of documents for sale of client's property, but not matters before city council.

5 Cases that cite this headnote

**[16]     Appeal and Error**

⚷ Continuance

When reviewing a trial court's order denying a motion for continuance, the Supreme Court considers whether the trial court committed a clear abuse of discretion on a case-by-case basis.

72 Cases that cite this headnote

**[17]     Appeal and Error**

⚷ Abuse of discretion

Trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.

58 Cases that cite this headnote

**[18]     Judgment**

⚷ Hearing and determination

The following nonexclusive factors may be considered when deciding whether a trial court abused its discretion in denying a motion for continuance seeking additional time to conduct discovery prior to summary judgment: length of time the case has been on file, materiality and purpose of the discovery sought, and due diligence to obtain the discovery sought. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(g).

94 Cases that cite this headnote

**[19]     Municipal Corporations**

⚷ Duties and liabilities

Official immunity protected city council member from liability to his law firm's client if the actions of which the client complained were (1) discretionary duties, (2) within the scope of member's authority as a city council person, and (3) performed in good faith under an objective reasonableness standard.

3 Cases that cite this headnote

**[20]     Judgment**

⚷ Hearing and determination

Denial of motion by law firm's client for continuance in order to conduct additional discovery on attorney's actions as city council member was not abuse of discretion in response to attorney's summary judgment motion based on official immunity; attorney supported moratorium on construction of apartment buildings, this moratorium adversely affected client in connection with sale of land, and although the client sought discovery to determine whether attorney acted as legal counsel for the city and possibly a faction of citizens and to uncover the nature of the advice provided to the city and the citizens group, none of the discovery could have raised a fact issue as to whether the attorney was acting within the scope of his authority as a council member as he conducted legal research on issues related to the moratorium, met with constituents, prepared for the council meetings, and participated in the deliberation and vote. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(g).

34 Cases that cite this headnote

**[21]     Municipal Corporations**

⚷ Duties and liabilities

A city council member is immune from liability for actions taken (1) within the scope of authority (2) in performing the discretionary duties of the office in (3) good faith.

1 Cases that cite this headnote

6 Cases that cite this headnote

**[22]** **Attorney and Client**
👉 Acting for party adversely interested

**Municipal Corporations**
👉 Duties and liabilities

Attorney, who as city council member supported moratorium on construction of apartment buildings, had official immunity from liability to his law firm's client that was adversely affected by the moratorium and claimed a conflict of interest; legal research by the attorney was in preparation for the council meeting, and he acted in objective good faith within the scope of authority as council member and not as attorney for city or citizens group.

1 Cases that cite this headnote

**[23]** **Attorney and Client**
👉 What constitutes a retainer

Legal research that attorney conducted as city council member in preparation for a city council vote did not create an attorney-client relationship with city, even though the attorney shared that information with fellow council members as part of deliberations.

1 Cases that cite this headnote

**[24]** **Judgment**
👉 Evidence and Affidavits in Particular Cases

**Judgment**
👉 Attorneys

Speculation by client's principal was not evidence of an attorney-client relationship between council member and a citizens group favoring construction moratorium adverse to client of member's law firm and, therefore, did not create a fact issue precluding summary judgment on whether member was acting outside the scope of his authority as a council member during his interactions with constituents or during his preparations and research for city council meetings and was not entitled to official immunity from liability for alleged conflict of interest.

**[25]** **Officers and Public Employees**
👉 Liabilities for official acts

To determine whether a public official has acted in good faith and is entitled to official immunity, courts use an objective standard, asking whether a reasonably prudent official, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred.

17 Cases that cite this headnote

**[26]** **Officers and Public Employees**
👉 Liabilities for official acts

The standard of good faith as an element of official immunity is not a test of carelessness or negligence, or a measure of an official's motivation.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*153** Jeff Archer, Austin, for Amicus Curiae J.E. "Buster" Brown.

Roger Townsend, Alexander Dubose Jones & Townsend LLP, Houston, for Amicus Curiae Greenberg Traurig of New York.

Reagan W. Simpson, King & Spalding LLP, Houston, for Amicus pro se.

N. Bennett Sandlin, Austin, for Amicus Curiae Texas Municipal Leaguetexas Municipal League.

Amy Warr, Office of Attorney Gen., Austin, for Amicus Curiae The State of Texas.

Boyd Aaron Mouse, Kane Russell Coleman & Logan, David L. Patterson, Godwin & Gruber, L.L.P., Dallas, for other interested parties.

Russell James DePalma, Michael P. Lynn, John T Cox, Lynn Tillotson & Pinker, LLP, Robert E. Goodfriend, McKool Smith, P.C., B. Prater Monning III, Monning & Wynne, L.L.P., Dallas, for Petitioners.

Donald E. Godwin, David L. Patterson, Chad Michael Ruback, Godwin & Gruber, L.L.P., Dallas, for Respondent.

**Opinion**

**\*154** Justice WAINWRIGHT delivered the opinion of the Court.

 [1] We consider the applicability of legislative and official immunity to legislators, who are also practicing attorneys, when their public and private professional responsibilities conflict. Our legal system has long recognized the vital role of the fiduciary duties that attorneys owe their clients. Our system of government charges legislators with fidelity to the public trust in the discharge of their official duties. We affirm the vitality of both obligations. However, when these obligations conflict, we hold that legislative immunity shields lawyer-legislators from civil liability for activities within their legislative capacities.

A shareholder in a law firm, who also served as a legislator on a city council, voted in favor of an ordinance that adversely affected a firm client. The client sued the shareholder and his firm for malpractice for (1) negligently failing to inform the client in advance of the city council meeting at which the ordinance was passed and (2) breach of fiduciary duty arising from a failure to avoid or disclose a conflict of interest created by the shareholder's support of the ordinance and his vote. We conclude, based on undisputed summary judgment evidence, that notifying the client of the council meeting was outside the agreed scope of the representation, and therefore, there was no duty to inform the client of the meeting. We also conclude that the lawyer-legislator is immune from liability for any conflict of interest arising from his support of, preparation for, and vote on the ordinance. Because the client's claims against the firm derive from the actions of the shareholder, the firm is not liable for failing to disclose a conflict of interest arising from the shareholder's legislative and official actions. We reverse the court of appeals and render judgment in favor of the lawyer-legislator and the law firm.

## I. Factual and Procedural Background

In 1992 William Thau, an attorney and shareholder with the law firm of Jenkens & Gilchrist, P.C. (Jenkens), began his representation of Two Thirty Nine Joint Venture (239 JV). He provided legal services for 239 JV's formation and its acquisition, development, and sale of 239 acres of land in Irving, Texas. By the summer of 1994, 239 JV had sold all but 11 of the 239 acres. At the request of 239 JV, Thau reviewed a contract for the sale of the remaining 11 acres as an apartment tract and drafted an amendment to the contract. The contract provided the potential buyer with a review period and a right to reject the contract before September 17, 1994.

On Sunday, September 4, 1994, the Irving City Council posted a 72–hour notice of a meeting to consider, among other items, an ordinance that would place a 120–day moratorium on apartment construction in Irving. At the September 7, 1994 Council meeting at which the ordinance was discussed, Councilperson Harry Joe, also a shareholder at Jenkens, moved to impose the moratorium. The ordinance imposing the moratorium passed unanimously. As a result, the potential buyer of 239 JV's 11 acres cancelled the contract. Joe had not told anyone at Jenkens or 239 JV about the meeting, its agenda, or his position on the moratorium.

On November 9, 1994, Arthur Hewett and Jerry Ragsdale, principals of 239 JV, met with Joe to discuss the impact of the moratorium on 239 JV's property. Hewett and Ragsdale explained that they felt Joe should "be working to support [239 JV's] interest," stop providing leadership to those in favor of the moratorium, "stop voting against [239 JV] and stop influencing the votes of others against [239 JV]." **\*155** In a memorandum to Joe, Thau later described Joe's actions as "le[a]d[ing] the charge to impose and continue the moratorium against the building of any apartment projects" in certain Irving neighborhoods. The parties acknowledge that Joe did not agree to stop supporting the moratorium at this meeting. On December 15, 1994, after the moratorium's initial 120–day period expired, the City Council voted to extend the moratorium until May 26, 1995. Joe voted in favor of the extension.

After the extension passed, 239 JV began the process of seeking a waiver from the moratorium and discussed its options with Thau and Joe. Joe indicated to 239 JV representatives that he believed the 11–acre tract would be eligible for a waiver but that to secure a waiver of the moratorium, 239 JV would need citizen support. Both Hewett and Ragsdale testified that after these conversations, they considered Joe, as well as Thau, to be 239 JV's lawyer. There

is no dispute that at this time no Jenkens attorney represented 239 JV on matters before the City Council.

In anticipation of a May 18, 1995 City Council meeting at which another extension of the moratorium would be discussed, Joe used the Jenkens library to research the legality of extending the moratorium. Although the City of Irving later reimbursed Jenkens for copying and paralegal expenses, as was customary, there is no evidence that the City paid Jenkens or Joe for any legal advice. Also in anticipation of the May 18 Council meeting, Joe sent two firm-wide voice mails advising his fellow shareholders of the subject of the upcoming vote and asking if any clients would be affected. Joe also asked the Irving city attorney to provide a written opinion regarding Joe's potential conflict of interest. The city attorney's May 16, 1995 opinion concluded that no conflict existed, but it was expressly predicated on Joe's representation that at that time Jenkens was not representing any clients who had an interest in property that would be impacted by the moratorium. Two days later, the City Council voted to extend the moratorium by another unanimous vote, including Joe's.

In June 1995, 239 JV sought a waiver of the moratorium for the remaining 11–acre tract. The application for the waiver was denied by city officials, and 239 JV appealed to the City Council. On June 22, 1995, the Council voted to table the appeal. Joe attended this meeting but abstained from the Council vote. On July 6, 1995, the city attorney issued a second opinion at Joe's request concerning Joe's potential conflict of interest. Based on Joe's representation that Jenkens "had no active file nor active work for Two Thirty Nine Joint Venture in May and June, 1995," the opinion concluded that no conflict existed. However, Jenkens's billing records show that Bill Thau performed legal work for 239 JV during that period. After the Council tabled 239 JV's appeal, representatives from 239 JV met with members of Jenkens's executive committee. At this meeting, Jenkens shareholders promised to represent 239 JV in obtaining a waiver at no charge and asked 239 JV not to pursue legal action until Jenkens had an opportunity to try to secure the waiver. Jenkens was unable to secure the waiver for 239 JV, but the tract eventually sold in 1997 for an amount near the 1994 contract price.

 **[2]**　On April 18, 1997, 239 JV filed this lawsuit. The live pleadings included claims that Joe and Jenkens owed 239 JV "a duty of ordinary care and a fiduciary duty and one of loyalty" and that the actions of Jenkens and Joe constituted a breach of those duties. The pleadings also included a section

entitled "estoppel/quasi **\*156** estoppel." [1] 239 JV described the basis of its claims as Joe's and Jenkens's failure to disclose the alleged conflict of interest created by Joe's involvement with the moratorium while Jenkens represented 239 JV in ongoing efforts to sell a tract of land for an apartment building and failure to disclose matters that were material to Jenkens's representation of 239 JV (including the Council's September 1994 meeting). 239 JV claims that timely disclosure of the meeting would have allowed it to grandfather its property before the moratorium passed.

[1]　　　In this section, 239 JV's pleadings allege (1) that the conduct by Jenkens and Joe regarding efforts to assist 239 JV in obtaining a waiver from the moratorium constituted concealment or false representation of material facts, and in light of the fiduciary duty owed, 239 JV materially relied upon these representations to its detriment; and (2) that 239 JV reasonably relied upon Jenkens's representations and fraudulent concealment in its decision to delay litigation. These allegations raise the defense of equitable estoppel and appear to be intended to rebut defendants' assertion of the two-year statute of limitations. *See Schroeder v. Tex. Iron Works, Inc.,* 813 S.W.2d 483, 489 (Tex.1991). Equitable estoppel is not a cause of action but may be asserted as a defensive plea to bar a defendant from raising a particular defense. *See, e.g., Leonard v. Eskew,* 731 S.W.2d 124, 132 n. 2 (Tex.App.-Austin 1987, writ ref'd n.r.e.). However, neither Jenkens nor Joe raised statute of limitations in their summary judgment motions, so just as the statute of limitations defense is not before us, neither is 239 JV's response to that affirmative defense.

On June 12, 1997, Joe moved for summary judgment based on official immunity. 239 JV requested a continuance to conduct discovery, which the trial court denied. The trial court granted Joe's motion for summary judgment on July 11, 1997. Over a year later, after Jenkens and 239 JV conducted discovery, Jenkens filed an amended motion for summary judgment on six grounds: (1) Joe was entitled to legislative and official immunity, and Jenkens was entitled to assert any defenses that Joe could have raised since he was responsible for all of the allegedly tortious conduct, (2) chapter 171 of the Local Government Code provides 239 JV's exclusive remedy, (3) Jenkens had no duty to influence or control Joe's actions as a public servant, (4) 239 JV cannot establish proximate cause as a matter of law because the moratorium and extensions may have passed without Joe's support, (5) 239 JV waived any conflict or claim for malpractice when it consented to representation by Jenkens, and (6) 239 JV's theory of damages was impermissibly speculative as a matter of law. The trial

court granted summary judgment in favor of Jenkens on September 23, 1998, and 239 JV appealed. A divided court of appeals reversed and remanded all claims against Jenkens and Joe. The court of appeals reversed the trial court's judgment in favor of Joe because it concluded that the trial court abused its discretion in denying 239 JV's motion for a continuance to obtain discovery before the summary judgment hearing. The court of appeals reversed the judgment in favor of Jenkens because (1) a fact issue existed regarding whether Joe and Jenkens breached a duty to disclose a conflict of interest arising out of Joe's activities as a public official, (2) Jenkens did not conclusively establish that Joe was immune from liability, and (3) fact issues existed as to proximate cause, damages, and waiver of a conflict of interest. Joe and Jenkens petitioned this Court for review.

## II. Standard of Review

[3] [4] [5] Jenkens moved for summary judgment under Texas Rules of Civil Procedure 166a(c) and 166a(i). Joe moved for summary judgment under Rule 166a(c). We review the trial court's summary judgments de novo. *See FM Props. Operating* **\*157** *Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex.2000). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Southwestern Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002); *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997). Under Texas Rule of Civil Procedure 166a(c), the party moving for summary judgment bears the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Haase v. Glazner,* 62 S.W.3d 795, 797 (Tex.2001); *Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 223 (Tex.1999). We affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 626 (Tex.1996); *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989).

## III. Jenkens's Motion for Summary Judgment

### A. Conflict of Interest

239 JV claims that it retained Jenkens to assist it in selling 11 acres and that Joe's leadership role, discussion, preparation,

and vote regarding the moratorium created an impermissible conflict, the nondisclosure of which breached the fiduciary duty and duty of loyalty Joe and Jenkens owed to 239 JV. Jenkens contends that Joe's legislative immunity shields Joe from liability for 239 JV's claims for breach of its fiduciary duty and duty of loyalty and that the potential liability that Jenkens faces derives from its shareholder's actions as a city councilperson. We agree that without Joe's actions in this case, no conflict of interest would exist on which to predicate Jenkens's potential liability to 239 JV. Thus, if Joe is immune from liability, Jenkens cannot be derivatively liable for Joe's actions. *See DeWitt v. Harris County,* 904 S.W.2d 650, 654 (Tex.1995) (holding that an employer is entitled to assert any affirmative defenses—including official immunity—that its employee may assert); *accord Harris County v. Louvier,* 956 S.W.2d 106, 110 n. 8 (Tex.App.-Houston [14th Dist.] 1997, no pet.); *see also Cameron Compress Co. v. Kubecka,* 283 S.W. 285, 287 (Tex.Civ.App.-Austin 1926, writ ref'd) (Respondeat superior "declares the act of the servant to be the act of the master, and that which excuses or justifies the one will in like manner excuse and justify the other."). We therefore initially address the parties' contentions regarding legislative immunity for Joe's actions.

[6] [7] This Court has recognized that individuals acting in a legislative capacity are immune from liability for those actions. *In re Perry,* 60 S.W.3d 857, 859 (Tex.2001). Legislative immunity applies to legislators at the federal, state, regional, and local levels of government—including city council members—who are performing "legitimate legislative functions." *Bogan v. Scott–Harris,* 523 U.S. 44, 53, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998) (stating that legislative immunity extends to local legislators); *Tenney v. Brandhove,* 341 U.S. 367, 376, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (noting that legislative immunity only protects actions within "the sphere of legitimate legislative activity"); *In re Perry,* 60 S.W.3d at 860; *see, e.g., Clear Lake City Water Auth. v. Salazar,* 781 S.W.2d 347 (Tex.App.-Houston [14th Dist.] 1989, orig. proceeding [leave denied] ); *see also Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency,* 440 U.S. 391, 402–05, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979) (extending absolute immunity to members of a regional planning agency, which was created by two states' compact and consented to by Congress); **\*158** *Butz v. Economou,* 438 U.S. 478, 511–13, 98 S.Ct. 2894, 57 L.Ed.2d 895(1978) (recognizing absolute immunity for Department of Agriculture officials when performing legislative and prosecutorial functions).

[8] [9] The Court assumes, without deciding, that Joe's activities in support of the moratorium on apartment construction created an impermissible conflict with his duties to 239 JV as a Jenkens shareholder. We hold that legislative immunity shields Joe from liability for any conflict of interest created by legitimate legislative functions undertaken in connection with his position as a city councilperson. We now analyze whether Jenkens established as a matter of law that the actions on which 239 JV based the alleged conflict of interest constitute legitimate legislative functions.

239 JV's pleading claimed that Joe's "leadership role, discussion or vote" in favor of the moratorium created a conflict of interest that adversely affected 239 JV. Specifically, 239 JV claimed that Joe was the "acknowledged leader of the faction of Irving citizens who oppose[d] apartment construction." 239 JV also alleged that Joe "used the resources available to him at [Jenkens] and ... had legal research performed at his request and under his direction to further the interests of the citizens group opposed to apartment construction and his political goals and interests to the detriment of 239 JV."

Jenkens's summary judgment evidence establishes as a matter of law that the actions that 239 JV claims created a conflict of interest were legitimate legislative functions undertaken by Joe as a councilperson. First, we consider Joe's vote in favor of and discussion with council members regarding the moratorium. The text of the ordinance, the City Council minutes, and Joe's affidavit establish that the ordinance at issue was a law of general application based on concerns over zoning and commercial development facing the Irving community. Joe testified that he spoke in favor of the moratorium at the September City Council meeting. Hewett's deposition testimony that "[i]t was generally believed there was a voting block, including Harry Joe, that Harry Joe controlled" does not remove Joe's legislative acts from the protection of legislative immunity. We hold that Joe's discussion, persuasion of colleagues, and vote on the ordinance were legitimate legislative functions.

We also conclude that Joe's alleged leadership role in supporting the moratorium and opposing apartment construction constituted legitimate legislative functions. Joe testified that citizens expressed concerns that an increasing number of multi-family dwellings would impact crime, gangs, schools, and parks in the area, and he concluded that the moratorium was appropriate until Irving could adopt a new comprehensive plan for development. Joe testified that

he communicated with several constituents regarding the moratorium and their concerns about the increased number of multi-family dwellings in the area. Just as voting to impose and extend a moratorium on apartment construction constituted a legitimate legislative function, so was Joe's involvement with his constituents regarding a pending issue before the City Council. [2] Jenkens established **\*159** as a matter of law that the actions on which 239 JV bases the alleged conflict of interest constitute legitimate legislative functions.

[2]  Texas Disciplinary Rule of Professional Conduct 1.13 indicates that under some circumstances not present here, an attorney's involvement with certain public interest activities could create a conflict of interest:

> A lawyer serving as a director, officer or member of a legal services, civic, charitable or law reform organization, apart from the law firm in which the lawyer practices, shall not knowingly participate in a decision or action of the organization:
> (a) if participating in the decision would violate the lawyer's obligations to a client under Rule 1.06; or
> (b) where the decision could have a material adverse effect on the representation of any client of the organization whose interests are adverse to a client of the lawyer.

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.13, reprinted in TEX. GOV'T CODE, tit. 2, subtit. G app. A. However, Rule 1.13 does not encompass the legislative activity Joe engaged in as a city councilperson and instead limits an attorney's involvement in "legal services, civic, charitable or law reform organization[s]." In addition, we note that the Rules do not define standards of civil liability of lawyers for professional conduct. TEX. DISCIPLINARY R. PROF. CONDUCT PREAMBLE ¶ 15.

[10] 239 JV's claims against Jenkens based on a conflict created by Joe's legislative actions fail because 239 JV's claims against Jenkens derive from Joe's actions. Because Joe is immune from liability for any conflict of interest that may have been created by acts within the sphere of legitimate legislative activity, Jenkens cannot be liable for those activities or for a conflict of interest created by those activities. We conclude that the trial court properly granted Jenkens's motion for summary judgment because Joe is immune from liability for failing to disclose a conflict of interest, and because of this immunity, Jenkens cannot be held derivatively liable. *See DeWitt,* 904 S.W.2d at 654.

We briefly address the summary judgment evidence showing that Joe met with representatives from 239 JV to discuss whether the 11–acre tract would be appropriate for a waiver from the ordinance. 239 JV claims that Joe gave its representatives legal advice that 239 JV was a good candidate to obtain a waiver. Whether Joe's comments could be construed as legal advice does not change our analysis. 239 JV complains that Joe's actions in favor of the moratorium were contrary to 239 JV's interests and therefore constituted a conflict of interest. We conclude that despite 239 JV's status as a Jenkens client and Joe's position as a shareholder in the firm, Joe is immune from liability for conflicts created by his legislative acts. Thus, even if Joe provided 239 JV with legal advice, Joe is immune from claims that his legislative activities created a conflict with the client's interests.

### B. Scope of Representation

 [11]    239 JV alleges that Joe and Jenkens committed legal malpractice by negligently failing to inform 239 JV of a matter material to the representation, the September 7, 1994 Irving City Council meeting at which the moratorium on apartment construction passed. 239 JV claims that timely disclosure of the impending Council vote on the moratorium would have allowed it to grandfather its property under an exception to the moratorium and then consummate the pending contract on the 11–acre tract. To recover on a claim for legal malpractice, the plaintiff must establish: (1) the attorney owed the plaintiff a duty, (2) the attorney breached that duty, (3) the breach proximately caused the plaintiff's injuries, and (4) damages occurred. *Peeler v. Hughes & Luce,* 909 S.W.2d 494, 496 (Tex.1995).

 [12]    [13]    [14]    Generally, a lawyer's fiduciary duties to a client, although extremely important, "extend[ ] only to dealings within the scope of the underlying relationship of the parties." *See Rankin v. Naftalis,* 557 S.W.2d 940, 944 (Tex.1977); *see also Joseph v. State,* 3 S.W.3d 627, 639 (Tex.App.-Houston [14th Dist.] 1999, no pet.) ("The nature of the attorney-client relationship defines an attorney's duties and the professional services to be rendered."); **\*160** Restatement (Third) of the Law Governing Lawyers § 16 cmt. c; § 50 cmt. d (2000) (a lawyer's duties are ordinarily limited to matters covered by the representation). While it is true that an attorney owes a client a duty to inform the client of matters material to the representation, *Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex.1988), this duty to inform does not extend to matters beyond the scope of the

representation. *See, e.g., Joseph,* 3 S.W.3d at 639 (noting that an attorney could not render ineffective representation to a criminal defendant on offenses for which she was not retained to represent defendant); *Klager v. Worthing,* 966 S.W.2d 77, 83 (Tex.App.-San Antonio 1996, no writ) (holding that law firm did not assume a duty to supervise a client's medical care despite agreeing to represent client in silicone breast implant litigation); Restatement § 50 cmt. d (a lawyer is not liable for failing to act beyond the scope of representation). In fact, the lawyer may not act beyond the scope of the contemplated representation without additional authorization from the client. Tex. Disciplinary R. Prof'l Conduct 1.02; Restatement § 16, cmt. c; § 27, cmt. e.

 [15]    In this case, 239 JV argues that Joe and Jenkens had a duty to inform 239 JV of the September 7, 1994 meeting. Viewing the facts in the light most favorable to 239 JV, the scope of Jenkens's representation included Thau's reviewing and drafting sale documents for the 11–acre tract but did not include representation of 239 JV in matters before the Irving City Council. Arthur Hewett, a principal in 239 JV, confirmed that 239 JV handled its planning and zoning issues before the Irving City Council internally and that Jenkens never represented 239 JV in such matters. Such matters were thus beyond the agreed scope of representation between 239 JV and Jenkens. Moreover, the scheduling of the September 7th Council meeting was a matter of public record to which 239 JV had access. The nature of the meeting was publicly available, as evidenced by the fact that other developers took action to grandfather their plats upon learning of the pending moratorium. Because representing 239 JV before the City Council was not included in the scope of Jenkens's representation, Jenkens had no duty to inform 239 JV of the September 7, 1994 meeting. Thus, the trial court properly granted summary judgment in favor of Jenkens on 239 JV's claim that Jenkens negligently failed to inform 239 JV about the September 7, 1994 City Council meeting on the moratorium.

### IV. Joe's Motion for Summary Judgment

Less than two months after 239 JV filed this lawsuit, Joe moved for summary judgment based solely on the affirmative defense of official immunity. 239 JV filed a motion for continuance and a response to Joe's motion for summary judgment. The trial court denied 239 JV's motion for continuance and granted Joe's motion for summary judgment on official immunity. The court of appeals reversed the trial

court's denial of 239 JV's motion for continuance. We reverse the court of appeals and address the merits of Joe's motion for summary judgment on official immunity.

### A. 239 JV's Motion for Continuance

In its motion for continuance, 239 JV argued that because the case had been on file for less than two months, 239 JV had been deprived of an adequate opportunity to conduct discovery to respond to Joe's motion for summary judgment. 239 JV also explained that its lead counsel had been in trial for approximately three weeks during the pendency of 239 JV's suit and attached an affidavit from counsel **\*161** in support. The trial court denied 239 JV's motion for continuance.

 **[16]** **[17]** **[18]** The trial court may order a continuance of a summary judgment hearing if it appears "from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition." Tex.R. Civ. P. 166a(g). When reviewing a trial court's order denying a motion for continuance, we consider whether the trial court committed a clear abuse of discretion on a case-by-case basis. *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 800 (Tex.2002). A trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Id.* We have considered the following nonexclusive factors when deciding whether a trial court abused its discretion in denying a motion for continuance seeking additional time to conduct discovery: the length of time the case has been on file, the materiality and purpose of the discovery sought, and whether the party seeking the continuance has exercised due diligence to obtain the discovery sought. *Id.* (diligence and length of time on file); *Tenneco Inc. v. Enter. Prods. Co.,* 925 S.W.2d 640, 647 (Tex.1996) (materiality and purpose); *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 521–22 (Tex.1995) (materiality); *State v. Wood Oil Distrib., Inc.,* 751 S.W.2d 863, 865 (Tex.1988) (diligence); *see also Perrotta v. Farmers Ins. Exch.,* 47 S.W.3d 569, 576 (Tex.App.-Houston [1st Dist.] 2001, no pet.) (using these factors to decide whether a trial court abused its discretion in denying a motion for continuance).

 **[19]** **[20]** Here, Joe's motion for summary judgment raised a single defense to 239 JV's claims—official immunity. Official immunity protects Joe from liability if the actions of which 239 JV complains were (1) discretionary duties, (2)

within the scope of Joe's authority as a city councilperson, and (3) performed in good faith under an objective reasonableness standard. *Ballantyne v. Champion Builders, Inc.,* 144 S.W.3d 417, 422, 2004 WL 1533950 (Tex.2004); *City of Lancaster v. Chambers,* 883 S.W.2d 650, 656 (Tex.1994). In its motion for continuance, 239 JV argued that it needed additional discovery on the second element of official immunity, claiming that "serious questions exist as to whether [Joe] acted as legal counsel for the City of Irving and certain of its constituents, rather than as councilman" and more time was required to investigate "the nature of the advice provided by [Jenkens and Joe] to the City of Irving and possibly members of the Valley Ranch Concerned Citizens Coalition, the faction of Irving citizens who oppose apartment construction." Specifically, 239 JV contended that it needed to depose Irving City Council members, members of the citizens group, Jenkens representatives with knowledge of the firm's representation of 239 JV, and the Irving city attorney. 239 JV attached the affidavit of Arthur Hewett, one of its principals, in support of these contentions. Hewett's affidavit stated that "from information available to me and other representatives of 239 JV, it appears that Joe acted in the capacity as legal counsel to the City Council of the City of Irving and possibly gave legal advice to the citizens group in Irving opposing apartment construction." Attached to Hewett's affidavit was a Jenkens invoice for reimbursement of research expenses regarding the moratorium, which Hewett claims was sent to the City of Irving, and notes from a Jenkens librarian regarding research she performed on the moratorium. Finally, 239 JV attached correspondence in which attorneys for 239 JV attempted to work with opposing counsel to schedule depositions.

 **\*162** We cannot conclude that the trial court's denial of the motion was so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *See Marchand,* 83 S.W.3d at 800–01. We acknowledge 239 JV's attempts to obtain the requested discovery in the short time the case was on file and see no indication that 239 JV was merely trying to delay the summary judgment hearing. However, we do not agree that the discovery sought by 239 JV was material to its response to Joe's motion for summary judgment on official immunity. 239 JV describes its claims as arising from Joe and Jenkens's failure to disclose a conflict of interest created by Joe's involvement with the moratorium while Jenkens represented 239 JV in ongoing efforts to sell a tract of land for an apartment building and failure to disclose matters that were material to Jenkens's representation of 239 JV (including the Council's September 1994 special meeting to consider

the moratorium). 239 JV argued that to respond to Joe's defense that he was officially immune from any liability from these causes of action, it needed additional discovery to determine whether Joe acted as legal counsel for the City of Irving and possibly a faction of Irving citizens who opposed apartment construction in the area and to uncover the nature of the advice Joe and Jenkens provided to the City and the citizens group. However, none of the discovery described could have raised a fact issue as to whether Joe was acting within the scope of his authority as a city councilperson as he conducted legal research on issues related to the moratorium, met with constituents, prepared for the City Council meetings, and participated in the deliberation and vote at the Council meeting. These are the type of activities that Joe has a duty to participate in as a city councilperson and therefore fall well within the scope of his authority as a public official. The fact that Joe, as a City Council member, utilized his legal experience in evaluating and discussing issues on the Council's agenda does not mean that he became the Council's attorney. We conclude 239 JV failed to identify "facts essential to justify [its] opposition" to Joe's motion for summary judgment, and therefore, the trial court did not abuse its discretion in denying 239 JV's motion for continuance.

### B. Official Immunity

**[21]** **[22]** In reviewing the trial court's summary judgment in favor of Joe on official immunity, we consider whether Joe established each element of the defense as a matter of law. *Ballantyne*, 144 S.W.3d at 424. A city councilperson is immune from liability for actions taken (1) within the scope of authority (2) in performing the discretionary duties of the office in (3) good faith. *See id*. In his motion for summary judgment, Joe argues that "on the occasions in question he was performing his discretionary duties as Irving City Councilperson and Mayor Pro Tem, in good faith, and was acting within his authority as City Councilperson and Mayor Pro Tem" and is therefore, immune from suit. Joe attached his affidavit to support his motion.[3] 239 JV contended that "serious **\*163** questions exist as to whether [Joe] acted in good faith and within the scope of his authority." 239 JV contends its evidence creates a fact issue that precludes summary judgment in favor of Joe. 239 JV attached the following evidence to its response: the affidavit of Arthur Hewett (a principal of 239 JV), Jenkens's billing statements addressed to 239 JV, a letter to the Irving city attorney from Bill Thau, two memos from the city attorney to Joe, an unaddressed expense reimbursement from Jenkens, a

Westlaw research cover page containing written notes, and the minutes from the June 22, 1995 Irving City Council meeting.

[3]   239 JV objected to Joe's affidavit because (1) the affidavit failed to state that the affidavit is based upon Joe's personal knowledge and that the facts stated are true and correct and (2) the final paragraph is improper affidavit testimony because it contains legal conclusions not supported by factual assertions and because Joe is not authorized to testify about whether Jenkens represented 239 JV. On July 10, 1997, Joe filed motion for leave to file an amended affidavit, which the trial court granted. Joe's amended affidavit explicitly stated that it was based on personal knowledge and that the facts included in his affidavit were true and correct. Joe also filed objections to Arthur Hewett's affidavit, which was attached to 239 JV's response to Joe's motion for summary judgment. The record does not indicate that the trial court ruled on either parties' objections but on July 11, 1997 granted Joe's motion for summary judgment, relying on "the Motion, supporting affidavits, the Response and supporting affidavits (to the extent admissible), and the pleadings." We consider Joe's amended affidavit and Hewett's affidavit as filed.

239 JV claims that Joe's position and actions related to the moratorium created an impermissible conflict of interest that Joe had a duty to avoid or disclose to 239 JV. Assuming that a conflict of interest between Joe's obligations to 239 JV as a firm client and his actions as a city councilperson existed, we hold that official immunity extends to protect Joe from liability for any conflict of interest that his vote or other discretionary duties undertaken in good faith and within the scope of his authority as a councilperson may have created. We now analyze whether Joe established as a matter of law that he was acting in good faith and within the scope of his authority as a city councilperson in performance of the discretionary duties of the office.

In his affidavit, Joe explains that he was a member of the Irving City Council on September 7, 1994, and after considering alternative courses of action, he voted to adopt an ordinance that imposed a moratorium on the acceptance and processing of multi-family development permits for 90 days at the September 7 City Council meeting. We conclude that Joe's affidavit established as a matter of law that his actions involved personal deliberation, decision, and judgment characteristic of a discretionary act that was delegated to him as a public official. *See Ballantyne*, 144 S.W.3d at 425. In its response to Joe's motion for summary

judgment, 239 JV did not dispute that Joe was performing discretionary duties as a councilperson.

Joe's affidavit establishes that voting on the moratorium was within the scope of his authority as an Irving city councilperson, and 239 JV does not dispute that. However, 239 JV argues that Joe's other activities concerning the moratorium fall outside the scope of Joe's authority as a councilperson. Joe's affidavit states that in the spring of 1995, he conducted legal research, with the assistance of his firm's librarian, to study the legality of extending the moratorium because of threatened litigation against the City regarding the legality of the moratorium and "to confirm that an extension of the moratorium was in Irving's best interest." In its response to Joe's motion for summary judgment, 239 JV argues that Joe's legal research on the legality of the moratorium was inappropriate because (1) his actions were beyond the scope of authority of a councilperson and created an attorney-client relationship between the City and Joe, and (2) Joe developed an attorney-client relationship with the Citizen's Coalition Group in Irving by "apparently [giving] citizens of Irving the legal research he developed to help them further his cause." 239 JV argues that these actions created a conflict of **\*164** interest that Joe was required to avoid or disclose and resolve with 239 JV.

 **[23]** We conclude that 239 JV's evidence does not create a fact issue that Joe was acting beyond the scope of his authority as a city councilperson. Conducting legal research in preparation for a city council vote does not create an attorney-client relationship between Joe and the City, and sharing that information with fellow council members as part of deliberations does not change that conclusion. 239 JV points to a Jenkens billing statement titled "Gen. Expense Reimbursement–H. Joe" as evidence that Joe and the City had an attorney-client relationship. The statement, which 239 JV argues was submitted to the City for payment, is an administrative reimbursement for the librarian's retrieval of requested case law and did not include any charges for Joe's services. Thus, Joe's motion for summary judgment establishes that Joe's research was in preparation for a city council meeting, was not part of legal services provided to the City of Irving, and does not create an attorney-client relationship between Joe and the City as a matter of law.

 **[24]** The only evidence that 239 JV cites to support its contention that Joe developed an attorney-client relationship with the Citizen's Coalition Group in Irving is the following paragraph from Hewett's affidavit:

I was present at the Irving City Council Meeting held on or about June 22, 1995, wherein 239 JV's request for an exemption from the moratorium was considered. At one point during the meeting, a gentleman named Jim Parrow, identified himself by name and as a proponent of the moratorium. This gentleman then cited 5th Circuit case law to the City Council in support of the legality of the moratorium. Based upon these and other facts, it is my belief that Mr. Joe requested that legal research be performed at [Jenkens] for the purpose of advising the Irving City Council of the power of the City Council to impose the moratorium and supporting the citizens group favoring the moratorium.

Nothing in this paragraph indicates that Joe served as a lawyer for a citizens group. Hewett's speculation is not evidence of an attorney-client relationship between Joe and a citizens group and therefore, does not create a fact issue on whether Joe was acting outside the scope of his authority as a councilperson during his interactions with constituents or during his preparations and research for city council meetings. Joe's evidence establishes that he acted within the scope of his authority as a councilperson as a matter of law.

 **[25]** **[26]** We now turn to whether Joe acted in good faith while executing the discretionary functions required of him as a city councilperson. To determine whether a public official has acted in good faith, we use an objective standard, asking whether a reasonably prudent official, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred. *Ballantyne,* 144 S.W.3d at 426; *Chambers,* 883 S.W.2d at 656. The standard of good faith as an element of official immunity is not a test of carelessness or negligence, or a measure of an official's motivation. *Ballantyne,* 144 S.W.3d at 426.

Joe's motion for summary judgment and accompanying affidavit establishes that he acted in objective good faith when he prepared for the Council meetings and voted on the moratorium and its extensions. In his affidavit, Joe details Irving's growing number of multi-family dwellings

compared to single family residences and contrasts that ratio to neighboring communities **\*165** with specific numbers. He explains his constituents' and the mayor's concerns regarding the increase of multi-family dwellings in Irving and the increasing ratio of multi-family dwellings to single family dwellings. In addition, Joe states that the council members, including himself, considered alternative actions before voting to impose a temporary moratorium on the acceptance and processing of multi-family development permits. In his affidavit, Joe also explains that when the City Council considered extending the moratorium in May 1995, Joe "concluded that the moratorium should in fact be extended, at least until the City of Irving was able to adopt a new comprehensive plan for further multi-family development" "[a]s a result of input from citizens, and based upon [his] own observations."

239 JV's response to Joe's motion for summary judgment provides no relevant evidence to support its contention that Joe failed to act in objective good faith when voting on the moratorium or conducting research in preparation to vote on the moratorium. Instead, in its briefing to this Court, 239 JV argues that "Joe misrepresented the existing attorney-client relationship between [Jenkens] and 239 JV to avoid any accusations of a conflict of interest" and that "[n]o reasonable private attorney/public official would completely disregard his private clients in pursuing his political agenda thereby ignoring potential conflict issues." Neither this argument, nor 239 JV's evidence in response to Joe's motion for summary judgment, refute Joe's evidence that he acted in objective good faith. Joe established, as a matter of law, that a reasonably prudent official, under the same or similar circumstances, could have believed that his conduct, preparing for and voting in favor of the moratorium, was justified. Thus, Joe established as a matter of law that he was officially immune from liability for the alleged conflict of interest arising from his activities as an Irving city councilperson.

### V. Conclusion

For the foregoing reasons, we reverse the court of appeals' judgment and render judgment that 239 JV take nothing.

Justice SCHNEIDER did not participate in the decision.

**All Citations**

145 S.W.3d 150, 47 Tex. Sup. Ct. J. 1058

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

138 Tex. 565
Supreme Court of Texas.

KINZBACH TOOL CO., Inc.,

v.

CORBETT-WALLACE CORPORATION et al.

No. 7828.    |    March 4, 1942.
|    Rehearing Denied April 8, 1942.

Error from Court of Civil Appeals for First Supreme Judicial District, Harris County.

Suit by the Kinzbach Tool Company, Inc., against the Corbett-Wallace Corporation and G. E. Turner to establish a trust against the amount of a commission to be paid by the first-named defendant to the last-named defendant, which suit was consolidated with a suit by the Corbett-Wallace Corporation against the Kinzbach Tool Company, Inc., to recover the amount alleged to be due under a contract involving sales rights to a patented tool known as a 'whipstock', wherein the defendant filed a cross-action. To review a judgment of the Court of Civil Appeals, 145 S.W.2d 235, reversing the judgment of the district court in favor of the Corbett-Wallace Corporation, the Kinzbach Tool Company, Inc., brings error.

Judgments of the Court of Civil Appeals and the district court reversed and the cause remanded with instructions.

West Headnotes (12)

[1]    **Principal and Agent**
    Acting for Parties Adversely Interested

Where seller promised to pay commission to buyer's trusted employee if employee was successful in negotiating sale of a contract right, relationship of employee to buyer was that of a "fiduciary", and employee in representing both parties without disclosing to buyer his adverse interest in the deal violated his duty as a fiduciary.

36 Cases that cite this headnote

[2]    **Principal and Agent**

    Nature of Agent's Obligation

It is the duty of a fiduciary to deal openly and to make full disclosure to the party with whom he stands in such relationship.

22 Cases that cite this headnote

[3]    **Principal and Agent**
    Nature of Agent's Obligation

One occupying a fiduciary relationship to another must measure his conduct by high equitable standards and not by the standards required in dealings between ordinary parties.

29 Cases that cite this headnote

[4]    **Principal and Agent**
    Acting for Parties Adversely Interested

Where seller of contract right had agreed to pay commission to buyer's trusted employee if employee was successful in negotiating sale, but directed that employee refrain from disclosing price for which the seller would sell, it was the duty of employee as a fiduciary, on being instructed by buyer to get a price, to give buyer such information and disclose that he was getting a commission from the seller.

3 Cases that cite this headnote

[5]    **Principal and Agent**
    Acting for Parties Adversely Interested

Where seller of contract right agreed to pay buyer's trusted employee a commission for negotiating the sale and employee successfully negotiated the sale without disclosing to buyer amount for which seller would have been willing to sell, or fact that employee was to receive a commission from seller, employee and seller could not justify payment of commission to employee on ground that buyer suffered no damages because he received full value under the sales agreement.

1 Cases that cite this headnote

[6]    **Trusts**

🔑 Individual Interest in Transactions

Where a fiduciary takes any gift in violation of his duty or acquires an interest adverse to his principal without a full disclosure, he has betrayed his trust and must account to his principal for all he has received.

16 Cases that cite this headnote

**[7]     Principal and Agent**

🔑 Nature of Agent's Obligation

Where seller of contract right agreed to pay commission to buyer's trusted employee for negotiating sale and employee negotiated the sale without disclosing to buyer that he was acting in a dual capacity, fact that buyer had not complained of prior similar conduct by employee did not justify employee's violation of his fiduciary relationship.

4 Cases that cite this headnote

**[8]     Principal and Agent**

🔑 Torts by Third Persons

A third party knowingly participating in a breach of duty by a fiduciary becomes a joint tort-feasor with the fiduciary and is liable as such.

86 Cases that cite this headnote

**[9]     Principal and Agent**

🔑 Torts by Third Persons

Where seller of contract right without buyer's knowledge agreed to pay buyer's trusted employee a commission for negotiating sale, seller became a party to employee's breach of his fiduciary duty and therefore became a joint tort-feasor with employee with regard to rights of the buyer.

44 Cases that cite this headnote

**[10]     Principal and Agent**

🔑 Acting for Parties Adversely Interested

Where seller of contract right without buyer's knowledge had agreed to pay buyer's trusted employee a commission of $5,000 for

negotiating the sale, and after the deal was closed seller paid employee $500 and agreed to pay an additional $500 when buyer made installment payment of $2,500, buyer on learning the facts properly tendered $1,500 only in full settlement of the installment, since it had right to deduct amount already paid to employee by seller and amount agreed to be paid from proceeds of installment.

4 Cases that cite this headnote

**[11]     Tender**

🔑 Refusal to Accept

An actual tender is not required when party to whom money is due has signified in advance that he will refuse to accept it.

9 Cases that cite this headnote

**[12]     Sales**

🔑 Excuses for Default or Delay

Where buyer's trusted employee had breached his fiduciary obligation by acting for seller in negotiating sale, and seller rejected buyer's tender, in settlement of first installment, of amount of installment less commission paid by seller to employee and amount agreed to be paid from proceeds of installment, no further tenders were required of buyer, since it was obvious that tender of subsequent installments with employee's commission deducted would be rejected.

9 Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*510**  Kayser, Liddell, Benbow & Butler, Frank A. Liddell, and **\*566**  Hardway, Woodruff & Austin, all of Houston, for plaintiff in error.

Sewell, Taylor, Morris & Connally, of Houston, for defendant in error turner.

T. J. Stovall and W. F. Tarver, both of Houston, for defendant in error Corbett-Wallace Corporation.

**Opinion**

CRITZ, Justice.

The pertinent facts of this case, as presented by the record, viewed in the light of the trial court's findings and judgment, are as follows:

This suit grows out of a transaction had between Kinzbach Tool Company and the Corbett-Wallace Corporation, both private corporations. For convenience, we will hereinafter refer to the Corbett-Wallace Corporation as Corbett, and to Kinzbach Tool Company as Kinzbach. During the time here involved, Kinzbach and Corbett were engaged in the oil field tool business in the City of Houston, Texas. In March, 1937, Corbett was owner of a sales right contract on a patented tool called 'whipstock.' Corbett decided that it would make an attempt to sell such contract right to Kinzbach. E. B. Corbett, was the present of Corbett and its majority stockholder. Robert Kinzbach was the vice president of Kinzbach. E. B. Corbett and Robert Kinzbach were unfriendly with each other. About March 1, 1937, E. B. Corbett sent word to one G. E. Turner, an employee of Kinzbach, that he wanted to see him. **\*567** E. B. Corbett knew that Turner was an employee of Kinzbach. In response to E. B. Corbett's message, Turner went to see him. At such meeting E. B. Corbett told Turner that Corbett wanted to sell the whipstock contract to Kinzbach. Corbett then told Turner to see what he could do, and come back and report. In this interview Corbett agreed to pay Turner a commission if the whipstock contract was sold to Kinzbach. Also, in this interview Corbett informed Turner that it wanted $20,000 for the whipstock contract, and would pay Turner a commission out of that figure. In such interview Corbett instructed Turner not to mention to his (Turner's) employer, Kinzbach, what the whipstock contract could be bought for. The general trend of this conversation between E. B. Corbett and Turner was that Turner was given to understand that Corbett wanted to get as much as possible from Kinzbach for the whipstock contract, and would not take less than $20,000 for it. Turner was cautioned not to make known this figure to his employer. Turner was to see what Kinzbach would pay, but was not to give Kinzbach any information as to what Corbett wanted for the contract. Turner was to get Kinzbach to make Corbett an offer, but was not to give him any information as to price. It appears that E. B. Corbett, and also one Wallace, vice president of Corbett, had many interviews with Turner after the first one above detailed, in regard to this deal. In none

of these interviews were the instructions to Turner above mentioned altered.

At the times above mentioned, and at all times involved in this case, Turner was a trusted employee of Kinzbach, receiving a regular monthly salary. His duties were to sell Kinzbach's products, and he performed such other services as his employer directed.

After the conversation between E. B. Corbett and Turner, above detailed, Turner approached the officers of Kinzbach **\*\*511** about buying the whipstock contract from Corbett. Kinzbach advised Turner that they were interested. Frank Kinzbach, the president of Kinzbach, expressly instructed Turner to find out what Corbett would sell for, but not to quote any price.

It appears that there were several conversations regarding this deal between E. B. Corbett and Wallace, and Turner, on the one hand, and Frank Kinzbach, Robert Kinzbach, and Turner, on the other. At some time during these conversations **\*568** Turner was advised by Kinzbach that it would probably be willing to pay as much as $25,000 for the whipstock contract.

At none of the conversations between Turner and his employer, Kinzbach, did Turner ever disclose that he was to get a commission from Corbett if the whipstock contract was sold to it, Kinzbach. Furthermore, Turner never in any way disclosed to Kinzbach that Corbett might take $20,000, and even pay him a commission out of that amount. All this was in spite of the fact that Turner had been instructed by his employer to get from Corbett this very information.

After the above events had transpired, and as a culmination of prior events, Frank Kinzbach, acting for Kinzbach, and W. F. Tarver, acting for Corbett, closed a deal by which Kinzbach agreed to pay Corbett $25,000 for this whipstock contract. Under such sale contract Kinzbach paid Corbett $2,500 in cash. The balance, $22,500, was made payable $2,500 January 1, 1938, and $5,000 on June 1st of each succeeding year until the full purchase price was paid. The deferred payments were to bear no interest until maturity. A right of acceleration of installments was provided in the event of default in the payment of any installment for six months. The contract also provided for the usual ten per cent. attorney's fees. It is not shown that W. F. Tarver had any knowledge of any transactions with Turner.

After the above deal was fully consummated, Kinzbach for the first time discovered that Turner was to receive a commission of $5,000 for the sale of this whipstock contract to it. Kinzbach immediately discharged Turner. It appears that prior to the consummation of the deal Corbett had agreed to pay Turner a commission, but had not agreed what it would be. After the deal was closed Corbett paid Turner $500, being twenty per cent. of the $2,500 cash paid by Kinzbach. Corbett further agreed to pay Turner twenty per cent. additional, if and when the balance of the payments were made. This left $4,500 of Turner's commission unpaid. Under their agreement Turner was to get $500 when Kinzbach made payment of the first $2,500 deferred installment, and $1,000 out of each of the four $5,000 deferred installments, when paid.

When the first deferred installment of $2,500 on this contract became due, Kinzbach, having found out about Turner's commission, tendered to Corbett the sum of $1,500 in full **\*569** settlement thereof. Such tender was made on the theory that the $2,500 installment should be credited by the $500 commission theretofore paid by Corbett to Turner, and by the additional $500 that Turner was to receive out of the proceeds of such first deferred installment. This tender was rejected by Corbett. On June 23, 1938, Kinzbach tendered to Corbett the sum of $2,500, on the condition that Corbett would give Kinzbach a receipt showing that such payment was made and received without prejudice to any rights Kinzbach might have against Corbett and Turner. This additional tender was also rejected by Corbett. In November, 1938, Kinzbach tendered to Corbett the $2,500 installment unconditionally. This tender was also rejected by Corbett.

After the above events, Kinzbach filed suit against Corbett and Turner, seeking to establish a trust against the $5,000 to be paid Turner. Also, on the same day the Kinzbach suit was filed, Corbett filed suit in the same court against Kinzbach, to recover the $2,500 installment due June 1, 1938, with ten per cent. attorney's fees. This installment was past due. Both suits were consolidated and tried as one. Kinzbach answered the Corbett suit, and set up its defenses, and asked for affirmative relief by way of cross-action against both Corbett and Turner.

During the pendency of this suit Corbett filed an amended petition, in which it sought to mature this entire contract with Kinzbach, and sought recovery thereon in the amount of $22,500, with ten per cent. attorney's fees, $2,250.

Kinzbach answered Corbett's amended petition. In such answer Kinzbach pleaded as before, and, in addition thereto, **\*\*512** pleaded estoppel against Corbett. Corbett asserted the right to mature its entire contract.

Simply stated, Kinzbach prosecutes and defends this suit on the theory that the facts we have recited constitute such wrongful conduct on the part of Corbett and Turner as entitled it, Kinzbach, to recover against them the $5,000 commission paid, and agreed to be paid, by Corbett to Turner. As we understand its pleadings, brief, and argument, Kinzbach in effect contends that it is entitled to have its first $2,500 deferred installment credited by $1,000 being the $500 paid Turner and the $500 he would get out of the proceeds of such installment if paid. Kinzbach then contends that it **\*570** is entitled to have the four $5,000 installments credited by $1,000 each. Of course, if this is done, it would follow that Corbett's obligation to Turner for $4,500 should be cancelled.

The district court, where the case was tried without a jury, entered the following judgment:

1. Kinzbach was awarded a judgment against Turner for $500, being the commission Corbett had paid Turner on the $2,500 cash payment made by Kinzbach to Corbett.

2. Corbett was awarded a judgment cancelling its obligation to pay Turner $4,500, and the obligation of Kinzbach to Corbett was credited by that sum.

3. Corbett was adjudged to have rightfully accelerated the due dates of the installments due under the contract between it and Kinzbach.

4. It was adjudged that Corbett had the right to recover from Kinzbach the ten per cent. attorney's fees on the sum of $22,500 represented by the face of the Kinzbach contract.

As a final result of the above, as between Corbett and Kinzbach, Corbett recovered a judgment from Kinzbach for $20,250. We infer that this sum was arrived at by taking the face of the Kinzbach contract, $22,500, and adding ten per cent. thereof thereto, $2,250, as attorney's fees, and then deducting from the sum produced the cancelled Turner commission of $4,500.

On appeal thereto, the Court of Civil Appeals ruled:

(1) That Corbett's obligation to pay Turner was valid in all respects; and, therefore, same should not be cancelled or annulled.

(2) That Kinzbach's $22,500 obligation to Corbett should not be credited by the sum of $4,500.

(3) That Turner was rightfully entitled to retain the $500 paid him by Corbett.

(4) That in all other respects than as above shown, the judgment of the district court should be affirmed.

As a result of the above rulings, the Court of Civil Appeals reversed the judgment of the trial court, and rendered judgment as follows:

**\*571** I. The judgment of the trial court cancelling Corbett's $4,500 obligation to Turner was reversed, and such obligation was decreed to be valid and binding.

II. The judgment of the trial court in favor of Kinzbach and against Turner for $500 was reversed, and judgment rendered that Kinzbach take nothing against Turner.

III. Corbett was awarded a judgment against Kinzbach for the sum of $22,500, plus $2,250 attorney's fees, or a total of $24,750. 145 S.W.2d 235.

This case is before this Court on writ of error granted on application of Kinzbach.

As we interpret the opinion of the Court of Civil Appeals, it holds that Turner had a lawful right in this instance to contract for and accept a secret commission from Corbett, for services rendred Corbett in assisting it to sell this whipstock contract to Kinzbach. We interpret such holding to be based upon the further holding that Turner did not occupy the status of a fiduciary of Kinzbach in the transactions he had with Corbett and Kinzbach, in an effort to further the consummation of the contract in question here. We are not in accord with such holding.

The term 'fiduciary' is derived from the civil law. It is impossible to give a definition of the term that is comprehensive enough to cover all cases. Generally speaking, it applies to any person who occupies a position of peculiar confidence towards another. It refers to integrity and fidelity. It contemplates fair dealing and good faith, rather than legal obligation, as the basis of the transaction. The term includes those informal relations **\*\*513** which exist whenever one party trusts and relies upon another, as well as technical fiduciary relations. 25 C.J. p. 1118; Peckham v. Johnson, Tex.Civ.App., 98 S.W.2d 408; Johnson v. Peckham, 132 Tex. 148, 120 S.W.2d 786, 120 A.L.R. 720; Swiney v. Womack, 343 Ill. 278, 175 N.E. 419; Abbitt v. Gregory, 201 N.C. 577, 160 S.E. 896; Niland v. Kennedy, 316 Ill. 253, 147 N.E. 117; Lindholm v. Nelson, 125 Kan. 223, 264, P. 50; Roecher v. Story, 91 Mont. 28, 5 P.2d 205; Roberts v. Parsons, 195 Ky. 274, 242 S.W. 594; Seely v. Rowe, 370 Ill. 336, 18 N.E.2d 874; Bliss v. Bahr, 161 Or. 79, 87 P.2d 219. Authorities could be cited from practically every State in the Union, supporting the above-stated rule, but we deem that the ones above cited are sufficient.

**\*572** **[1]** We now come to determine whether Turner occupied the relationship of a fiduciary to Kinzbach in his transactions regarding this deal. During the negotiations leading to the consummation of this contract, Turner was a trusted employee of Kinzbach, receiving his pay regularly by the month. He had been such employee for some seven years. His duties were to act as a salesman, but he rendered such other services as his employer instructed. Corbett and Kinzbach were not friendly with each other, and could not deal directly. Turner knew this. Corbett decided that it wanted to sell this whipstock contract to Kinzbach. Corbett called Turner, Kinzbach's employee, over the telephone, and arranged an interview with him. At this interview Corbett informed Turner that it wanted to sell this whipstock contract to Kinzbach. In this interview Corbett instructed Turner to see what he could do, and stated that if the deal was made it 'would take care of him'; meaning Turner would be paid for his services. In this conversation Corbett gave Turner to understand that it might sell the whipstock contract to Kinzbach for $20,000, and would pay him a commission out of that sum. Also, in this interview Turner was told to keep secret from his employer, Kinzbach, what the whipstock contract could be bought for, as Corbett wanted to get as much as it could for it. Turner carried out Corbett's instructions, and approached his employer, Kinzbach, in regard to the purchase of the whipstock contract. Kinzbach advised Turner that it was interested in making the purchase, and instructed Turner to find out what Corbett would sell for, but not to quote it a price. To make a long story short, Turner, Kinzbach's trusted employee, permitted his employer to consummate a contract whereby it bought for $25,000 that which he, Turner, knew might be bought for $20,000. Turner purportedly accepted the instructions of his employer to see what the contract could

be bought for, without disclosing to it that it could be bought for $20,000, and without disclosing to it the fact that he was acting for the opposite side in the deal for a profit to himself. Certainly such a record justified the trial court in concluding that Turner had no right to collect a commission from Corbett. Further, we think that the above record shows, as a matter of law, that Turner abused his fiduciary relationship with Kinzbach. Certainly good conscience and fair dealing called on Turner, as a trusted employee of Kinzbach, when he was told by it to get a price from Corbett, to disclose his adverse interest in the deal. His failure to do this was a violation of his duty, and, therefore, a wrongful act.

**\*573** Turner contends that he committed no wrong against his employer, Kinzbach, in rendering services to Corbett, (a) because the matter was entirely separate and apart from the ordinary course of his employ ment with Kinzbach; (b) because he did not purport to represent either Kinzbach or Corbett in the transaction, and had no authority to represent them; (c) because he violated no confidence or breach of duty to Kinzbach; (d) because Kinzbach suffered no damage or loss as a result of his, Turner's, acts; and (e) because Kinzbach had allowed Turner to do a similar act once before. Corbett, in substance, makes the same contentions as does Turner.

 **[2]** **[3]** **[4]** We are unable to agree that the facts of this case bring it within any rule that would make Turner's act and conduct in this instance measure up to the rule of fair dealing and good faith towards Kinzbach, which the law required of him. It is the duty of a fiduciary to deal openly, and to make full disclosure to the party with whom he stands in such relationship. Mecham on Agency, p. 784, sec. 953; Id., p. 314, sec. 469; Parks v. Schoellkopf Co., Tex.Civ.App., 230 S.W. 704; Scott v. Weaver, Tex.Civ.App., 2 S.W.2d 870; Peckham v. Johnson, Tex.Civ.App., 98 S.W.2d 408; **\*\*514** Johnson v. Peckham, 132 Tex. 148, 120 S.W.2d 786, 120 A.L.R. 720. One occupying a fiduciary relationship to another must measure his conduct by high equitable standards, and not by the standards required in dealings between ordinary parties. Peckham v. Johnson, supra; Johnson v. Peckham, supra. Turner's position as a trusted employee of Kinzbach, in the capacity already detailed, called on him to make full disclosure to his employer of all the facts and circumstances concerning his dealings with Corbett. Also, when he received instructions from Kinzbach to get a price from Corbett it was his duty as a fiduciary to inform his employer what the whipstock contract might be bought for. It was also his duty to make disclosure to his employer that he was getting a commission from Corbett.

 **[5]** **[6]** It is beside the point for either Turner or Corbett to say that Kinzbach suffered no damages because it received full value for what it has paid and agreed to pay. A fiduciary cannot say to the one to whom he bears such relationship: You have sustained no loss by my misconduct in receiving a commission from a party opposite to you, and therefore you are without remedy. It would be a dangerous precedent for us to say that unless some affirmative loss can be shown, the person who has violated his fiduciary relationship with another may **\*574** hold on to any secret gain or benefit he may have thereby acquired. It is the law that in such instances if the fiduciary 'takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received.' United States v. Carter, 217 U.S. 286, 30 S.Ct. 515, 520, 54 L.Ed. 769, 775, 19 Ann.Cas. 594. See also Ash v. A. B. Frank Co., Tex.Civ.App., 142 S.W. 42; Armstrong v. O'Brien, 83 Tex. 635, 19 S.W. 268.

 **[7]** It is contended that on a former occasion, in a matter involving a small amount, Turner was guilty of conduct similar to this as regards Kinzbach, and that Kinzbach knew such fact and did not complain thereof. We do not think that the mere fact that Kinzbach may have overlooked such former act, licensed Turner, as a matter of law, to violate his fiduciary relationship in this instance.

 **[8]** **[9]** It is settled as the law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such. 2 Tex.Jur., p. 557; Miller v. Himebaugh, Tex.Civ.App., 153 S.W. 338; William Cameron & Co. v. Blackwell, 53 Tex.Civ.App. 414, 115 S.W. 856. It follows that when Corbett employed Turner, who it knew was Kinzbach's fiduciary, under the circumstances and conditions we have already detailed, it became a party to the breach of duty committed by Turner, and therefore became a joint tort-feasor with Turner with regard to the rights of Kinzbach.

 **[10]** **[11]** **[12]** It appears that when the first installment of $2,500 became due on this contract, Kinzbach tendered to Corbett, in payment thereof, the sum of $1,500. This was all that was due, because Kinzbach had a right to deduct therefrom the $500 Turner had received on the $2,500 cash payment it had made and the $500 Turner was to receive out of the proceeds of such installment. Corbett absolutely rejected such tender, thereby absolutely rejecting Kinzbach's

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

right to any credit for Turner's commissions. It is therefore evident that it would have been useless for Kinzbach to make any tender of payment on any subsequent installment due under this contract, with Turner's commission thereon deducted therefrom. The law does not require an actual tender when the party to whom the money is due has signified in advance that he will **\*575** refuse to accept it. It is sufficient to say that we think Kinzbach has made all tenders that were required of him under the facts of this record.

It appears that all installments due to be paid by Kinzbach to Corbett under this contract are now due without any acceleration.

The judgments of the Court of Civil Appeals and district court are both reversed and set aside, and this cause is remanded to the district court with instructions as follows:

(1) If Kinzbach promptly tenders into court, for the benefit of Corbett, the sum of $17,500, such sum shall be awarded to Corbett in full payment of Kinzbach's obligation to it on this contract. This sum is arrived at by deducting from the $22,500 the $5,000 Turner commission.

(2) Corbett's obligation to Turner, in the sum of $4,500, shall be cancelled.

(3) If Kinzbach fails to make prompt payment to Corbett in the sum of $17,500, as above indicated, the court will enter judgment **\*\*515** for that amount plus ten per cent. thereof as attorney's fees, in favor of Corbett and against Kinzbach.

(4) If Kinzbach makes prompt payment of the $17,500, as above directed, judgment shall be entered against Corbett and Turner for all costs in this case in the district court. If Kinzbach fails to make such payment, and judgment is entered for Corbett against Kinzbach for $17,500 plus ten per cent. attorney's fees, the trial court is left with the power to apportion costs as in his sound judgment may be just and right, giving due consideration to the matters litigated herein and the things which have caused the accumulation of costs.

(5) Corbett and Turner shall pay all costs occasioned by this appeal in the Court of Civil Appeals and in this Court.

(6) Any matters which may come before the trial court, not covered by the above instructions, are left to be adjudicated by that court.

## Motions for Rehearing and to Further Instruct The District Court.

This cause is before us on two motions, viz.:

**\*576** (a) Motion No. 15475, which is a motion for rehearing filed by the Corbett-Wallace Corporation.

(b) Motion No. 15476, which is a motion filed by Kinzbach Tool Company, Inc., to further instruct the district court.

We have read and carefully considered the motion for rehearing filed herein by the Corbett-Wallace Corporation, and still adhere to the views expressed in our original opinion. It is therefore ordered that same be in all things overruled.

We have read and carefully considered the motion to further instruct the district court filed herein by Kinzbach Tool Company, Inc., and, in our opinion, same should be granted. It is therefore ordered and adjudged that in addition to the instructions given to the trial court in our original opinion and judgment the following instruction is given:

(4-A) If it should appear on remand that Corbett has enforced the erroneous judgment of the trial court by execution or otherwise, then the trial court shall render judgment that plaintiff take nothing by its suit, and that Kinzbach on its cross-action recover of Corbett that portion of the $5,000 secret commission remaining after deducting enough thereof, which, together with the amount collected by Corbett plus interest at the legal rate on the $2,250 attorney's fee and on the accelerated installments from the date collected, will equal and extinguish $22,500, the balance of the contract price.

## All Citations

138 Tex. 565, 160 S.W.2d 509

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

39 S.W.3d 191
Supreme Court of Texas.

Douglas LEHMANN and
Virginia Lehmann, Petitioners,
v.
HAR–CON CORPORATION, Respondent.
Melvin G. Harris and Helena M. Harris, Petitioners,
v.
Harbour Title Company, Respondent.

Nos. 99–0406, 99–0461.    |    Argued
Jan. 26, 2000.    |    Decided Feb. 1, 2001.

In personal injury action, the 129th District Court, Harris County, granted summary judgment in favor of one defendant. Plaintiffs appealed. In unrelated action for tort and breach of contract, the 281st District Court, Harris County, granted summary judgment for one defendant. Plaintiffs appealed. The Houston Court of Appeals, Fourteenth District, 1998 WL 429853 and 1999 WL 211859, dismissed appeals as untimely perfected. Plaintiffs in both cases petitioned for review, and cases were consolidated. The Supreme Court, Hecht, J., held that: (1) inclusion of a Mother Hubbard clause does not indicate that a judgment rendered without a conventional trial is final for purposes of appeal, overruling *Mafrige*, 866 S.W.2d 590, and (2) orders from which plaintiffs had appealed were not final, appealable judgments.

Reversed and remanded.

Baker, J., filed concurring opinion in which Enoch and Hankinson, JJ., joined in part.

West Headnotes (12)

**[1]** **Appeal and Error**
    Necessity of final determination

As a general rule, an appeal may be taken only from a final judgment.

342 Cases that cite this headnote

**[2]** **Appeal and Error**
    Final Judgments or Decrees

Whether a judicial decree is a final, appealable judgment must be determined from its language and the record in the case.

39 Cases that cite this headnote

**[3]** **Judgment**
    Final judgment

A judgment that finally disposes of all remaining parties and claims, based on the record in the case, is final, regardless of its language.

127 Cases that cite this headnote

**[4]** **Judgment**
    Final judgment

A judgment that actually disposes of every remaining issue in a case is not interlocutory merely because it recites that it is partial or refers to only some of the parties or claims.

11 Cases that cite this headnote

**[5]** **Judgment**
    Final judgment

If a court has dismissed all of the claims in a case but one, an order determining the last claim is final.

17 Cases that cite this headnote

**[6]** **Appeal and Error**
    Nature and Scope of Decision

If the intent to dispose of all claims is clear from the order, then the order is final and appealable, even though the record does not provide an adequate basis for rendition of judgment.

63 Cases that cite this headnote

**[7]** **Appeal and Error**
    Nature and Scope of Decision

Inclusion of a Mother Hubbard clause—which is the statement, "all relief not granted is denied," or essentially those words—does not indicate that a judgment rendered without a conventional

trial is final for purposes of appeal; overruling *Mafrige v. Ross*, 866 S.W.2d 590.

115 Cases that cite this headnote

**[8]**    **Appeal and Error**
        Nature of remedy by dismissal

Right to appeal should not be lost by an overly technical application of the law.

6 Cases that cite this headnote

**[9]**    **Appeal and Error**
        Final Judgments or Decrees

In cases in which only one final and appealable judgment can be rendered, when there has not been a conventional trial on the merits, an order or judgment is not final for purposes of appeal unless it actually disposes of every pending claim and party or unless it clearly and unequivocally states that it finally disposes of all claims and all parties.

652 Cases that cite this headnote

**[10]**    **Appeal and Error**
        Finality as to All Parties

    **Appeal and Error**
        Determination of part of controversy

An order does not dispose of all claims and all parties, for purposes of appealability, merely because it is entitled "final," or because the word "final" appears elsewhere in the order, or even because it awards costs, nor does an order completely dispose of a case merely because it states that it is appealable; rather, there must be some other clear indication that the trial court intended the order to completely dispose of the entire case.

240 Cases that cite this headnote

**[11]**    **Appeal and Error**
        Finality as to All Parties

    **Appeal and Error**
        Determination of part of controversy

Order that did not indicate that it was a final judgment and did not dispose of all pending claims and parties was not a final, appealable judgment.

367 Cases that cite this headnote

**[12]**    **Appeal and Error**
        Finality as to All Parties

    **Appeal and Error**
        Determination of part of controversy

Order stating that plaintiffs took nothing as to "one of the defendants" was not a final, appealable judgment; language did not suggest that all of plaintiffs' claims were denied, and defendant named in order was not the only defendant remaining in the case.

100 Cases that cite this headnote

**Attorneys and Law Firms**

**\*192**  Howard R. King, Hill Angel & King, Houston, for Petitioner in No. 99-0406.

James E. Simmons, Simmons & Lawrence, John H. Thomisee, Jr., Henry S. Platts, Chalker Bair, Houston, for Respondent in No. 99-0406.

James F. Tyson, Houston, Jerry D. Conner, Conner & Dreyer, Houston, for Petitioner in No. 99-0461.

Ben A. Baring, Paul J. McConnell, III, DeLange Hudspeth McConnell & Tibbetts, Houston for Respondent in No, 99-0461.

**Opinion**

Justice HECHT delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice OWEN, Justice ABBOTT, and Justice O'NEILL joined.

In these two consolidated cases we revisit the persistent problem of determining when a judgment rendered without a conventional trial on the merits is final for purposes of appeal. We consider only cases in which one final and appealable judgment can be rendered and not cases, like some probate and receivership proceedings, in which multiple judgments final for purposes of appeal can be rendered on certain

discrete issues.[1] And we consider a judgment's finality only for purposes of appeal and not for other purposes, such as issue and claim preclusion.[2] In *Mafrige v. Ross,*[3] we held that a summary judgment is final if it contains language purporting to dispose of all claims and parties. We gave as one example of such language what we have called a "Mother Hubbard" clause[4] —a recitation that all relief not expressly granted is denied.[5] Since then, the routine inclusion of this general statement in otherwise plainly interlocutory orders and its ambiguity in many contexts have rendered it inapt for determining finality when there has not been a conventional trial. We no longer believe that a Mother Hubbard clause in an order or in a judgment issued without a full trial can be taken to indicate finality. We therefore hold that in cases in which only one final and appealable judgment can be rendered, a judgment issued without a conventional trial is final for purposes of appeal if and only if either it actually disposes of all claims and parties then before the court, regardless of its language, or it states with unmistakable clarity that it is a final judgment **\*193** as to all claims and all parties. In the two cases before us, the court of appeals concluded that judgments that do not meet this test were final and dismissed the appeals as having been untimely perfected.[6] We reverse and remand for consideration of the merits of the appeals.

1    *See Crowson v. Wakeham,* 897 S.W.2d 779, 783 (Tex.1995) (involving probate proceedings); *Huston v. Federal Deposit Ins. Corp.,* 800 S.W.2d 845, 847 (Tex.1990) (involving receivership proceedings).

2    *See Street v. Honorable Second Court of Appeals,* 756 S.W.2d 299, 301 (Tex.1988).

3    866 S.W.2d 590 (Tex.1993).

4    *Teer v. Duddlesten,* 664 S.W.2d 702, 704 (Tex.1984).

5    *Mafrige,* 866 S.W.2d at 590 n. 1.

6    *Lehmann v. Har–Con Corp.,* 1998 WL 429853 (Tex.App.—Houston [14th Dist.] 1998), 988 S.W.2d 415 (1999) (op. on reh'g); *Harris v. Harbour Title Co.,* 1999 WL 211859 (Tex.App.—Houston [14th Dist.] 1999).

**I**

***Lehmann v. Har–Con Corp.***

Douglas and Virginia Lehmann sued the University of St. Thomas and Har–Con Corp. in the district court in Harris County to recover damages for injuries Douglas suffered in a construction accident. The University cross-claimed against Har–Con for indemnity. The Lehmanns settled with Har–Con and executed a release, agreeing in part to indemnify Har–Con against certain claims which had been or could be asserted by or through them. Virginia then filed an amended petition on behalf of her minor son against both defendants, claiming damages for loss of parental consortium because of his father's injuries. In response, Har–Con filed a counterclaim against Virginia and a third-party petition against Douglas, seeking indemnity from them under the terms of their prior release.

The Lehmanns and Har–Con all moved for summary judgment on Har–Con's indemnity claims. The district court denied the Lehmanns' motion and granted Har–Con's motion. The court's order granting Har Con's motion stated in full:

**[caption]**

**ORDER**

On this *12* day of *March,* 1998 came on to be considered the Motion for Summary Judgment of HAR–CON CORPORATION. After considering the motion, the response, the summary judgment evidence and the argument of counsel, the Court is of the opinion that the motion should be in all things granted. It is therefore,

ORDERED, ADJUDGED AND DECREED that the Motion for Summary Judgment by HAR–CON CORPORATION be and it is hereby GRANTED.

All relief not expressly granted herein is denied.

Signed this the *12* day of *March,* 1998

　　s/_____

　　JUDGE PRESIDING

[s/ Attorneys for Har–Con Corporation]

The order did not reference Virginia's claims on behalf of her son against Har–Con, although it would appear that Har Con's summary judgment on its indemnity claim would effectively bar recovery for Virginia's son. The order also did not reference Virginia's son's claims against the

University, which would not appear to be affected by Har–Con's summary judgment. The order contained a "Mother Hubbard" clause stating that "[a]ll relief not expressly granted herein is denied."

The district clerk advised the Lehmanns by postcard that an interlocutory summary judgment order had issued. The record does not reflect whether the parties received a copy of the actual order after it was signed. The Lehmanns tell us that the practice of the district clerk in Harris County is not to send copies of orders to the parties but to give parties notice by postcard when orders are signed. The notice does not completely describe the content of the order.

The Lehmanns appear to have believed that the summary judgment order was interlocutory because they moved to sever it and Har–Con's claims into a separate action, ostensibly to make the summary judgment final. The court granted the motion to sever on the twenty-fifth day after the summary judgment order was signed. Twenty-eight days after the severance **\*194** order was signed, the Lehmanns noticed their appeal from the summary judgment order.

If the summary judgment was not final until the severance order was signed, then the Lehmanns' appeal was timely. But the court of appeals held that the summary judgment order was final when it issued because of the Mother Hubbard clause and that the order was not modified by the severance so as to restart the time for perfecting appeal.[7] Because the Lehmanns did not perfect appeal within thirty days of the signing of the order as prescribed by the rules of appellate procedure,[8] the court dismissed the appeal for want of jurisdiction. In holding that the summary judgment order was final, the court followed our decision in *Mafrige,* although the court expressed concerns that the inclusion of a Mother Hubbard clause in an otherwise plainly interlocutory order should not make the order final.

[7] 988 S.W.2d 415 (op. on reh'g).

[8] *See* TEX.R.APP. P. 26.1 (appellate time limits).

We granted the Lehmanns' petition for review and consolidated it for argument and decision with *Harris v. Harbour Title Co.*[9]

[9] 43 TEX. SUP.CT. J. 94, 96 (Nov. 12, 1999).

### *Harris v. Harbour Title Co.*

Melvin and Helena Harris sued five defendants—Greenfield Financial Corp. and Larry J. Greenfield ("the Greenfield defendants"), Tim Rice and Rice Development, Inc. ("the Rice defendants"), and Harbour Title Co.—in the district court in Harris County on breach-of-contract and tort claims arising from a conveyance of real property. The court granted an interlocutory default judgment against Tim Rice on liability only, leaving for later a determination of the damages to be assessed against him. The Harrises nonsuited their claims against the Greenfield defendants. The fifth defendant, Harbour Title Co., moved for summary judgment, which the court granted with the following order:

**[caption]**

**Order Granting Harbour Title Company's**

**Motion for Summary Judgment**

On August 28, 1998, came on to be heard the Motion for Summary Judgment of one of the defendants, Harbour Title Company, and the Court having considered the Motion, together with any response, and the supplemental briefing filed by the parties to date is of the opinion that said Motion is with merit and should be granted. It is therefore

ORDERED that defendant Harbour Title Company's Motion for Summary Judgment is in all things granted; it is further

ORDERED that the Plaintiffs, Melvin G. Harris and Helena M. Harris take nothing as to any of their claims against Harbour Title Company.

All relief requested and not herein granted is denied.

SIGNED this *15* day of October 1998.

s/_____

JUDGE PRESIDING

APPROVED AND ENTRY REQUESTED:

[s/ Attorneys for Harbour Title Company]

Although the order did not reference the Harrises' pending claims against the Rice defendants, it nevertheless contained a Mother Hubbard clause stating that "[a]ll relief requested and not herein granted is denied."

The Harrises assert that they received notice of the order by a postcard that described the order as an interlocutory summary judgment, but the postcard is not in our record. The record does not reflect whether the parties obtained a copy of the order after it was signed. It appears that the district clerk followed her usual procedure of notifying the parties by **\*195** postcard in lieu of providing copies of the order.

The district court apparently did not consider the summary judgment order to be final; forty-six days after it was signed, the court generated a form order setting the case for trial the next year. The Harrises, too, appear to have believed the summary judgment to be interlocutory; two weeks after the order issued setting the case for trial, the Harrises obtained what was captioned a "Final Default Judgment" against the Rice defendants. Twenty-five days later the Harrises noticed their appeal from Harbour Title's summary judgment.

If Harbour Title's summary judgment did not dispose of the Harrises' claims against the Rice defendants, and the default judgment against those defendants was the final order in the case, then the Harrises' appeal was timely. But following *Mafrige,* as it had done in *Lehmann,* the court of appeals concluded that the summary judgment order was final and therefore dismissed the appeal as not having been timely perfected. We granted the Harrises' petition for review and consolidated it with *Lehmann* for argument and decision. [10]

[10]    43 TEX. SUP.CT. J. 94, 96 (Nov. 12, 1999).

## II

### A

 **[1]**    **[2]**    Though its origins are obscure and its rationale has varied over time, [11] the general rule, with a few mostly statutory exceptions, is that an appeal may be taken only from a final judgment. [12] A judgment is final for purposes of appeal if it disposes of all pending parties and claims in the record, except as necessary to carry out the decree. [13] (An order that does not dispose of all pending parties and claims may also be final for purposes of appeal in some instances, such as orders that resolve certain discrete issues in some probate [14] and receiverships [15] cases, but we exclude those cases from consideration here. Nor do we consider when a judgment may be final for purposes other than appeal, such as claim and issue preclusion. [16]) Because the law

does not require that a final judgment be in any particular form, whether a judicial decree is a final judgment must be determined from its language and the record in the case. Since timely perfecting appeal (as well as filing certain post-judgment motions and requests) hangs on a party's making this determination correctly, certainty is crucial.

[11]    *See* CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE §§ 3906–3907 (1992).

[12]    *See, e.g., North East Indep. Sch. Dist. v. Aldridge,* 400 S.W.2d 893, 895 (Tex.1966); *Gulf C. & S. F. Ry. v. Fort Worth & N. O. Ry.,* 68 Tex. 98, 2 S.W. 199, 200 (1886), *op. on reh'g,* 68 Tex. 98, 3 S.W. 564 (1887); see TEX. CONST. art. V, § 3–b (direct appeals to the Supreme Court); TEX. CIV. PRAC. & REM.CODE §§ 15.003(c) (interlocutory joinder and intervention appeals), 51.012 (court of appeals jurisdiction), 51.014 (interlocutory appeals); TEX. GOV'T CODE §§ 22.001(c) (direct appeals), 22.225(d) (interlocutory appeal to the Supreme Court).

[13]    *See Jack B. Anglin Co., v. Tipps,* 842 S.W.2d 266, 272 (Tex.1992); *Linn v. Arambould,* 55 Tex. 611, 617–18 (1881) (surveying several tests for determining when a judgment is final). *See generally* 49 C.J.S. *Judgments* § 11 (1947); 46 AM.JUR.2D *Judgments* § 200–206 (1994).

[14]    *Crowson v. Wakeham,* 897 S.W.2d 779, 783 (Tex.1995).

[15]    *Huston v. Federal Deposit Ins. Corp.,* 800 S.W.2d 845, 847 (Tex.1990).

[16]    *See Street v. Second Court of Appeals,* 756 S.W.2d 299, 301 (Tex.1988).

From the beginning, however, certainty in determining whether a judgment is final has proved elusive. What has vexed courts in this State and elsewhere is this: must a final judgment dispose of all parties and claims specifically, or may it do so by general language or even by inference? If a specific disposition of each party and **\*196** claim is strictly required, a judgment apparently intended by the parties and the trial court to be final and appealable may not be. An appeal from such a judgment must be dismissed or at least abated, resulting in delay and a waste of the courts' and the parties' resources. More importantly, if a judgment intended to be final did not meet the strict requirements, then the case would remain open, allowing the possibility of further proceedings and appeal years later. On the other hand, if a judgment may dispose of all parties and claims by general language or inference, a party or trial court may think that a judgment is

interlocutory, only to be told later by the appellate court after the time for appeal has passed that the judgment was final. A party who is uncertain whether a judgment is final must err on the side of appealing or risk losing the right to appeal.

In 1881, after struggling with these problems for many years,[17] we attempted to resolve them in the case of *Linn v. Arambould.*[18] There we stated that a final judgment after trial must dispose of the issues "intrinsically, and not inferentially."[19] That is, specificity was strictly required. The results of this rule were predictable. Appellate courts frequently declared shabbily drafted judgments interlocutory even though the trial courts and the parties had obviously intended for them to be final.[20] Confused parties were spending time and money attempting to appeal from possibly final judgments, only to have the appellate courts dismiss the appeals for want of jurisdiction.[21] As this Court later reflected on *Arambould* 's intrinsic-disposition requirement for finality:

[17]    See *Hanks v. Thompson,* 5 Tex. 6, 8 (1849) (defining a final judgment as awarding the judicial consequences which the law attaches to the facts and determining the subject matter of the controversy between the parties); *accord West v. Bagby,* 12 Tex. 34 (1854). *See also Fitzgerald v. Fitzgerald,* 21 Tex. 415 (1858); *Hancock v. Metz,* 7 Tex. 177 (1851) (both holding that a judgment for the defendant for costs did not constitute a final judgment); *Warren v. Shuman,* 5 Tex. 441, 450 (Tex.1849) (finding that a judgment that awards costs without disposing of the subject matter of the controversy is not a final judgment). *See generally* 31 JEREMY C. WICKER, TEXAS PRACTICE, CIVIL TRIAL & APPELLATE PROCEDURE § 506, at 289–311 (1985) (chronicling, in depth, the challenges of distinguishing between final and interlocutory judgments in various contexts beginning in the mid–19th century).

[18]    55 Tex. 611 (1881).

[19]    *Id.* at 619.

[20]    See *Aldridge,* 400 S.W.2d at 895.

[21]    See, e.g., *East & West Tex. Lumber Co. v. Williams,* 71 Tex. 444, 9 S.W. 436 (1888); *Hill v. Templeton,* 25 S.W. 652 (Tex.Civ.App.1894); *Mills v. Paul,* 4 Tex.Civ.App. 503, 23 S.W. 395 (1893).

By its application most judgments easily became black or white—final or interlocutory; but all too often judgments which were obviously intended to be final were being held interlocutory because of careless draftsmanship. The rule had to be changed to accommodate oversight or carelessness.[22]

[22]    *Aldridge,* 400 S.W.2d at 895.

In 1896 we altered course. In *Rackley v. Fowlkes,*[23] the plaintiff had, in a prior suit, sued for title to real property and for rent for the four years the property was in the defendant's possession, but at trial he offered no evidence of the amount of rent due until after the evidence was closed, and because the offer was late the court refused to hear it. The court in that suit rendered judgment awarding title to the plaintiff without mentioning his claim for rent. When the plaintiff filed a second suit for the rent, the defendant asserted res judicata in defense. The trial court rendered judgment for the plaintiff, concluding that the rent claim had not been adjudicated in the prior suit, and the court of civil appeals affirmed. We reversed the judgments of the lower courts, not because the rent claim should have been adjudicated **\*197** in the first suit, but because it *was* adjudicated:

[23]    89 Tex. 613, 36 S.W. 77, 78 (1896).

The proposition seems to be sound in principle and well supported by authority that where the pleadings and judgment in evidence show that the pleadings upon which the trial was had put in issue plaintiff's right to recover upon two causes of action, and the judgment awards him a recovery upon one, but is silent as to the other, such judgment is prima facie an adjudication that he was not entitled to recover upon such other cause. This liberal construction of the judgment against the party who sought to recover therein is supported by the presumption that the court performed the duty devolved upon it upon the submission of the cause by disposing of every issue presented by the pleadings so as to render its judgment final and conclusive of the litigation, and by the further fact that the policy of the law favors the speedy settlement of litigation and opposes the harassing of the defendant with two suits for the same cause.[24]

[24]    *Id.* at 78 (citations omitted).

Three years later we used the rule stated for purposes of res judicata in *Rackley* to determine whether a judgment was final for purposes of appeal. In *Davies v. Thomson,*[25] the plaintiffs sued for money and an interest in real property as their share of a joint venture. The trial court rendered judgment on a jury verdict awarding the plaintiffs money without mentioning

the claim for an interest in real property. We held that the judgment disposed of both claims was therefore final and appealable.[26]

25    92 Tex. 391, 49 S.W. 215 (1899).

26    *Id.* at 217.

Neither *Rackley* nor *Davies* mentioned *Arambould* or attempted to reconcile their results with the rule in that case, thereby generating confusion in the appellate courts over how to determine finality in cases involving cross-claims and counterclaims. Some courts treated judgments that merely implicitly disposed of all claims as final, while other courts required that final judgments expressly adjudicate each claim.[27] In 1913, the Court resolved the conflict in *Trammell v. Rosen,*[28] rejecting the rule stated in *Arambould.* The plaintiff in *Trammell* sued on a promissory note secured by property that the defendant and his wife claimed was their homestead. The couple counterclaimed to establish their homestead claim and for damages for wrongful sequestration. The trial court instructed a verdict for the plaintiff on his claim and against the defendants on their counterclaim. The judgment recited the verdict and awarded damages to the plaintiff but did not mention the counterclaim.[29] Citing *Rackley,* the Court concluded that the judgment was final, reasoning that by granting the plaintiff's claim the trial court implicitly but necessarily denied the defendants' counterclaim.[30] Still, the Court strongly encouraged courts to expressly address each claim and party in final judgments to avoid further confusion:

27    *See Trammell v. Rosen,* 106 Tex. 132, 157 S.W. 1161, 1162 (1913) (listing the various appellate courts subscribing to each school of construction).

28    *Id.*

29    *Id.* at 1161.

30    *Id.* at 1161–1163.

We feel constrained to hold that the judgment of the trial court, although irregular and imperfect in form, is sufficient to support the appeal. However, we feel impelled to say, also, that we think that, as a matter of practice, and to avoid confusion, every final judgment should plainly, explicitly, and specifically dispose of each and every party to the cause, and of each and every issue therein presented by the pleadings.[31]

31    *Id.* at 1163. *See also Burton Lingo Co. v. First Baptist Church,* 222 S.W. 203, 204 (Tex. Comm'n App.1920, holding approved) (citing *Trammell* for support of its presumption that the judgment disposed of a claim).

**\*198** Two cases decided after *Trammell* suggest that the entire record should be considered in determining whether a post-trial judgment is final. In *Hargrove v. Insurance Investment Corp.,* we held that a judgment for the plaintiff was final when "considered as a whole in the light of the entire record".[32] Similarly, in *Ferguson v. Ferguson,* we held that a judgment awarding the plaintiff recovery on some of her claims while silent as to others was final, stating that "[i]n arriving at whether or not a judgment is final, the pleadings and evidence must also be taken into consideration".[33] Neither case should be read to deviate from the presumptive rule of *Trammell.* We did not hold in either case that the record could be used to show that a post-trial judgment final on its face was really not final. In two other cases during the same time period we did not mention the record in applying *Trammell.*[34]

32    142 Tex. 111, 176 S.W.2d 744, 746 (1944).

33    161 Tex. 184, 338 S.W.2d 945, 947 (1960).

34    *Gamble v. Banneyer,* 137 Tex. 7, 151 S.W.2d 586 (1941); *Vance v. Wilson,* 382 S.W.2d 107 (Tex.1964) (res judicata).

In 1966, we reaffirmed *Rackley, Davies,* and *Trammell* in *North East Independent School District v. Aldridge.*[35] The school district sued Aldridge for breach of contract, and he asserted in his defense that he had contracted only as an agent for his principal. He also brought a third-party action against his principal, alleging that the principal was responsible for any damages to which the school district might be entitled. The trial court granted a partial summary judgment holding Aldridge personally liable to the district and directed that the case proceed to trial to determine the amount of damages to be awarded. The parties then stipulated to the amount of damages, and the trial court rendered judgment for the district against Aldridge based on the stipulation. The judgment did not mention Aldridge's third-party action against his principal. The court of civil appeals dismissed Aldridge's appeal, holding that the trial court's judgment was not final.[36] We held that the judgment against Aldridge disposed of the third-party action and was final for purposes of appeal. After reviewing the courts' historical difficulties in making finality determinations, we stated the following rule

35    400 S.W.2d 893 (Tex.1966).

36    *North East Indep. Sch. Dist. v. Aldridge,* 392 S.W.2d 607 (Tex.Civ.App.—San Antonio 1965), *rev'd and remanded,* 400 S.W.2d 893 (Tex.1966).

for determining, in most instances, whether judgments in which parties and issues made by the pleadings are not disposed of in express language are, nevertheless, final for appeal purposes. When a judgment, not intrinsically interlocutory in character, is rendered and entered in a case regularly set for conventional trial on the merits, no order for a separate trial of issues having been entered ..., it will be presumed for appeal purposes that the Court intended to, and did, dispose of all parties legally before it and of all issues made by the pleadings between such parties. [37]

37    400 S.W.2d at 897–898.

We added: "Of course, the problem [of determining whether judgments are final] can be eliminated entirely by a careful drafting of judgments to conform to the pleadings or by inclusion in judgments of a simple statement that all relief not expressly granted is denied." [38] Inclusion of a catch-all statement—which we later denominated a "Mother Hubbard" clause [39] —would make clear that a post-trial judgment on the merits, presumed to have disposed of all claims, did indeed do so.

38    *Id.* at 898.

39    *Teer v. Duddlesten,* 664 S.W.2d 702, 704 (Tex.1984).

**\*199  B**

The presumption that a judgment rendered after a conventional trial on the merits is final and appealable has proved fairly workable for nearly a century, but we have never thought that it could be applied in other circumstances, as we first explained nearly sixty years ago. In *Davis v. McCray Refrigerator Sales Corp.,* [40] the plaintiff sued for the unpaid balance of the purchase price of a refrigerator, and the defendant counterclaimed for cancellation of the debt and for damages for payments already made and lost merchandise due to improper refrigeration. The defendant also filed a plea in abatement on the grounds that the plaintiff was a foreign corporation not licensed to do business in Texas and therefore not entitled to sue in state court. The trial court deferred ruling on the defendant's plea until after the case was tried

on the merits. After the jury returned a verdict, the trial court rendered judgment both that the plaintiff's claim be dismissed and that the plaintiff take nothing. [41] The only basis the trial court had for dismissal was the defendant's plea in abatement, while the only basis for rendering a take-nothing judgment was plaintiff's failure of proof at trial. The judgment did not mention the defendant's counterclaim. The court of civil appeals rejected the defendant's argument that the judgment was interlocutory and reversed and rendered judgment for the plaintiff. [42] This Court reversed and dismissed the appeal. Citing *Trammell,* the Court acknowledged that while a final judgment need not expressly dispose of each issue so long as other provisions of the judgment necessarily imply that the unmentioned issues have been disposed of, a dismissal of the plaintiff's suit did not necessarily imply a disposal of the defendant's cross-action . [43] The Court explained:

40    136 Tex. 296, 150 S.W.2d 377 (1941).

41    *McCray Refrigerator Sales Corp. v. Davis,* 140 S.W.2d 477, 478 (Tex.Civ.App.—Fort Worth 1940), *rev'd,* 136 Tex. 296, 150 S.W.2d 377 (1941).

42    *Id.*

43    150 S.W.2d at 378.

[I]f the court had intended to merely sustain the plea in abatement and dismiss plaintiff's suit, and had intended to retain the defendant's cross-action for further consideration, it would have entered the very judgment that was entered in this case. The mere failure of the judgment to refer to defendant's cross-action was not sufficient in itself to raise an inference that it was thereby intended to dispose of the cross-action. [44]

44    *Id.*

Although the judgment did not "merely" sustain the plea in abatement but also decreed that the plaintiff take nothing, the inclusion of the dismissal in the judgment as the first basis for decision was enough to make *Trammell* 's presumptive finality rule inapplicable.

*Davis* may have departed too far from *Trammell.* The trial court's decree following a jury trial on the merits that the plaintiff take nothing without mention of the defendant's counterclaim should perhaps have been presumed to deny all relief, despite the alternative ruling that the plaintiff's claim should be dismissed. But regardless of *Davis* 's unusual circumstances, the case makes the point, which we expressly

acknowledged in *Aldridge,* that "[i]t will not be presumed that a judgment dismissing a plaintiff's suit on nonsuit, plea to the jurisdiction, plea in abatement, for want of prosecution, etc., also disposed of the issues in an independent cross-action." [45]

45    *Aldridge,* 400 S.W.2d at 897.

We have since held that "etc." includes default judgments and summary judgments. [46] The reason for not applying a presumption in any of these circumstances **\*200** is that the ordinary expectation that supports the presumption that a judgment rendered after a conventional trial on the merits will comprehend all claims simply does not exist when some form of judgment is rendered without such a trial. On the contrary, it is quite possible, perhaps even probable these days in cases involving multiple parties and claims, that any judgment rendered prior to a full-blown trial is intended to dispose of only part of the case. Accordingly, the finality of the judgment must be determined without the benefit of any presumption.

46    See, e.g., *Houston Health Clubs, Inc. v. First Court of Appeals,* 722 S.W.2d 692 (Tex.1986), and the cases cited therein.

 **[3]**    **[4]**    **[5]**    A judgment that finally disposes of all remaining parties and claims, based on the record in the case, is final, regardless of its language. [47] A judgment that actually disposes of every remaining issue in a case is not interlocutory merely because it recites that it is partial or refers to only some of the parties or claims. Thus, if a court has dismissed all of the claims in a case but one, an order determining the last claim is final. [48] This is settled law in Texas, and while there have been proposals to change it by rule, proposals that are currently pending consideration by this Court's Advisory Committee, we are not inclined to depart from it here. The language of an order or judgment cannot make it interlocutory when, in fact, on the record, it is a final disposition of the case.

47    *Farmer v. Ben E. Keith Co.,* 907 S.W.2d 495, 496 (Tex.1995) (per curiam); *H.B. Zachry Co. v. Thibodeaux,* 364 S.W.2d 192, 193 (Tex.1963) (per curiam); *McEwen v. Harrison,* 162 Tex. 125, 345 S.W.2d 706, 707 (1961).

48    *Farmer,* 907 S.W.2d at 496; *H.B. Zachry Co.,* 364 S.W.2d at 193; *McEwen,* 345 S.W.2d at 707.

 **[6]**    But the language of an order or judgment *can* make it final, even though it should have been interlocutory, if that language expressly disposes of all claims and all parties. It

is not enough, of course, that the order or judgment merely use the word "final". The intent to finally dispose of the case must be unequivocally expressed in the words of the order itself. But if that intent is clear from the order, then the order is final and appealable, even though the record does not provide an adequate basis for rendition of judgment. So, for example, if a defendant moves for summary judgment on only one of four claims asserted by the plaintiff, but the trial court renders judgment that the plaintiff take nothing on all claims asserted, the judgment is final—erroneous, but final. [49] A judgment that grants more relief than a party is entitled to is subject to reversal, but it is not, for that reason alone, interlocutory. [50]

49    *Young v. Hodde,* 682 S.W.2d 236 (Tex.1984) (per curiam); *Chessher v. Southwestern Bell Tel. Co.,* 658 S.W.2d 563, 564 (Tex.1983) (per curiam).

50    *Id.*

Texas appellate courts, this Court included, have had difficulty determining when a judgment is final on its face —by its own express terms, in other words—even though it should not have been because no sufficient basis for rendering a final judgment was presented. In *Schlipf v. Exxon Corp.,* [51] the plaintiffs sued for gas royalties and prejudgment interest, and moved for summary judgment only on the royalties issue. Neither the defendant nor an intervenor moved for summary judgment against the plaintiffs. The trial court granted the plaintiffs' motion, awarding the royalties claimed, but denied prejudgment interest. The judgment recited:

51    644 S.W.2d 453 (Tex.1982) (per curiam).

the relief herein granted Plaintiffs, ... is in satisfaction of all of their claims and causes of action ... and all claims and/or causes of action herein asserted by all parties herein and not herein granted are hereby in all things denied and concluded.... [52]

52    *Id.* at 454.

 **\*201**   We held that this language conclusively disposed of all parties and issues, as it clearly did, although in reaching this conclusion, we reiterated our observation in *Aldridge* that the finality of a judgment would be made clear "by inclusion ... of a simple statement that all relief not expressly granted is denied." [53] This observation, appropriate in *Aldridge* in reference to judgments after a conventional trial on the merits, was misleading in *Schlipf,* because the only "relief" properly under consideration when the order issued was that raised

by the motion for summary judgment[54]—the plaintiffs' entitlement to royalties. After a full trial on the merits, the statement in a judgment that all relief not requested is denied signifies finality; there is no expectation that the court tried only part of the case, absent an order for severance or separate trials. But after a motion for partial summary judgment, the same statement in a judgment is ambiguous. It may refer only to the motion on which the trial court is ruling, not to all claims of all parties, and not even to other claims of the movant.

53      *Id.*

54      See *New York Underwriters Ins. Co. v. Sanchez,* 799 S.W.2d 677, 678 (Tex.1990) (per curiam); *Young v. Hodde,* 682 S.W.2d 236 (Tex.1984) (per curiam); *Chessher v. Southwestern Bell Tel. Co.,* 658 S.W.2d 563, 564 (Tex.1983) (per curiam).

Two years later, in *Teer v. Duddlesten,* we emphasized that the *Aldridge* language—all relief not expressly granted is denied—which we termed for the first time a "Mother Hubbard" clause, has no place in partial summary judgments because, by definition, those proceedings do not address all of the facts and issues in a case.[55] A Mother Hubbard clause, we said, could not convert a partial summary judgment into a final order.[56] Following *Teer,* most courts of appeals held that a Mother Hubbard clause could not make final a judgment rendered without a full trial,[57] although other courts reached the contrary conclusion.[58]

55      *Teer v. Duddlesten,* 664 S.W.2d 702, 704 (Tex.1984).

56      *Id.*

57      *E.g., Bethurum v. Holland,* 771 S.W.2d 719 (Tex.App.—Amarillo 1989, no writ); *Sakser v. Fitze,* 708 S.W.2d 40, 42 (Tex.App.—Dallas 1986, no writ) (declaring that a Mother Hubbard clause in an order does not convert an intrinsically interlocutory partial summary judgment into a final judgment).

58      *E.g., Georgetown Assoc., Ltd. v. Home Fed. Sav. & Loan Ass'n,* 795 S.W.2d 252, 253 (Tex.App.—Houston [14th Dist.] 1990, writ dism'd w.o.j.); *Hodde v. Young,* 672 S.W.2d 45, 47 (Tex.App.—Houston [14th Dist.] ) (holding that a judgment was final and appealable because it contained a Mother Hubbard clause), *writ ref'd, n.r.e.,* 682 S.W.2d 236 (Tex.1984) (per curiam) (noting that the erroneous rendition of a final judgment is not fundamental error).

We attempted to clarify matters in *Mafrige v. Ross.*[59] There, two plaintiffs sued some twelve defendants for malicious prosecution, slander, libel, conspiracy, and negligence.[60] No party other than the plaintiffs asserted any claims. The defendants, some individually and some in groups, filed a total of eight summary judgment motions, some directed against one of the plaintiffs and some against both.[61] Only one motion addressed both of the plaintiffs and all of the claims asserted;[62] even together, the other seven motions did not address both plaintiffs and all claims.[63] The trial court granted all eight motions with eight separate orders, one for each motion.[64] Each order stated that the **\*202** plaintiff or plaintiffs, depending on whether the motion had been directed at one or both, were to take nothing against the movant or movants.[65] Thus, taken together, the eight orders provided that both of the plaintiffs were to take nothing against all of the defendants. On the plaintiffs' appeal, however, the court of appeals held that there was not a final judgment because most of the defendants had not moved for summary judgment on all claims by both plaintiffs and thus were not entitled to a final judgment, and the "take nothing" language of the orders did not make them final.[66] The court also held that if the orders had contained Mother Hubbard clauses they would have been final under this Court's precedents, although the court of appeals did not agree that that would have been the proper result.[67]

59      866 S.W.2d 590 (Tex.1993).

60      *Id.* at 590.

61      *Id.*

62      *Ross v. Arkwright Mut. Ins. Co.,* 834 S.W.2d 385, 388–389 (Tex.App.—Houston [14th Dist.] 1992), *rev'd sub nom. Mafrige v. Ross,* 866 S.W.2d 590 (Tex.1993).

63      *Id.*

64      866 S.W.2d at 590–591.

65      *Id.*

66      *Ross,* 834 S.W.2d at 394.

67      *Id.* at 393–395.

We reversed, holding that the "take nothing" language in the eight summary judgment orders disposed of all claims asserted by both plaintiffs against each of the defendants and thus constituted a final judgment. We then explained:

If a summary judgment order appears to be final, as evidenced by the inclusion of language purporting to dispose of all claims or parties, the judgment should be treated as final for purposes of appeal. If the judgment grants more relief than requested, it should be reversed and remanded, but not dismissed. We think this rule to be practical in application and effect; litigants should be able to recognize a judgment which on its face purports to be final, and courts should be able to treat such a judgment as final for purposes of appeal. [68]

68    *Mafrige,* 866 S.W.2d at 592; *accord Springer v. Spruiell,* 866 S.W.2d 592 (Tex.1993) (per curiam).

As examples of "language purporting to dispose of all claims or parties," we gave not only the "take nothing" language of the orders before us, and the statement that summary judgment is granted as to all claims asserted, but also the standard Mother Hubbard clause-that all relief not expressly granted is denied. [69]  In so doing we revived the ambiguity created in *Schlipf* that *Teer* had tried to end.

69    *Id.* at 590 n. 1.

The ambiguity has persisted in our decisions. In *Martinez v. Humble Sand & Gravel, Inc.,* [70] we held that the inclusion of a Mother Hubbard clause in an order did not necessarily make it final. There, some but not all of the defendants moved for summary judgment, and the trial court granted the motions, dismissing the plaintiff's cause of action against "those Defendants", but also ordering that summary judgment was proper "as to all remaining Defendants", thereby suggesting that the court intended to render a final summary judgment. [71] However, the trial court subsequently severed the summary judgment by order inviting other defendants to move on the same grounds. [72]  Although this order contained a Mother Hubbard clause, we held that judgment had not been rendered for the non-moving defendants. [73]

70    875 S.W.2d 311 (Tex.1994) (per curiam).

71    *Id.* at 313.

72    *Id.*

73    *Id.*

But in *Bandera Electric Cooperative, Inc. v. Gilchrist,* [74] we held that a Mother Hubbard clause in a summary judgment made it final. There the plaintiff moved for summary judgment on its claims without mentioning the defendant's counterclaims. [75]  The defendant did not move for summary judgment. The trial court **\*203** granted the plaintiff's motion by order that included a Mother Hubbard clause. We concluded that the order was final, albeit erroneous. [76] We attempted to explain that our ruling was consistent with *Martinez* because the conflict in the orders involved in that case showed that they were not final even though "a Mother Hubbard clause ... would have created a final and appealable judgment". [77]  Besides its obvious inadequacy in explaining the result in *Martinez,* this explanation suggested that a Mother Hubbard clause would by itself make any summary judgment final, contrary to our holding in *Teer.*

74    946 S.W.2d 336 (Tex.1997) (per curiam).

75    *Id.* at 337.

76    *Id.*

77    *Id.* at 337 n. 2.

Determining the significance of omitting a Mother Hubbard clause in an order has been no easier. In *Park Place Hosp. v. Estate of Milo,* we suggested that the absence of a Mother Hubbard clause indicated that a summary judgment was intended to be interlocutory. [78]  There, the trial court granted summary judgment for three of five remaining defendants and later severed the judgment from the case. We concluded that the judgment did not become final for purposes of appeal until it was severed, in part based on the omission of a Mother Hubbard clause. But in two other cases we held that the omission of a Mother Hubbard clause did not make a summary judgment interlocutory that otherwise appeared final. In *Continental Airlines, Inc. v. Kiefer,* [79] the defendant moved for summary judgment "on all claims brought by" the plaintiffs. After the motion was filed, but before it was heard and decided, the plaintiffs amended their pleadings to add additional claims. The defendant did not amend its motion to address these later claims. The trial court granted what it entitled a "final summary judgment", dismissing the plaintiffs' cause of action—"cause", singular—although

multiple causes of action had been asserted. We held that the judgment was final, explaining as follows:

[78]   909 S.W.2d 508, 510 (Tex.1995).

[79]   920 S.W.2d 274, 276 (Tex.1996).

Finality "must be resolved by a determination of the intention of the court as gathered from the language of the decree and the record as a whole, aided on occasion by the conduct of the parties." 5 RAY W. MCDONALD, TEXAS CIVIL PRACTICE § 27:4[a], at 7 (John S. Covell, ed., 1992 ed.); *see Ferguson v. Ferguson,* 161 Tex. 184, 338 S.W.2d 945, 947 (1960). In the circumstances described here, we think the district court intended to render a final, appealable judgment.... Neither the parties nor the court of appeals have suggested that the judgment was not final. [80]

[80]   *Id.* at 277.

The judgment did not include a Mother Hubbard clause, but we did not find its omission significant. We reached a similar conclusion in *Inglish v. Union State Bank.* [81]

[81]   945 S.W.2d 810 (Tex.1997) (per curiam).

In sum, our opinions have not been entirely consistent on whether the inclusion or omission of a Mother Hubbard clause does or does not indicate that a summary judgment is final for purposes of appeal. This ambivalence has resulted in considerable confusion in the courts of appeals. [82]

[82]   *See, e.g.,* Elaine A. Carlson & Karlene S. Dunn, *Navigating Procedural Minefields: Nuances in Determining Finality of Judgments, Plenary Power, and Appealability,* 41 SO. TEX. L.REV.. 953, 969–1001 (2000); William J. Cornelius & David F. Johnson, *Tricks, Traps, and Snares in Appealing a Summary Judgment in Texas,* 50 Baylor L.Rev. 813, 825–835 (1998).

## III

### A

 **[7]**   Much confusion can be dispelled by holding, as we now do, that the inclusion of a Mother Hubbard clause—by which we mean the statement, "all relief not granted is denied", or essentially those words— **\*204**  does not indicate that a judgment rendered without a conventional trial is final for purposes of appeal. We overrule *Mafrige* to the extent it states

otherwise. If there has been a full trial on the merits either to the bench or before a jury, the language indicates the court's intention to finally dispose of the entire matter, assuming that a separate or bifurcated trial is not ordered. But in an order on an interlocutory motion, such as a motion for partial summary judgment, the language is ambiguous. It may mean only that the relief requested *in the motion*—not all the relief requested by anyone in the case—and not granted by the order is denied. The clause may also have no intended meaning at all, having been inserted for no other reason than that it appears in a form book or resides on a word processor. For whatever reason, the standard Mother Hubbard clause is used in interlocutory orders so frequently that it cannot be taken as any indication of finality.

As we have already explained, an order can be a final judgment for appeal purposes even though it does not purport to be if it actually disposes of all claims still pending in the case. Thus, an order that grants a motion for partial summary judgment is final if in fact it disposes of the only remaining issue and party in the case, even if the order does not say that it is final, indeed, even if it says it is not final. (Again, we do not consider here the various kinds of cases in which there may be more than one final judgment for purposes of appeal.) Also, an order can be final and appealable when it should not be. For example, an order granting a motion for summary judgment that addressed all of the plaintiff's claims when it was filed but did not address claims timely added by amendment after the motion was filed may state unequivocally that final judgment is rendered that the plaintiff take nothing by his suit. Granting more relief than the movant is entitled to makes the order reversible, but not interlocutory. [83]

[83]   *See Young v. Hodde,* 682 S.W.2d 236, 237 (Tex.1984) (per curiam); *Chessher v. Southwestern Bell Tel. Co.,* 658 S.W.2d 563, 564 (Tex.1983) (per curiam); *Schlipf v. Exxon Corp.,* 644 S.W.2d 453 (Tex.1983) (per curiam).

While the present problems in determining whether an order is a final judgment should be lessened significantly by denying the standard Mother Hubbard clause of any indicia of finality in any order not issued after a conventional trial, the difficulty in determining what does make an order final and appealable remains. One solution would be stricter requirements for the form of a final judgment. Rule 58 of the Federal Rules of Civil Procedure takes this approach by requiring that to be final a judgment must "be set forth on a separate document" and be entered by the clerk on the civil docket. The separate-document requirement was added to the rule in 1963 to remove uncertainty over whether a trial judge's

opinion or order constituted a final judgment.[84] Rule 58, with its dual requirements, " 'enhances certainty by insisting on formality.' "[85] The United States Supreme Court has insisted on strict compliance with the rule, quoting Professor Moore's observation that the rule

[84] *Bankers Trust Co. v. Mallis,* 435 U.S. 381, 384–385, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978).

[85] CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2781 (2d ed.1995) (quoting Benjamin Kaplan, *Amendments of the Federal Rules of Civil Procedure, 1961–1963,* 77 HARV. L.REV. 801, 831 (1964)).

" 'would be subject to criticism for its formalism were it not for the fact that something like this was needed to make certain when a judgment becomes effective, which has a most important bearing, inter alia, on the time for appeal and the making of post-judgment motions that go to the finality of the judgment **\*205** for purposes of appeal.' "[86]

[86] *United States v. Indrelunas,* 411 U.S. 216, 220–221, 93 S.Ct. 1562, 36 L.Ed.2d 202 (1973).

The one recognized exception is a party's failure to object.[87]

[87] *Bankers Trust,* 435 U.S. at 387–388, 98 S.Ct. 1117.

The price of certainty, however, as federal rulemakers have come to realize, is that in many cases the failure to comply with Rule 58 means that no final judgment was ever rendered, and the time for appeal remains open.[88] A proposed amendment to Rule 58 would provide that if final judgment is not rendered on a separate document, it is deemed rendered on the sixtieth day after the clerk's entry on the civil docket.[89] While this proposal helps ensure that every case will be closed, it also makes it more likely that a party will not be aware that the time for appeal is running—the problem the 1963 amendment to Rule 58 was meant to cure—because he does not know of the clerk's entry on the civil docket.

[88] COMMITTEE ON RULES OF PRACTICE & PROCEDURE OF THE JUDICIAL CONFERENCE OF THE UNITED STATES, PRELIMINARY DRAFT OF PROPOSED AMENDMENTS TO THE FEDERAL RULES OF APPELLATE, BANKRUPTCY, CIVIL, AND CRIMINAL PROCEDURE 100–114 (Aug.2000).

[89] Id.

There may be other solutions to these dilemmas which could be implemented by changes in our own rules, and this Court's Advisory Committee is presently studying the issues. But we do not write rules by opinion.[90] We must decide what Texas law requires for finality given the present rules.

[90] *State Dept. of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992); *Alvarado v. Farah Mfg. Co.,* 830 S.W.2d 911, 915 (Tex.1992).

**[8] [9] [10]** In the past we have tried to ensure that the right to appeal is not lost by an overly technical application of the law.[91] Fundamentally, this principle should guide in determining whether an order is final. Simplicity and certainty in appellate procedure are nowhere more important than in determining the time for perfecting appeal. From the cases we have reviewed here, we conclude that when there has not been a conventional trial on the merits, an order or judgment is not final for purposes of appeal unless it actually disposes of every pending claim and party or unless it clearly and unequivocally states that it finally disposes of all claims and all parties. An order that adjudicates only the plaintiff's claims against the defendant does not adjudicate a counterclaim, cross-claim, or third party claim, nor does an order adjudicating claims like the latter dispose of the plaintiff's claims. An order that disposes of claims by only one of multiple plaintiffs or against one of multiple defendants does not adjudicate claims by or against other parties. An order does not dispose of all claims and all parties merely because it is entitled "final", or because the word "final" appears elsewhere in the order, or even because it awards costs. Nor does an order completely dispose of a case merely because it states that it is appealable, since even interlocutory orders may sometimes be appealable. Rather, there must be some other clear indication that the trial court intended the order to completely dispose of the entire case. Language that the plaintiff take nothing by his claims in the case, or that the case is dismissed, shows finality if there are no other claims by other parties; but language that "plaintiff take nothing by his claims against X" when there is more than one defendant or other parties in the case does not indicate finality.

[91] *Verburgt v. Dorner,* 959 S.W.2d 615, 616–617 (Tex.1997).

To determine whether an order disposes of all pending claims and parties, it may of course be necessary for the appellate court **\*206** to look to the record in the case. Thus, in the

example just given, if the record reveals that there is only one plaintiff and only one defendant, X, the order is final, but if the record reveals the existence of parties or claims not mentioned in the order, the order is not final. On the other hand, an order that expressly disposes of the entire case is not interlocutory merely because the record fails to show an adequate motion or other legal basis for the disposition. The record may help illumine whether an order is made final by its own language, so that an order that all parties appear to have treated as final may be final despite some vagueness in the order itself, while an order that some party should not reasonably have regarded as final may not be final despite language that might indicate otherwise.

One may argue after *Aldridge* and *Mafrige* that it is perilous to suggest any particular language that will make a judgment final and appealable because that language can then be inserted in orders intended to be interlocutory. But to leave in doubt the degree of clarity required for finality creates its own problems. The Mother Hubbard clause proved to give no indication of finality not just because it found its way into every kind of order, but because it was inherently ambiguous, as we have explained. A statement like, "This judgment finally disposes of all parties and all claims and is appealable", would leave no doubt about the court's intention. An order must be read in light of the importance of preserving a party's right to appeal. If the appellate court is uncertain about the intent of the order, it can abate the appeal to permit clarification by the trial court.[92] But if the language of the order is clear and unequivocal, it must be given effect despite any other indications that one or more parties did not intend for the judgment to be final. An express adjudication of all parties and claims in a case is not interlocutory merely because the record does not afford a legal basis for the adjudication. In those circumstances, the order must be appealed and reversed.

[92]     TEX.R.APP. P. 27.2.

**B**

 [11]    [12]    Nothing in the order in *Lehmann* indicates that it is a final judgment, and it did not dispose of all pending claims and parties. The order in *Harris* states that plaintiffs take nothing as to "one of the defendants", but that language does not suggest that all of the plaintiffs' claims were denied. As the order recites and as the record demonstrates, the defendant named in the order was not the only defendant remaining

in the case. Thus, we conclude that a final and appealable judgment was not rendered in either case.

We are concerned that in neither case were the non-movants provided a copy of the court's signed order but were merely sent notice by postcard that an order had been signed. The Rules of Civil Procedure do not require clerks to send all parties copies of all orders, only final orders.[93] Nevertheless, the practice of courts in some counties is to require that a party seeking an order provide copies and addressed, postage-paid envelopes for all other parties. The Court's Advisory Committee should consider whether the rules should require that all parties be given copies of all orders signed in a case.

[93]     *See* TEX.R. CIV. P. 306a(3).

**IV**

We must respond briefly to the concurring opinion. It would hold that no "type of conclusory finality language can ever be read to grant more relief than requested by the parties."[94] This goes too far. The legitimate problem with Mother Hubbard clauses, which we failed to appreciate in *Mafrige,* is that they are ambiguous: one cannot be sure whether the denial of all relief other than what has been expressly **\*207** granted is limited to relief requested in a motion or extends to all relief requested in the litigation. But it is a long way from the now well-established fact that Mother Hubbard clauses can understandably be misread to the concurring opinion's conclusion that clear language should be given no meaning. We require certainty for finality, but we cannot say that certainty is impossible.

[94]     *Post* at 217.

The concurring opinion claims as authority for its position pre-*Mafrige* law, but before *Mafrige,* this Court repeatedly held that general language in a summary judgment finally disposed of the litigation even though no party had requested final relief. In *Schlipf v. Exxon Corp.* we held that an order granting the plaintiffs' motion for summary judgment on one of its claims and generally denying all other relief was final, even though no defendant had moved for summary judgment or requested the denial of any relief.[95] Similarly, in *Chessher v. Southwestern Bell Telephone Co.* we held that a summary judgment generally disposing of all four claims asserted by the plaintiff was final, even though the defendant moved for summary judgment on only one of the claims.[96]

Again in *Young v. Hodde,* we agreed that a Mother Hubbard clause in an order granting summary judgment for the plaintiff disposed of a defendant's counterclaim, even though the plaintiff's motion had addressed only his own claims and not the counterclaim.[97] It has simply never been the law in Texas that a summary judgment generally disposing of all claims and parties is nevertheless interlocutory merely because rendition of a final judgment was improper. In essence, the concurring opinion's position is that a trial court has no jurisdiction to grant more relief than is requested, and that if it does so, its action is absolutely void. We do not agree that a court's *power* to act, as distinct from the proper exercise of that power, is defined by a party's request for relief.

[95]  [644 S.W.2d 453 (Tex.1982)](#) (per curiam).

[96]  [658 S.W.2d 563 (Tex.1983)](#) (per curiam). Although our opinion did not quote the trial court's order, an examination of the record in the case reveals that the order recited that the court had considered the defendant's motion for summary judgment, the plaintiff's responses, and the defendant's reply, and had notified the parties that "it had determined to grant the defendant's motion for summary judgment." The decretal portion of the order stated "that plaintiff, Paul G. Chessher, take nothing of and from defendant, Southwestern Bell Telephone Company. Costs of court are hereby taxed against plaintiff, Paul G. Chessher."

[97]  *Young v. Hodde,* 682 S.W.2d 236, 236–237 (Tex.1984) (per curiam), *writ ref'd n.r.e.,* [672 S.W.2d 45 (Tex.App. —Houston [14th Dist.] ).](#)

The concurring opinion acknowledges that its position may result in more appeals being taken from orders that look final but are really interlocutory, but it argues that appellate courts can easily deal with such problems by abating appeals to allow trial courts to clarify their orders. What the concurring opinion ignores is that trial courts and parties will assume that orders with general dispositive language mean what they say, only to learn months or years after an appeal should have been taken that no final judgment was ever rendered. JUSTICE BAKER would insist that every order granting summary judgment

> specifically identify: (1) the claims each party brought; (2) the grounds upon which each party seeks summary judgment; (3) each ground upon which the trial court granted summary judgment; and (4) each ground upon

which the trial court denied summary judgment.

Any order that failed to meet these requirements would be interlocutory, according to JUSTICE BAKER, "*regardless* of how clearly it states that it is a final judgment disposing of all parties and issues."[98] The very real risk of such a rule is that thousands of judgments intended to be final would remain interlocutory because they did not comply with all of these requirements. **\*208** This is precisely what has happened in the federal system, as we have already explained, even though the federal rules impose far fewer requirements on final judgments than the concurring opinion would.

[98]  *Post* at 219 (emphasis in original).

\* \* \* \* \*

For the reasons we have explained, the judgments of the court of appeals in these cases are reversed, and the cases are remanded to that court for further proceedings.

Justice BAKER filed a concurring opinion in which Justice ENOCH joined, except for Part IV and the discussion of Inglish and Bandera, and in which Justice HANKINSON joined, except Part IV.

The Court granted these petitions in *Lehmann* and *Harris* to solve the *Mafrige* problems. The Court fails to do so. Thus, while I concur in the result the Court reaches, I cannot agree with the reasoning it uses to reach that result.

In March 1993, we granted writ in *Mafrige v. Ross* to resolve the inherent problems in determining finality of summary judgments for purposes of appeal. [866 S.W.2d 590 (Tex.1993).](#) There we recognized that determining finality had "been a recurring and nagging problem throughout the judicial history of this state." *Mafrige,* 866 S.W.2d at 590. Thus, in a major departure from our prior jurisprudence, we created a new rule providing: "If a summary judgment order appears to be final, as evidenced by the inclusion of language purporting to dispose of all claims or parties, the judgment should be treated as final for purposes of appeal." *Mafrige,* 866 S.W.2d at 592.

Despite the certainty we intended this bright-line rule to provide, the last seven years have proved that the *Mafrige* rule has created more problems than it solved—confusing the

lower courts, operating as a trap for unwary litigants, and consistently bringing about arguably unjust and oftentimes absurd results. So, in November 1999, we granted the petitions in these cases to resolve the *Mafrige* problems. Inexplicably, the Court begins its opinion by chronicling the evolution of the rules and presumptions governing finality of orders following a conventional trial on the merits from the middle of the last century to the present.[1] Then, with very little discussion of the problems *Mafrige* and its progeny created in determining summary judgment finality, the Court concludes that the solution is to maintain the principle of the *Mafrige* legal fiction—with only slight modification.

[1] These rules and presumptions are irrelevant to the issues before the Court today. As we have repeatedly admonished—in *Mafrige,* in *Aldridge,* and even in the Court's opinion today—the rules governing finality after a conventional trial are wholly inappropriate for determining finality of summary judgments. *See Mafrige,* 866 S.W.2d at 592; *North East Indep. Sch. Dist. v. Aldridge,* 400 S.W.2d 893, 897–98 (Tex.1966); *Lehmann,* 39 S.W.3d 191.

However, rather than solve, the Court merely perpetuates the problems *Mafrige* created. The cases grappling to apply *Mafrige* illustrate that there is but one real solution. We should return to the principle we announced in *Teer v. Duddlesten*—that a Mother Hubbard clause simply "has no place in a partial summary judgment," and that a summary judgment order is not an appealable, final judgment unless it actually disposes of all parties and issues. 664 S.W.2d 702, 703–04 (Tex.1984).

The Court states: "[W]e do not write rules by opinion." 39 S.W.3d at 205. The Court is right; we should not establish rules by judicial fiat. We should not have done so in *Mafrige* and we should not have perpetuated the *Mafrige* problems with *Inglish* and *Bandera.* Any new summary judgment finality rule should be achieved by this Court's formally promulgating a new procedure rule. The Court should recognize this, overrule *Mafrige* and its progeny, and await a recommendation by **\*209** our rules advisory committee. Because the Court refuses to take this path, I concur in the judgment only.

## I. *MAFRIGE* AND ITS PROGENY

Before *Mafrige,* courts determined summary judgment finality by reviewing the live pleadings, the summary

judgment motion, and the summary judgment order. *Harris County v. Nash,* 22 S.W.3d 46, 49–50 (Tex.App.—Houston [14th Dist.] 2000, pet. filed); *Kaigler v. General Elec. Ins. Mortgage Corp.,* 961 S.W.2d 273, 275 (Tex.App.—Houston [1st Dist.] 1997, no pet.). A summary judgment was deemed final and appealable only if it expressly disposed of all parties and issues or if it was severed from the remainder of the suit. *Pan Am. Petroleum Corp. v. Texas Pac. Coal & Oil Co.,* 159 Tex. 550, 324 S.W.2d 200, 200 (1959) ("[A] summary judgment which does not dispose of all parties and issues in the pending suit is interlocutory and not appealable unless a severance of that phase of the case is ordered by the trial court.").

With *Mafrige,* this Court attempted to simplify this process by holding that the "magic language" of a Mother Hubbard or similar finality clause conclusively transforms an interlocutory summary judgment into a final, appealable order. *Mafrige,* 866 S.W.2d at 592. We have twice revisited *Mafrige* to clarify its scope. *See Inglish v. Union State Bank,* 945 S.W.2d 810, 811 (Tex.1997) (holding that the *Mafrige* rule applies even when neither party appeals the erroneous summary judgment); *Bandera Elec. Coop., Inc. v. Gilchrist,* 946 S.W.2d 336, 337 (Tex.1997) (explaining that when the *Mafrige* rule renders a partial summary judgment final for purposes of appeal, the appellate court should reverse and remand only the erroneously disposed claims). Unfortunately, *Mafrige* did little towards alleviating the lower courts' confusion—and *Inglish* and *Bandera* only compounded it. The Court's opinion suffers the same problem. Namely, its slightly-modified *Mafrige* rule falls far short of remedying the myriad of problems the *Mafrige* fiction and its progeny created.

## A. FINALITY LANGUAGE

One source of confusion under *Mafrige* has been uncertainty about what language triggers its finality rule. In *Mafrige,* we held that a partial summary judgment is treated as final for appeal purposes when the order contains a Mother Hubbard clause stating that "all relief not expressly granted is denied" or other language "purporting to dispose of all claims or parties." 866 S.W.2d at 590 & n. 1, 592. We further clarified that "other" finality language includes "a statement that the summary judgment is granted as to all claims asserted by the plaintiff, or a statement that the plaintiff takes nothing against defendant." *Mafrige,* 866 S.W.2d at 590 n. 1.; *see also Inglish,* 945 S.W.2d at 811 (holding statement

that "[d]efendant is entitled to summary judgment in this case," and that plaintiff should "take nothing on account of his lawsuit" rendered partial summary judgment final for purposes of appeal); *Springer v. Spruiell,* 866 S.W.2d 592, 593 (Tex.1993) (holding that summary judgment order reciting plaintiffs "have and recover nothing" purported to dispose of all parties and issues).

Despite these examples, some lower courts have refused to hold orders containing this exact language final for purposes of appeal. *E.g., Carey v. Dimidjian,* 982 S.W.2d 556, 558 (Tex.App.—Eastland 1998, no pet.) (holding that order containing Mother Hubbard clause was not final and appealable where the motion was labeled "Partial Summary Judgment" and the parties treated the order as interlocutory); *Hinojosa v. Hinojosa,* 866 S.W.2d 67, 69–70 (Tex.App.— El Paso 1993, no writ) (holding that order containing Mother Hubbard clause did not render judgment final because it did not dispose of counterclaim). Other courts have struggled with what "other" language purports to render a judgment final—often reaching opposite conclusions about identical clauses. *Compare* **\*210** *Postive Feed, Inc. v. Guthmann,* 4 S.W.3d 879, 881 (Tex.App.—Houston [1st Dist.] 1999, no pet.)* (holding that order granting defendant's summary judgment "in all things" purported to be final), *with St. Paul Ins. Co. v. Mefford,* No. 05–96–01581–CV, 1998 WL 821537 (Tex.App.—Dallas Nov. 30, 1998, no pet.) (not designated for publication), 1998 WL 821537, at \*2 [2] (holding that order granting defendant's summary judgment "in all things" did not purport to be final).

[2] The unpublished opinions cited in Part I are cited only as examples, not as precedent. *See* TEX.R.APP. P. 47.7.

While the Court recognizes that the "routine inclusion of [a Mother Hubbard clause] in otherwise plainly interlocutory orders and its ambiguity in many contexts have rendered it inapt for determining finality," 39 S.W.3d at 192, it ignores the obvious problems courts have faced interpreting *other* language "purporting to dispose of all claims or parties." *Mafrige,* 866 S.W.2d at 592. In fact, despite the Court's extensive analysis and discussion, its holding represents but a minor departure from *Mafrige.*

Its modified rule has two parts. The first represents no change in Texas law. It simply reiterates that a summary judgment order that *actually* disposes of all parties and issues is final for purposes of appeal. 39 S.W.3d at 192. The second part provides that a Mother Hubbard clause is no longer enough

to invoke the fiction that an otherwise interlocutory order is treated as final for purposes of appeal. Instead, to invoke the *Mafrige* fiction, an interlocutory order must now "clearly and unequivocally state [ ] that it finally disposes of all claims and all parties." 39 S.W.3d at 205. The Court further explains that the statements "plaintiff take nothing by his claims in the case" and "[t]his judgment finally disposes of all parties and all claims and is appealable" clearly and unequivocally state that an order is final. 39 S.W.3d at 205. In essence, the Court's rule does no more than replace one set of magic language with another—while ignoring the reality that courts will likely face the same challenges deciding what language "clearly and unequivocally states" that an order is final, 39 S.W.3d at 205, as they did deciding what other language clearly "purport[s] to dispose of all claims or parties" under *Mafrige.* 866 S.W.2d at 592.

## B. OMITTED PARTIES

Applying *Mafrige* to omitted parties, like those in both *Lehmann* and *Harris,* has also troubled the lower courts. Specifically, they have struggled with deciding when finality language operates to render a summary judgment final against omitted parties. This issue often surfaces when both the summary judgment motion *and* the resulting order omit any specific reference to one or more parties. [3] In this situation, several courts have held that *Mafrige* applies, reasoning that issues and parties are co-extensive and thus if "an order disposes of all issues in a case, then it necessarily disposes of all parties to a case, and vice versa." *Kaigler,* 961 S.W.2d at 276; *see also Lehmann v. Har–Con Corp.,* 988 S.W.2d 415, 416–17 (Tex.App.—Houston [14th Dist.] 1999, pet. granted); *Harper v. Newton,* 910 S.W.2d 9, 12 n. 1 (Tex.App.—Waco), *rev'd sub nom. on other grounds, Dallas County v. Harper,* 913 S.W.2d 207 (Tex.1995).

[3] This issue also arises when a trial court expressly mentions and disposes of a party even though that party was not mentioned in the motion for summary judgment. Here, the lower courts have been more willing to apply *Mafrige* and hold that the order purports to dispose of all parties and issues. *See, e.g., Mikulich v. Perez,* 915 S.W.2d 88, 91–92 (Tex.App.—San Antonio 1996, no writ).

In contrast, other courts have interpreted *Mafrige* more narrowly, reasoning that an "order that explicitly grants a summary judgment in favor of less than all the defendants *does not* clearly evidence an intent to dispose of all

claims against all defendants, especially those against whom **\*211** summary judgment was not sought, regardless of the inclusion of a Mother Hubbard clause." *Lowe v. Teator,* 1 S.W.3d 819, 823–24 (Tex.App.—Dallas 1999, pet. filed); *see also Midkiff v. Hancock E. Tex. Sanitation, Inc.,* 996 S.W.2d 414, 416 (Tex.App.—Beaumont 1999, no pet.); *Vanderwiele v. Llano Trucks, Inc.,* 885 S.W.2d 843, 845 (Tex.App.—Austin 1994, no writ).

Here the Court summarily dismisses this omitted parties problem:

> Nothing in the order in *Lehmann* indicates that it is a final judgment, and it did not dispose of all pending claims and parties. The order in *Harris* states that plaintiff take nothing as to "one of the defendants", but that language does not suggest that all of the plaintiffs' claims were denied. As the order recites and as the record demonstrates, the defendant named in the order was not the only defendant remaining in the case. Thus, we conclude that a final appealable judgment was not rendered in either case.

39 S.W.3d at 206. Despite the presence of a Mother Hubbard clause, the trial court and parties in *Lehmann* continued treating the order as interlocutory-even in the face of this Court's admonishment that a Mother Hubbard clause indicates finality.[4] 988 S.W.2d at 416. The Court now holds that the order did not purport to be final based solely on its new rule discounting the dispositive effect of Mother Hubbard clauses.

[4] In fact, the district clerk sent all the parties (including those omitted from the summary judgment order) a postcard indicating that an "Order for Interlocutory Summary Judgment" had been signed. *Lehmann,* 988 S.W.2d at 416.

However, the Court's resolution merely sidesteps the real problem. What happens in the next case when, on facts identical to *Lehmann,* a trial court signs an interlocutory summary judgment with the Court's new magic language rather than a Mother Hubbard clause? We are right back where we started. Substituting one magic phrase for another leads nowhere.

The reality is simply that omitted parties oftentimes do not believe that a summary judgment order that they have not seen, that does not mention them, and that results from a hearing in which they did not participate will operate to dispose of them or their claims. But, under the Court's standard, if these parties do not perfect a timely appeal from the erroneous judgment, their right to appeal is forever lost. This result elevates form over substance and hinders parties' rights to have the merits of their claims considered. *See, e.g., Rodriguez v. NBC Bank,* 5 S.W.3d 756, 763 n. 4 (Tex.App.—San Antonio 1999, no pet.) (recognizing this Court's "express goal of reaching the merits of a cause of action, instead of dismissing actions on procedural technicalities").

## C. OMITTED CROSS–CLAIMS AND COUNTERCLAIMS

The courts of appeals have also treated omitted cross-claims and counterclaims inconsistently—despite our holding in *Bandera.* In *Bandera,* the trial court signed an order with a Mother Hubbard clause that did not mention the defendant's counterclaims. 946 S.W.2d at 337. This Court explained that "[b]ecause the order contained a Mother Hubbard clause denying all other relief, it also purported to dispose of [the defendant's] counterclaims." *Bandera,* 946 S.W.2d at 337. But several courts have refused to apply *Mafrige* in this situation, maintaining that a summary judgment that does not mention counterclaims or cross-claims cannot purport to be final-regardless of whether it contains finality language. *E.g., Sommers v. Concepcion,* 20 S.W.3d 27, 33 (Tex.App.—Houston [14th Dist.] 2000, pet. denied); *Hervey v. Flores,* 975 S.W.2d 21, 25 (Tex.App.—El Paso 1998, pet. denied); *cf. Coleman Cattle Co., Inc. v. Carpentier,* 10 S.W.3d 430, 433 n. 2 (Tex.App.—Beaumont 2000, no pet.). Other courts have followed *Bandera* 's mandate, holding that finality language—such as "plaintiff takes nothing" **\*212** —renders a judgment final for appeal purposes, despite omission of any reference to defendant's counterclaims. *In re Monroe,* No. 05–99–01758–CV, 2000 WL 378519 (Tex.App.—Dallas Mar.31, 2000, orig. proceeding) (not designated for publication), 2000 WL 378519, at \*1–2; *see also Kaigler,* 961 S.W.2d at 275–76.

The Court's rule does not provide a satisfactory remedy for this situation either. The Court states:

An order that adjudicates only the plaintiff's claims against the defendant does not adjudicate a counterclaim, cross-claim, or third party claim, nor does an order adjudicating claims like the latter dispose of the plaintiff's claims. An order that disposes of claims by only one of multiple plaintiffs or against one of multiple defendants does not adjudicate claims by or against other parties. An order does not dispose of all claims and all parties merely because it is entitled "final," or because the word "final" appears elsewhere in the order, or even because it awards costs. Nor does an order completely dispose of a case merely because it states that it is appealable, since even interlocutory orders may sometimes be appealable. Rather, there must be some other clear indication that the trial court intended the order to completely dispose of the entire case.

39 S.W.3d at 205.

Under its modified finality rule, the lower courts' disagreement in this area will continue because too many questions are left unanswered. For example, should a "final" summary judgment order stating that defendant is granted summary judgment "in all things" dispose of a cross-claim by another defendant as well as the claim by the plaintiff that brought the original claim? In this situation, there is no doubt that the order is unambiguous. However, it is likewise clear, but not from the order, that the third party's claim against the defendant was never considered. Should an order granting summary judgment for a plaintiff that recites it is a final and appealable order be final for counterclaims not mentioned in the motion or order? The order unequivocally states that it is a final, appealable order. Nonetheless there is a counterclaim that has not been considered. The Court states that a summary judgment granted for a plaintiff "does not adjudicate a counterclaim" and then goes on to say that to make the order final there must be "some other clear indication that the trial court intended the order to completely dispose of the entire case." 39 S.W.3d at 205. In the example above, does the additional statement that "this is a final, appealable order" provide this "other clear indication"? These very issues are repeatedly raised in the courts of appeals, and the Court's modified rule simply does not resolve them.

## D. TRIAL COURTS' AND PARTIES' INTENT

Differing philosophies about the effect the trial courts' and parties' intent should have on how *Mafrige* applies has created the most confusion and inconsistency. The courts of appeals have taken three approaches. Some courts apply a bright-line test, holding that a Mother Hubbard clause or other finality language *always* renders an order final for appeal purposes, regardless of any evidence of contrary intent. *E.g., Preston v. American Eagle Ins. Co.,* 948 S.W.2d 18, 20–21 & n. 1 (Tex.App.—Dallas 1997, no writ) (holding that summary judgment purported to be final despite fact it was entitled "partial summary judgment"); *cf. In re Cobos,* 994 S.W.2d 313, 315 (Tex.App.—Corpus Christi 1999, orig. proceeding) ("As *Mafrige* and *Inglish* make clear, the intent of the trial court is not the controlling consideration in determining whether a judgment is final."). Other courts modify this approach, looking only within the four corners of the order and giving effect to any evidence of contrary intent found there. *E.g., Rodriguez,* 5 S.W.3d at 763–64 (Tex.App.—San Antonio 1999, no pet.) ("Looking within the four corners of the summary judgment order, the plain language of the **\*213** Mother Hubbard clause did not, and could not, purport to grant or deny any more relief than the relief which [the defendant] sought."); *Midkiff,* 996 S.W.2d at 416 (looking to order "as a whole" to conclude that summary judgment order containing Mother Hubbard clause did not purport to be final).

Finally, despite our holding in *Inglish* that the trial court's intent is irrelevant in this context, other courts still refuse to apply *Mafrige* if there is evidence of contrary intent *anywhere* in the record. This usually occurs when the parties and court treat an order as interlocutory by continuing with the litigation rather than appealing the erroneous order. *E.g., Lowe,* 1 S.W.3d at 823–24 (holding that summary judgment could not be final where the record reflected that there were parties who did not participate in the summary judgment proceeding); *Carey,* 982 S.W.2d at 558 (relying, in part, on court's and parties' treatment of order containing Mother Hubbard clause as interlocutory to conclude judgment was not final).

The Court's solution to this problem is as confusing as the rule it seeks to supplant. It appears to reject the bright-line approach *Mafrige* espouses and instead adopt a

rule combining the second and third approaches. First, the Court notes that an order is final for appeal purposes if it "unequivocally states that it finally disposes of all parties and all claims and is appealable." 39 S.W.3d at 205. It also explains that "[i]f the language of the order is clear and unequivocal, it must be given effect despite any other indications that one or more parties did not intend for the judgment to be final." 39 S.W.3d at 206. From these statements, the Court's new rule walks and talks a lot like a bright-line *Mafrige* rule, with magic language establishing finality.

However, the Court also states that "[t]o determine whether an order disposes of all pending claims and parties, it may of course be necessary for the appellate court to look to the record in the case." 39 S.W.3d at 205. This sounds more like a pre-*Mafrige* rule, where a court must look to the record and the order to determine if an order actually disposes of all pending parties and issues.

Because of the lower courts' confusion and disagreement about the role of intent in determining finality, I am convinced that the Court has not provided a workable rule that clearly defines that role as it applies to determining summary judgment finality.

### E. APPLYING *MAFRIGE* TO NON– SUMMARY JUDGMENT ORDERS

Finally, the question of whether *Mafrige* applies outside the summary judgment context has confused the lower courts. Courts of appeals have applied *Mafrige* to a plea to the jurisdiction, *Webb v. HCM Mgmt. Corp.*, No. 07–96–0369–CV, 1998 WL 16033 (Tex.App.—Amarillo Jan. 12, 1998, pet. denied) (not designated for publication) 1998 WL 16033, at *1; an agreed judgment, *In re Cobos*, 994 S.W.2d at 315–16; a directed verdict, *e.g., Polley v. Odom*, 957 S.W.2d 932, 943 (Tex.App.—Waco 1997, judgm't vacated); and a severance order, *Harris County Flood Control Dist. v. Adam*, 988 S.W.2d 423, 427 (Tex.App.—Houston [1st Dist.] 1999, pet. filed). In contrast, at least one court has declined to apply *Mafrige* to a dismissal for want of jurisdiction. *In re Tejas*, Nos. 01–98–00688–CV, 01–98–00689–CV, 01–98–00690–CV, 1998 WL 394562 (Tex.App.—Houston [1st Dist.] July 13, 1998, orig. proceeding) (not designated for publication), 1998 WL 394562, at *1 n. 1. And another has expressly refused to extend *Mafrige* to any order that is not a summary judgment. *Biltmore Swim & Racquet Club*

*Recreational Ass'n v. McAbee*, No. 05–98–00252–CV, 1998 WL 459819 (Tex.App.—Dallas Aug.10, 1998, no pet.) (not designated for publication), 1998 WL 459819, at *1.

In *Aldridge*, this Court held that a presumption of finality exists when an order is signed following a traditional trial on the **\*214** merits. *Aldridge*, 400 S.W.2d at 897–98. But we specifically noted that such a finality presumption would not be appropriate in other contexts. *Aldridge*, 400 S.W.2d at 897. Then in *Mafrige* we carved out an exception to what we had said in *Aldridge* by holding that an irrebuttable finality presumption applies to summary judgments containing a Mother Hubbard or similar finality clause. *Mafrige*, 866 S.W.2d at 592. Here again, just as we had limited *Aldridge* to conventional trials on the merits, we expressly limited *Mafrige* to summary judgments. *Mafrige*, 866 S.W.2d at 591 ("[T]he issue is whether ... a summary judgment, which purports to be final by the inclusion of Mother Hubbard language or its equivalent, should be treated as final for purposes of appeal."). Unfortunately, several courts of appeals have erroneously applied *Mafrige* in other contexts, causing confusion over how to determine finality of various other types of orders.

*Mafrige* and its progeny *are* limited to summary judgments —*with good reason*. No good can come of interjecting additional uncertainty into (1) conventional trials on the merits, to which the majority acknowledges the *Aldridge* presumption has "proved a fairly workable" rule, 39 S.W.3d at 200, or (2) numerous other types of orders, when even the majority acknowledges that "the ordinary expectation" supporting a finality presumption "simply does not exist when some form of judgment is rendered without such a trial" because "it is quite possible, perhaps even probable these days ... that any judgment rendered prior to a full-blown trial is intended to dispose of only part of the case." 39 S.W.3d at 200.

However, the Court's opinion here implicates finality of all judgments. This expansion into issues not before the Court today can only cause mischief in areas already plagued by confusion. If the Court persists in adhering to *Mafrige*'s principles, it should at least limit its holding, as we did in *Mafrige*, to summary judgments.

### II. POLICY CONSIDERATIONS

Not surprisingly, the post-*Mafrige* era has given rise to considerable analysis by courts and commentators of both the competing policies *Mafrige* implicates and suggestions for reform. A few have applauded the bright-line rule. *See Kaigler,* 961 S.W.2d at 275–76 (recognizing that the rule provides harsh results, but emphasizing that uniform enforcement "encourage[s] attentiveness to correct judgments"); *Boyce, Mafrige v. Ross and the Pitfalls of Presumptions,* APPELLATE ADVOCATE, Nov. 1997, at 7 (opining that *Mafrige* "resolved the confusion created by prior contradictory language and flatly inconsistent holdings").

However, praises have been few and far between. Criticism has been the rule and the comments call for this Court to reconsider our decision:

> What began as a benign growth allowing review of unripe claims on appeal, in *Mafrige,* became a malignant cancer cutting off causes of action before trial, in *Inglish.* If it were up to me, I would lock Mother Hubbard in the cupboard and return to the rule before *Aldridge* that a judgment is final and appealable only if it expressly disposes of all parties and all claims in the case. That appellants can even cite authority for the absurd result they seek, illustrates how wrong a turn the law has taken in this area—and how strong the need to right it.

*Harris County Flood Control Dist.,* 988 S.W.2d at 427–28 (Taft, J., concurring in denial of rehearing en banc); *see also, e.g., Lehmann,* 988 S.W.2d at 418 ("*Mafrige* is not as clear to litigants as the supreme court believes it is.... In short, *Mafrige* has created several problems: 1) it is catching the parties by surprise ...; 2) it exalts form over substance; and 3) in more than a few situations, it ignores common sense."); Carlson & Dunn, *Navigating* **\*215** *Procedural Minefields: Nuances in Determining Finality of Judgments, Plenary Power, and Appealability,* 41 S. TEX. L.REV. 953, 971 (2000) ("[D]espite the appeal of the certainty provided by this bright-line rule, the reality is that still, after seven years, it continues to operate as a trap for unwary litigants, bringing about arguably unjust and oftentimes draconian results."); Swanda, *Summary Judgment, Mother Hubbard Clauses, and Mafrige v. Ross,* APPELLATE ADVOCATE, May 1997, at

3 (complaining that the questions *Mafrige* raises "are just as elusive" as the questions it sought to resolve).

Strong policies support our practice of adhering to settled rules of law "unless there exists the strongest reasons for chang[e]." *Benavides v. Garcia,* 290 S.W. 739, 740–41 (Tex. Comm'n App.1927, judgm't adopted). But we have also recognized the "doctrine of stare decisis does not stand as an insurmountable bar to overruling precedent." *Gutierrez v. Collins,* 583 S.W.2d 312, 317 (Tex.1979). "Generally, we adhere to our precedents for reasons of efficiency, fairness, and legitimacy." *Weiner v. Wasson,* 900 S.W.2d 316, 320 (Tex.1995). However, when adherence to a judicially-created rule of law no longer furthers these interests, and "the general interest will suffer less by such departure, than from a strict adherence," we should not hesitate to depart from a prior holding. *Benavides,* 290 S.W. at 740. The lower courts' application of *Mafrige* over the last seven years illustrates undeniably that this is just such a case.

We intended *Mafrige, Inglish,* and *Bandera* to provide certainty to litigants. Instead, they have bred chaos. Most disturbing is that the casebooks are now replete with examples of dismissed cases where the parties and courts clearly intended an order containing finality language to be interlocutory.[5] *E.g., Inglish,* 945 S.W.2d at 811; *In re Cobos,* 994 S.W.2d at 315–16; *Pena v. Valley Sandia, Ltd.,* 964 S.W.2d 297, 298–99 (Tex.App.—Corpus Christi 1998, no pet.); *Kaigler,* 961 S.W.2d at 275–76. Even the Court acknowledges:

[5] Oftentimes in these cases litigation continues to move forward. Any error in including magic finality language in a summary judgment is not discovered until it is too late; the appellate timetable has expired and the trial court has lost plenary power to act. The litigants have forever lost their right to complain of the judgment.

[T]he ordinary expectation that supports the presumption that a judgment rendered after a conventional trial on the merits will comprehend all claims simply does not exist when some form of judgment is rendered without such a trial. On the contrary, it is quite possible, perhaps even probable these days in cases involving multiple parties and claims, that any judgment rendered prior to a full-blown trial is intended to dispose of only part of the case. Accordingly, the finality of the judgment must be determined without the benefit of any presumption.

39 S.W.3d at 200. Because of this reality, it is difficult to understand why the Court persists in adhering to *Mafrige*'s principles.

The author of the Court's opinion recently opined: "Appellate procedure should not be tricky. It should be simple, it should be certain, it should make sense, and it should facilitate consideration of the parties' argument on the merits...." *Lane Bank Equip. Co. v. Smith Southern Equip., Inc.,* 10 S.W.3d 308, 314 (Tex.2000) (Hecht, J., concurring). This Court has repeatedly refused to adopt positions which elevate form over substance. *See, e.g., Phillips v. Beaber,* 995 S.W.2d 655, 658 (Tex.1999); *Nueces Canyon Consol. Indep. Sch. Dist. v. Central Educ. Agency,* 917 S.W.2d 773, 775–76 (Tex.1996). The Court here even recognizes that "[s]implicity and certainty in appellate procedure are nowhere more important than in determining the time for perfecting appeal." 39 S.W.3d at 205. Unfortunately though, the Court declines to embrace this opportunity **\*216** to effectuate meaningful change and provide certainty for courts and litigants. Instead the Court leaves them as it found them, grappling with determining whether summary judgment orders are fictitiously made final.

### III. THE SOLUTION

The Court notes: "[W]e do not write rules by opinion. We must decide what Texas law requires for finality, given the present rules ." 39 S.W.3d at 205. Yet, the *Mafrige* finality rule this Court created represented such a major departure from prior Texas law. In fact, but for the judicially-created *Mafrige* rule, no one would dispute that "what Texas law requires for finality" of summary judgments is an order actually disposing of all parties and issues.

Rather than simply amend the *Mafrige* finality rule and perpetuate the problems the unworkable system *Mafrige* and its progeny created, the Court should focus on shaping a real solution—one providing the desired certainty and protecting parties' right to appellate review. This requires wiping the slate clean. *Mafrige* created enough problems with its fictional finality and its holding that trial courts can use magic language to create final summary judgments by granting relief not requested. 866 S.W.2d at 591–92. In *Inglish* we compounded the problem by confirming that *Mafrige* applies even when the parties continue litigating rather than appealing a partial summary judgment made final under *Mafrige.* 945 S.W.2d at 811. We completed the trilogy in *Bandera,* holding that when a party appeals a summary judgment granting more

relief than requested, the court of appeals should address the merits of the appeal, remanding only the part of the judgment that exceeds the relief requested in the summary judgment motion. 946 S.W.2d at 337. Undeniably, these rules were designed to simplify summary judgment finality. But, in application, these cases only demonstrate that we should have adhered to our own admonishments that this Court simply should not make rules by opinion. *E.g., Alvarado v. Farah Mfg. Co.,* 830 S.W.2d 911, 915 (Tex.1992) (explaining that we should not revise rules by opinion); *see also Verburgt v. Dorner,* 959 S.W.2d 615, 619 (Tex.1997) (Baker, J., dissenting) (noting that this Court's jurisprudence forbids rule amendments by judicial fiat).

Thus, we should overrule *Mafrige, Inglish,* and *Bandera*—to the extent they created new rules by judicial fiat—and instead tackle the problems of summary judgment finality through our rulemaking process. Accordingly, we should return to our prior position that a Mother Hubbard clause (or other magic language) has no place in any summary judgment order—final or partial—and that a trial court may not *sua sponte* grant more relief than the parties request simply by adding conclusory finality language to a summary judgment order. Further, a summary judgment should be entitled to no presumption at all about whether it is final.

Returning to the law as it was pre-*Mafrige* requires determining the state of the law before *Mafrige. Mafrige* actually held two things: (1) that " 'Mother Hubbard' language or its equivalent in an order granting summary judgment makes an otherwise partial summary judgment final for appeal purposes;" and (2) that if a summary judgment "grants more relief than requested, it should be reversed and remanded, but not dismissed." 866 S.W.2d at 590, 592.

Before *Mafrige,* this first holding was not the law. In *Teer v. Duddlesten* we held that:

> There is no presumption in partial summary judgments that the judgment was intended to make an adjudication about all parties and issues. The Mother Hubbard clause that "all relief not expressly granted is denied" has no place in a partial summary judgment hearing. The concepts of a partial summary judgment on the one hand, and a judgment **\*217** that is presumed to determine all issues and facts on the other, are inconsistent.

664 S.W.2d at 704. In *Mafrige* we recognized this earlier statement in *Teer,* but rejected it and held that finality

language could render a partial summary judgment final for purposes of appeal. 290 S.W.2d at 592.

*Mafrige*'s second holding—that a summary judgment granting more relief than requested should be reversed and remanded, but not dismissed—does not appear to be an entirely new rule. In both *Teer* and *Chessher,* another pre-*Mafrige* case, we reversed and remanded (rather than dismissed) summary judgment orders after determining that they were interlocutory because they granted more relief than requested. *See Teer,* 664 S.W.2d at 705; *Chessher v. Southwestern Bell Tel. Co.,* 658 S.W.2d 563, 564 (Tex.1983). *But see Ross v. Arkwright Mut. Ins. Co.,* 834 S.W.2d 385, 393 (Tex.App.—Houston [14th Dist.] 1992) (opining that these cases are "in direct contravention of TEX.R. CIV. P. 166a(c)" and discussing disagreement in the courts over whether summary judgment orders granting more relief than requested were interlocutory or appealable, but erroneous, judgments), *rev'd sub. nom. Mafrige,* 866 S.W.2d at 590. Thus, while the courts were not entirely in agreement, it appears we had already established the rule that a summary judgment order granting more relief than requested is not interlocutory—it is simply erroneous. For this reason, I agree with the Court that if an order actually does dispose of each claim and every party, it is an appealable judgment, even if it grants more relief than requested. This is consistent with the long-standing rule that if an order *actually* disposes of all parties and issues, it is final for appeal purposes. *E.g., Houston Health Clubs, Inc. v. First Court of Appeals,* 722 S.W.2d 692, 693 (Tex.1986). However, consistent with my view that we should overrule *Mafrige* and its progeny and recognize no presumption *for or against* finality, I do not believe any type of conclusory finality language can ever be read to grant more relief than requested by the parties.[6]

6    It would *not* be enough for a court to generally state "plaintiff takes nothing," "defendant is granted summary judgment in all things," or "this is a final appealable judgment." Conclusory finality clauses (i.e. "magic language") do not indicate that a trial court *actually* granted relief *not requested* for or against parties or issues are *not mentioned* in the order.

We should determine summary judgment finality by comparing the live pleadings and the summary judgment order. A summary judgment order should only be final if it matches the contents of the pleadings. And, as was the law before *Bandera,* a court of appeals should summarily reverse any summary judgment granting more relief than requested,

without any *sua sponte* severance of some issues while others are remanded.

Wiping the slate clean by overruling the rules created in *Mafrige, Inglish,* and *Bandera* while we study the best method of tackling summary judgment finality through our formal rule-promulgation process is the better solution for several reasons. First, this approach strikes a more reasonable balance between the competing policies of promoting certainty and preserving parties' rights to appellate review. And, under this approach, the trial court and the parties drafting summary judgment orders would have the burden, and *the incentive,* to ensure that the pleadings, summary judgment motions, and the summary judgment orders match. If a premature appeal is taken, the court of appeals need only compare the pleadings, motions, and order. If the order does not dispose of parties or issues raised in the pleadings, then it is interlocutory and the court must dismiss the appeal.[7] If the order explicitly **\*218** disposes of issues and parties not raised in the motion, it is erroneous and the court must reverse the entire order.

7    Of course, this procedure would not apply if the order fell within the category of cases for which there can be more than one final judgment, or the category of orders for which a court of appeals has been granted statutory authority to review interlocutory orders.

Most importantly, this approach alters the consequences of poorly-drafted orders. Specifically, the consequence flowing from a poorly drafted order becomes the risk of a *premature* appeal rather than an *untimely* one. This eliminates the greatest risk *Mafrige* created—that an interlocutory order, contrary to the trial court's and (at least one party's) intent, will be fictitiously made final, starting the appellate and plenary power timetables even while the litigation continues. No one would argue that conducting a trial after the trial court's plenary power has expired is not a waste of judicial resources. Moreover, because overruling *Bandera* eliminates the benefits of a premature appeal, taking such an appeal would not be a cost-efficient mistake for litigants to make, increasing the incentive to ensure orders are more clearly drafted. If a premature appeal is nonetheless taken, it would not create an onerous burden for the appellate court. The opposing party need only file a brief pointing out that the pleadings, motion, and order do not match, leading to automatic remand or dismissal.

No one disputes that rules governing summary judgment finality could be helpful to the bench and bar and facilitate judicial efficiency. But history, as well as our own precedent,

has shown that judicial opinions are not the place to achieve this. Any attempt to adhere to the *Mafrige* principle or retain parts of it while rejecting others can only lead to more problems. Instead, this Court should overrule *Mafrige* and its progeny and start anew. As the Court even notes, our rules advisory committee is currently studying summary judgment finality. 39 S.W.3d at 216. Retaining parts of *Mafrige, Inglish, Bandera* as modified by the Court's less-than-clear opinion today—only to follow with promulgation of a concurrent finality rule—will only lead to more confusion.

I agree that the cases here should be reversed. But, because the Court refuses to fix the problems its judicial rulemaking in *Mafrige* caused and allow our rulemaking process to work, I cannot join the Court's opinion.

## IV. RECOMMENDATION

I recognize that the Supreme Court of Texas Advisory Committee on Rules of Civil Procedure has been studying the problem of summary judgment finality. It has proposed an amendment to Rule 166a of the *Texas Rules of Civil Procedure:*

> (j) Statement of Grounds. An order granting summary judgment must state the ground or grounds on which the motion was granted. No judgment may be affirmed on other grounds stated in the motion unless they are asserted by appellee in the appellate court as alternative grounds for affirmance.

I do not believe this proposed amendment goes far enough.

First I would suggest to the committee that they consider requiring each summary judgment order specifically identify: (1) the claims each party brings; (2) the grounds upon which each party seeks summary judgment; (3) each ground upon which the trial court granted summary judgment; and (4) each ground upon which the trial court denied summary judgment.

This solution is intuitive. In the vast majority of cases, this formality, rather than including magic language, would provide notice to parties about what has actually happened. In practice, this procedure alleviates many problems *Mafrige*'s finality rule has caused.

Under this approach, a summary judgment is not final unless the order specifically identifies each claim for relief, the grounds upon which each party seeks summary judgment, and the court's disposition **\*219** of each claim and party. The appellate court's jurisdiction is determined only by looking at whether the trial court rendered an order expressly disposing of all remaining parties and issues. If the trial court errs by omitting certain claims or parties from the order, as happened in *Lehmann* and *Harris,* it is not a final order for purposes of appeal. Under this approach a party *never* loses its right to appeal based upon the finality of a summary judgment order *that is silent* about the party or its claims or that *sua sponte* grants relief no party requested without mentioning the parties or claims—*regardless* of how clearly it states that it is a final judgment disposing of all parties and issues.

Most significantly, *in practice* this would lead to better drafting and fewer erroneous appeals. Specifically, if required to expressly list each ground upon which summary judgment is requested, trial courts are not likely to *add* grounds to their order that the summary judgment motion did not raise.

Second, I would suggest the committee consider a rule requiring that the prevailing party, who is charged with drafting the court's order, serve copies on all other parties at least ten days *before* the trial court is to sign and enter the order. Consistent with this suggestion, I agree with the Court's suggestion that the clerk send copies of all the actual signed orders—rather than just a postcard indicating that the court has signed an order.

The majority's author criticizes my first recommendation, asserting that there is a "very real risk" that requiring judges to be explicit in their summary judgment orders would result in "thousands of judgments intended to be final ... remain[ing] interlocutory." 39 S.W.3d at 196. He contends that "[t]his is precisely what has happened in the federal system even though the federal rules impose far fewer requirements on final judgments than the dissent would." 39 S.W.3d at 208. Federal Rule 58, to which he refers, requires that *all final judgments* "be set forth on a separate document" and be entered by the clerk on the docket. FED.R.CIV.P. 58.

This criticism only serves to amplify the real dangers of straying outside the summary judgment context in these cases. How finality of different types of judgments is determined must be governed by the *nature* of the judgment. *Houston Health Clubs, Inc., 722 S.W.2d at 693* ("In determining whether a judgment is final, different

presumptions apply depending on whether the judgment follows a conventional trial on the merits or results from default or a motion for summary judgment."). Cognizant of this, my recommendation, unlike Federal Rule 58, is limited to summary judgment finality.

The live pleadings define the issues in a case. The issues tried do not always mirror these pleadings. *See Vance v. Wilson,* 382 S.W.2d 107, 108 (Tex.1964). Nonetheless, we have repeatedly recognized that a presumption should exist that all issues presented by the pleadings are disposed of in a conventional trial on the merits. *See Aldridge,* 400 S.W.2d at 897–98; *Vance,* 382 S.W.2d at 108. This presumption can be rebutted by a contrary showing in the record. *See Richey v. Bolerjack,* 589 S.W.2d 957, 959 (Tex.1979). But absent such a rebuttal, this presumption prevents judgments from languishing after trial based solely on variations in the pleadings and judgment. This presumption has saved us from the types of problems the federal system has experienced.

However, we sensibly limited this presumption to judgments "not intrinsically interlocutory in character." *Aldridge,* 400 S.W.2d at 897. We have also explained that summary judgments are intrinsically interlocutory and thus they should not be presumed final. *Houston Health Clubs, Inc.,* 722 S.W.2d at 693. Thus, there is nothing illogical about requiring that finality language be explicit. And I respectfully disagree that my recommendation, limited to summary judgments, will cause such **\*220** major havoc in the court system. Further, I believe the additional formality in this context is worth the certainty and protections such a rule provides.

## V. CONCLUSION

In Texas, the test for determining summary judgment finality has always been whether the judgment disposes of all parties and all issues raised in the pleadings. In *Mafrige* we created a legal fiction to simplify the process of determining finality. But *Mafrige* created more problems than it solved. It is beyond me why the Court insists on struggling through pages and pages of history about presumptions, magic language, and Mother Hubbard clauses instead of squarely considering the problems *Mafrige* caused and providing a solution. Its willingness to cling to this legal fiction, while refusing to recognize that our rulemaking in *Mafrige* and its progeny was not the correct solution, will only create more problems.

I concur in the judgment in these cases. But, because the Court declines to overrule *Mafrige, Inglish,* and *Bandera,* and await our promulgation of a rule governing summary judgment finality, I do not concur in its reasoning.

**All Citations**

39 S.W.3d 191, 44 Tex. Sup. Ct. J. 364

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

904 S.W.2d 617
Supreme Court of Texas.

M.R. CHAMPION, INC. and Barbara Champion,
Independent Executrix of the Estate of
M.R. Champion, Deceased, Petitioners
v.
Dennis MIZELL, Respondent.

No. D–4296.  |  March 2, 1995.
|  Rehearing Overruled Sept. 14, 1995.

Partner sued defendant partner for terminating partnership. The District Court, Number 12, Leon County, William L. McAdams, entered judgment for defendant, and plaintiff appealed. The Waco Court of Appeals, Thomas, C.J., 902 S.W.2d 1, reversed, finding that jury finding that defendant breached duty to plaintiff included finding that partnership continued in existence until alleged breach of duty occurred. Defendant applied for writ of error to Supreme Court. The Supreme Court held that jury's finding that plaintiff breached partnership agreement when he was barred from entering customer property for theft of equipment controlled legal determination as to when partnership terminated, regardless of finding that defendant breached fiduciary duty.

Application for writ of error granted, judgment of court of appeals reversed, judgment rendered for defendant.

West Headnotes (3)

**[1]**    **Partnership**
👉 As to fiduciary relation of partners
**Partnership**
👉 Continuance of Partnership for Purposes of Winding Up

Partners owe each other and their partnership a duty in the nature of a fiduciary duty in the conduct and winding up of partnership business, and are liable for breach of that duty. Vernon's Ann.Texas Civ.St. arts. 6132b–4.04, 6132b–4.05.

10 Cases that cite this headnote

**[2]**    **Partnership**
👉 Continuance of Partnership for Purposes of Winding Up

After partnership terminates, duty to partner is limited to matters relating to winding up of partnership's affairs; specifically, person has no duty to offer his former partners or partnership a business opportunity which arises after partnership has terminated. Vernon's Ann.Texas Civ.St. arts. 6132b–4.04, 6132b–4.05.

9 Cases that cite this headnote

**[3]**    **Partnership**
👉 Instructions
**Partnership**
👉 Judgment

Defendant partner was entitled to judgment, even though jury found that defendant breached fiduciary duty, as jury's determination that plaintiff partner breached fiduciary duty controlled issue of whether such duty existed, but jury's finding that defendant partner later also breached duty did not control issue of whether duty continued to exist, where trial court instructed jury that defendant owed plaintiff and partnership a fiduciary duty, but definition did not describe how duty was affected by termination of the partnership, jury did not determine when defendant's breach occurred, and jury found that plaintiff breached partnership agreement and conducted self in such a way that it was not reasonably practicable to carry on partnership business, and based on this finding, trial court found partnership terminated at this time, before breach of fiduciary duty alleged by plaintiff, but jury was not asked to determine whether defendant still had duty to plaintiff at the time that he seized business opportunity, and was not informed that legal effect of plaintiff's breach was to terminate partnership.

8 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*617** Leslie C. Taylor, Houston, Amy C. Thomas, Mexia, and W. James Kronzer, Jr., Houston, for petitioners.

Harry Herzog and Mark D. Wilson, Houston, for respondent.

**Opinion**

PER CURIAM.

Petitioners' motion for rehearing is granted, our prior opinion is withdrawn, and the following is now the opinion of the Court.

This case involves a dispute between two former partners. The dispositive issue is whether the trial court correctly construed the jury verdict in rendering judgment. The court of appeals held it did not. 902 S.W.2d 1. We disagree.

Dennis Mizell and M.R. Champion, as partners, contracted to provide services to Northwestern Resources Company for a year **\*618** beginning in January 1986. At the end of that year, Champion negotiated a second one-year contract with Northwestern under the name of M.R. Champion, Inc. ("MRCI"), assuring Mizell that they would still perform the contract as partners. In January 1987, Northwestern barred Mizell from its premises for taking some of its property. Champion continued to work for Northwestern throughout the year using equipment leased from Mizell. In December 1987, Champion negotiated a three-year contract with Northwestern covering 1988–1990, again in the name of MRCI. A month later Champion told Mizell the partnership was over.

 **[1]** **[2]** Mizell sued Champion and MRCI. Before the case could be tried, Champion died and the independent executrix of his estate was added as a defendant. Although Mizell asserted a number of claims, he went to trial on only one: breach of fiduciary duty in not obtaining the three-year contract with Northwestern for the partnership. The law applicable to this claim is not disputed. Partners owe each other and their partnership a duty in the nature of a fiduciary duty in the conduct and winding up of partnership business, and are liable for a breach of that duty. TEX.REV.CIV.STAT.ANN. art. 6132b–4.04, –4.05 (Vernon Supp.1995). [1] After the partnership terminates, however, the duty is limited to matters relating to the winding up of the partnership's affairs. *Rice v. Angell,* 73 Tex. 350, 11 S.W. 338, 340 (1889). Specifically, a person has no duty to offer his former partners or partnership a business opportunity which arises after the partnership has terminated. *Id.* 11 S.W. at 340. The dispute centers on when the partnership terminated. Defendants contend that the partnership terminated in January 1987 as a result of Mizell's misconduct toward Northwestern, and that Champion had no duty to refer new business opportunities, like the three-year contract, to the partnership. Mizell asserted that the partnership was not dissolved until Champion withdrew in January 1988, and that Champion continued to be bound by his fiduciary duty when he obtained the three-year contract for MRCI.

[1] This case was tried under, and is governed by, the Texas Uniform Partnership Act as it existed prior to adoption of the Texas Revised Partnership Act in 1994. Although the statutory provisions were completely revised in 1994, the principles as they apply to this case have not changed. Accordingly, we refer to the Revised Act.

The trial court instructed the jury that Champion owed Mizell and the partnership a fiduciary duty which the trial court defined. The definition did not describe how the duty was affected by termination of the partnership. The jury found that Champion breached his fiduciary duty to Mizell and the partnership, but it was not asked to find when the breach occurred. The jury also found that after Mizell was barred from Northwestern's premises in January 1987, he breached the partnership agreement and conducted himself in such a way that it was not reasonably practicable to carry on partnership business. Based upon this latter finding, the trial court found that the partnership terminated in January 1987, before the breach of fiduciary duty asserted by Mizell. *See* TEX.REV.CIV.STAT.ANN. art. 6132b–6.01 (Vernon Supp.1995). Mizell does not challenge this finding.

On motions of all parties for judgment on the verdict, the trial court rendered judgment for defendants. The court of appeals reversed and rendered judgment for Mizell. It reasoned that since no party complained of a lack of evidence to support any of the jury's findings, judgment must be based on those findings if possible. In the court of appeals' view, the jury's finding that Champion breached his fiduciary duty to Mizell necessarily included the finding that the partnership continued in existence until December 1987, when the only damages claimed by Mizell occurred. The court of appeals concluded that the breach finding left the trial court no alternative but to render judgment for Mizell. 902 S.W.2d 1.

 **[3]** We disagree with the court of appeals' analysis. Whether Champion still had a duty to Mizell in December 1987 was

not a factual determination which the jury could, or was asked to, make. It was a legal determination, based on the jury's finding concerning Mizell's conduct in January 1987, and the trial court's finding that the partnership **\*619** terminated. The jury was not instructed that the legal effect of Mizell's conduct was to terminate the partnership, and it may have believed otherwise. But that belief, if it existed, cannot change the legal effect of the jury's finding. The jury's finding that Champion breached his fiduciary duty does not control the legal determination of whether such duty existed; the finding concerning Mizell's conduct does.

We conclude that the trial court correctly rendered judgment for defendants. Accordingly, a majority of the court grants Champion's application for writ of error and, without hearing oral argument, reverses the judgment of the court of appeals and renders judgment that Mizell take nothing. TEX.R.APP.P. 170.

### All Citations

904 S.W.2d 617, 38 Tex. Sup. Ct. J. 331

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

401 S.W.3d 110
Court of Appeals of Texas,
Houston (14th Dist.).

Katsy CLUCK, John W. Mecom, III, and
Mary Elizabeth Mecom Hahnfeld, Appellants

v.

John W. MECOM, Jr., as Trustee of the Mary
Elizabeth Mecom Irrevocable Trust No. II, Appellee.

No. 14–09–00837–CV.  |  March 15, 2011.

**Synopsis**
**Background:** Beneficiaries, the grandchildren of settlor,
brought action against trustee, who was settlor's son and
beneficiaries' father, alleging breach of fiduciary duty,
conversion, and civil theft. The 113th District Court,
Harris County, Patricia Ann Hancock, J., granted summary
judgment to trustee. Beneficiaries appealed.

**Holdings:** The Court of Appeals, Charles W. Seymore, J.,
held that:

[1] genuine issue of material fact as to whether trustee
breached fiduciary duty, including through self-dealing,
precluded no-evidence summary judgment in favor of trustee;

[2] trustee did not wrongfully exercise dominion or control
over trust assets, as would support beneficiaries' conversion
claim; and

[3] genuine issue of material fact as to date on which
beneficiaries discovered their injuries precluded traditional
summary judgment based on limitations.

Affirmed in part, reversed in part, and remanded.

West Headnotes (14)

**[1]      Fraud**
   Fiduciary or confidential relations
The elements of a claim for breach of fiduciary
duty are: (1) a fiduciary relationship between the
plaintiff and the defendant; (2) a breach by the

defendant of his fiduciary duty to the plaintiff;
and (3) an injury to the plaintiff or a benefit to
the defendant as a result of the breach.

3 Cases that cite this headnote

**[2]      Judgment**
           Trust cases
Genuine issue of material fact as to whether
trustee breached fiduciary duty, including
through self-dealing, precluded no-evidence
summary judgment in favor of trustee in
beneficiaries' action against trustee. Vernon's
Ann.Texas Rules Civ.Proc., Rule 166a(c, i).

1 Cases that cite this headnote

**[3]      Fraud**
           Duty to disclose facts
A fiduciary has an affirmative duty to make a
full and accurate confession of all his fiduciary
activities, transactions, profits, and mistakes.

Cases that cite this headnote

**[4]      Fraud**
           Presumptions and burden of proof
When a plaintiff alleges self-dealing by the
fiduciary as part of a breach of fiduciary duty
claim, a presumption of unfairness automatically
arises, which the fiduciary bears the burden to
rebut.

4 Cases that cite this headnote

**[5]      Conversion and Civil Theft**
           In general;  nature and elements
The elements of a conversion claim are: (1) the
plaintiff owned, possessed, or had the right to
immediate possession of personal property; (2)
the defendant wrongfully exercised dominion or
control over such property; and (3) the plaintiff
suffered injury.

2 Cases that cite this headnote

**[6]      Trusts**

 Waste, conversion, or embezzlement by trustee

Trustee did not wrongfully exercise dominion or control over trust assets, as would support beneficiaries' conversion claim, even if beneficiaries did not receive anything from trust, where trustee was named as successor trustee of trust by his mother, the settlor, and he had acted as trustee since settlor's death.

Cases that cite this headnote

**[7]  Judgment**

 Bar of statute of limitations

Genuine issue of material fact as to date on which beneficiaries discovered their injuries precluded traditional summary judgment based on limitations, in beneficiaries' action against trustee alleging breach of fiduciary duty. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

Cases that cite this headnote

**[8]  Limitation of Actions**

 Causes of action in general

**Limitation of Actions**

 In general; what constitutes discovery

**Limitation of Actions**

 Nature of harm or damage, in general

As a general rule, a cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later and even if all resulting damages have not yet occurred.

Cases that cite this headnote

**[9]  Limitation of Actions**

 In general; what constitutes discovery

The "discovery rule," when applicable, defers accrual of a cause of action until the plaintiff knew, or, exercising reasonable diligence, should have known, of the facts giving rise to the cause of action.

Cases that cite this headnote

**[10]  Judgment**

 Particular defenses

A defendant seeking summary judgment based on limitations must: (1) conclusively prove when the cause of action accrued and (2) negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving, as a matter of law, there is no genuine issue of fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the nature of her injury.

Cases that cite this headnote

**[11]  Judgment**

 Particular defenses

If a summary judgment movant establishes that limitations bars the action, the nonmovant must then adduce summary-judgment proof raising a fact issue to avoid the statute of limitations.

Cases that cite this headnote

**[12]  Limitation of Actions**

 Fraud of person acting in official or fiduciary capacity

Although a person to whom a fiduciary duty is owed is relieved of the responsibility of diligent inquiry into the fiduciary's conduct, for purposes of limitations period, so long as that relationship exists, when the fact of misconduct becomes apparent, it can no longer be ignored, regardless of the nature of the relationship.

Cases that cite this headnote

**[13]  Limitation of Actions**

 Questions for Jury

Ascertaining the date that a claimant knew, or should have known, of an injury generally entails a fact question.

Cases that cite this headnote

**[14]  Limitation of Actions**

 Questions for Jury

If reasonable minds could not differ about the conclusion to be drawn from facts in the record as to when a claimant knew, or should have known, of an injury, commencement of the limitations period may be determined as a matter of law.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*112** James R. Lovell, Dumas, John H. Lovell, Amarillo, Courtney D. Miller, Amarillo, for Appellants.

John Andrew Ramirez, Houston, Curt M. Langley, Houston, Jody Gene Sheets, Dallas, Allison Gabbert, Houston, for Appellee.

Panel consists of Justices SEYMORE, BOYCE, and CHRISTOPHER.

**OPINION**

CHARLES W. SEYMORE, Justice.

Appellants, Katsy Cluck ("Katsy"), John W. Mecom, III ("John"), and Mary Elizabeth Mecom Hahnfeld ("Mary Elizabeth"), appeal a summary judgment in favor of appellee, John W. Mecom, Jr., as Trustee of the Mary Elizabeth Mecom Irrevocable Trust No. II ("Mecom"), in appellants' suit for breach of fiduciary duty, conversion, and civil theft. In four issues, appellants contend the trial court erred by rendering a no-evidence summary judgment relative to the merits of their claims and a traditional summary judgment based on the statute of limitations. We affirm the summary judgment on appellants' conversion and civil-theft claims but reverse and remand the summary judgment on their claim for breach of fiduciary duty. [1]

[1] Another plaintiff below, Kathleen Mecom Fogarty, does not appeal the judgment. Thus, we do not address the portion of the judgment disposing of her claims.

**I. BACKGROUND**

Appellants are three of Mecom's four children. [2] Mary Elizabeth Mecom ("Mrs. **\*113** Mecom"), now deceased,

was Mecom's mother and appellants' grandmother. In 1983, Mrs. Mecom established "The Mary Elizabeth Mecom Irrevocable Trust No. II." In the trust instrument, she conveyed certain assets to the trust including a money-market fund, securities, bonds, partnership interests, promissory notes, accounts receivable, "[a]ll household goods and personal effects owned" by Mrs. Mecom, and real estate. Mrs. Mecom served as original trustee and named Mecom as successor trustee. Mecom has served as trustee since Mrs. Mecom's death on May 4, 1996. Under its terms, upon Mrs. Mecom's death, the trust terminated and appellants became successor beneficiaries because no power of appointment was exercised in Mrs. Mecom's will.

[2] We will refer to these three children collectively as "appellants" except when necessary to refer to an appellant separately. Because their sibling, Kathleen Mecom Fogarty, has not joined this appeal, we omit her from the background discussion.

On August 13, 2008, Katsy filed the underlying suit against Mecom and also joined John and Mary Elizabeth as involuntary plaintiffs. In their live pleading, appellants allege that Mecom has not made any distributions to them as required under the trust, has failed to fully disclose transactions involving trusts assets, and converted, stole, and squandered assets. Appellants further allege that Mecom committed such misconduct via the following actions: (1) as executor of, and sole heir under, Mrs. Mecom's will, Mecom did not classify certain assets as property of the estate when filing probate documents and estate-tax returns, but after the probate matter was closed, he claimed ownership of these assets as property of the estate rather than the trust; (2) Mecom forgave his own debts to the trust without any consideration to the trust or the beneficiaries; and (3) Mecom commingled trust assets with his own property or sold assets and retained the proceeds. Appellants plead claims for breach of fiduciary duty, conversion, and liability under the Texas Theft Liability Act. Appellants request damages, a declaratory judgment "determining [their] rights and interests," an order compelling an accounting, attorney's fees, removal of Mecom as trustee, and appointment of a successor trustee or a receiver.

Mecom filed an amended motion for summary judgment including (1) a no-evidence ground challenging elements of appellants' claims, and (2) a traditional ground contending all claims are barred by the applicable statutes of limitations. [3] In their response, appellants presented evidence purporting to defeat the no-evidence ground, and, consistent with their pleading, appellants raised the discovery rule and doctrine of

fraudulent concealment relative to the limitations ground. On September 15, 2009, the trial court signed an order granting summary judgment on both the no-evidence and traditional grounds. Subsequently, the trial court denied appellants' motion for reconsideration.

3    Mecom previously filed a traditional motion followed by a separate no-evidence motion. After further discovery, Mecom filed his amended motion, which is the motion granted by the trial court.

## II. NO–EVIDENCE SUMMARY JUDGMENT

In appellants' first three issues, they challenge no-evidence summary judgment on all their claims.

### A. Standard of Review

After adequate time for discovery, a party may move for summary judgment on the ground there is no evidence of one or more essential elements of a claim on which an adverse party would have the **\*114** burden of proof at trial. *Tex.R. Civ. P.* 166a(i); *W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex.2005). The movant must state the elements on which there is no evidence. *Tex.R. Civ. P.* 166a(i). Unless the respondents produce summary-judgment evidence raising a genuine issue of material fact on the challenged element, the trial court must grant the motion. *Id.; Urena,* 162 S.W.3d at 550. To defeat a no-evidence motion for summary judgment, the non-movants need not marshal their evidence, but must identify in their response evidence raising a genuine issue of fact on the challenged elements. *See* comment to *Tex.R. Civ. P.* 166a(i); *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 207 (Tex.2002); *Pico v. Capriccio Italian Rest.,* 209 S.W.3d 902, 912 (Tex.App.-Houston [14th Dist.] 2006, no pet.); *San Saba Energy, L.P. v. Crawford,* 171 S.W.3d 323, 330 (Tex.App.-Houston [14th Dist.] 2005, no pet.).

We review a summary judgment *de novo. Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). We take as true all evidence favorable to the nonmovants and indulge every reasonable inference and resolve any doubts in their favor. *Id.*

### B. Breach of Fiduciary Duty

 [1]    [2]    The elements of a claim for breach of fiduciary duty are (1) a fiduciary relationship between the plaintiff and the defendant, (2) a breach by the defendant of his fiduciary duty

to the plaintiff, and (3) an injury to the plaintiff or a benefit to the defendant as a result of the breach. *Priddy v. Rawson,* 282 S.W.3d 588, 599 (Tex.App.-Houston [14th Dist.] 2009, pet. denied) (citing *Lundy v. Masson,* 260 S.W.3d 482, 501 (Tex.App.-Houston [14th Dist.] 2008, pet. denied); *Jones v. Blume,* 196 S.W.3d 440, 447 (Tex.App.-Dallas 2006, pet. denied); *Punts v. Wilson,* 137 S.W.3d 889, 891 (Tex.App.-Texarkana 2004, no pet.)). In his motion, Mecom asserted that appellants have no evidence of the second and third elements.[4]

4    In his amended motion for summary judgment, Mecom cited the third element as "an injury to the plaintiff *and* benefit to the defendant ..." (emphasis added)—in the conjunctive; but the element is actually "an injury to the plaintiff *or* benefit to the defendant ..." (emphasis added)—in the disjunctive. *See Priddy,* 282 S.W.3d at 599.

 [3]    [4]    A fiduciary "has an affirmative duty to make a full and accurate confession of all his fiduciary activities, transactions, profits, and mistakes." *Jackson Law Office, P.C. v. Chappell,* 37 S.W.3d 15, 22 (Tex.App.-Tyler 2000, pet. denied) (citing *Montgomery v. Kennedy,* 669 S.W.2d 309, 312–14 (Tex.1984); *Kinzbach Tool Co., Inc. v. Corbett–Wallace Corp.,* 138 Tex. 565, 160 S.W.2d 509, 513–14 (1942)). Additionally, when a plaintiff alleges self-dealing by the fiduciary as part of a breach-of-fiduciary-duty claim, a presumption of unfairness automatically arises, which the fiduciary bears the burden to rebut. *See Houston v. Ludwick,* No. 14–09–00600–CV, 2010 WL 4132215, at \*7 (Tex.App.-Houston [14th Dist.] Oct. 21, 2010, pet. denied) (mem. op.); *Chappell,* 37 S.W.3d at 22 (citing *Stephens County Museum, Inc. v. Swenson,* 517 S.W.2d 257, 261 (Tex.1974); *Int'l Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 576 (Tex.1963)). Mecom admitted in his deposition that he owed a fiduciary duty to manage the assets for appellants' benefits and a duty to disclose his personal transactions with the trust.

We question whether a no-evidence summary judgment could be appropriate under the circumstances of this case because Mecom bears the burden to fully disclose his activities as fiduciary and prove the fairness of his personal transactions with the trust. *See* **\*115** *Houston,* 2010 WL 4132215, at \*7; *Chappell,* 37 S.W.3d at 22. Nevertheless, to the extent that a no-evidence summary judgment could be appropriate, appellants presented sufficient evidence to defeat this ground by offering Mecom's testimony demonstrating his inability thus far to fully explain his activities as trustee, including his personal transactions involving trust assets. For example, in his deposition, Mecom gave the following responses

to inquiries regarding various entries on an accounting he produced relative to the trust:

- "I'm not sure" when asked what trust assets had to be sold to pay estate and inheritance taxes of Mrs. Mecom.

- "I can't remember" when asked about assets he sold and for which he retained the proceeds.

- "I don't recall" when asked if he ever repaid $35,324 he owed the trust in 1996–97.

- "I don't recall" when asked how the trust accumulated $81,314.57 in general and administrative expenses in 1997.

- "I don't recall" when asked about a transaction he had with the trust in 1999 totaling $96,161.26.

- "I don't know" when asked how Mrs. Mecom's debts increased by $41,624 in 1999 when she had been deceased for three years.

- "I don't know" when asked about charging general office and administrative expenses of half-a-million dollars per year.

- "I don't know" when asked how his account payable to the trust was reduced by $536,691.

In his appellate brief, Mecom asserts appellants failed to cite the whole of his testimony demonstrating he deferred to his retained professionals, including his accountant, John West, as more equipped to explain the transactions. Mecom further suggests appellants did not complain to the trial court that they lacked an opportunity to obtain further information from these professionals before submission of the motion for summary judgment. Therefore, Mecom suggests appellants have not met their burden to defeat no-evidence summary judgment because they failed to present evidence that persons more familiar with the transactions were unable to explain them.

However, on this record, we conclude for several reasons that Mecom may not, at least for summary-judgment purposes, merely defer to other professionals to justify his inability thus far to prove fairness of the transactions. First, once appellants cited evidence in their response showing Mecom's inability to explain the transactions, the record contains no reply from Mecom informing the trial court he deferred to other professionals to provide such explanations. *See* Tex.R. Civ. P. 166a(c) (providing trial court must grant motion for summary judgment if "moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response"); *Stiles v. Resolution Trust Corp.,* 867 S.W.2d 24, 26 (Tex.1993) (recognizing that Rule 166a(c) unequivocally restricts the trial court's ruling to issues raised in the motion, response, and any subsequent replies). Second, the evidence indicated that certain unexplained transactions involved Mecom personally, such as forgiveness of his own substantial debt to the trust. Finally, some evidence indicated Mecom and at least his accountant have taken various seemingly inconsistent positions regarding the trust assets, including the following: (1) Mecom claimed Mrs. Mecom's household goods and personal effects were conveyed to him under her will, yet his testimony indicated he did not list these items in probate court filings or estate-tax returns, prepared by his accountant **\*116** and signed by Mecom; (2) at one point, Mecom's accountant told appellants the trust was never funded because assets were not properly conveyed thereto, but Mecom's testimony indicating transactions regarding trust assets were conducted after creation of the trust raises a reasonable inference such assets may have indeed existed; and (3) Mecom claimed most trust assets were dissipated to pay Mrs. Mecom's liabilities, which fails to explain why debts to the trust may have been forgiven.

In sum, appellants presented evidence sufficient to raise a genuine issue of material fact on whether Mecom breached his fiduciary duty. Moreover, with respect to the third element of appellants' claim, evidence of breach constitutes evidence that they have suffered an injury because transactions which Mecom has failed thus far to explain involve disposition of assets for which appellants were the intended beneficiaries. Accordingly, the trial court erred by granting no-evidence summary judgment on the claim for breach of fiduciary duty. We sustain appellants' second issue.

### C. Conversion

[5] [6] In his motion for summary judgment, Mecom asserted that appellants have no evidence of the following elements of a conversion claim: (1) the plaintiff owned, possessed, or had the right to immediate possession of personal property; (2) the defendant wrongfully exercised dominion or control over such property; and (3) the plaintiff suffered injury. *See United Mobile Networks, L.P. v. Deaton,* 939 S.W.2d 146, 147 (Tex.1997) (per curiam); *Burns v. Rochon,* 190 S.W.3d 263, 268 (Tex.App.-Houston [1st Dist.] 2006, no pet.).

We agree that appellants did not raise a genuine issue of material fact on the second above-cited element—whether Mecom wrongfully exercised dominion or control over appellants' property. The extent of appellants' summary-judgment response relative to this element was the following paragraph:

[Mecom] admits he was named as the successor trustee of the Trust by his mother, the Settlor, and he admits that he has been acting as the trustee of the Trust since she passed away on May 4, 1996. Schedule A to the Trust outlines the assets which were conveyed to the Trust.

... Settlor has conveyed, transferred and assigned, and does by these presents convey, transfer and assign unto the Trustee the assets and properties described in Schedule A attached hereto and made a part hereof, ...

Even though Schedule A listed four pages of assets which were transferred to the Trust, [Mecom] testified that he is not aware of any assets left in the Trust. [Mecom] also admitted that although his mother set up the Trust for the benefit of [Mecom's] children, they did not receive anything from it. Since four pages of assets were transferred to the Trust (of which [Mecom] admits he is the Trustee), and [Mecom] has testified that the beneficiaries have not received anything from the Trust, and he is not aware of any assets left in the trust, there is at least a fact issue as to whether or not [Mecom] wrongfully exercised dominion or control over the Trust assets.

(citations to evidentiary exhibit numbers omitted).

We conclude these facts alone are insufficient to raise a reasonable inference that Mecom *wrongfully* exercised dominion or control over trust assets. Accordingly, the trial court properly granted no-evidence **\*117** summary judgment on appellants' conversion claim. We overrule their second issue.

### D. Civil Theft

The Texas Theft Liability Act permits a civil cause of action for damages against a party who commits theft via any of the numerous methods defined under the Texas Penal Code. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 134.001–.005 (West 2005). Under the theory applicable to the present case, the plaintiff must prove the defendant unlawfully appropriated the plaintiff's property with intent to deprive the plaintiff of the property and the plaintiff sustained damages. *See id.* §§ 134.002, .003; Tex. Pen.Code Ann. § 31.03(a) (West Supp.

2009). In his motion for summary judgment, Mecom asserted that appellants have no evidence of any elements of civil theft.

We agree that appellants did not raise a genuine issue of material fact on whether Mecom unlawfully appropriated appellants' property with intent to deprive them of the property. Appellants' summary-judgment response regarding this element was identical in pertinent respects to their above-quoted response relative to the conversion claim, except they contend the recited facts show "there is definitely a fact issue as to whether or not [Mecom], as Trustee, unlawfully appropriated, secured, or stole the Trust assets."

Again, we conclude these facts alone are insufficient to raise a reasonable inference Mecom unlawfully appropriated trust assets, much less that he committed any such conduct with intent to deprive appellants of the property. Accordingly, the trial court properly granted no-evidence summary judgment on appellants' civil-theft claim. We overrule appellants' first and third issues.

## III. TRADITIONAL SUMMARY JUDGMENT

**[7]** Because the trial court erred by granting no-evidence summary judgment on appellants' claim for breach of fiduciary duty, we must consider their fourth issue, challenging traditional summary judgment on the statute-of-limitations ground. *See Knott,* 128 S.W.3d at 216 (recognizing that, when trial court does not specify in its order grounds relied on in granting summary judgment, appellate court must affirm if any ground presented to the trial court and preserved for appellate review is meritorious).

### A. Standard of Review and Applicable Law

A party moving for traditional summary judgment must establish there is no genuine issue of material fact and he is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Knott,* 128 S.W.3d at 215–16. A defendant moving for summary judgment must conclusively negate at least one element of the plaintiff's theory of recovery or plead and conclusively establish each element of an affirmative defense. *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995). If the defendant establishes its right to summary judgment, the burden shifts to the plaintiff to raise a genuine issue of material fact. *Id.*

[8]   [9]   The accrual date of appellants' claim is the pivotal dispute with respect to the limitations issue in this case. As a general rule, a cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later and even if all resulting damages have not yet occurred. *S.V. v. R.V.,* 933 S.W.2d 1, 4 (Tex.1996). The discovery rule, when applicable, defers accrual of a cause of action until the plaintiff knew, or, exercising reasonable diligence, should have known, of the facts giving rise **\*118** to the cause of action. *HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 886 (Tex.1998).

[10]   [11]   A defendant seeking summary judgment based on limitations must (1) conclusively prove when the cause of action accrued and (2) negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving, as a matter of law, there is no genuine issue of fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the nature of her injury. *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999). If the movant establishes that limitations bars the action, the nonmovant must then adduce summary-judgment proof raising a fact issue to avoid the statute of limitations. *Id.*

**B. Analysis**

The four-year statute of limitations applies to a claim for breach of fiduciary duty. *See* Tex. Civ. Prac. & Rem.Code Ann. § 16.004(a)(5) (West 2002). In his motion for summary judgment, Mecom contended appellants' claim accrued when Mrs. Mecom died on May 4, 1996, or alternatively, if the discovery rule is applicable, no later than December 16, 1998; thus, appellants' suit, filed August 13, 2008, is barred by limitations.

Mecom cited *Guardian Trust Co. v. Studdert,* 36 S.W.2d 578, 583 (Tex.Civ.App.-Beaumont 1931), *aff'd,* 55 S.W.2d 550 (Tex. Comm'n App.1932, holding approved) and *Nordyke v. Nordyke,* No. 07–96–406–CV, 1998 WL 4508, at *3 (Tex.App.-Amarillo 1998, pet. denied) to support his position that claims against a trustee accrue on the date the trust is terminated. However, these cases are not controlling in the present situation because appellants have raised the discovery rule.

[12]   In his motion, despite contending the limitations period commenced upon Mrs. Mecom's death, Mecom also seemed to acknowledge that the discovery rule may be applicable to a claim for breach of fiduciary duty. Indeed, the Texas Supreme

Court has held that a fiduciary's misconduct is inherently undiscoverable. *S.V.,* 933 S.W.2d at 8; *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 456 (Tex.1996). The reason for this principle is that a person to whom a fiduciary duty is owed is either unable to inquire into the fiduciary's actions or unaware of the need to do so. *S.V.,* 933 S.W.2d at 8. Although a person to whom a fiduciary duty is owed is relieved of the responsibility of diligent inquiry into the fiduciary's conduct so long as that relationship exists, when the fact of misconduct becomes apparent, it can no longer be ignored, regardless of the nature of the relationship. *Id.; see Computer Assocs.,* 918 S.W.2d at 456.

[13]   [14]   Ascertaining the date that a claimant knew, or should have known, of an injury generally entails a fact question. *See Childs v. Haussecker,* 974 S.W.2d 31, 37–39 (Tex.1998). However, if reasonable minds could not differ about the conclusion to be drawn from facts in the record, commencement of the limitations period may be determined as a matter of law. *See id.* We conclude Mecom failed to prove as a matter of law that appellants knew, or should have known, of their alleged injury as of December 16, 1998. [5]

[5]      Because Mecom failed to negate application of the discovery rule, we need not consider appellants' fraudulent-concealment defense to the limitations ground.

Other than recitals of the general law applicable to limitations and the discovery rule, the following is the extent of Mecom's argument in his motion for summary judgment **\*119** regarding the accrual date if the discovery rule is applicable:

> Assuming, *arguendo,* that [appellants'] claims against [Mecom] did not accrue when the Trust terminated upon Mrs. Mecom's death on May 4, 1996 (which [Mecom] expressly denies), the evidence proves that accrual occurred no later than December 16, 1998. On that date, [appellants] forwarded [Mecom] a letter advising of concerns with regard to the Trust and their interest in same. See Exhibit H. Prior to sending such missive, [appellants] met with [Mecom's] accountant, West, to discuss the Trust, and were informed that they would not be receiving anything from the Trust.

The referenced meeting occurred in 1998 between appellants, Bill Becknell (Mecom's attorney), and John West (Mecom's accountant). In their depositions taken after this suit was filed, appellants each testified West informed them during the meeting that, in essence, the trust had not been funded properly because the assets were not individually itemized in the trust instrument. Then, appellants wrote and all signed the referenced December 16, 1998 letter, the body of which is pertinent in its entirety:

Dear Daddy:

As you know, at your suggestion, we recently had a meeting with Bill Becknell and John West in order to obtain information regarding any interest we may have in the Mary Elizabeth Mecom Trust or in Grandmother's estate. Billy and John suggested that we write this letter to state our objectives and try to get answers to some of our concerns.

Our objective is to simply be proactive in resolving all the issues concerning Grandmother's estate in the friendliest and beneficial way to all those involved. We also feel that by writing this letter and letting everybody be on the same page we can continue to build and foster our family bond.

In our last family meeting, it was our understanding that you would keep us updated on the status of Mary Elizabeth Mecom Trust and the Estate. Since that meeting we basically have not been told anything about what was going on with the Trust and the Estate, such as the status of the payment of liabilities and taxes, and the sale of assets. Although we met with Billy and John, they did not provide enough information to answer most of our questions. Therefore, we would like to schedule another meeting in the near future in order to obtain the answers to two basic questions:

1. What, if any interest do you feel we have in the Mary Elizabeth Mecom Trust and/or Grandmother's estate; and

2. When do you believe these matters will be resolved?

Daddy, we realize this is your decision, and we are not trying to upset you with these questions. However, we are all adults now with our own financial responsibilities and it is very difficult to plan for the future when we have these unresolved issues hanging over our heads. Specifically, we need to know when we should plan to receive any distribution from the Trust and/or the Estate. If there will

be no distribution we should also know this so we can plan accordingly. This question was prompted by your remark at the last family meeting that you wanted to "pass this (the estate) on to us".

Regardless of how this is resolved we all feel it would be healthy to have a discussion with you just so that we can understand the situation.

Thanks for your understanding Daddy,

**\*120** We disagree with Mecom's contention that the information conveyed at the meeting or the substance of the letter conclusively demonstrate any alleged misconduct on Mecom's part was apparent by December 16, 1998. John did testify that, at the time of the meeting, he believed assets existed that were not "in the trust's possession" and he did not trust West and was skeptical of his statements. Katsy also testified that, at the time of the meeting, she considered West's explanation inconsistent with information provided to appellants shortly after Mrs. Mecom's death; i.e., they were beneficiaries of the trust. However, this testimony does not establish appellants knew, as a result of the meeting, that Mecom had committed any wrongdoing. To the contrary, construing John's testimony in context, he actually suggested that West was motivated for his own gain to claim there were no assets in the trust. John opined that West used words such as "technically" and "properly" to describe the alleged non-funding of the trust because he "was trying to figure out how to take assets of the trust ... and use them to his benefit." John explained that West, as Mecom's financial advisor, had a "carried interest" in their joint business ventures and "for that reason it was in his best interest to keep as many of the assets as possible on his side of the table so he had more to play with." Although John's explanation of his suspicions was not exactly clear, neither he nor Katsy seemed to specifically testify they knew, as a result of the meeting, that West misled them because Mecom individually, or in collaboration with West, had mishandled or misappropriated trust assets.

Although appellants expressed in the subsequent letter to Mecom that they had not received complete information, the letter does not reflect they were aware of any omission rising to the level of a breach of fiduciary duty. To the contrary, a reasonable inference is that appellants believed disclosure would be forthcoming considering they were requesting more information. Although the tone of the letter indicates appellants were delicately inquiring because Mecom is their father, appellants did not accuse him of any misconduct or base their suggestion they might receive no distribution on the

fact that he may have wrongfully retained or squandered trust assets. The tenor of the entire letter reflects merely an inquiry about the status of trust assets.

Moreover, John testified that Becknell had been the long-time Mecom family attorney and personally represented John in unrelated matters, John trusted and relied on Becknell, and when Becknell advised appellants to write the letter, John knew Becknell also represented Mecom. The fact that appellants used Mecom's attorney to assist them in requesting information from Mecom supports a reasonable inference appellants did not yet view the relationship with Mecom as adversarial concerning the trust; rather, they wished to enlist Mecom's cooperation to resolve the trust issues.

In the "Statement of Facts" portion of his motion for summary judgment, Mecom suggested that appellants received no response to the letter yet failed to take affirmative action to obtain distribution of trust assets until they filed suit approximately ten years later. We recognize that appellants' testimony was quite vague and non-committal regarding their attempts to learn more information about the trust after sending the letter; they answered many deposition questions by expressing a lack of memory regarding a particular topic, especially dates on which they inquired about the trust.

Nonetheless, John testified that, during this ten-year period, he had casual conversations **\*121** with Mecom, in which John generally referenced the need to resolve the trust, but John did not make any accusations during these conversations. When asked what actions he took to ensure the assets were distributed to the beneficiaries, John responded that he was a beneficiary, not a trustee, and "what am I supposed to do? ... I don't know." Mary Elizabeth could not recall specific conversations about the trust, but testified that anytime appellants asked Becknell, he reassured them, "he's working on it," although it is unclear whether "he" in this quote meant Becknell or Mecom. Katsy generally testified that, after writing the letter, she asked additional questions and appellants were generally led to believe "these questions will be answered." Katsy also indicated that she trusted her father to take care of her and, as of the date of her deposition, still believed he would do so. This testimony collectively raises an inference that appellants reasonably depended on Mecom, not only as trustee but also as their father, to provide further information and believed it would be forthcoming.

In their testimony collectively, appellants did indicate they were made to feel greedy for asking about the trust, they felt intimidated and uncomfortable "pushing" matters, the situation was "sensitive" considering the trustee is their father, and they tried to obtain answers in a "roundabout" manner because Mecom had delegated his duties to answer questions about the trust to Becknell or West. However, this reluctance to further inquire does not conclusively establish appellants knew Mecom had committed any misconduct. Viewed in the light most favorable to appellants, this evidence also supports an inference that they had a reasonable basis for failing to more firmly pursue distribution of the assets and waiting for Mecom to resolve the trust issues.

In sum, we recognize that the ten years between the letter and the date appellants filed suit is a comparatively lengthy period. Nevertheless, as we have mentioned, Mecom bore the burden to negate application of the discovery rule. *See KPMG Peat Marwick,* 988 S.W.2d at 748. Further, appellants were relieved of the responsibility of diligent inquiry into Mecom's conduct unless "the fact of misconduct" became "apparent." *See S.V.,* 933 S.W.2d at 8. In his motion, Mecom cited no evidence conclusively demonstrating any misconduct was apparent to appellants during this period. Instead, the evidence raises an inference that appellants were still relying on Mecom as fiduciary to explain disposition of the trust assets. Consequently, on the present record, Mecom has not proved appellants' claim is barred by limitations. The evidence presents, at most, a fact issue for the jury regarding the date on which appellants discovered their injuries.

Accordingly, the trial court erred by granting traditional summary judgment based on the statute of limitations relative to appellants' claim for breach of fiduciary duty. We sustain their fourth issue.

### IV. CONCLUSION

We affirm the summary judgment on appellants' conversion and civil-theft claims but reverse the summary judgment on their claim for breach of fiduciary duty and remand for further proceedings.

**All Citations**

401 S.W.3d 110

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

418 S.W.3d 280
Court of Appeals of Texas,
Dallas.

JOSE FUENTES CO., INC., d/b/a Gloria's, Gloria Rubio, Jose Fuentes, G. Rubio Enterprises, Inc., J.F. Greenville Company, Inc., J. Fuentes Colleyville, L.P., Jose Fuentes Colleyville, Inc., Carlos Fuentes, Inc., Gloria's Fort Worth Restaurant, L.P., Gloria Fuentes, Inc., J. Fuentes Rockwall, L.P., Jose Fuentes Addison, Inc., Gloria's Firewheel Restaurant, Inc., J. Fuentes Arlington, L.P., Gloria's Domain, Inc., and Nancy Fuentes Fairview, Inc., Appellants
v.
Mario ALFARO, Mario Sabino's, Inc. and Sabino Valle, Appellees.

No. 05–11–00228–CV.    |    Nov. 26, 2013.

**Synopsis**
**Background:** Owners of restaurant chain filed tort claims against former employee, his business partner, and restaurant that they started. Defendants filed motion for no-evidence summary judgment. Following a hearing, the 162nd Judicial District Court, Dallas County, Lorraine A. Raggio, J., granted motion. Chain owners appealed.

**Holdings:** The Court of Appeals, Evans, J., held that:

[1] no-evidence summary judgment motion that challenged "one or more" of the listed elements of each claim, without identifying the specific element or elements being challenged, was legally insufficient;

[2] there is no "fair notice" exception to requirement that a no-evidence motion for summary judgment identify which specific element or elements of the claim are being challenged; and

[3] legal insufficiency of a no-evidence motion for summary judgment that does not specify the element or elements being challenged may be raised for the first time on appeal.

Reversed and remanded.

O'Neill, J., filed a dissenting opinion in which Lang and Lang–Miers, JJ., joined.

West Headnotes (7)

**[1]    Courts**
         Construction and application of rules in general

In reviewing a motion for no-evidence summary judgment, the Court of Appeals adheres closely to the text of applicable rule of procedure and the comment to that rule informing its construction. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

Cases that cite this headnote

**[2]    Judgment**
         Motion or Other Application

A no-evidence motion that only generally challenges the sufficiency of the nonmovant's case and fails to state the specific elements that the movant contends lack supporting evidence is fundamentally defective and cannot support summary judgment as a matter of law. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

6 Cases that cite this headnote

**[3]    Judgment**
         Motion or Other Application

A no-evidence motion for summary judgment may be directed at specific factual theories or allegations within a claim or defense only if the challenge to the factual allegation is connected to a no-evidence challenge to a specified element of a claim or defense. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

Cases that cite this headnote

**[4]    Judgment**
         Motion or Other Application

No-evidence summary judgment motion that challenged "one or more" of the listed elements

of each of plaintiffs' tort claims, without identifying the specific element or elements being challenged, was legally insufficient; motion did not indicate, as defendants contended, that they were challenging each and every element of plaintiffs' claims, and it failed to specify even a single element that was being challenged. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

5 Cases that cite this headnote

**[5]** **Judgment**
　　 Nature of summary judgment

The purpose of a motion for no-evidence summary judgment is to assess the proof on an element of a claim or defense the movant believes in good faith is unsupported by evidence, after there has been adequate time for discovery, to determine if there is a genuine need for trial. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

Cases that cite this headnote

**[6]** **Judgment**
　　 Motion or Other Application

There is no "fair notice" exception, to be discerned through a plaintiff's thorough response, to requirement that a no-evidence motion for summary judgment identify which specific element or elements of the claim are being challenged. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

2 Cases that cite this headnote

**[7]** **Appeal and Error**
　　 Judgment

Legal insufficiency of a no-evidence motion for summary judgment that does not specify the element or elements being challenged may be raised for the first time on appeal without an objection in trial court. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*282** Jeffrey R. Boggess, Law Office of Jeffrey R. Boggess, Addison, for Appellants.

Bryan L. Sample, Law Offices of Bryan L. Sample, Dallas, Robert W. Buchholz, The Law Office of Robert W. Buchholz, P.C., Dallas, for Appellees.

Before the Court En Banc.

**OPINION**

Opinion by Justice EVANS.

The Court decides this appeal en banc to resolve the important issues raised regarding no-evidence summary judgment practice. Appellants complain that a no-evidence motion for summary judgment that challenges "one or more" of the listed elements of each of appellants' claims—without identifying the specific element or elements being challenged—is legally insufficient. We conclude such a motion fails to meet the standard of specificity mandated by rule 166a(i) of the Texas Rules of Civil Procedure because it fails to identify what element or elements are being challenged. We further conclude there is no "fair notice" exception to the rule that would force a non-movant to present evidence in support of an element that is not specifically identified as a challenged element. Finally, because appellees' motion is clearly insufficient, we conclude it may be challenged for the first time on appeal. We reverse the trial court's judgment and remand the cause for further proceedings.

**FACTUAL BACKGROUND**

Gloria Rubio and Jose Fuentes are the founders and current owners of a restaurant chain known as "Gloria's." Gloria's menu focuses on Salvadoran, Mexican, and Tex–Mex cuisine. According to appellants, they spent significant time and money researching recipes, food preparation, and restaurant decoration, which they claim resulted in customer loyalty, recognition, and financial success. Appellants assert that their research produced trade secrets known only to Rubio, Fuentes, and Gloria's employees, and that they had contractual relationships with both their employees and their suppliers.

Mario Alfaro worked as a manager at Gloria's for twenty years. Alfaro then left Gloria's to start a new restaurant, Mario Sabino's, with his business partner, Sabino Valle. Mario Sabino's served food similar to that found on Gloria's menu. Appellants claim that appellees used confidential information, misappropriated trade secrets including recipes, and tortiously interfered with Gloria's contractual relations by recruiting Gloria's employees to unlawfully compete with Gloria's.

**\*283** Appellants sued for tortious interference with business relations, misappropriation of trade secrets, and conversion. Appellants' fourth amended petition set forth thirty-two paragraphs of factual allegations and then, as to each cause of action, incorporated all thirty-two paragraphs by reference and pleaded the elements of each claim. In response, appellees filed a motion for no-evidence summary judgment asserting that appellants had no evidence to support "one or more" of the elements of each of their asserted claims. The motion referred to the page numbers of appellants' petition on which each claim was asserted, listed the essential elements of the claim, and concluded by stating that appellants "have no evidence on one or more elements of this cause of action." The motion contained no argument or other discussion of any specific element of appellants' claims. Appellants responded by endeavoring to bring forward some evidence in support of their factual allegations and multiple theories of recovery as to each element of all three of their causes of action. The parties then briefed the adequacy of appellants' proffered evidence to support each of appellants' causes of action. Following a hearing, the trial court granted appellees' motion on all claims. Through severance of some claims and parties and non-suits of others, the summary judgment became final. This appeal ensued.

### ANALYSIS

### I. REQUIRED SPECIFICITY FOR NO–EVIDENCE MOTION FOR SUMMARY JUDGMENT

 **[1]** **[2]** **[3]** In reviewing a motion for no-evidence summary judgment, this Court adheres closely to the text of rule 166a(i) and the comment to that rule informing its construction. *See Bever Props., L.L.C. v. Jerry Huffman Custom Builder, L.L.C.,* 355 S.W.3d 878, 888 (Tex.App.-Dallas 2011, no pet.). The rule requires the movant in a no-evidence summary judgment motion to specifically state which elements of the non-movant's claims lack supporting evidence. TEX.R. CIV. P. 166a(i). The comment to the rule states that the motion "must be specific in challenging the evidentiary support for an element of a claim or defense," and the rule "does not authorize conclusory motions or general no-evidence challenges to an opponent's case." *Id*. 1997 cmt. A no-evidence motion that only generally challenges the sufficiency of the non-movant's case and fails to state the specific elements that the movant contends lack supporting evidence is fundamentally defective and cannot support summary judgment as a matter of law. *See Roehrs v. FSI Holdings, Inc., 246 S.W.3d 796, 805 (Tex.App.-Dallas 2008, pet. denied).* A no-evidence motion for summary judgment may be directed at specific factual theories or allegations within a claim or defense *only* if the challenge to the factual allegation is connected to a no-evidence challenge to a specified element of a claim or defense. *Garcia v. State Farm Lloyds,* 287 S.W.3d 809, 819 (Tex.App.-Corpus Christi 2009, pet. denied) ("[A] motion for no-evidence summary judgment that only generally attacks a factual theory, without specifying the elements of the claims being attacked, is insufficient to support a no-evidence summary judgment."); *Pakideh v. Pope,* No. 13–08–00560–CV, 2010 WL 3820899, at \*4–5 (Tex.App.-Corpus Christi Sept. 30, 2010, no pet.) (mem. op.) (no-evidence challenge to fourteen factual allegations not connected to a no-evidence challenge to an element of a claim was defective); *see also Callaghan Ranch, Ltd. v. Killam,* 53 S.W.3d 1, 3–4 (Tex.App.-San Antonio 2000, pet. denied).

 **[4]** In this case, appellees' motion for no-evidence summary judgment identified each of appellants' claims, gave the page **\*284** number in the petition where the claim could be found, and listed the essential elements of each claim. The motion asserted, both before and after listing the elements of each claim, that appellants had no evidence to support "one or more" of the elements of the claim. The motion contains no further discussion regarding any of the claims or their elements. In their first issue on appeal, appellants contend the motion was legally insufficient to support summary judgment because the motion failed to "state the elements as to which there is no evidence" as required by the rule.

Appellees respond that the language of the motion was sufficient to inform appellants that they were moving for summary judgment on the ground that there was no evidence to support "each and every" element of appellants' claims. In making this argument, appellees equate the phrase "one or more" with the phrase "each and every." The two phrases, however, are fundamentally different. The phrase "each and

every" clearly has the single meaning of "all." In contrast, the phrase "one or more" means "at least one" but also potentially "several" or "all." It is in exactly this sense that the phrase is used in rule 166a(i) when it permits a movant to seek a no-evidence summary judgment on the ground that there is no evidence of "one or more" essential elements of a claim. *Nelson v. Regions Mortg., Inc.,* 170 S.W.3d 858, 861 (Tex.App.-Dallas 2005, no pet.) (rule 166a(i) does not limit number of elements that may be challenged in no-evidence motion). But the rule requires that each element challenged must be specifically identified as such, so the non-movant is not left to guess which elements the movant challenges. When a movant uses a word or phrase that does not clearly identify which element or elements the motion challenges, it is the obligation of the movant to provide a rational basis in the motion for the non-movant to eliminate other possible alternative meanings of the unclear identification of the challenged element or elements; otherwise, the motion is legally insufficient. By only challenging "one or more" listed elements, this no-evidence motion failed to specify even a single element that was challenged.

Appellees argue that the combination of identifying "the claims plead by the Plaintiffs, the elements of each cause of action, and that they have no evidence on one or more elements of the cause of action" renders the motion "simple, clear and unambiguous." The fact that appellees' motion references the page number in appellants' petition where the elements of each claim are alleged and thirty-two paragraphs of factual allegations are incorporated by reference, together with a listing of the elements in the no-evidence motion itself, does nothing to inform appellants about which elements of each claim the motion challenges. This combination even in close proximity, without more, does nothing to clarify the scope of the motion.

Appellees argue in detail about the sufficiency of appellants' responsive evidence to support each factual theory of recovery within each of appellants' claims. In so doing, appellees contend the no-evidence motion is legally sufficient to challenge not only each element of each claim but also each factual theory of recovery within each claim. Although we agree that a motion for no-evidence summary judgment *may* challenge distinct factual allegations and theories of recovery —*see* rule 166a(e)—such a challenge *must* be specific and connected to a particular element of a cause of action or defense to meet the requirements of the rule. *See* TEX.R. CIV. P. 166a(i); *Garcia,* 287 S.W.3d at 819; *Pakideh,* 2010 WL 3820899, at *4–5. In this case, appellees' motion does

not challenge any specific facts alleged by appellants, but only cites **\*285** the page number of the petition where all thirty-two factual paragraphs are incorporated by reference into each asserted cause of action. Such a general allusion to the facts cannot provide the basis for a specific no-evidence challenge to specific factual allegations or theories.

 **[5]**    The purpose of a motion for no-evidence summary judgment is to assess the proof on an element of a claim or defense the movant believes *in good faith* is unsupported by evidence, after there has been adequate time for discovery, to determine if there is a genuine need for trial. *See Reynosa v. Huff,* 21 S.W.3d 510, 512 (Tex.App.-San Antonio 2000, no pet.); *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 10.001 (West 2002) (signing motion certifies movant's belief that contention made is warranted by existing law and evidence). To force a non-movant to produce proof on all elements of its claim when the movant has simply challenged "one or more" elements would require the non-movant to unnecessarily produce its evidence on an element or elements the movant may have no reasonable basis to challenge. Indeed, appellants point out in their reply brief that they did exactly this: they filed approximately one hundred pages of responsive material out of an abundance of caution— concerned that the trial court might pass over the deficiencies of this motion and reach the merits. This result renders the rule's specificity requirement meaningless, allows movants to sidestep the requirement that a no-evidence challenge be based on a good faith belief to challenge a specific element or elements, and expands no-evidence summary judgment practice far beyond its intended scope. The rule's specificity requirement is critical to preventing unnecessary production of evidence out of uncertainty regarding which of several possible meanings a court may interpret a no-evidence motion to include in its scope.

Texas courts that have addressed no-evidence motions using the same or similar wording have found the motions legally insufficient to support summary judgment on elements that were not specifically identified. In *Keathley v. Baker,* No. 12–07–00477–CV, 2009 WL 1871706, at *4 (Tex.App.-Tyler June 30, 2009, no pet.) (mem. op.), the court concluded that a motion challenging "one or more" elements of the plaintiff's breach of contract and DTPA claims was conclusory because it failed to challenge specific elements and could not support summary judgment on those claims. In *Fernea v. Merrill Lynch Pierce Fenner & Smith, Inc.,* No. 03–09–00566–CV, —— S.W.3d ——, ——, 2011 WL 2769838, at *3 (Tex.App.-Austin July 12, 2011) *appeal abated*, No. 03–09–00566–CV,

2011 WL 4424291 (Tex.App.-Austin Sept. 23, 2011, no pet.), a movant's challenge was stated as, "there is no evidence of one or more essential elements of the Plaintiff's causes of action against Merrill Lynch." The court decided "such a statement does not, by itself, meet the requirements of a no-evidence motion for summary judgment." *Id.* In *Callaghan Ranch,* the movant listed the elements of the plaintiff's claim for implied dedication and contended there was "at least one element" the plaintiff could not satisfy. *Callaghan Ranch,* 53 S.W.3d at 4. The movant went on, however, to specifically discuss the element of acceptance. *Id.* The court addressed the element specifically discussed by the movant, but the language "at least one element," even in conjunction with a listing of the elements, was insufficient to raise a challenge to any other element. *Id.* We conclude the decisions in these cases align with our analysis here and are supported by a plain reading of rule 166a(i) and its comment.

### *286 II. FAIR NOTICE

 [6]    Appellees contend that, at a minimum, their motion provided appellants with fair notice of the elements being challenged, thereby satisfying the requirements of rule 166a(i). They argue that we should discern fair notice based on appellants' thorough response to the motion and the detailed briefing on the issues in the trial court. We decline to recognize a fair notice exception to the rule. *See Bever,* 355 S.W.3d at 888 (citing *Mott,* 249 S.W.3d at 98, favorably for proposition that fair notice exception does not extend to elements requirement of no-evidence motion for summary judgment).

Appellees support their fair notice argument by citing *Timpte Industries, Inc. v. Gish,* 286 S.W.3d 306, 311 (Tex.2009). In *Timpte Industries,* the plaintiff contended that a no-evidence motion only challenged one element, but not a second element, of the plaintiff's product liability claim. *Id.* at 310. The supreme court observed that immediately after listing the elements of the claim, the no-evidence motion expressly challenged two elements of the plaintiffs claim and repeated the challenge to the same two elements at the conclusion of the motion. *Id.* at 311. The court determined this met the specificity requirements of rule 166a(i). *Id.* In its reasoning, the court stated the purpose of the rule was " 'to provide the opposing party with adequate information for opposing the motion.' " *Id.* (quoting *Westchester Fire Ins. Co. v. Alvarez,* 576 S.W.2d 771, 772 (Tex.1978)). Then the court "analogized this purpose to that of the 'fair notice'

pleading requirements of Rules 45(b) and 47(a)." *Id.* But the supreme court clearly required the no-evidence motion to specifically identify the challenged elements to satisfy the requirements of rule 166a(i). Accordingly, *Timpte Industries* does not substitute a general fair notice standard for the specificity requirement of rule 166a(i), and neither do we.

Rule 166a(i) unconditionally requires a movant to specify the elements as to which there is no evidence. *See* TEX.R. CIV. P. 166a(i). We apply the rule strictly so as not to deprive litigants of their right to a full hearing on the merits of any real issue of fact. *See Compton v. Calabria,* 811 S.W.2d 945, 949 (Tex.App.-Dallas 1991, no writ). The rule provides no latitude to allow movants to avoid the requirement of specificity by claiming the non-movant had "fair notice" of what the motion was intended to challenge. *See Mott,* 249 S.W.3d at 98. Rather, the rule specifies the manner in which the movant provides the "adequate information" discussed in *Timpte Industries:* that is, by specifying which elements of the non-movant's claim or defense lack supporting evidence. *See* TEX.R. CIV. P. 166a(i).

Traditional summary judgments cannot be upheld upon grounds not raised in the motion for summary judgment. *City of Midland v. O'Bryant,* 18 S.W.3d 209, 218 (Tex.2000); *Chessher v. Sw. Bell Tel. Co.,* 658 S.W.2d 563, 564 (Tex.1983). This prohibition applies to no-evidence summary judgments as well. *See Fraud–Tech, Inc. v. Choicepoint, Inc.,* 102 S.W.3d 366, 387 (Tex.App.-Fort Worth 2003, pet. denied); *Callaghan Ranch,* 53 S.W.3d at 4; *Specialty Retailers, Inc. v. Fuqua,* 29 S.W.3d 140, 147–48 (Tex.App.-Houston [14th Dist.] 2000, pet. denied); *see also* TEX.R. CIV. P. 166a cmt. (no-evidence motion for summary judgment "must be specific in challenging the evidentiary support for an element of a claim or defense"). The comment is clear that the rule "does not authorize conclusory motions or general no-evidence challenges to an opponent's case." TEX.R. CIV. P. 166a(i) 1997 cmt. Appellants' argument that a fair notice standard should be substituted for the **\*287** specificity requirement of rule 166a(i) runs contrary to both the rule and controlling authorities.

Furthermore, given the complete absence of specificity in the motion at issue, we cannot conclude appellants had any notice as to which elements of their claims appellees were challenging. The fact that appellants, out of an abundance of caution, chose to address all of the elements of each of their factual theories of each of their claims in response to the

motion does not transform appellees' conclusory motion into a legally sufficient no-evidence motion for summary judgment.

## III. WAIVER

 [7]  Finally, appellees argue that appellants failed to challenge the sufficiency or clarity of the motion in the trial court.[1] Appellees would have us apply traditional summary judgment standards to no-evidence motions when they argue that appellants "did not move for a continuance of the hearing [and] did not file any special exceptions to the Motion...." *See McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 342 (Tex.1993) ( "An exception is required should a non-movant wish to complain on appeal that the grounds [in a traditional motion for summary judgment] relied on by the movant were unclear or ambiguous."). We disagree.

[1]     We note that in the trial court, appellants mentioned in their response to appellees' no-evidence motion that the elements challenged were not specified and, therefore, the motion was insufficient.

This Court has held that the legal sufficiency of a no-evidence motion for summary judgment may be challenged for the first time on appeal in the same manner as a challenge to the legal sufficiency of a traditional motion for summary judgment. *See Cimarron Hydrocarbons Corp. v. Carpenter,* 143 S.W.3d 560, 562–63 (Tex.App.-Dallas 2004, pet. denied); *Preston Nat'l Bank v. Stuttgart Auto Ctr. Inc.,* 05–09–00020–CV, 2010 WL 3310727, at \*2 (Tex.App.-Dallas Aug. 24, 2010, no pet.) (mem. op.); *Monroe v. Dallas Cnty.,* 05–07–01630–CV, 2009 WL 2569449, at \*4 (Tex.App.-Dallas Aug. 21, 2009, no pet.) (mem. op.); *Crocker v. Paulyne's Nursing Home, Inc.,* 95 S.W.3d 416, 419 (Tex.App.-Dallas 2002, no pet.); *Gross v. Methodist Hosps. of Dallas,* 05–00–02124–CV, 2002 WL 1380399, at \*3 (Tex.App.-Dallas, June 27, 2002, no pet.) (op. on reh'g) (not designated for publication).[2] Traditional motions for summary judgment are based on argument for the relief sought supported by evidence supplied with the motion. This corpus of material provides information from which the non-movant can determine the scope of the motion. With all the contents of a traditional motion for summary judgment, it is appropriate to require an exception or objection in the trial court if a non-movant claims the traditional motion is ambiguous as to what grounds form its basis.

[2]     *Accord In re Estate of Swanson,* 130 S.W.3d 144, 147 (Tex.App.-El Paso 2003, no pet.); *Cuyler v. Minns,* 60

S.W.3d 209, 213 (Tex.App.-Houston [14th Dist.] 2001, pet. denied); *Callaghan Ranch,* 53 S.W.3d at 3.

But an exception or objection in the trial court is not required when a traditional motion fails to present any ground for summary judgment on a claim or defense. *McConnell,* 858 S.W.2d at 342 ("summary judgments must stand or fall on their own merits, and the non-movant's failure to except or respond cannot supply by default the grounds for summary judgment or the summary judgment proof necessary to establish the movant's right"). We are not permitted to "read between the lines" or infer from the pleadings any grounds for granting summary judgment other than **\*288** those grounds expressly set forth before the trial court. *See Nall v. Plunkett,* 404 S.W.3d 552, 555 (Tex.2013). A motion for no-evidence summary judgment that does not specify the element or elements that are being challenged does not provide *any ground* upon which the trial court can grant summary judgment. Given the brevity of no-evidence summary judgment motions, which are often lacking significant argument in support of the relief sought, there is nothing to provide guidance as to the basis or the scope of the motion except the identification of the challenged elements. Thus, while a nonspecific and conclusory motion for no-evidence summary judgment is inherently ambiguous, it is also insufficient as a matter of law and does not require an objection. *See Callaghan,* 53 S.W.3d at 3.

## CONCLUSION

Based on the foregoing, we conclude appellees' motion for no-evidence summary judgment is insufficient as a matter of law. We resolve appellants' first issue in their favor. It is unnecessary for us to address the remaining issues presented by the parties. *See* TEX.R.APP. P. 47.1.

We reverse the trial court's judgment and remand the cause for further proceedings.

O'NEILL, J., dissenting.

Dissenting Opinion By Justice O'NEILL, dissenting.
Because I would conclude Mario Sabino's no-evidence motion for summary judgment gave fair notice of the elements being challenged, and that Gloria's waived any complaint seeking further specificity, I respectfully dissent.

Gloria's sued Mario Sabino's for misappropriation of trade secrets, tortious interference with contractual relations, and conversion arising out of Mario Sabino's operation of a restaurant in competition with Gloria's. Gloria's also sought a permanent injunction based upon Mario Sabino's alleged misappropriation of trade secrets.

Mario Sabino's filed a no-evidence motion for summary judgment on Gloria's claims. In its motion, Mario Sabino's followed the same formula challenging each of appellant's three claims (tortious interference, misappropriation of trade secrets, and conversion). In each challenge, Mario Sabino's stated: "There is no competent summary judgment evidence of one or more of the following elements of [name of tort] on which Plaintiffs have the burden of proof at trial." In each challenge, Mario Sabino's then listed all elements of the particular claim being challenged. Finally, Mario Sabino's concluded each challenge contending that it was entitled to summary judgment because Gloria's had no evidence of "one or more" elements of the specified cause of action.

Gloria's did not specially except to the motion. Instead, Gloria's, interpreting the motion as challenging each of the enumerated elements of each cause of action, responded to the motion in full, purporting to raise a fact issue on each enumerated element. Gloria's did, however, complain in its conclusion that the motion was "vague" and failed to mention the "exact elements" it was challenging. The trial court granted Mario Sabino's motion in its entirety.

According to Gloria's, the trial court erred in granting the no-evidence motion for summary judgment because the motion failed to identify any element that lacked evidentiary support. The majority agrees concluding the motion did nothing "to inform" Gloria's about which elements of each claim were being challenged. The majority thus concludes the motion was legally insufficient as a matter of law and **\*289** can, therefore, be challenged for the first time on appeal.

I agree with the majority that a no-evidence motion for summary judgment must "state the elements" upon which the movant believes there is no evidence. Tex.R. Civ. P. 166a(i). I also agree the motion must be specific in challenging the evidentiary support for an element of a claim or defense. *Timpte Indus., Inc. v. Gish,* 286 S.W.3d 306, 310 (Tex.2009) (citing comment to rule 166a(i)). However, I would conclude that in determining whether a no-evidence motion for summary judgment satisfied the rule's requirements, we determine whether the motion gave the nonmovant fair notice

of the element being challenged. I would further conclude the motion in this case did so.

In *Timpte Industries,* the plaintiff nonmovant complained that the defendant's no-evidence motion for summary judgment was insufficient to meet rule 166a(i)'s specificity requirements with respect to an element of his products liability cause of action. The Texas Supreme Court explained that the underlying purpose of the specificity requirement is "to provide the opposing party with adequate information for opposing the motion, and to define the issues for the purpose of summary judgment." *Id.* at 311 (citing *Westchester Fire Ins. Co. v. Alvarez,* 576 S.W.2d 771, 772 (Tex.1978) (traditional summary judgment case)); *see also Henning v. OneWest Bank, FSB,* 405 S.W.3d 950, 963 (Tex.App.-Dallas 2013, no pet.). The supreme court specifically analogized this purpose to that of "fair notice" pleading requirements. *Timpte,* 286 S.W.3d at 311; *Henning,* 405 S.W.3d at 963. The court then, in construing the no-evidence motion, determined whether the motion provided "fair notice" as to what element or elements were being challenged. *Timpte,* 286 S.W.3d at 311. In doing so, the supreme court expressly considered whether the record as a whole revealed any confusion as to the elements challenged and specifically considered the nonmovant's response to the no-evidence motion. *Id.; see also Henning,* 405 S.W.3d at 962 ("fair notice" where, among other things, the record revealed no confusion as to the movant's assertions of no evidence).

I would conclude the motion in this case as a whole, read in context and in conjunction with Gloria's reply, gave Gloria's fair notice that the motion was challenging each and every element that was listed in the motion. I would further conclude that Gloria's claim that it chose to address all the elements of each of its causes of action because it was afraid to "guess" as to "which" elements were being challenged is disingenuous. The motion can reasonably be read in only one of two ways—as challenging all of the listed elements—or as challenging no specific element.[1] While "one or more" elements does not necessarily include all elements, it certainly can. It is apparent from Gloria's response to the motion that it construed the motion as challenging all of the enumerated elements.

---

[1]    Stated otherwise, it would not have been reasonable for Gloria's to interpret the motion as requiring it to pick one element of a cause of action and respond to only that element. The motion either required Gloria's to do

nothing, to object to the motion, or to respond to each element.

I would further conclude that while the motion for summary judgment may have suffered from an ambiguity, Gloria's was required to object in the trial court and preserve this complaint for review.[2] *See* **\*290** *Crocker v. Paulyne's Nursing Home, Inc., 95 S.W.3d 416, 420 (Tex.App.-Dallas 2002, no pet.)* (if an element challenged in a no-evidence motion for summary judgment is unclear or ambiguous, the nonmovant must object) (*citing McConnell v. Southside Indep. Sch. Dist., 858 S.W.2d 337, 342–43 (Tex.1993)*); *see also Dishner v. Huitt–Zollars, Inc., 162 S.W.3d 370, 376 (Tex.App.-Dallas 2005, no pet.); Dorsett v. Hispanic Hous. & Educ. Corp., 389 S.W.3d 609, 612 (Tex.App.-Houston [14th Dist.] 2012, no pet.)* (presuming nonmovant understood which elements of claim were being challenged when nonmovant did not specially except).

[2]     To the extent the statement in Gloria's conclusion to its summary judgment response can be interpreted as an objection, Gloria's nevertheless waived error by failing to obtain a ruling on the objection. *See Franco v. Slavonic Mut. Fire Ins. Ass'n, 154 S.W.3d 777, 784 (Tex.App.-Houston [14th Dist.] 2004, no pet.)* (traditional summary judgment); *see also McConnell v. Southside Indep. Sch. Dist., 858 S.W.2d 337, 344 n. 6* (when nonmovant files proper exception to traditional motion for summary judgment, and such exception is overruled, the nonmovant may have a valid complaint on appeal).

I would further conclude the majority places too much weight on the possibility that the motion in this case might somehow immunize the movant from the requirement that a no-evidence motion be based on goodfaith. There is no suggestion Mario Sabino's did not have a proper basis to challenge each and every element of Gloria's claims, and the summary judgment record suggests otherwise. And there is

nothing inherently improper about "forcing" a plaintiff to come forward with more than a scintilla of evidence to raise a fact issue on each element of the claims for which it has filed suit. *See Nelson v. Regions Mort., Inc., 170 S.W.3d 858, 861 (Tex.App.-Dallas 2005, no pet.)* (a no-evidence summary judgment motion may challenge any or all of the elements of the plaintiff's claims). Further, if Gloria's wanted more specific allegations upon which to base a motion for sanctions, or if it believed responding to the motion with some evidence of each element of its causes of action was unduly burdensome, it could have objected to the motion in the trial court.

Finally, the majority's conclusion leads to what I perceive to be a more problematic result. Specifically, the majority's conclusion effectively allows a summary judgment nonmovant to lay behind the log—attempt to raise a fact issue on the *precise* elements they later claim were not raised—and if they fail to do so in the trial court—then obtain a wholesale and summary reversal on appeal. This result is particularly problematic where, as here, Mario Sabino's could have easily cured the error in the trial court had Gloria's properly objected and obtained a ruling.

I would conclude Mario Sabino's no-evidence motion for summary judgment was legally sufficient because it gave Gloria's fair notice that Mario Sabino's was challenging each of the elements listed in the motion. Further, to the extent the motion was vague or ambiguous, I would conclude Gloria's waived error by failing to object. Therefore, I respectfully dissent.

Joined by Justices LANG and LANG–MIERS.

**All Citations**

418 S.W.3d 280

---

287 S.W.3d 809
Court of Appeals of Texas,
Corpus Christi–Edinburg.

Ramon and Anita GARCIA, Appellants,
v.
STATE FARM LLOYDS, Appellee.

No. 13–07–00381–CV.  |  April 30, 2009.

**Synopsis**
**Background:** Insureds under homeowners' insurance policy brought action against insurer, alleging that insurer failed to pay for mold and water damage to insureds' home. The 275th District Court, Hidalgo County, Juan R. Partida, J., entered summary judgment in favor of insurer, and insureds appealed.

**Holdings:** The Court of Appeals, Benavides, J., held that:

[1] genuine issue of material fact precluded summary judgment on claims relating to insurers' failure to pay for water damage, but

[2] insureds failed to present any summary judgment evidence that insurer had committed any breaches, wrongdoing, or misrepresentations, other than failing to fully pay for water damage.

Affirmed in part, reversed in part, and remanded.

Yanez, J., filed a concurring opinion.

West Headnotes (13)

[1]     **Appeal and Error**
        Finality as to All Parties
        Order granting summary judgment was final and appealable, even though order failed to dispose of one named party, since plaintiff had never served party and had never expected to serve party.

        2 Cases that cite this headnote

[2]     **Appeal and Error**
        Determination of Questions of Jurisdiction in General
        Appellate courts are obligated to review sua sponte issues affecting jurisdiction.

        2 Cases that cite this headnote

[3]     **Appeal and Error**
        Finality as to All Parties

        **Appeal and Error**
        Determination of Controversy
        An appellate court examines the entire record to determine whether an order disposes of all pending claims and parties, so as to be final and appealable.

        1 Cases that cite this headnote

[4]     **Appeal and Error**
        Finality as to All Parties
        A judgment is final for purposes of appeal when: (1) the judgment expressly disposes of some, but not all defendants, (2) the only remaining defendants have not been served or answered, and (3) nothing in the record indicates that the plaintiff ever expected to obtain service on the unserved defendants.

        3 Cases that cite this headnote

[5]     **New Trial**
        Compliance with Requirements
        Affidavits of plaintiff's attorney and attorney's secretary were sufficient to show that plaintiff's motion for new trial had been mailed prior to deadline, and thus motion was timely filed under mailbox rule, even though motion had been received by trial court clerk after deadline. Vernon's Ann.Texas Rules Civ.Proc., Rules 5, 329b.

        Cases that cite this headnote

[6]     **New Trial**
        Compliance with Requirements

Plaintiff's motion for new trial, mailed prior to filing deadline, was required, pursuant to mailbox rule requiring motion to be received "not more than ten days tardily," to be received by trial court clerk within ten days of deadline, rather than within ten days of mailing. Vernon's Ann.Texas Rules Civ.Proc., Rule 5.

Cases that cite this headnote

**[7]** **Appeal and Error**

 Judgment

Insureds could raise for first time on appeal the issue of whether insurer's no-evidence summary judgment motion failed to properly challenge elements of insureds' claims, so as to require that insurers motion to be treated as a traditional summary judgment motion. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

5 Cases that cite this headnote

**[8]** **Appeal and Error**

 Judgment

The lack of specificity of a motion for no-evidence summary judgment may be raised as an issue for the first time on appeal. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

2 Cases that cite this headnote

**[9]** **Judgment**

 Motion or Other Application

Insurer's no-evidence summary judgment motion failed to sufficiently address elements of insureds' breach-of-contract claims, by alleging that there was no evidence that insurer owed insureds more than insurer had already paid, that there was no evidence that insureds had any complaint with the way insurer handled their claims other than that insurer did not pay enough, and that there was no evidence of any misrepresentations by insurer, and thus motion had to be treated as a traditional summary judgment motion; motion merely attacked insureds' factual theories without specifying which elements the theory allegedly supported.

Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

2 Cases that cite this headnote

**[10]** **Judgment**

 Motion or Other Application

A motion for no-evidence summary judgment that only generally attacks a factual theory, without specifying the elements of the claims being attacked, is insufficient to support a no-evidence summary judgment. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

4 Cases that cite this headnote

**[11]** **Judgment**

 Motion or Other Application

Insurer's no-evidence summary judgment motion sufficiently addressed insureds' claims for mental anguish, treble damages for knowing violations of the insurance code, and exemplary damages based on malicious conduct, and thus did not have to be treated as a traditional summary judgment motion; motion clearly stated that insureds had provided no evidence on required elements of claims that insureds had suffered mental anguish, that insurer had knowingly violated insurance code, or that insurer had engaged in malicious conduct. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i); V.T.C.A., Bus. & C. § 17.50(a); V.T.C.A., Insurance Code § 541.152; V.T.C.A., Civil Practice & Remedies Code § 41.003(a)(2); Rules App.Proc., Rule 38.1(i).

1 Cases that cite this headnote

**[12]** **Judgment**

 Insurance Cases

Genuine issue of material fact as to the amount actually and necessarily spent by insureds to repair water damage to their home precluded summary judgment in favor of insurer on insureds' claims that insurer failed to pay amounts for which insurer was liable pursuant to homeowners' insurance policy, that insurer breached its duty of good faith and fair dealing,

and that insurer violated the Insurance Code and the Deceptive Trade Practices Act. V.T.C.A., Bus. & C. § 17.50; V.T.C.A., Insurance Code § 541.151.

Cases that cite this headnote

**[13]** **Insurance**
&#128273; Duty to Settle or Pay

**Insurance**
&#128273; Fraud or Misrepresentation

Insureds under homeowners policy failed to show that insurer had committed any breaches, wrongdoing, or misrepresentations, other than failing to fully pay for water damage to insureds' home, and thus insurer could not be liable on insureds' extra-contractual claims for mental anguish, treble damages for knowing violations of the insurance code, exemplary damages based on malicious conduct, or misrepresentation. V.T.C.A., Bus. & C. § 17.50(a); V.T.C.A., Insurance Code § 541.151; V.T.C.A., Civil Practice & Remedies Code § 41.003(a)(2).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*811** Matthew R. Pearson, Gravely & Pearson, LLP, San Antonio, Joseph Prestia, Prestia & Ornelas, Edinburg, for appellants.

Warren R. Taylor, Kristie Johnson, Taylor & Taylor, Houston, Victor A. Vicinaiz, Roerig, Oliveira & Fisher, McAllen, for appellee.

Before Chief Justice VALDEZ and Justices YA#NEZ and BENAVIDES.

**OPINION**

Opinion by Justice BENAVIDES.

Appellants, Ramon and Anita Garcia, appeal from two orders granting summary judgment in favor of appellee, State Farm Lloyds ("State Farm"). By four issues, the Garcias contend the trial court erred in overruling their objections to State Farm's summary judgment evidence, sustaining State Farm's objections to their summary judgment evidence, and in granting final summary judgment in State Farm's favor. **\*812** We affirm, in part, and reverse and remand, in part. [1]

[1] As this is a memorandum opinion, and the parties are familiar with the facts, we will only recite those facts necessary to explain the Court's decision and the basic reasons for it. *See* TEX. R. APP. P. 47.4.

## I. JURISDICTION

**[1]** As a preliminary matter, we address several jurisdictional issues. First, on August 6, 2007, the clerk of this Court sent the Garcias' counsel a "defect letter," noting that the trial court's March 27, 2007 summary judgment did not appear to be a final appealable order because it did not dispose of all parties; specifically, the judgment did not address causes of action against Andy's Refrigeration, a defendant below. [2] The Garcias and State Farm responded that all parties considered the trial court's order to be a final order because Andy's Refrigeration was never served. Although the Garcias attempted to serve Andy's Refrigeration in 2004, service was not effected. It is undisputed that there were no further attempts at service.

[2] We note that in their original petition, appellants sued several defendants individually, including Julie Merkt, Thomas C. Van Dyke, Jr., Doug Cook, and Andy's Refrigeration. The docket sheet reflects that Merkt, Van Dyke, Jr., and Cook were served with citation, but does not reflect that they answered. However, the record contains appellants' First Amended Petition, in which only State Farm Lloyds and Andy's Refrigeration are named as defendants. "When a party's name is omitted from an amended pleading, he is as effectively dismissed as where a formal order of dismissal is entered." *Randolph v. Jackson Walker, L.L.P.,* 29 S.W.3d 271, 274 (Tex.App.-Houston [14th Dist.] 2000, pet. denied); *see* TEX. R. CIV. P. 65 .

**[2]** **[3]** Appellate courts are obligated to review *sua sponte* issues affecting jurisdiction. *M.O. Dental Lab v. Rape,* 139 S.W.3d 671, 673 (Tex.2004). We examine the entire record to determine whether an order disposes of all pending claims and parties. *Lehmann v. Har–Con Corp.,* 39 S.W.3d 191, 205–06 (Tex.2001).

**[4]** In support of their argument, the parties cite the principle that a judgment may be final, even though it does not dispose

of all parties named in the petition, if the remaining party was never served with citation and did not file an answer, and nothing in the record indicates that the plaintiff ever expected to obtain service upon the remaining party. *See Youngstown Sheet & Tube Co. v. Penn,* 363 S.W.2d 230, 232 (Tex.1962) (describing when failure to obtain service on defendant may be treated as a nonsuit for purposes of determining finality of judgment); *M.O. Dental Lab.,* 139 S.W.3d at 674–75 (holding that decision in *Penn* survives *Lehmann* ). We agree. Here, although Andy's Refrigeration was never served, there is nothing in the record to suggest that the Garcias ever expected to do so. "[A] judgment is final for purposes of appeal when (1) the judgment expressly disposes of some, but not all defendants, (2) the only remaining defendants have not been served or answered, and (3) nothing in the record indicates that the plaintiff ever expected to obtain service on the unserved defendants." *Sondock v. Harris County Appraisal Dist.,* 231 S.W.3d 65, 67 n. 1 (Tex.App.-Houston [14th Dist.] 2007, no pet.) (citing *Penn,* 363 S.W.2d at 232; *M.O. Dental Lab.,* 139 S.W.3d at 674–75). We conclude that the summary judgment is final for purposes of appeal. *See id.*

 **[5]**    Second, State Farm has filed a motion to dismiss this appeal for want of jurisdiction. State Farm argues that because the Garcias' motion for new trial was filed more than thirty days after summary **\*813** judgment was granted, the motion was untimely and therefore, the notice of appeal was untimely. The Garcias contend that their motion for new trial was timely filed under the "mailbox rule." *See* TEX. R. CIV. P. 5. State Farm contends that it was not.

The trial court's order granting summary judgment was signed on March 27, 2007; therefore, a motion for new trial was due on or before April 26, 2007. *See* TEX. R. CIV. P. 329b. In their response to State Farm's motion, the Garcias assert that they mailed their motion for new trial on April 20, 2007, six days before the deadline. They contend the motion for new trial was placed in an envelope correctly addressed to the clerk, stamped first-class United States postage on April 20, 2007 by a computerized pre-paid postage machine, and mailed through the United States Postal Service on that date. The motion for new trial was received and file-stamped by the Hidalgo County District Clerk's office on May 4, 2007. The Garcias filed a notice of appeal on June 11, 2007. *See* TEX. R. APP. P. 26.1(a) (providing notice of appeal must be filed within thirty days after judgment is signed, or within ninety days if any party files a motion for new trial).

The question before us is whether the Garcias perfected their appeal in reliance upon the "mailbox rule." Rule 5 provides, in pertinent part that

> if any document is sent to the proper clerk by first-class United States mail in an envelope or wrapper properly addressed and stamped and is deposited in the mail on or before the last day for filing same, the same, if received by the clerk not more than ten days tardily, shall be filed by the clerk and be deemed filed in time. A legible postmark affixed by the United States Postal Service shall be prima facie evidence of the date of mailing.

TEX. R. CIV. P. 5. Texas courts have held that, "[i]n the absence of a proper postmark or certificate of mailing, an attorney's uncontroverted affidavit may be evidence of the date of mailing." *Lofton v. Allstate Ins. Co.,* 895 S.W.2d 693, 693–94 (Tex.1995).

In support of their argument that they timely filed their motion for new trial, the Garcias produced a copy of the envelope, correctly addressed to the district clerk's office, and stamped "United States Postage," dated April 20, 2007. The Garcias acknowledge that the United States Postage stamp was affixed by a computerized rented postage machine at their counsel's office. State Farm argues that the stamp on the envelope is not a United States Postal Service postmark and does not establish actual mailing on April 20, 2007. Thus, according to State Farm, the April 20, 2007 postmark does not constitute prima facie evidence of mailing. *See* TEX. R. CIV. P. 5.

We need not decide whether the April 20, 2007 postmark constitutes prima facie evidence of mailing because the Garcias also produced two affidavits. The first affidavit, from Shannon Loyd, states that she completed the motion for new trial on April 20, 2007, used her office's United States Postal Service machine to post mark the envelope, and mailed it on that date. A second affidavit, from Angelica Coronado, Ms. Loyd's secretary, states that she and Ms. Loyd used the office postal machine to postmark the envelope containing the motion for new trial on April 20, 2007 and mailed it on that date. State Farm offered no evidence controverting either affidavit. We conclude the two affidavits constitute prima facie evidence that the motion for new trial was placed in the United States mail, postage **\*814** pre-paid, on April 20,

2007. *See Lofton,* 895 S.W.2d at 693–94; *Alvarez v. Thomas,* 172 S.W.3d 298, 302–03 (Tex.App.-Texarkana 2005, no pet.) (noting certificate of service and attorney's affidavit are both prima facie evidence of date of mailing).

 **[6]** State Farm also contends that even if the Garcias establish that they mailed the motion for new trial on April 20, 2007, "the mailbox rule's requirements were not met as the motion was not received by the Court until May 4, 2007, more than ten days after mailing." According to State Farm, unlike Texas Rule of Appellate Procedure 9.2(b), which provides that a document is timely if received within "ten days after the filing deadline," *see* TEX. R. APP. P. 9.2(b), Texas Rule of Civil Procedure 5 provides that a document is timely filed if it is received by the clerk "not more than ten days tardily." *See* TEX. R. CIV. P. 5.

State Farm cites *Guevara v. Nolot* in support of its position that the mailbox rule's requirements were not met because the motion for new trial was not received within ten days of mailing. *See Guevara v. Nolot,* No. 05–05–1238–CV, 2006 WL 1391287, at *2 (Tex.App.-Dallas May 23, 2006, no pet.) (mem. op.). In *Guevara,* the Dallas Court of Appeals found an appeal bond was timely filed under Rule 5 when the evidence showed it was mailed and received by the justice court clerk prior to the due date. *Id.* at *2. In doing so, the court noted that "the record contains evidence showing the appeal bond was delivered within ten days *of the date of mailing* and was received and signed for by [the clerk]." *Id.* at *2 (emphasis added). We note, however, that the *Guevara* court was not addressing whether Rule 5 requires receipt of a document within ten days from mailing or within ten days of the filing deadline; rather, the court was simply rejecting an argument that a court clerk's testimony that she did not recall receiving the appeal bond constituted evidence that it was not received. *Id.* Thus, the court's comment regarding delivery of the appeal bond "within ten days of mailing" was dicta.

The Garcias cite *Stokes v. Aberdeen Ins. Co.,* 917 S.W.2d 267, 268 (Tex.1996) and *Williams v. Schneiber,* 148 S.W.3d 581, 585–86 (Tex.App.-Fort Worth 2004, no pet.), noting that in finding documents timely filed under the mailbox rule, neither court relied on receipt within ten days of *mailing.* In *Stokes,* the supreme court found a motion for new trial was timely filed where it was sent by Federal Express to the court clerk (received the following day) and mailed the same day to the district judge. *Stokes,* 917 S.W.2d at 267. The court held it was not necessary for the clerk to receive the same piece of paper that the party mailed via United States mail to benefit

from the mailbox rule. *Id.* at 268 ("We construe the words 'the same' in the rules to mean an original or any copy of the motion sufficient for filing.").

Similarly, in *Schneiber,* the Fort Worth Court of Appeals held that the mailbox rule was properly invoked if the clerk timely received a copy of the relevant pleading, even if it was not the one mailed. *Schneiber,* 148 S.W.3d at 585. In *Schneiber,* the plaintiff mailed an appeal bond on August 22, 2002 and faxed a copy on August 27, 2002, which was within the prescribed time period. *Id.* at 584. Although the clerk did not receive the appeal bond that was placed in the mail, the faxed copy was received. *Id.* at 584–85. Relying on *Stokes,* the *Schneiber* court held that the appellant invoked the mailbox rule by mailing the appeal bond on August 22 and ensuring the clerk received a faxed copy on August 27. *Id.* at 586.

We conclude that none of the cases cited directly address the question before us: whether the language in Rule 5 "not more **\*815** than ten days tardily" refers to ten days from the date of mailing or ten days from the deadline for filing. The supreme court has stated that as a general rule, appellate courts should not dismiss an appeal for a procedural defect whenever an arguable interpretation of the appellate rules would preserve the appeal. *Verburgt v. Dorner,* 959 S.W.2d 615, 616 (Tex.1997); *see Warwick Towers Council v. Park Warwick, L.P.,* 244 S.W.3d 838, 839 (Tex.2008); *Schneiber,* 148 S.W.3d at 585 (citing *Verburgt,* 959 S.W.2d at 616–17).

We have already determined that the Garcias established that they mailed their motion for new trial on April 20, 2007. The record contains evidence that it was received by the clerk's office by May 4, 2007—within ten days of the April 26, 2007 deadline. Applying a reasonable interpretation that preserves the Garcias' appeal, *see Verburgt,* 959 S.W.2d at 616, we hold that the "not more than ten days tardily" requirement in Rule 5 refers to ten days past the filing deadline referenced in the rule ("on or before the last day for filing same"). *See* TEX. R. CIV. P. 5. We therefore hold that the Garcias' motion for new trial was timely filed. Accordingly, the deadline for filing the notice of appeal was extended, and this appeal is properly before this Court. *See* TEX. R. APP. P. 26.1(a). We overrule State Farm's motion to dismiss for lack of jurisdiction. We now turn to the merits of this appeal.

## II. BACKGROUND

State Farm issued a homeowners insurance policy, the standard HO–B policy, to the Garcias for their home in McAllen, Texas. The Garcias filed claims under their policy for water and mold damage on June 22, 2002. After inspections were performed, on December 10, 2002, State Farm paid the Garcias $26,779.42. The letter accompanying the payment indicated that the payment was for "water damage."

The Garcias filed suit against State Farm on October 4, 2004, alleging breach of contract, breach of the duty of good faith and fair dealing, violations of the Texas Insurance Code, and violations of the Texas Deceptive Trade Practices Act. *See* TEX. BUS. & COMM. CODE ANN. § 17.50 (Vernon Supp. 2008); TEX. INS. CODE ANN. § 541.151 (Vernon Pamphlet 2008).[3] The Garcias alleged claims against State Farm based on its failure to pay for mold damage and to fully pay for the water damage to their home.

[3]     The Garcias initially pleaded violations of former Texas Revised Civil Statutes article 21.21, which was repealed and codified without substantive change. See Act of May 10, 2001, 77th Leg., R.S., ch. 290, § 1, 2001 TEX. GEN. LAWS 548, 548–51, *repealed and recodified* by Act of May 22, 2003, 78th Leg., R.S., ch. 1674 §§ 2, 26, 2003 TEX. GEN. LAWS 3611, 2659–61 (current versions at TEX. INS. CODE ANN. §§ 541.051, 541.056 (Vernon Pamphlet 2008)). The parties' briefs refer to the insurance code, and so will we.

State Farm filed two motions for summary judgment. The first motion purported to raise no-evidence and traditional grounds with respect to State Farm's liability. *See* TEX. R. CIV. P. 166a(c), (i). State Farm argued that there was no coverage for mold claims under the Texas Supreme Court's decision in *Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 753 (Tex.2006). Furthermore, State Farm argued that there was no evidence that the amount it had already paid was insufficient to make the repairs for water damage to the Garcias' home. It also challenged the Garcias' extra-contractual claims, arguing that because there was no coverage for the Garcias' claim for mold damage, there could be no liability for extra-contractual claims. Furthermore, it argued there was no evidence of any misrepresentation by State Farm, attaching deposition testimony **\*816** from the Garcias to support this argument, and that there was no evidence that the Garcias had any complaint with how State Farm handled their claims, except that State Farm did not pay enough. Finally, the motion argued that the Garcias were not entitled to recover additional living expenses.

The second motion was a "conditional" motion—State Farm argued that the trial court need only address the second motion if the first were denied. This second motion challenged the Garcias' alleged damages for mental anguish, treble damages under the Insurance Code, and exemplary damages.[4]

[4]     The two motions raised numerous issues, in many instances without being entirely clear. The vague and piecemeal nature of State Farm's motions for summary judgment have resulted in an opinion that is, to a degree, necessarily disjointed.

The Garcias responded and objected to State Farm's summary judgment evidence. The Garcias submitted a report from their expert, Frank Zamora, that estimated costs for repair as $55,716.35. The Garcias also claimed they had to borrow $20,000, in addition to the amount already paid by State Farm, to continue repairs, but they had run out of money before the repairs were completed. State Farm, in turn, objected to the Garcias' summary judgment evidence.

The trial court sustained State Farm's objections, overruled the Garcias' objections, and granted both motions for summary judgment without specifying the basis of its rulings. This appeal ensued.

### III. SUMMARY JUDGMENT STANDARDS

The trial court granted both of State Farm's motions for summary judgment without stating the grounds for its rulings. Under these circumstances, we must affirm the judgment if any of the grounds alleged in the motions were meritorious. *W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex.2005). The standard of review we apply is determined by whether the motion was brought on no-evidence or traditional grounds. *See* TEX. R. CIV. P. 166a(c), (i); *see also Ortega v. City Nat'l Bank,* 97 S.W.3d 765, 771 (Tex.App.-Corpus Christi 2003, no pet.) (op. on reh'g).

A no-evidence summary judgment is equivalent to a pretrial directed verdict, and we apply the same legal sufficiency standard on review. *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 582 (Tex.2006); *Ortega,* 97 S.W.3d at 772. Once an appropriate motion for no-evidence summary judgment is filed, the burden of producing evidence is entirely on the non-movant; the movant has no burden to attach any evidence to the motion. TEX. R. CIV. P. 166a(i). We may not consider any evidence presented by the movant unless it creates a fact

question. *Binur v. Jacobo,* 135 S.W.3d 646, 651 (Tex.2004); *Newkumet v. Allen,* 230 S.W.3d 518, 521 (Tex.App.-Eastland 2007, no pet.).

To defeat a no-evidence motion for summary judgment, the non-movant must merely produce a scintilla of probative evidence to raise a genuine issue of material fact. *Ortega,* 97 S.W.3d at 772. "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion of a fact.' " *Id.* (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983)). More than a scintilla exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* (citing *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994)). In determining whether the non-movant has met its burden, we review the evidence in the light most favorable to the non-movant, crediting such evidence if reasonable **\*817** jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Tamez,* 206 S.W.3d at 582; *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005).

We review the trial court's granting of a traditional motion for summary judgment *de novo. See Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003); *Branton v. Wood,* 100 S.W.3d 645, 646 (Tex.App.-Corpus Christi 2003, no pet.). When reviewing a traditional summary judgment, we must determine whether the movant met its burden to establish that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979). The movant bears the burden of proof in a traditional motion for summary judgment, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *See Sw. Elec. Power Co.,* 73 S.W.3d at 215. We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005).

We will affirm a traditional summary judgment only if the record establishes that the movant has conclusively proved its defense as a matter of law or if the movant has negated at least one essential element of the plaintiff's cause of action. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex.2004); *Am. Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 425 (Tex.1997); *Clear*

*Creek Basin,* 589 S.W.2d at 678. A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *City of Keller,* 168 S.W.3d at 816. Only when the movant has produced sufficient evidence to establish its right to summary judgment does the burden shift to the plaintiff to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the element challenged by the defendant. *Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 223 (Tex.1999); *see Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995).

When a party moves for summary judgment under both Rules 166a(c) and 166a(i) of the Texas Rules of Civil Procedure, we will first review the trial court's judgment under the standards of Rule 166a(i). *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600 (Tex.2004). If the appellant fails to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether appellee's summary judgment proof satisfies the less stringent Rule 166a(c) burden. *Id.*

## IV. STATE FARM'S NO–EVIDENCE MOTION

 **[7]**    By their fourth issue, the Garcias argue that the trial court erroneously granted State Farm's no-evidence motions for summary judgment. Before we address the merits of State Farm's no-evidence motions, however, we must first address the Garcias' argument that the no-evidence motions did not properly challenge elements of their claims.

Texas Rule of Civil Procedure 166a(i) requires that a no-evidence motion for summary judgment "state the elements as to which there is no evidence." *See* TEX. R. CIV. P. 166a(i). The Garcias argue that because State Farm's motion did not satisfy this requirement, the entire motion must be treated as a traditional motion for summary judgment, which would place the summary judgment burden of proof on State Farm rather than on the Garcias. *See* **\*818** *Michael v. Dyke,* 41 S.W.3d 746, 751–52 (Tex.App.-Corpus Christi 2001, pet. denied).

The Garcias did not object in the trial court to the sufficiency of the no-evidence motion. The courts of appeals are split on whether the sufficiency of a motion under Rule 166a(i) may be raised for the first time on appeal. *Compare Holloway v. Tex. Elec. Utility Constr., Ltd.,* 282 S.W.3d 207, 212–14 n. 2 (Tex.App.-Tyler 2009, no pet. h.) (holding issue may be raised for the first time on appeal); *Helm Cos. v. Shady Creek Housing Partners, Ltd.,* No. 01–05–00743,

2007 WL 2130186, at *6 n. 7 (Tex.App.-Houston [1st Dist.] July 26, 2007, pet. denied) (mem. op.) (same); *Bean v. Reynolds Realty Group, Inc.,* 192 S.W.3d 856, 859 (Tex.App.-Texarkana 2006, no pet.) (same); *In re Estate of Swanson,* 130 S.W.3d 144, 147 (Tex.App.-El Paso 2003, no pet.)* (overruling prior decision in *Walton v. Phillips Petroleum Co.,* 65 S.W.3d 262, 268 (Tex.App.-El Paso 2001, pet. denied) and holding that issue may be raised for the first time on appeal); *and Cimarron Hydrocarbons Corp. v. Carpenter,* 143 S.W.3d 560, (Tex.App.-Dallas 2004, pet. denied) (holding issue may be raised for first time on appeal); *and Cuyler v. Minns,* 60 S.W.3d 209, 212–14 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (same); *and Callaghan Ranch Ltd. v. Killam,* 53 S.W.3d 1, 3 (Tex.App.-San Antonio 2000, pet. denied) (same); *with Barnes v. Sulak,* No. 03–01–00159–CV, 2002 WL 1804912, at *9 n. 4 (Tex.App.-Austin Aug. 08, 2002, no pet.) (not designated for publication) (holding objection must be raised in the trial court); *Williams v. Bank One, Tex., N.A.,* 15 S.W.3d 110, 117 (Tex.App.-Waco 1999, no pet.) (same); *and Roth v. FFP Operating Partners, L.P.,* 994 S.W.2d 190, 194–95 (Tex.App.-Amarillo 1999, pet. denied) (same). We have never been required to decide this issue, although we have mentioned it in prior decisions. *See, e.g., Los Cucos Mexican Café, Inc. v. Sanchez,* 2007 WL 1288820, at *5 n. 5 (Tex.App.-Corpus Christi May 3, 2007, no pet.) (mem. op.); *Galvan v. Tex. Low Cost Ins. Agency,* No. 13–00–593–CV, 2002 WL 34249760, at *3 n. 2 (Tex.App.-Corpus Christi May 16, 2002, no pet.) (not designated for publication).

**[8]** Today, we join the majority of Texas courts, which have held that the lack of specificity of a motion for no-evidence summary judgment may be raised for the first time on appeal. The supreme court has held that a nonmovant need not object to the legal sufficiency of a traditional summary judgment and may raise that argument for the first time on appeal. *See McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 342 (Tex.1993) ("Even if the non-movant fails to except or respond, if the grounds for summary judgment are not expressly presented in the motion for summary judgment itself, the motion is legally insufficient as a matter of law."). We see no reason why the rule should be different when the motion challenged is filed under Rule 166a(i) on no-evidence grounds. *See Cimarron Hydrocarbons Corp.,* 143 S.W.3d at 563. Accordingly, we will review the Garcias' argument that the no-evidence motion failed to state the specific elements of their claims that State Farm sought to challenge.

**[9]** We agree with the Garcias with respect to State Farm's first motion. State Farm's first motion for summary judgment stated that it was being brought under both subsections (c) and (i) of Texas Rule of Civil Procedure 166a. However, State Farm's only arguments on no-evidence grounds were that: (1) there was no evidence that it owed the Garcias more than it already paid; (2) there was no evidence that the Garcias had any complaint with the way State Farm handled their claims, other than that State Farm **\*819** did not pay enough; and (3) there was no evidence of any misrepresentations by State Farm.

On appeal, State Farm claims that these arguments were sufficient to attack the Garcias' breach of contract claims and all of their "extra-contractual" claims. State Farm points out that the Garcias have not challenged the trial court's rulings with respect to the mold claims, which the supreme court has held are not covered losses under the policy. *See Fiess,* 202 S.W.3d at 753. With respect to the water damage claims, State Farm argues that there is no evidence to show that it owed the Garcias more than the $26,779.42 it already paid, and this is sufficient to defeat all the Garcias' claims.

**[10]** However, a motion for no-evidence summary judgment that only generally attacks a factual theory, without specifying the elements of the claims being attacked, is insufficient to support a no-evidence summary judgment. *See Killam,* 53 S.W.3d at 3–4. Rule 166a(i) is clear in its requirement that the motion "must" state specifically the elements of the claim challenged, and the comment to the rule further provides that the "motion must be specific in challenging the evidentiary support for an element of a claim or defense; paragraph (i) does not authorize conclusory motions or general no-evidence challenges to an opponent's case." TEX. R. CIV. P. 166a cmt. Here, State Farm's no-evidence motion did not state specifically which elements of the claims were being challenged, but rather, attacked one of the Garcias' factual theories without specifying which elements the theory allegedly supported. Accordingly, we will treat these arguments as traditional summary judgment grounds. *See Michael,* 41 S.W.3d at 751–52. [5]

5      Other courts of appeals have held that the appropriate inquiry is whether the no-evidence motion provides "fair notice" of the elements for which there was no evidence. *See Roth v. FFP Operating Partners, L.P.,* 994 S.W.2d 190, 194 (Tex.App.-Amarillo 1999, pet. denied); *Cf. In re Estate of Hall,* No. 05–98–01929–CV, 2001 WL 753795, at *3 (Tex.App.-Dallas July 05, 2001, no

pet.) (not designated for publication) (holding that a motion that failed to state the elements of the claims challenged did not provide "fair notice"). Recently, in dicta, this Court implied as much. *See Villarreal v. Del Mar College,* No. 13–07–00119–CV, 2009 WL 781750, at *3 & n. 21, *5 n. 45 (Tex.App.-Corpus Christi Mar. 26, 2009, no pet. h.) (mem. op.) (citing *Waite v. Woodard, Hall & Primm, P.C.,* 137 S.W.3d 277, 281 (Tex.App.-Houston [1st Dist.] 2004, no pet.) (holding that by failing to reference Rule 166a(c) or to cite any evidence to establish claim as a matter of law, the plaintiff's motion failed to provide fair notice that motion was brought on traditional grounds)). However, in *Michael v. Dyke,* this Court rejected a "fair notice" standard when construing a no-evidence motion for summary judgment. 41 S.W.3d 746, 750–51 n. 3 (Tex.App.-Corpus Christi 2001, no pet.); *see also Hansler v. Nueces County,* No. 13–99–583–CV, 2001 WL 997350, at *3 (Tex.App.-Corpus Christi May 3, 2001, no pet.) (contrasting, in dicta, the "fair notice" standard under Rule 166a(c) with subsection (i)'s specificity requirement). We reaffirm that holding today, and we again hold that the "fair notice" standard does not apply to Rule 166a(i)'s requirement that the motion state specifically the elements for which there is no evidence. To the extent that *Villarreal* suggests otherwise, we note that the issue was not raised by the appellant, and our statements were dicta. *See Villarreal,* 2009 WL 781750, at *5 n. 45.

> Generally, "Texas follows a 'fair notice' standard for pleading, which looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant." *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 896 (Tex.2000). In other words, even though the pleading is not precise, if the responding party understood the allegations or the court, on review, can decipher the allegations, the pleading provided "fair notice." *See id.; see, e.g., 1994 Land Fund II v. Ramur, Inc.,* No. 05–98–00074–CV, 2001 WL 92696, at *6 (Tex.App.-Dallas Feb. 05, 2001, no pet.) (not designated for publication) (reviewing factual assertions in no-evidence motion for summary judgment and assigning assertions to elements of non-movant's claims by applying "fair notice" standard).
>
> However, Rule 166a(i) and the comments thereto make clear that, with respect to the elements of the non-movant's claims being challenged, the movant must do more than provide "fair notice"—the movant "must" state the specific elements for which there is no evidence. TEX. R. CIV. P. 166a(i) & cmt. Even though by applying a "fair notice" standard, this Court

could make an educated guess as to the elements being challenged, we decline to do so because: (1) the rule is clear as to its requirements and uses the mandatory term "must," (2) it is relatively easy to state the elements of a claim for which there is no evidence, and (3) a proper motion shifts the burden to the non-movant to come forward with evidence. Applying a "fair notice" standard would place too great a burden on the non-movant and would be clearly contrary to the express language of Rule 166a(i). *See Holloway v. Tex. Elec. Utility Constr., Ltd.,* No. 12–07–00427–CV, 2009 WL 765304, at *5 (Tex.App.-Tyler Mar. 25, 2009, no pet. h.); *Fieldtech Avionics & Instruments, Inc. v. Component Control.Com, Inc.,* 262 S.W.3d 813, 824 n. 4 (Tex.App.-Fort Worth 2008, no pet.); *Mott v. Red's Safe & Lock Servs., Inc.,* 249 S.W.3d 90, 98 (Tex.App.-Houston [1st Dist.] 2007, no pet.); *Michael,* 41 S.W.3d at 751 n. 3; *Callaghan Ranch Ltd. v. Killam,* 53 S.W.3d 1, 3 (Tex.App.-San Antonio 2000, pet. denied).

**\*820** **[11]** The second, conditional motion for summary judgment, however, is a different story. First, State Farm's second motion clearly stated that there was no evidence that the Garcias suffered mental anguish. It stated that "mental anguish damages are limited to situations where the handling of a claim created anguish significant enough to seriously disrupt the insured's life." State Farm also argued that there was no evidence that its conduct caused the Garcias any such mental anguish.[6] *See* TEX. BUS. & COMM. CODE ANN. § 17.50(a) (Vernon Supp. 2008) (allowing mental anguish damages for violations of DTPA and for violations of chapter 541 of the Texas Insurance Code); *see also Berry v. Covarrubias,* No. 14–03–01137–CV, 2004 WL 1631117, at *8 (Tex.App.-Houston [14th Dist.] 2004, no pet.) (mem. op.) ("Berry presented no evidence of mental anguish. Thus, putting aside any admission on Berry's behalf, the trial court's ruling was correct on no-evidence grounds.").

6     State Farm also presented evidence to support its no-evidence arguments. However, we cannot consider evidence submitted in support of a no-evidence motion for summary judgment, except to the extent that evidence raises a fact issue in the Garcias' favor. *Binur v. Jacobo,* 135 S.W.3d 646, 651 (Tex.2004).

Next, State Farm's second motion argued that the Garcias would only be entitled to statutory treble damages under the Texas Insurance Code if there were evidence that State Farm "knowingly" violated a statutory provision. *See* TEX. INS. CODE ANN. § 541.152 (Vernon Pamphlet 2008). State Farm argued that there was no evidence that it had acted knowingly;

thus, the Garcias are not entitled to treble damages under the insurance code. Finally, State Farm argued that there was no evidence of malice, which State Farm argues would be required to support a claim for punitive damages. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a)(2) (Vernon 2008).

Although the Garcias' appellate brief points to the evidence they submitted in response to the second motion for summary judgment, they do not cite a single case or explain how this evidence supports their claims for mental anguish, treble damages under the insurance code, or punitive damages. *See* TEX. R. APP. P. 38.1(i). Accordingly, nothing is presented for our review.

In sum, we sustain the Garcias' fourth issue with respect to the no-evidence arguments in State Farm's first motion. However, **\*821** we affirm the trial court's judgment that the Garcias are not entitled to recover mental anguish, treble damages for knowing violations of the insurance code,[7] or exemplary damages for their extra-contractual claims based on malicious conduct. *See* TEX. R. APP. P. 38.1(i); *Anderson v. Long,* 118 S.W.3d 806, 811 (Tex.App.-Fort Worth 2003, no pet.).[8]

---

[7] We note that the DTPA allows treble damages if the consumer proves that the conduct was committed "intentionally." *See* TEX. BUS. & COMM. CODE ANN. § 17.50(b)(1) (Vernon 2002). The Garcias, however, did not plead they were entitled to treble damages for State Farm's intentional conduct, but rather, limited their pleading to knowing violations. The Garcias, likewise, did not argue to the trial court that State Farm's conduct was intentional. *See* TEX. R. CIV. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal.").

[8] The Garcias' second issue argues that the trial court erroneously sustained State Farm's objections to their summary judgment evidence. However, we need not address the Garcias' second issue in order to affirm the summary judgment for failure to adequately brief how that evidence, if properly considered, supported their claims. *See* TEX. R. APP. P. 47.1.

## V. STATE FARM'S TRADITIONAL MOTION

By their third and fourth issues, the Garcias argue that State Farm failed to meet its burden to show that there are no genuine issues of material fact with respect to one or more

elements of their claims, and that they proffered sufficient evidence to defeat the traditional motion. As part of these arguments, the Garcias also argue that the traditional motion did not negate any elements of their claims to the extent that these were based on State Farm's failure to pay for all their water damage, as opposed to mold damage.

First, the Garcias argue that the traditional motion was limited to their mold claims, which State Farm argued were precluded by the Texas Supreme Court's decision in *Fiess* and which the Garcias do not challenge on appeal. 202 S.W.3d at 753. The Garcias argue that because State Farm's traditional motion for summary judgment was based solely on the *Fiess* decision, the traditional motion has no effect on their claims for water damage to the home.

It is true that the motion for summary judgment argued that the Garcias' breach of contract claim was barred because mold damage is not covered by the policy, relying on *Fiess.* The Garcias, however, have argued that State Farm's no-evidence arguments should be treated as traditional grounds for summary judgment. Accordingly, we will proceed in the manner suggested by the Garcias. *See Michael,* 41 S.W.3d at 751–52.

**[12]** On appeal, State Farm argues that the Garcias' evidence fails to raise a fact issue because it does not demonstrate the amount that the Garcias actually spent on repairs, and more importantly, does not demonstrate that the Garcias spent more than the $26,779.42 already paid by State Farm. However, because we must treat State Farm's argument as raising a traditional ground, State Farm bore the initial burden to demonstrate that no genuine issue of material fact exists with respect to the Garcias' breach of contract claim. *Mason,* 143 S.W.3d at 798; *Grinnell,* 951 S.W.2d at 425; *Clear Creek Basin,* 589 S.W.2d at 678. State Farm has not done so.

State Farm attached the insurance policy to its motion for summary judgment. It provides:

**\*822** We will pay only the actual cash value of the damaged building structure(s) until repair or replacement is completed.... *Upon completion of repairs or replacement,* we will pay the additional amount claimed under replacement cost coverage, but our payment will not exceed the smallest of the following:

(1) the limit of liability under the policy applicable to the damaged or destroyed building structure(s);

---

(2) the cost to repair or replace that part of the building structure(s) damaged, with material of like kind and quality and for the same use and occupancy on the same premises; or

(3) the amount actually and necessarily spent on repair or replace the damaged building structure(s).

(Emphasis added). State Farm argues that its liability is limited to the amount the Garcias "actually and necessarily" spent to repair their home, and there is no evidence that the Garcias spent more than it already paid to repair the water damage. State Farm, however, incorrectly assumes that its liability is limited to the amount the Garcias actually spent.

The contractual provision urged by State Farm as a limit of its liability only applies "[u]pon completion of repairs or replacement." State Farm did not present any evidence demonstrating that the repairs have been completed. In fact, State Farm's evidence included Ramon Garcia's deposition testimony, wherein he stated that the Garcias had not yet replaced the floors in their house because they ran out of money. *See Binur,* 135 S.W.3d at 651 (providing that evidence attached to a no-evidence motion may be considered if it creates a fact issue). He testified that there was carpet that still needed to be replaced. Viewing the evidence in the light most favorable to the Garcias, this evidence shows that the repairs for the water damage to their home were not completed. Because the evidence shows that the Garcias had not completed the repairs to their home, it is impossible to determine the "amount actually and necessarily spent." Thus, State Farm's motion for summary judgment was based on a flawed premise. Accordingly, we reverse the trial court's summary judgment on the Garcias' breach of contract claim based on State Farm's failure to pay for water damage.

Second, State Farm argued that the Garcias' "extra-contractual" claims failed because there was no coverage. State Farm argued that to establish a breach of the duty of good faith and fair dealing, the Garcias had to prove that State Farm knew or should have known its liability was reasonably clear and that despite clear liability, it failed to attempt to effectuate a prompt, fair, and equitable settlement of the claim. *See Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 56 (Tex.1997). State Farm argued that there can be no bad faith for failure to pay a claim that is not actually covered. *See Republic Ins. Co. v. Stoker,* 903 S.W.2d 338, 341 (Tex.1995). We agree with the Garcias that State Farm's motion for summary judgment limited this argument to the Garcias' mold

claims. This portion of the motion for summary judgment specifically argued that "[t]he *Fiess* ruling and terms of the policy excluding coverage for mold and [additional living expenses] establish that State Farm's liability was never reasonably clear." State Farm did not assert that its liability never became reasonably clear because it paid all it owed for water damage. Accordingly, the trial court's summary judgment was in error to the extent that it was granted on the Garcias' bad faith claims relating to the failure to pay for water damage.

State Farm likewise argued that when bad faith, insurance code, and DTPA **\*823** claims "are premised on the same set of facts, the statutory claims depend on the existence of a valid bad faith claim." State Farm reasoned that because *Fiess* compels the conclusion that State Farm was not liable for a covered claim, the Garcias' extra-contractual claims necessarily fail along with their breach of contract claims. Again, we agree with the Garcias that this argument was limited to the Garcias' mold claims. Accordingly, the trial court's summary judgment was in error to the extent that it was granted on the Garcias' insurance code and DTPA claims relating to the failure to pay for water damage.

 **[13]**    Third, State Farm presented testimony from the Garcias that they did not "know of any complaints" they had with respect to State Farm's handling of their claims "other than that ... [they] haven't been paid enough." This argument was not limited to the Garcias' mold claims, and we find that the Garcias have not preserved their arguments against this ground for the summary judgment. As we noted above, although the Garcias' appellate brief points to the evidence they submitted in response to the motion for summary judgment, they do not cite a single case or explain how this evidence supports their extra-contractual claims, to the extent those are based on something other than State Farm's failure to pay for water damage. Additionally, the Garcias' brief does not explain their testimony that they did not know of any other complaints with State Farm's handling of the claims. *See* TEX. R. APP. P. 38.1(i). Accordingly, we affirm the summary judgment on the Garcias' extra-contractual claims, to the extent those are based on something other than State Farm's failure to pay for all the water damage, as that is the extent of State Farm's argument to the trial court.

Furthermore, State Farm also argued that there was no evidence of any extra-contractual claims based on misrepresentations by State Farm, citing testimony from Anita Garcia to that effect and testimony from Ramon

Garcia that he did not talk to anyone from State Farm. The Garcias alleged several causes of action based on misrepresentations by State Farm. TEX. BUS. & COMM. CODE ANN. § 17.50(a)(1), (4); *id*. § 17.46(b)(5), (7), (12), (24) (Vernon 2008); TEX. INS. CODE ANN. § 541.151 (Vernon Pamphlet 2008); *id*. § 541.051(1) (Vernon Pamphlet 2008); *id*. § 541.060(a)(1) (Vernon Pamphlet 2008); *id*. § 541.061 (Vernon Pamphlet 2008). On appeal, the Garcias do not explain their testimony, cite any cases, or point to any misrepresentations by State Farm. Accordingly, we affirm the summary judgment on the Garcias' statutory misrepresentation claims. TEX. R. APP. P. 38.1(i).

Fourth, State Farm argued that because "coverage is not afforded pursuant to the terms and conditions of the policy," the Garcias' insurance code claims fail as a matter of law. With respect to the mold claims, State Farm is correct, and the Garcias have not challenged that ruling on appeal. To the extent these general statements could be construed as challenging State Farm's liability for the water damage, we have already rejected State Farm's argument that they have no further liability under the policy. Thus, to the extent the trial court granted summary judgment on the Garcias' insurance code claims based on this reasoning, we reverse the summary judgment on the insurance code claims.

Finally, State Farm argued that the Garcias did not incur any "additional living expenses," an element of their damages, because the house was inhabitable during the repairs, and the Garcias' daughter, Melinda Guerra, and her family were living in the residence during the entire time. State Farm presented testimony from Ramon **\*824** Garcia to support this argument. The Garcias have not addressed this argument on appeal. *See* Tex. R. App. P. 38.1(i). Therefore, we affirm the trial court's judgment to the extent it holds that the Garcias are not entitled to additional living expenses as an element of their damages.

## VI. CONCLUSION

We affirm, in part, and reverse and remand, in part. Because the Garcias do not dispute that mold is not a covered loss under their homeowners policy, we affirm the summary judgment dismissing the Garcias' mold claims. We also affirm the trial court's summary judgment on the Garcias' claims for (1) mental anguish damages; (2) treble damages; (3) exemplary damages; and (4) damages for additional living expenses under the policy. We likewise affirm the trial court's

summary judgment on the Garcias' insurance code and DTPA claims, to the extent those are based on "something other than State Farm's failure to pay for water damage" or are based on misrepresentations by State Farm. However, we reverse the trial court's judgment on the Garcias' claims for breach of contract and breach of the duty of good faith and fair dealing relating to water damage.

To further summarize, on remand, the claims still available to the Garcias are (1) breach of contract and breach of the duty of good faith and fair dealing, and (2) violations of the insurance code and DTPA, to the extent those are based on State Farm's failure to pay for all the water damage to the Garcias' home. The damages available for these claims will not include: (1) mental anguish damages; (2) treble damages under the Insurance Code for conduct committed "knowingly," (3) exemplary damages based on malicious conduct, and (4) additional living expenses under the policy.

Concurring opinion by Justice LINDA REYNA YA#NEZ.

LINDA REYNA YA#NEZ, Justice, concurring.
I agree that State Farm's no-evidence motion for summary judgment is legally insufficient because it fails to state specifically which elements of the Garcias' claims are being challenged.[1] I further agree that the motion is therefore treated as a traditional motion for summary judgment.[2] However, in reviewing the motion as a traditional motion, I would hold that it is legally insufficient as a matter of law because the grounds for summary judgment are not expressly presented in the motion. Accordingly, I concur in the judgment, but for different reasons.

[1]   *See* TEX. R. CIV. P. 166a(i); *Callaghan Ranch, Ltd. v. Killam*, 53 S.W.3d 1, 3 (Tex.App.-San Antonio 2000, pet. denied).

[2]   *See Hamlett v. Holcomb*, 69 S.W.3d 816, 819 (Tex.App.-Corpus Christi 2002, no pet.).

### Sufficiency of State Farm's Motion

In its motion, State Farm argued only one non-mold-related "ground," as follows:

> Additionally, there is no evidence that the amount paid by State Farm

was insufficient to repair the water damage. The Garcias have repaired their home, yet there is no evidence the cost of repairs exceeded the $26,779.42 State Farm paid.

The majority addresses the argument that State Farm makes in its appellate brief—that based on a specific provision in the policy, State Farm's liability is limited to the amounts the Garcias "actually and necessarily spent" to repair the damage to their home. The majority finds the provision **\*825** State Farm relies on to be inapplicable, and thus concludes that the motion was "based on a flawed premise."

In *McConnell v. Southside ISD,* the supreme court held:

> Consistent with the precise language of Rule 166a(c), we hold that a motion for summary judgment must itself expressly present the grounds upon which it is made. A motion must stand or fall on the grounds *expressly presented in the motion*. In determining whether grounds are expressly presented, reliance may not be placed on briefs or summary judgment evidence.
>
> ....
>
> These rules also permit the trial court to consider a brief in support of a motion for summary judgment as guidance in making its determination whether the summary judgment evidence demonstrates that the moving party is "entitled to judgment," *see* TEX. R. CIV. P. 166a(c), but not in determining whether summary judgment grounds and issues are expressly presented.
>
> ....
>
> Even if the non-movant fails to except or respond, if the grounds for summary judgment are not expressly presented in the motion for summary judgment itself, the motion is legally insufficient as a matter of law.[3]

3     *McConnell v. Southside ISD,* 858 S.W.2d 337, 341–42 (Tex.1993) (emphasis added).

To recover under a breach of contract cause of action, the Garcias were required to show: (1) the existence of a valid contract, (2) that they performed or tendered performance, (3) that State Farm breached the contract, and (4) that they sustained damages as a result of State Farm's breach.[4]

4     *Renteria v. Trevino,* 79 S.W.3d 240, 242 (Tex.App.-Houston [14th Dist.] 2002, no pet.).

To be entitled to summary judgment, State Farm was required to show that it was entitled to judgment as a matter of law and that no genuine issue of material fact exists.[5] State Farm was required to disprove, as a matter of law, one of the essential elements of each of the Garcias' causes of action.[6]

5     *See Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215–16 (Tex.2003).

6     *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991).

Here, the majority implicitly construes State Farm's motion as challenging either the "breach" element or "damages" element of the Garcias' claim. I conclude that State Farm has failed to expressly present the grounds upon which the motion is made in the motion itself.[7] Accordingly, I would hold that the motion is legally insufficient as a matter of law.[8]

7     *See McConnell,* 858 S.W.2d at 341.

8     *See id.* at 342.

**All Citations**

287 S.W.3d 809

531 S.W.2d 206
Court of Civil Appeals of Texas,
Tyler.

Richard S. HARVEY, Appellant,

v.

Dan L. CASEBEER, Appellee.

No. 878.    |    Dec. 4, 1975.    |
Rehearing Denied Dec. 31, 1975.

Holder of promissory note brought action to recover payment from maker. The 114th Judicial District Court, Smith County, Galloway Calhoun, J., instructed verdict for maker, and holder appealed. The Court of Civil Appeals, Dunagan, C.J., held that maker lacked standing to raise issue that holder had received note from trust in breach of his fiduciary duty as trustee; that although holder's breach of fiduciary duty deprived him of holder in due course status, maker, who was not cestui que trust, was not entitled to raise such breach as defense to his liability on note; and that whether maker was liable on note was question for trier of fact.

Reversed and remanded.

West Headnotes (11)

[1]     **Appeal and Error**

⬤ Effect of Evidence and Inferences Therefrom on Direction of Verdict

In reviewing instructed verdict, Court of Civil Appeals will view all evidence in light most favorable to appellant and give him benefit of all legitimate inferences which are to be drawn therefrom in his favor.

Cases that cite this headnote

[2]     **Trusts**

⬤ Purchase of Property in General

Trustee shall not buy or sell, directly or indirectly, any property belonging to trust estate, from or to himself, and such self-dealing transactions may be attacked by beneficiary even though he has suffered no damages and even though trustee has acted in good faith. Vernon's Ann.Civ.St. art. 7425b–12.

7 Cases that cite this headnote

[3]     **Trusts**

⬤ Persons Entitled to Enforce Trust

No one except cestui que trust has standing to enforce trust provisions. Vernon's Ann.Civ.St. art. 7425b–12.

Cases that cite this headnote

[4]     **Trusts**

⬤ Persons Entitled to Enforce Trust

Maker of note made to secure loans from trust was, in his capacity as obligor of such trust, at most person who incidentally benefited by performance of trust, and did not have standing to enforce trust.

Cases that cite this headnote

[5]     **Trusts**

⬤ Purchase of Property in General

Rule that trustee cannot purchase at his own sale really means that such sale is subject to attack by cestui, and if cestui desires to let sale stand then title of purchasing trustee is unexceptionable. Vernon's Ann.Civ.St. art. 7425b–12.

1 Cases that cite this headnote

[6]     **Bills and Notes**

⬤ Mode or Form of Transfer

Note which was made by maker to secure loan from trust res was negotiated for full consideration by trustee to himself in violation of his fiduciary duty not to self-deal in trust property, and thus such trustee was deprived from classification as "Holder in Due Course." V.T.C.A., Bus. & C. §§ 3.302(a)(3), 3.304(b); Vernon's Ann.Civ.St. art. 7425b–12.

1 Cases that cite this headnote

[7]     **Bills and Notes**

☞ Persons as to or Against Whom Defenses Are Available

Where note made payable to trust was negotiated for full consideration by trustee to himself, in violation of his fiduciary duty not to self-deal and maker of note was not cestui of such trust, maker could not raise cestui's defense of breach of fiduciary duty as defense to his liability to pay trustee on note, even though trustee was mere "holder" of note. V.T.C.A., Bus. & C. §§ 1.201(20), 3.302(a)(3), 3.304(b), 3.306(4), 3.603(a); Vernon's Ann.Civ.St. art. 7425b–12.

Cases that cite this headnote

[8] **Equity**

☞ He Who Comes Into Equity Must Come with Clean Hands

Suits brought on promissory notes, rather than for specific performance, need not invoke equity jurisdiction of court, and thus doctrine of unclean hands is not applicable to such suits.

1 Cases that cite this headnote

[9] **Equity**

☞ He Who Comes Into Equity Must Come with Clean Hands

Where promissory note holder's action against maker was for enforcement and did not raise issue of specific performance, equity jurisdiction of court was not invoked, and thus maker could not raise defense of "unclean hands."

1 Cases that cite this headnote

[10] **Bills and Notes**

☞ Persons as to or Against Whom Defenses Are Available

Maker is required to pay note if maker's payment will discharge his liability thereon, even if holder of note acquires note from trust in breach of his fiduciary duty as trustee. V.T.C.A., Bus & C. § 3.603(a).

Cases that cite this headnote

[11] **Bills and Notes**

☞ Questions for Jury

Where maker of note lacked standing to raise defense that holder of note had violated breach of his fiduciary duty as trustee in purchasing note from trust, whether maker was liable to holder was question for trier of fact. V.T.C.A., Bus. & C. § 3.306(4).

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*207** Jesse M. DeWare, IV, Lawrence & Lawrence, Tyler, for appellant.

Charles H. Clark, Tyler, for appellee.

**Opinion**

DUNAGAN, Chief Justice.

Appellant instituted this suit on four promissory notes payable to his daughter's trust and executed by appellee. This appeal is taken from an instructed verdict in favor of appellee. We reverse and remand.

 [1] In reviewing an instructed verdict, we view all of the evidence in the light most favorable to appellant and give him the benefit of all legitimate inferences which are to be drawn therefrom in his favor. Frazier v. Hanlon Gasoline Co., 29 S.W.2d 461, 471 (Tex.Civ.App.—Eastland 1930, writ ref'd).

Appellee executed these notes to the Frances Lynn Harvey Trust to secure loans totalling $7,596.61 made in late 1970 and early 1971. Appellant, as sole trustee, later transferred these notes to himself individually for full consideration. The amount alleged to be in default is disputed. However, appellee's motion for instructed verdict was granted solely on the ground that the transfer of the notes violated the Texas Trust Act and therefore precluded appellant's suit as an individual.

 [2] A trustee shall not buy or sell, directly or indirectly, any property belonging to the trust estate, from or to itself. Tex.Rev.Civ.Stat.Ann. art. 7425b—12. Self-dealing transactions may be attacked by the beneficiary even though he has suffered no damages and even though the trustee has acted in good faith. Slay v. Burnett Trust, 143 Tex. 621, 187 S.W.2d 377, 389 (1945).

**\*208** **[3]** **[4]** **[5]** Appellant's breach of his fiduciary duty is complained of by a person other than the beneficiary. No one except a cestui que trust can enforce the trust. Restatement (Second) of Trusts, Section 200. Appellee, an obligor of this trust, is at most a person incidentally benefitted by the performance of the trust and cannot enforce it. Restatement (Second) of Trusts, Section 200, comment D. The rule that 'a trustee cannot purchase at his own sale' really means that such a sale is subject to attack by the cestui. If the cestui desires to let the sale stand, the title of the purchasing trustee is unexceptionable. Bogert, Trusts and Trustees, Section 543 at 483—484 (2d ed.).

**[6]** **[7]** This action was brought under the Commercial Paper chapter of the Texas Business and Commerce Code. However, the Texas Trust Act could be raised as a defense if raised by a proper party. Appellant's possession of the promissory notes which were indorsed to him entitles him to the status of Holder. Tex.Bus. & Comm. Code Ann., Section 1.201(20). He is not a Holder in Due Course if he purchased the notes with knowledge that a fiduciary negotiated the instruments in breach of duty. Tex.Bus. & Comm. Code Ann., Sections 3.302(a) (3) and 3.304(b). Although a mere Holder takes an instrument subject to certain defenses, the party liable on the instrument cannot raise the claim of a third person as a defense to his liability. Tex.Bus. & Comm. Code Ann., Section 3.306(4). [1] Thus, appellee cannot defend on the basis of appellant's alleged violation of his fiduciary duty to the beneficiary.

[1] '(4) * * * The claim of any third person to the instrument is not otherwise available as a defense to any party liable

thereon unless the third person himself defends the action for such party.'

Appellee relies on Steves v. United Services Automobile Association, 459 S.W.2d 930 (Tex.Civ.App.—Beaumont 1970, writ ref'd n.r.e.). There, a trustee, who purchased real estate from the trust estate, sought specific performance of a profitable contract of sale of that property. Although the court discussed Article 7425b—12, specific performance was denied under the equitable doctrine of unclean hands and the potential liability of the defendant purchaser to the beneficiaries if specific performance were granted. Steves v. United Services Automobile Association, supra, at 934. We find the instant suit distinguishable on both grounds.

**[8]** **[9]** **[10]** A suit brought on promissory notes, rather than for specific performance, need not invoke the equity jurisdiction of the court and the doctrine of unclean hands is not applicable. See Birk v. Jackson, 75 S.W.2d 918, 920 (Tex.Civ.App.—Eastland 1934, writ dism'd). Also, appellee's payment of the debt, even though made with knowledge of the Holder's wrongful acquisition of the notes, would discharge appellee's liability thereon. Tex.Bus. & Comm. Code Ann., Section 3.603(a).

**[11]** We hold that appellee could not rely on Subdivision 12 of the Texas Trust Act and the instruction of a verdict in his favor on that ground was improper. The judgment of the trial court is reversed and the cause remanded for a new trial.

**All Citations**

531 S.W.2d 206, 18 UCC Rep.Serv. 987

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

360 S.W.3d 606
Court of Appeals of Texas,
El Paso.

In the ESTATE OF Edmund
B. COLEMAN, Deceased.

No. 08–10–00324–CV. | Nov. 21, 2011.

**Synopsis**

**Background:** Executor, who was testator's son, filed application for probate of will, and after trial court entered order admitting will to probate, purported wife of testator opposed probate of will through motion for new trial. The Probate Court No. 1, El Paso County, Yvonne Rodriguez, J., granted summary judgment to executor and subsequently entered second order admitting will to probate. Purported wife appealed.

**Holdings:** The Court of Appeals, Christopher Antcliff, J., held that:

[1] probate court order granting summary judgment to executor on claims of purported wife of testator opposing probate of will was not final order and therefore did not trigger time period for appeal by purported wife;

[2] probate court order admitting will to probate was final order that ended a phase of probate proceedings, and therefore order was appealable; and

[3] summary judgment affidavit of purported wife of testator was insufficient to raise fact issue as to alleged undue influence, fraud, or fraudulent inducement on part of executor.

Affirmed in part, reversed in part, and remanded.

West Headnotes (13)

[1] **Appeal and Error**
 Determination of part of controversy
**Courts**
 Review and vacation of proceedings

An order granting summary judgment is generally not considered to be a final order unless it disposes of the entire case, but in probate cases, an order may be considered final even if it does not dispose of the entire probate proceeding. V.A.T.S. Probate Code, § 4A(c).

2 Cases that cite this headnote

[2] **Wills**
 Decisions of probate courts, judges, or other officers reviewable

Probate court order granting summary judgment to executor on claims of testator's purported wife opposing probate was not final order and therefore did not trigger time period for appeal by wife, in case in which executor applied for probate of will, which probate court granted, but then set aside in response to wife's new trial motion; order left unresolved executor's requests to admit will to probate, issue letters testamentary, and be appointed as executor. V.A.T.S. Probate Code, § 4A(c).

1 Cases that cite this headnote

[3] **Wills**
 Decisions of probate courts, judges, or other officers reviewable

Probate court order admitting will to probate was final order that ended a phase of probate proceedings, and therefore order was appealable, in case in which executor applied for probate of will, which probate court granted, purported wife of testator then moved for new trial and filed petition in opposition to probate of will, and probate court granted summary judgment to executor and entered order at issue, admitting will to probate; order recited that statutory requirements were satisfied and that court heard testimony and reviewed will, order stated that will named executor to serve as independent executor without bond, order stated that executor was qualified to act as executor and to receive letters testamentary, and order concluded by stating that letters testamentary would issue to executor. V.A.T.S. Probate Code, §§ 4A(c), 88(a–c), 89.

2 Cases that cite this headnote

**[4]**     **Judgment**
   Motion or Other Application

**Judgment**
   Presumptions and burden of proof

It is error for a trial court to grant a no-evidence summary judgment on a claim for which the moving party bears the burden of proof. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

Cases that cite this headnote

**[5]**     **Wills**
   Presumptions and Burden of Proof

**Wills**
   Execution, existence, and genuineness

Before a will is admitted to probate, the proponent of the will bears the burden of establishing that it was properly executed and that the testator had testamentary capacity.

2 Cases that cite this headnote

**[6]**     **Wills**
   Presumptions and Burden of Proof

**Wills**
   Execution, existence, and genuineness

The proponent of a will may make out a prima facie case on issues of proper execution and testamentary capacity by introducing a self-proving will into evidence; at that point, the burden of producing evidence negating testamentary capacity shifts to the opponent of the will, although the burden of persuasion always remains with the proponent.

1 Cases that cite this headnote

**[7]**     **Wills**
   Presumptions and Burden of Proof

**Wills**
   Execution, existence, and genuineness

After a will is admitted to probate, a will contestant has the burden of establishing that the will was not properly executed and that the testator did not have testamentary capacity.

2 Cases that cite this headnote

**[8]**     **Judgment**
   Evidence and Affidavits in Particular Cases

**Wills**
   Presumptions and Burden of Proof

**Wills**
   Execution, existence, and genuineness

Testator's son, as proponent of will, bore burden of establishing that will was properly executed and that testator had testamentary capacity and, therefore, was not entitled to no-evidence summary judgment on these issues, even if will was self-proving and had been admitted to probate before trial court granted purported wife's new trial motion; son never introduced the will into evidence as summary judgment proof, and the new trial order expressly set aside the entire previous order admitting the will to probate.

1 Cases that cite this headnote

**[9]**     **New Trial**
   Construction and operation

When the trial court grants a motion for new trial, the court essentially wipes the slate clean and starts over.

Cases that cite this headnote

**[10]**    **Wills**
   Personal, confidential, or fiduciary relations in general

If a will opponent's challenges to a will are based on a confidential relationship between the testator and the will proponent, the opponent has the burden of establishing a confidential relationship.

Cases that cite this headnote

**[11]**    **Wills**

 Personal, confidential, or fiduciary relations in general

If no confidential relationship is established by a party opposing a will based on a confidential relationship between testator and will proponent, the opponent has the burden to show undue influence, fraud, or fraudulent inducement.

Cases that cite this headnote

**[12]** **Wills**
 Assignment of errors or statement of grounds or reasons of appeal

Purported wife of testator waived on appeal any argument that probate court erred in granting summary judgment in favor of executor as to wife's claims of undue influence, fraud, and fraudulent inducement, where wife's appellate brief merely stated that probate court grant of summary judgment was error because wife's summary judgment affidavit "provided proof of the matters raised in her pleadings," wife's appellate brief only mentioned lack of testamentary capacity, and executor's appellate brief pointed out that wife's brief failed to challenge trial court's order sustaining executor's objections to wife's summary judgment affidavit.

Cases that cite this headnote

**[13]** **Judgment**
 Evidence and Affidavits in Particular Cases

Summary judgment affidavit of purported wife of testator was insufficient to raise fact issue as to alleged undue influence, fraud, or fraudulent inducement on part of testator's son regarding testator's execution of will; affidavit merely stated that testator "was in a weakened mental and physical condition and was susceptible to exertion of undue influence," that son "made deliberately false statements" about wife to testator, and that wife had seen testator with "big thick glasses" approximately one month before will was executed and that testator was not able to read, answer his cell phone, or sign his name without help.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*608** William R. Copeland, El Paso, TX, for Appellant.

Doris Sipes, El Paso, TX, for Appellee.

Before McCLURE, C.J., ANTCLIFF, J., and CHEW, C.J. (Senior) (Sitting by Assignment).

*OPINION*

CHRISTOPHER ANTCLIFF, Justice.

This is a dispute between Regina Mace Coleman and John Edmund Coleman concerning the estate of Edmund B. Coleman. The trial court granted John's application to admit a will to probate. Regina appeals from this order. We affirm in part and reverse and remand in part.

## FACTUAL AND PROCEDURAL BACKGROUND

In December 2008, John filed an application for probate of a will and for issuance of letters testamentary. The application alleged that John is Edmund's son, that John was named as executor of Edmund's estate in a self-proving will dated November 20, 2008, and that Edmund died on December 18, 2008, at the age of 82. The application further alleged that Edmund was divorced from Rebecca Ramirez Coleman on May 27, 2008, and that he "may have been married" to Regina at the time of his death in December of that same year. The probate court issued an order admitting the will to probate, appointing John independent executor, and directing that letters testamentary issue to John.

Regina filed a motion for new trial, asserting that she was undergoing medical treatment in Massachusetts when the will was admitted to probate. The trial court granted the motion for new trial in March 2009. Regina also filed a petition in opposition to probate of the will. She contended that the will should not have been admitted to probate because it was not executed in accordance with the formalities required for a self-proving will, Edmund did not have testamentary capacity to execute the will, and the will was the result of undue influence, fraud, and fraudulent inducement.

In January 2010, John filed a motion for a no-evidence summary judgment on Regina's claims. Regina filed a response, along with her own affidavit as summary judgment evidence. John made fifty objections to the affidavit. The trial court overruled eleven of the objections and sustained the remainder. On April 22, 2010, the court granted John's motion for summary judgment.

On July 28, 2010, the trial court issued another order admitting the will to probate. Regina filed a timely motion for new trial, asserting that she was not notified of the hearing that resulted in this order. The trial court denied this motion for new trial, and Regina filed a notice of appeal on October 14, 2010.

## JURISDICTION

Before addressing the issues raised by Regina, we pause to consider whether we have jurisdiction over this appeal. In his brief, John argues that the order granting summary judgment was a final order and that Regina failed to "preserve her right to appeal" because she did not file a notice of appeal or any motion to extend the appellate deadlines within thirty days after that order was signed. Although not expressly couched as such, we construe this argument as a challenge to our jurisdiction, which we have an obligation to resolve **\*609** before proceeding to the merits of the appeal. *See In re Estate of Morales,* 345 S.W.3d 781, 783 (Tex.App.-El Paso 2011, no pet.).

 **[1]** "A final order issued by a probate court is appealable to the court of appeals." TEX.PROB.CODE ANN. § 4A(c) (West Supp. 2011). Outside the probate context, an order granting summary judgment is not considered to be a final order unless it disposes of the entire case. *See Lehmann v. Har–Con Corp.,* 39 S.W.3d 191, 192–93 (Tex.2001). But in probate cases, an order may be considered final even if it does not dispose of the entire probate proceeding. *See Crowson v. Wakeham,* 897 S.W.2d 779, 781–82 (Tex.1995). In *Crowson,* the Supreme Court adopted the following test to determine whether a probate order is final:

> If there is an express statute ... declaring the phase of the probate proceedings to be final and appealable, that statute controls. Otherwise, if there is a proceeding of which the order in question may logically be

considered a part, but one or more pleadings also part of that proceeding raise issues or parties not disposed of, then the probate order is interlocutory.

*Id*. at 783. In adopting this test, the court noted that it has a policy of avoiding "constructions that defeat bona fide attempts to appeal." *Id*.

There is no statute declaring the summary judgment at issue here to be final and appealable. Accordingly, the order will be considered final only if it disposed of a particular phase of the proceedings. On the other hand, "if there is a proceeding of which the order ... may logically be considered a part, but one or more pleadings also part of that proceeding raise issues or parties not disposed of," the order is not final. *Crowson,* 897 S.W.2d at 783.

The Probate Code sets forth the procedure for probating and contesting a will. A person who wishes to probate a will and obtain letters testamentary must prove to the satisfaction of the court that the testator has been dead for less than four years, the court has jurisdiction and venue over the estate, citation has been served and returned in the proper manner, the will was not revoked, and the applicant is named as executor in the will and is not disqualified from obtaining letters testamentary. TEX.PROB.CODE ANN. § 88(a)–(c) (West 2003). The probate court must grant an application to probate a will and issue letters testamentary if, after a hearing, the court is satisfied that the will should be admitted to probate. *Id*. at § 89. "After a will has been admitted to probate, any interested person may institute suit in the proper court to contest the validity thereof...." *Id*. at § 93.

 **[2]** Here, John filed an "Application for Probate of Will and Issuance of Letters Testamentary," which the trial court granted. Rather than filing a contest to the will, Regina filed a motion for new trial and a "Petition in Opposition to the Probate of Will and Issuance of Letters Testamentary." When the court granted the motion for new trial, it expressly set aside the previous order admitting the will to probate. John then filed a motion for summary judgment on all of the claims raised in Regina's petition in opposition. The court granted the motion as to each claim.

We believe that the summary judgment may logically be considered part of the proceedings to admit the will to probate and authorize letters testamentary. By granting summary judgment on all of Regina's claims, the court apparently eliminated all of the substantive challenges to the will and

ended Regina's role in the **\*610** case. But the summary judgment was not a final order because it left unresolved John's requests to admit the will to probate, issue letters testamentary, and appoint him as executor. *See In re Estate of Rabke,* No. 04–07–00757–CV, 2009 WL 196328, at *1, *7 (Tex.App.-San Antonio Jan. 28, 2009, pet. denied) (mem. op.) (holding that no-evidence summary judgment regarding appellant's contest to application for probate of will was interlocutory). *But cf. Rosin v. Berco & Leja Rosin Trust,* No. 04–08–00601–CV, 2009 WL 1956386, at *1–*2 (Tex.App.-San Antonio July 8, 2009, pet. denied) (mem. op.) (holding that order dismissing will contestants' claims with prejudice, after will had already been admitted to probate, was a final order).

 **[3]**  Months after the summary judgment was entered, the court entered the second order admitting the will to probate. The order recites that the statutory requirements were satisfied and that the court heard testimony and reviewed the will. The order also states that the will named John as independent executor, to serve without bond, and that John is qualified to act as executor and to receive letters testamentary. The order concludes by stating that John took the required oath, that letters testamentary shall issue to John, "who is appointed as Independent Executor of Decedent's Will and Estate; and no other action shall be had in this Court than the return of an Inventory, Appraisement and List of Claims as required by law." This is a final order that ended a phase of the probate proceedings. *See In re Hudson,* 325 S.W.3d 811, 811 (Tex.App.-Dallas 2010, orig. proceeding) (holding that an order was appealable where it admitted a will to probate, appointed an independent executrix, and stated that no other action would occur in the probate court other than the return of an inventory, appraisement, and list of claims).

Regina's notice of appeal was timely when measured from the second order admitting the will to probate. *See* TEX.R.APP.P. 26.1(a)(1). Accordingly, we have jurisdiction over this appeal.

### SUMMARY JUDGMENT

The trial court granted John's motion for a no-evidence summary judgment against Regina on the issues of whether the will was executed with the requisite statutory formalities, whether Edmund lacked testamentary capacity, and whether the will was the product of undue influence, fraud, or fraudulent inducement. The court also granted summary judgment against Regina on the issue of whether there was a confidential relationship between John and Edmund. In her first issue, Regina asserts that the trial court erred in granting the no-evidence summary judgment because John had the burden of proof.

 **[4]**  The no-evidence summary judgment rule allows a party to move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim on which the adverse party would have the burden of proof at trial. *See* TEX.R.CIV.P. 166a(i). It is error for a trial court to grant a no-evidence summary judgment on a claim for which the moving party bears the burden of proof. *See Battin v. Samaniego,* 23 S.W.3d 183, 185–86 (Tex.App.-El Paso 2000, pet. denied).

 **[5]**   **[6]**   **[7]**  Before a will is admitted to probate, the proponent of the will bears the burden of establishing that it was properly executed and that the testator had testamentary capacity. *See Schindler v. Schindler,* 119 S.W.3d 923, 931 (Tex.App.-Dallas 2003, pet. denied); **\*611** *Guthrie v. Suiter,* 934 S.W.2d 820, 829 (Tex.App.-Houston [1st Dist.] 1996, no writ). The proponent may make out a prima facie case on these issues by introducing a self-proving will into evidence. At that point, the burden of producing evidence negating testamentary capacity shifts to the opponent of the will, although the burden of persuasion always remains with the proponent. *Schindler,* 119 S.W.3d at 931; *Bracewell v. Bracewell,* 20 S.W.3d 14, 26 (Tex.App.-Houston [14th Dist.] 2000, no pet.); *Guthrie,* 934 S.W.2d at 829; *Reynolds v. Park,* 485 S.W.2d 807, 815–16 (Tex.Civ.App.-Amarillo 1972, writ ref'd n.r.e.). After a will is admitted to probate, a will contestant has the burden of establishing that the will was not properly executed and that the testator did not have testamentary capacity. *In re Estate of Warren,* No. 12–09–00256–CV, 2010 WL 2638067, at *2 (Tex.App.-Tyler June 30, 2010, pet. denied) (mem. op.); *In re Estate of Graham,* 69 S.W.3d 598, 605 (Tex.App.-Corpus Christi 2001, no pet.).

 **[8]**   **[9]**  Under this authority, John had the initial burden of establishing that the will was properly executed and that Edmund had testamentary capacity. He argues that the burden shifted to Regina because the will is self-proving. The problem with this argument is that John did not introduce the will into evidence as summary judgment proof. Instead, he filed a no-evidence motion. John relies on the fact that the will had been admitted to probate before the court granted Regina's motion for new trial. However, "when the trial court grants a motion for new trial, the court essentially wipes the

slate clean and starts over." *Wilkins v. Methodist Health Care Sys.,* 160 S.W.3d 559, 563 (Tex.2005). John also points out that the probate court had the authority to grant a new trial as to only part of the case or to withdraw the order granting the new trial. However, the order granting the new trial expressly "sets aside" the entire previous order admitting the will to probate, and there is nothing in the record to show that the court withdrew the new trial order.

We conclude that the court erred by granting the no-evidence summary judgment on the issues of whether the will was executed with the requisite statutory formalities and whether Edmund lacked testamentary capacity. But the fact that the summary judgment was improper as to these issues does not mean that the entire summary judgment must be vacated. *See, e.g., Tex. Builders Ins. Co. v. Molder,* 311 S.W.3d 513, 523 (Tex.App.-El Paso 2009, no pet.) (reversing summary judgment in part).

 **[10]**  **[11]** If a will opponent's challenges to a will are based on a confidential relationship between the testator and the will proponent, the opponent has the burden of establishing a confidential relationship. *See Anaya v. Estrada,* 447 S.W.2d 245, 247 (Tex.Civ.App.-El Paso 1969, no writ). If no confidential relationship is established, the opponent has the burden to show undue influence, fraud, or fraudulent inducement. *See Urbanczyk v. Urbanczyk,* 278 S.W.3d 829, 833 & n. 4 (Tex.App.-Amarillo 2009, no pet.); *Buckner v. Buckner,* 815 S.W.2d 877, 880 (Tex.App.-Tyler 1991, no writ). Since Regina had the burden of proof, the court could grant a no-evidence summary judgment on these claims if Regina failed to present evidence raising a fact issue. Therefore, we only sustain Regina's first issue in part.

 **[12]** In her second issue, Regina argues that the trial court erred by granting summary judgment because her affidavit "provided proof of the matters raised in her pleadings." Although this issue is worded broadly enough to encompass arguments regarding all of Regina's claims, her briefing only mentions lack of testamentary capacity. It thus appears that  **\*612** she has waived any error in the summary judgment as to undue influence, fraud, and fraudulent inducement. *See Rangel v. Progressive County Mut. Ins. Co.,* 333 S.W.3d 265, 269–70 (Tex.App.-El Paso 2010, pet. denied).

Although John does not assert that Regina waived any error as to these claims, he does point out that Regina's brief fails to challenge the trial court's order sustaining his objections to her affidavit. Accordingly, we cannot consider most of

the affidavit. *See Little v. Needham,* 236 S.W.3d 328, 331 (Tex.App.-Houston [1st Dist.] 2007, no pet.). In the interest of justice, we will briefly address whether the remaining portions of the affidavit raise a fact issue as to undue influence, fraud, and fraudulent inducement.

 **[13]** There are only two remaining portions of the affidavit that are arguably relevant to these claims. First, the affidavit incorporates the allegations in Regina's response to the summary judgment motion. The response contains numerous factual conclusions that correspond with the elements of the claims. For example, the response states that Edmund "was in a weakened mental and physical condition, and was susceptible to the exertion of undue influence" and that John "made deliberately false statements" about Regina to Edmund. These conclusions are not competent summary judgment proof. *See Univ. of Tex. Sys. v. Ainsa, Skipworth, Zavaleta and Butterworth,* 823 S.W.2d 692, 695 (Tex.App.-El Paso 1992, no writ); *Harley–Davidson Motor Co., Inc. v. Young,* 720 S.W.2d 211, 213 (Tex.App.-Houston [14th Dist.] 1986, no writ).

Second, the affidavit states that approximately one month before the will was executed, Regina saw Edmund with "big thick glasses," although he had not previously worn glasses. At that time, he was not able to read, to answer his cell phone, or to sign his name without help in holding the pen. Although this suggests that Edmund may have been susceptible to influence, it does not raise a fact issue on all of the elements of Regina's claims. *See Garcia v. Vera,* 342 S.W.3d 721, 725 (Tex.App.-El Paso 2011, no pet.) (elements of fraud); *Turner v. Hendon,* 269 S.W.3d 243, 252–53 (Tex.App.-El Paso 2008, pet. denied) (elements of undue influence).

We overrule Regina's second issue.

### NEW TRIAL

In her third and fourth issues, Regina argues that the trial court erred in denying her second motion for new trial because she received no notice of the final hearing that resulted in the second order admitting the will to probate. It is unnecessary to address these issues. Having sustained Regina's first issue in part, we must reverse the order admitting the will to probate regardless of whether Regina was entitled to notice of the hearing.

## CONCLUSION

The probate court's July 28, 2010 order admitting the will to probate is reversed. The cause is remanded for further proceedings on Regina's claims that the will was not executed with the requisite statutory formalities and that Edmund lacked testamentary capacity. In all other respects, the order granting summary judgment is affirmed.

**All Citations**

360 S.W.3d 606

---

  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

231 S.W.3d 47
Court of Appeals of Texas,
Houston (14th Dist.).

George MATHIS, Jr., Appellant

v.

RESTORATION BUILDERS, INC., Appellee.

No. 14–05–00996–CV.  |  May 22, 2007.

**Synopsis**
**Background:** Visiting bidder to construction site brought action against construction company, claiming negligence and negligence per se, after sustaining injuries from falling through a hole in an elevated slab at the site. Construction company moved for no-evidence summary judgment on the basis that there was no evidence of causation. The 215th District Court, Harris County, Levi James Benton, J., granted the motion. Visiting bidder appealed.

**Holdings:** The Court of Appeals, Wanda McKee Fowler, J., held that:

[1] triable issues existed as to whether construction company workers failed to cover the hole and whether such failure was a substantial factor in causing visiting bidder's foreseeable harm;

[2] portion of deposition in which president of construction company explained an inconsistency in his summary judgment affidavit was not in the summary judgment record so as to enable its consideration on appeal; and

[3] visiting bidder did not implicate the doctrine of res ipsa loquitur.

Reversed and remanded.

Richard Edelman, J., filed statement in dissent.

West Headnotes (14)

**[1]**      **Appeal and Error**

 Extent of Review Dependent on Nature of Decision Appealed from

**Appeal and Error**
 Effect of Evidence and Inferences Therefrom on Direction of Verdict

**Appeal and Error**
 Judgment

**Judgment**
 Nature of Summary Judgment

A no-evidence summary judgment is essentially a pretrial directed verdict, and the Court of Appeals applies the same legal sufficiency standard in reviewing a no-evidence summary judgment as it applies in reviewing a directed verdict, such that it reviews the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion.

13 Cases that cite this headnote

**[2]**      **Judgment**
 Tort Cases in General

Genuine issues of material fact existed as to whether construction company workers failed to cover a hole in an elevated slab at construction site, and, if so, whether such failure was a substantial factor in causing visiting bidder's foreseeable harm upon falling though such hole, precluding summary judgment on the causation elements of visiting bidder's negligence and negligence per se claims.

Cases that cite this headnote

**[3]**      **Negligence**
 Necessity of Causation

**Negligence**
 Foreseeability

The elements of causation, in a negligence case, are cause in fact and foreseeability.

Cases that cite this headnote

**[4]**      **Negligence**
 "But-For" Causation; Act Without Which Event Would Not Have Occurred

**Negligence**

🔑 Substantial Factor

"Cause in fact," as an element of causation in a negligence case, is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred.

Cases that cite this headnote

**[5]** **Negligence**

🔑 Remoteness and Attenuation; Mere Condition or Occasion

"Cause in fact," as an element of causation in a negligence case, is not established when the defendant's negligence does no more than furnish a condition which makes the injuries possible; any act of negligence that does no more than put a person in a particular place at a particular time is too remote to constitute legal cause.

Cases that cite this headnote

**[6]** **Negligence**

🔑 Foreseeability

Foreseeability, as a prong of the causation element in a negligence case, means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others.

1 Cases that cite this headnote

**[7]** **Appeal and Error**

🔑 Matters Not Included or Shown in General

Deposition in which president of construction company explained an inconsistency in his summary judgment affidavit was not in the summary judgment record so as to enable appellate court to consider it on review of no-evidence summary judgment entered in favor of construction company in visiting bidder's negligence case; the deposition was only before the trial court on the construction company's motion for traditional summary judgment, not the motion for no-evidence summary judgment, and the deposition contained information that

was not what was stated in the affidavit. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

23 Cases that cite this headnote

**[8]** **Judgment**

🔑 Operation and Effect of Affidavit

Even if deposition in which president of construction company explained an inconsistency in his summary judgment affidavit had been before the trial as proper evidence supporting construction company's no-evidence summary judgment motion in visiting bidder's negligence case, the deposition did not allow for entry of summary judgment, as it required evidence to be weighed in order to resolve a conflict.

4 Cases that cite this headnote

**[9]** **Negligence**

🔑 Particular Cases

Visiting bidder did not implicate the doctrine of res ipsa loquitur in negligence case against construction company, which case arose from visiting bidder's fall through hole in elevated slab at construction site, even though the company had used the hole and had fenced the site, where the company was not in control of the hole at the time of visiting bidder's fall, and had not been in control of it for a period of almost two years prior to visiting bidder's fall.

Cases that cite this headnote

**[10]** **Negligence**

🔑 Res Ipsa Loquitur

Res ipsa loquitur is a doctrine used in negligence cases when the circumstances surrounding an accident constitute sufficient circumstantial evidence of the defendant's negligence to support such a finding.

Cases that cite this headnote

**[11]** **Negligence**

🔑 Nature and Character of Accident or Injury

**Negligence**

👉 Control or Management of Instrumentality

Res ipsa loquitur consists of two factors: (1) the character of the accident is such that it would not ordinarily occur absent negligence, and (2) the instrumentality causing the injury is shown to have been under the management and control of the defendant.

Cases that cite this headnote

**[12]**  **Negligence**

👉 Nature and Character of Accident or Injury

**Negligence**

👉 Control or Management of Instrumentality

The first factor of res ipsa loquitur, the character of the incident, is necessary to support an inference of negligence, while the second, control of instrumentality, is necessary to support the inference that the negligence was committed by the defendant.

Cases that cite this headnote

**[13]**  **Negligence**

👉 Control or Management of Instrumentality

To implicate res ipsa loquitur, the instrumentality causing the injury need not have been in the constant control of the defendant; rather, it is enough that the defendant was in control at the time that the negligence inferable from the character of the accident probably occurred, so that the reasonable probabilities point to the defendant and support a reasonable inference that he was the negligent party.

Cases that cite this headnote

**[14]**  **Negligence**

👉 Control or Management of Instrumentality

Res ipsa loquitur is not available when multiple defendants exercised control over the instrumentality causing the injury, and any one of them, wholly independent of the others, might have been responsible for the injury.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*49** Robert Joseph Killeen, Jr., Jay Alan McKendree, Houston, for appellant.

Chris C. Pappas, Robert Alan York, Houston, for appellee.

Panel consists of Justices FOWLER, EDELMAN, and FROST.

## MAJORITY OPINION

WANDA McKEE FOWLER, Justice.

Appellant, George Mathis, Jr. (Mathis), appeals from a summary judgment in favor of appellee, Restoration Builders, Inc. (Restoration). Restoration moved for summary judgment on both traditional and no-evidence grounds. The trial court expressly granted summary judgment on the ground that Mathis produced no evidence of causation. Mathis appeals, claiming that he raised a genuine issue of material fact by presenting conflicting testimony from Restoration's president, Robert Granberry. Mathis also contends that the court erred in granting the no-evidence summary judgment because he was entitled to an inference of liability under the doctrine of *res ipsa loquitur*. Because we find Mathis raised a genuine issue of material fact in his response to the no-evidence **\*50** summary judgment motion, we reverse and remand for further proceedings.

### Factual and Procedural Background

On October 30, 2001, Mathis visited a building owned by Petersen to review the property so he could propose a bid on wrought iron work. Mathis fell through a hole in the building's elevated slab. The hole had been covered by a piece of cardboard. He landed on the concrete flooring below, and sustained injuries to his head, neck, and torso. Mathis brought suit against Petersen and Restoration, claiming negligence and negligence per se.

Restoration moved for summary judgment, claiming there was no evidence of causation as to the negligence claim, and no evidence of any element of negligence per se. Restoration also moved for traditional summary judgment on the basis of the affirmative defenses of intervening and new and independent causes. The trial court expressly granted the

summary judgment based on its finding that no evidence of causation existed, thus disposing of both the negligence and negligence per se causes of action on Restoration's no-evidence summary judgment action. The trial court denied the traditional motion for summary judgment based on intervening and new and independent causes.[1] The court severed all claims between Mathis and Restoration from the original suit, and this appeal followed.

[1]    Accordingly, we will not review Restoration's traditional motion for summary judgment.

## Analysis

### I. Conflicting Testimony Raised a Fact Issue

Mathis's reply to Restoration's motion for summary judgment purported to raise a fact issue as to causation. The pertinent evidence amounts to conflicting statements by Restoration's president, Robert Granberry, that Restoration both did and did not cover the hole at issue in this case. The statement that the hole was covered came from a deposition of Granberry, and the statement that the hole was not covered by Restoration came from an affidavit in support of a prior motion for summary judgment.

### A. Standard of Review

 [1]    A no-evidence summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 750–51 (Tex.2003). We review the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *City of Keller v. Wilson,* 168 S.W.3d 802, 824 (Tex.2005). However, per *City of Keller,* although we "must consider all the summary judgment evidence on file, in some cases, that review will effectively be restricted to the evidence contrary to the motion." *Id.* at 825. Thus, in this case, our review is limited to the evidence favoring Mathis that was attached to the Response to the Motions for Summary Judgment, even though the body of Restoration's Motion for Summary Judgment, which was both a traditional and no-evidence motion, contained testimony on which Restoration relied. *Id.;* TEX. R. CIV. P. 166a(i). A no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *King Ranch,* 118 S.W.3d at 751. More **\*51**

than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* (quoting *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997)).

We turn now to the evidence Mathis presented. As we noted earlier, our inquiry is restricted to whether Mathis raised a fact issue as to causation, because the trial court granted the no-evidence motion as to causation, which is relevant to both negligence and negligence per se.

### B. Mathis's Evidence Raises an Issue as to Causation

The evidence Mathis attached to his response accomplished two things: First, it showed that Granberry, the President of Restoration, knew about the hole and took steps to ensure the safety of his people by covering it when workers were not using the hole to extract refuse. Second, the evidence created a fact issue as to whether Restoration covered the hole when it left the premises. It created a fact issue because it contained conflicting statements by Granberry that Restoration both did and did not cover the hole at issue in this case. Both statements, one made during a deposition, the other in an affidavit, were very precise and direct in nature, specifically referred to the hole that caused Mathis's injuries, and were completely contradictory.

### 1. Cause in Fact

 [2]    [3]    [4]    [5]    Restoration first contends that whether the hole was covered or not raises no genuine issue of material fact as to causation of Mathis's injuries. The elements of causation are cause in fact and foreseeability. *Western Invs., Inc. v. Urena,* 162 S.W.3d 547, 551 (Tex.2005). Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 799 (Tex.2003). Cause in fact is not established when the defendant's negligence does no more than furnish a condition which makes the injuries possible. *Id.* Any act of negligence that does no more than put a person in a particular place at a particular time is too remote to constitute legal cause. *Roberts v. Healey,* 991 S.W.2d 873, 878–79 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). In explaining cause in fact, the supreme court has said:

> In order to be a legal cause of another's harm, it is not enough that the harm would not have occurred had the

actor not been negligent. * * * [T]his is necessary, but it is not of itself sufficient. The negligence must also be a substantial factor in bringing about the plaintiff's harm. The word "substantial" is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called "philosophic sense," which includes every one of the great number of events without which any happening would not have occurred. Each of these events is a cause in the so-called "philosophic sense," yet the effect of many of them is so insignificant that no ordinary mind would think of them as causes.

*Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 472 (Tex.1991) (quoting Restatement (Second) of Torts § 431, cmt. a (1965)).

Thus, regarding the cause in fact prong of causation, the salient inquiry is whether the summary judgment evidence, viewed in the light most favorable to Mathis, could enable a juror to reasonably believe that Restoration did not merely create the conditions **\*52** making the injuries possible, but was negligent in such a way that it ought to bear some responsibility for causing the harm. Here, Restoration's negligence, if any, is not so attenuated that it is only a cause in the philosophical sense. Rather, if Restoration left the hole uncovered—as its President, Robert Granberry, stated under oath—that act, though an indirect proximate cause, could cause someone to cover the hole with a defective material such as cardboard, which someone did in this case, directly causing Mathis's injuries. In this way, the failure to cover the hole could have been a substantial factor in bringing about Mathis's harm. *See Dew v. Crown Derrick Erectors, Inc.,* 208 S.W.3d 448, 453 (Tex.2006) (plurality opinion) (holding that because removal of a rope barrier around an open hole in the floor of an oil platform was a foreseeable intervening force, platform erector was not entitled to an instruction on new and independent cause). Thus, Mathis's summary judgment evidence is sufficient to raise a fact issue as to cause in fact.

**2. Foreseeability**

[6]    The second prong of causation—foreseeability—also is met. Foreseeability means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others. *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex.1992). Mathis easily meets the foreseeability requirement, because the type of harm that a person of ordinary intelligence would anticipate from the negligent act is the type of harm that occurred. A hole in the floor, which opens into a basement area, poses a risk that a person might fall through the hole and suffer injury as a result. If a hole was left uncovered on a work site, it is quite foreseeable that someone would attempt to cover the hole and might choose an ineffective material. This is precisely what happened in this case. Thus, the harm was entirely foreseeable.

**3. Restoration's Argument that the Statements Are Not Inconsistent Fails**

[7]    Restoration next argues that there is no inconsistency in the testimony of Restoration's president. On the face of the statements, they are clearly contradictory. In his affidavit, Granberry states "Restoration Builders did not dig or cover any holes on the property at issue, including, but without limitation to the hole at issue which has been described as 'a hole next to a wall about twenty to thirty feet (20#–30′) from a sidewalk which is covered by cardboard.' " In his deposition testimony, he stated that "As far as the hole itself, ... I personally used powder actuated nails to [i]mbed the [steel] plate ... over the hole."

Restoration attempts to explain away this inconsistency by referring us to further deposition testimony by which Granberry explains that in the affidavit he was trying to say that Restoration never covered the hole *with cardboard*. However, we cannot consider this testimony because it was not before the trial court, and, more importantly that is not what the affidavit said. *See* TEX. R. CIV. P. 166a(c). The trial court had before it only Mathis's evidence in response to the no-evidence motion. *See id.* The trial court could not consider any of the evidence attached to the traditional motion for summary judgment. *See Binur v. Jacobo,* 135 S.W.3d 646, 651 (Tex.2004). Therefore, the portion of Granberry's deposition in which he explained the affidavit was not in the summary judgment record.

[8]    Even if the evidence had been before the trial court, we would reach the same result because the deposition testimony explaining away the affidavit would require us to weigh the evidence presented **\*53** to resolve a conflict in the

testimony. In this case we cannot do that. *See City of Keller, 168 S.W.3d at 825.* Based on the foregoing, we hold that the trial court erred in granting a no-evidence summary judgment on the element of causation. The conflicting testimony presented by Mathis, when viewed in the light most favorable to him, was sufficient to create a genuine issue of material fact.

## II. Res Ipsa Loquitur

[9]  [10]  [11]  [12]  [13]  [14]  For the sake of judicial economy, we will consider Mathis's res ipsa loquitur argument, even though we have already concluded that the case should be remanded. *See Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 625 (Tex.1996). Res ipsa is a doctrine used when the circumstances surrounding an accident constitute sufficient circumstantial evidence of the defendant's negligence to support such a finding. *Marathon Oil Co. v. Sterner,* 632 S.W.2d 571, 573 (Tex.1982). Res ipsa consists of two factors: 1) the character of the accident is such that it would not ordinarily occur absent negligence; 2) the instrumentality causing the injury is shown to have been under the management and control of the defendant. *Id.* The first factor is necessary to support an inference of negligence, while the second is necessary to support the inference that the negligence was committed by the defendant. *Mobil Chem. Co. v. Bell,* 517 S.W.2d 245, 251 (Tex.1974). The instrumentality need not have been in the constant control of the defendant. *Id.* It is enough that "the defendant was in control at the time that the negligence inferable from the first factor probably occurred, so that the reasonable probabilities point to the defendant and support a reasonable inference that he was the negligent party." *Id.* Res ipsa is not available when multiple defendants exercised control over the instrumentality and any one of them, wholly independent of the others, might have been responsible for the injury. *See Marathon Oil Co.,* 632 S.W.2d at 573–74; *Esco Oil & Gas, Inc. v. Sooner Pipe & Supply Corp.,* 962 S.W.2d 193, 195 (Tex.App.-Houston [1st Dist.] 1998, pet. denied).

The second element has not been satisfied. The summary judgment evidence shows that Restoration used the hole to remove debris from the basement of the building, and that Restoration fenced the site. However, none of this evidence shows that Restoration was in control of the injury-causing instrumentality at the time of Mathis's fall. Mathis, therefore, failed to implicate the res ipsa loquitur doctrine.

Even if Mathis had implicated res ipsa by showing that Restoration had been in control of the instrumentality at some point, the evidence in Mathis's response to the summary judgment motion shows that Restoration left the property in December of 1999. The injury here did not occur until October of 2001. A period of almost two years passed when Restoration was clearly not in control of the premises. Any negligence might be attributable to whomever was in control during that period of almost two years. Therefore, res ipsa cannot apply here. *See Marathon Oil Co.,* 632 S.W.2d at 573–74; *Esco Oil & Gas, Inc.,* 962 S.W.2d at 195.

### Conclusion

Having found that Mathis raised a genuine issue of material fact as to the element of causation, we hold that summary judgment was inappropriate on the negligence and negligence per se causes of action and remand for further proceedings on those claims.

EDELMAN, J. Dissenting.

 **\*54**  RICHARD EDELMAN, Justice, dissenting.

I do not agree with the majority opinion that Restoration's failure to cover the hole could be a proximate cause of someone else covering it with a defective material. Therefore, I would not reverse the summary judgment on that basis.

### All Citations

231 S.W.3d 47

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

874 S.W.2d 358
Court of Appeals of Texas,
Houston (14th Dist.).

Philip ROSE, Appellant,
v.
KOBER FINANCIAL CORPORATION, Appellee.

No. B14–92–01238–CV. | April 14, 1994.

Investor filed action under Deceptive Trade Practices-Consumer Protection Act (DTPA) in connection with his purchase of stock, and he then filed a supplemental petition alleging breach of contract, breach of fiduciary duty, misrepresentation, and negligence. The County Civil Court at Law No. 2, Harris County, Tom Sullivan, J., granted a defense motion for summary judgment on all issues. Investor appealed. The Court of Appeals, Draughn, J., held that: (1) the supplemental petition filed 27 days before the summary judgment hearing was timely and properly before the trial court, even though the petition had been filed only five days before the originally scheduled hearing; (2) an all-inclusive final summary judgment could not be granted where the defense motion addressed only the cause of action under DTPA without addressing the additional causes of action in the supplemental petition; and (3) the defense motion could not negate the damages element of any cause of action that was not expressly set out in the motion.

Reversed and remanded.

West Headnotes (9)

**[1]**  **Pleading**
  👈 Condition of Cause and Time for Amendment
  **Pleading**
  👈 Condition of Cause and Time for Amendment
  Pleading amendments sought within seven days of trial are to be granted unless there has been showing of surprise to opposing party. Vernon's Ann.Texas Rules Civ.Proc., Rule 63.

  1 Cases that cite this headnote

**[2]**  **Pleading**
  👈 Condition of Cause and Time for Amendment
  **Pleading**
  👈 Condition of Cause and Time for Amendment
  Summary judgment proceeding is "trial" within meaning of rule that allows pleading amendments within seven days of trial unless there has been showing of surprise to opposing party. Vernon's Ann.Texas Rules Civ.Proc., Rule 63.

  5 Cases that cite this headnote

**[3]**  **Pleading**
  👈 Condition of Cause and Time for Amendment
  Supplemental petition filed 27 days before summary judgment hearing was timely and properly before trial court, even though supplemental petition had been filed only five days before originally scheduled hearing. Vernon's Ann.Texas Rules Civ.Proc., Rule 63.

  1 Cases that cite this headnote

**[4]**  **Pleading**
  👈 Objections to Amendments and Rulings Relating Thereto
  Absent sufficient showing of surprise by opposing party, failure to obtain leave of court when filing late pleading may be cured by trial court's action in considering amended pleading. Vernon's Ann.Texas Rules Civ.Proc., Rule 63.

  4 Cases that cite this headnote

**[5]**  **Appeal and Error**
  👈 Judgment
  Absent any indication that supplemental petition had not been considered by trial court in ruling on motion for summary judgment, Court of Appeals would presume that leave to file supplemental petition had been granted. Vernon's Ann.Texas Rules Civ.Proc., Rule 63.

2 Cases that cite this headnote

4 Cases that cite this headnote

**[6]** **Judgment**

👉 Presumptions and Burden of Proof

Summary judgment disposing of plaintiff's entire case requires defendant to show that no fact issue existed as to at least one essential element of each cause of action. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

3 Cases that cite this headnote

**[7]** **Judgment**

👉 Partial Summary Judgment

All-inclusive final summary judgment could not be granted where defense motion addressed only cause of action under Deceptive Trade Practices-Consumer Protection Act (DTPA) without addressing additional causes of action in supplemental petition that had been filed before summary judgment hearing. V.T.C.A., Bus. & C. § 17.41 et seq.; Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

7 Cases that cite this headnote

**[8]** **Judgment**

👉 Motion or Other Application

Defense motion for summary judgment could not be granted on those causes of action in plaintiff's supplemental petition that had not been expressly set out in motion, despite defendant's claim that it had negated damages element of each cause of action. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

3 Cases that cite this headnote

**[9]** **Appeal and Error**

👉 Judgment or Order

Summary judgment that purported to be final judgment on all causes of action required reversal and remand, rather than dismissal of appeal, where motion for summary judgment addressed only one cause of action, while order purported to dispose of all claims.

**Attorneys and Law Firms**

**\*359** Jeffrey W. Gillespie, Houston, for appellant.

James L. Cornell, Tammy C. Manning, Houston, for appellee.

Before MURPHY, SEARS and DRAUGHN, JJ.

**OPINION**

DRAUGHN, Justice.

This is an appeal from the granting of summary judgment in favor of appellee, Kober Financial Corporation. Appellant, Philip Rose, initially filed suit against appellee to recover damages solely under the Texas Deceptive Trade Practices–Consumer Protection Act. ("DTPA"). In five points of error, appellant contends that the trial court erred in granting summary judgment because: (1) there are genuine issues of material fact concerning one or more elements of his causes of action; (2) appellee was granted more relief than requested by its motion for summary judgment; and (3) there are genuine issues of material fact concerning each element of appellee's affirmative defenses. We reverse and remand.

The record reveals that appellant filed his original petition on October 5, 1990, asserting that appellee and he had entered into an oral and written agreement that appellee would sell him stock in Fox Ridge Capital, Inc., at four cents ($.04) a share. The original petition also alleged that appellee violated the **\*360** DTPA by engaging in deceptive practices and unconscionable action in connection with the agreement. Appellee filed its original answer in the form of a general denial and raised the affirmative defenses of waiver, ratification and estoppel. On April 29, 1991, appellant filed his first amended petition, which added Gary Mooney as a plaintiff. On May 17, 1991, appellee filed its first amended answer, which contained special exceptions, a general denial, a specific denial, and raised the affirmative defenses of waiver, ratification, estoppel and failure to mitigate. On January 28, 1992, appellee filed its motion for severance of Mooney's claims, which the trial court granted on February 6, 1992. Mooney is not a party to this appeal.

Appellee filed its Motion for Summary Judgment or Alternatively, Motion for Partial Summary Judgment on June 2, 1992, and set it for hearing on July 2, 1992. On June 26, 1992, appellant filed his response to the motion and his first supplemental petition, which alleged for the first time causes of action for breach of contract, breach of fiduciary duty, misrepresentation, and negligence. Appellee did not amend its motion for summary judgment to address these additional causes of action. Appellant filed a supplemental response and his supporting affidavit on July 20, 1992. On July 22, 1992, appellee filed its objections to appellant's affidavit.

The summary judgment hearing was reset to July 23, 1992, at appellant's request. The hearing was held on July 23, 1992, and the summary judgment was signed on July 24, 1992. The trial court granted summary judgment in favor of appellee on "all claims set forth" by appellant.

We must view the facts in the light most favorable to appellant. On April 24, 1989, Rick Dickenson, a broker for appellee, called appellant several times and left messages on his answering machine. Appellant called Dickenson back and spoke with him several times between 11:00 p.m. and 3:00 a.m. During this period, appellant spoke with his brother, David Rose, and several friends about Fox Ridge Capital, Inc., stock. Dickenson told appellant that "his ship had come in," that "he could not go wrong," and that the "stock was going to run." Appellant asked Dickenson how much the stock would be the following day. Dickenson responded that he did not know the price, but told appellant to put a check in the overnight express mail if he wanted the stock. Appellant's friend, Mooney, sent Dickenson $2,000. Appellant verbally ordered $5,600 worth of Fox Ridge Capital, Inc., stock, but did not send a check by overnight express mail.

Appellant called Dickenson the next morning and asked him the opening price of the stock. Dickenson responded that he did not know because they had not started trading. Then, appellant called Investor Services located in Houston, Texas, and asked them about the price of the stock. Investor Services told appellant that they could get the stock at four cents ($.04) a share. Appellant decided to stay with appellee because Mooney had sent his money in, and appellant had already ordered the stock. Appellant continued to call Dickenson to find out the stock price, but Dickenson still stated that he did not know. When Dickenson called appellant two days later for a confirmation, the stock had gone up to fifteen and three-fourths cents ($.1575) a share.

Since Dickenson had not received appellant's check, he told Mooney and then appellant that he would buy the stock for himself if the check was not received the following day. Appellant reminded Dickenson that federal regulations allow him seven days to send the check and told him to go ahead and buy the stock for himself. Several days later, a man, who identified himself as Harvey, told appellant that they were going to sell his stock that was previously purchased in October 1988 to pay for the $5,600 worth of Fox Ridge Capital, Inc., stock that was ordered. Appellant informed Harvey that he could purchase the Fox Ridge Capital, Inc., stock for himself, but he better not touch the stock already purchased by appellant. On May 29, 1989, appellant transferred his account to another brokerage firm, where he purchased the Fox Ridge Capital, Inc., stock at fourteen cents ($.14) a share.

Appellant's second point of error is dispositive of this appeal, and we, therefore, consider it first. In his second point of error, **\*361** appellant asserts that the trial court erred in entering summary judgment by granting appellee more relief than requested in its motion for summary judgment. Appellant argues that appellee's motion for summary judgment was filed prior to appellant's first supplemental petition and did not address the additional causes of action based on breach of contract, breach of fiduciary duty, misrepresentation, and negligence.

Appellee argues that it had no duty to amend its motion for summary judgment because appellant's supplemental petition was filed untimely and should not have been considered by the trial court. The record reveals that the supplemental petition was filed on June 26, 1992, only five days prior to the hearing originally set for July 2, 1992, without leave of court. The trial court's judgment recites that it heard the motion on July 24, 1992, rather than July 2, 1992.

[1] [2] We must now determine if the supplemental petition was timely filed and before the trial court at the July 24, 1992, hearing. Rule 63 of the Texas Rules of Civil Procedure provides that:

> Parties may amend their pleadings ... provided, that any amendment offered for filing within seven days of the date of trial ... shall be filed only after leave of the judge is obtained, which leave shall be granted by the judge unless there is a showing that such filing will

operate as a surprise to the opposite party.

TEX.R.CIV.P. 63. Pleading amendments sought within seven days of the time of trial are to be granted unless there has been a showing of surprise to the opposing party. *Rogers v. Gonzales,* 654 S.W.2d 509, 515 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.). A summary judgment proceeding is a trial within the meaning of Rule 63. *Jones v. Houston Materials Co.,* 477 S.W.2d 694, 695 (Tex.Civ.App.—Houston [14th Dist.] 1972, no writ); *see also Leche v. Stautz,* 386 S.W.2d 872, 873 (Tex.Civ.App.—Austin 1965, writ ref'd n.r.e.).

[3] In the present case, appellant's first supplemental petition was filed twenty-seven days before the summary judgment hearing held on July 24, 1992. Thus, the supplemental petition was timely filed and properly before the trial court at the hearing.

[4] Even assuming that the supplemental petition had been untimely filed, a liberal interpretation has been given to Rule 63. In the absence of a sufficient showing of surprise by the opposing party, the failure to obtain leave of court when filing a late pleading may be cured by the trial court's action in considering the amended pleading. *See, e.g., Lloyds of London v. Walker,* 716 S.W.2d 99, 103 (Tex.App.—Dallas 1986, writ ref'd n.r.e.); *West v. Touchstone,* 620 S.W.2d 687, 689 n. 2 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.); *Swinney v. Winters,* 532 S.W.2d 396, 400 (Tex.Civ.App.—San Antonio 1975, writ ref'd n.r.e.); *Lucas v. Hayter,* 376 S.W.2d 790, 791 (Tex.Civ.App.—San Antonio 1964, writ dism'd).

[5] In this case, the record does not reveal whether leave of court was requested or granted. In addition, the record gives no indication that the trial court refused leave to file nor does it contain a motion to strike appellant's supplemental petition, which is a part of the record that was before the trial court. The trial court's judgment states that all pleadings on file were considered by the court. Where the record provides no basis to conclude that the supplemental petition was *not* considered by the trial court, and appellee has not shown surprise or prejudice, leave of court to file the amended petition is presumed. *Goswami v. Metropolitan Sav. and Loan,* 751 S.W.2d 487, 490 (Tex.1988). We, therefore, would presume that the trial court granted leave of court to file the supplemental petition in this case.

[6] A summary judgment for the defendant, disposing of the entire case, is proper only if, as a matter of law, the plaintiff could not succeed upon any theories pleaded. *Delgado v. Burns,* 656 S.W.2d 428, 429 (Tex.1983). Appellee was required to show conclusively that no fact issue existed as to at least one essential element of *each* of appellant's causes of action. *Clark v. First Nat'l Bank of Highlands,* 794 S.W.2d 953, 956 (Tex.App.—Houston [1st Dist.] 1990, no writ); **\*362** *Christensen v. Sherwood Ins. Serv.,* 758 S.W.2d 801, 803 (Tex.App.—Texarkana 1988, writ denied); *Mary Kay Cosmetics, Inc. v. North River Ins.,* 739 S.W.2d 608, 609 (Tex.App.—Dallas 1987, no writ).

[7] In the present case, appellant's first supplemental petition *added* causes of action for breach of contract, breach of fiduciary duty, misrepresentation, and negligence. Appellee's motion for summary judgment specifically stated that "Plaintiff has sued Defendant solely for violation of the Texas Deceptive Trade Practices–Consumer Protection Act." Appellee did not amend its motion for summary judgment to address appellant's four additional causes of action. A summary judgment may not be granted, as a matter of law, on a cause of action not addressed in the summary judgment proceeding. *Chessher v. Southwestern Bell Tel. Co.,* 658 S.W.2d 563, 564 (Tex.1983); *Johnson v. Rollen,* 818 S.W.2d 180, 183 (Tex.App.—Houston [1st Dist.] 1991, no writ); *Clark,* 794 S.W.2d at 955. Thus, the trial court erred in attempting to enter an all inclusive final summary judgment.

[8] Appellee argues, however, that it is not relevant whether these additional causes of action were addressed in his motion because it negated the damage element of all of appellant's causes of action. We disagree. Appellee did not negate the damage element of the additional causes of action because they were not *expressly* set out in its motion for summary judgment. *See* TEX.R.CIV.P. 166a(c).

[9] In order to be a final, appealable summary judgment, the order granting the motion must dispose of all parties and all issues before the trial court. *Mafrige v. Ross,* 866 S.W.2d 590, 591 (Tex.1993). However, where the summary judgment purports to grant more relief than requested, we must reverse and remand, rather than dismiss. *Mafrige,* 866 S.W.2d at 592. That is precisely the posture of this case. The court in granting the summary judgment motion, which was based only on DTPA grounds, purported to dispose of "all claims set forth" by appellant. Since the summary judgment purported to be final, rather than partial, we must, in

accordance with *Mafrige,* treat it so. Accordingly, we sustain appellant's second point of error.

Thus, without regard to its merits, or lack thereof, as to the DTPA claim, we reverse the summary judgment and remand the cause to the trial court.

**All Citations**

874 S.W.2d 358

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.